1

2                     UNITED STATES DISTRICT COURT

3                   WESTERN DISTRICT OF WISCONSIN

4      ----------------------------------------------------------

5      LONG, D.,

       individually and on behalf of

6      all others similarly situated,

7

                           Plaintiffs,

8

9          -vs-                          Case No. 3:15-cv-00081

10

       EPIC SYSTEMS CORPORATION,

11

12                         Defendant.

13     ----------------------------------------------------------

14

15                    Examination of DAYNA LONG, taken at

16     the instance of the Defendant, under and pursuant

17     to Chapter 804.05 of the Wisconsin Statutes, before

18     TRICIA P. TREXELL, Court Reporter and Notary Public in

19     and for the State of Wisconsin, at Quarles & Brady LLP,

20     33 East Main Street, Suite 900, Madison, Wisconsin, on

21     April 26, 2016, commencing at 9:02 a.m. and concluding at

22     1:47 p.m.

23

24     Job no. 106580

25

## Page 2

A P P E A R A N C E S

HABUSH, HABUSH & ROTTIER
JASON KNUTSON, ESQ.
BREANNE SNAPP, ESQ.
150 East Gilman Street,
Madison, Wisconsin 53703
appeared on behalf of the Plaintiffs.

HAWKS QUINDEL
KATELYNN WILLIAMS, ESQ.
222 West Washington Avenue
Madison, Wisconsin 53701
appeared on behalf of the Plaintiffs.

SEYFARTH SHAW
NOAH FINKEL, ESQ.
131 South Dearborn Street
Chicago, Illinois 60603
appeared on behalf of the Defendant.

EPIC
KAIJA HUPILA, ESQ.
1979 Milky Way,
Verona, Wisconsin 53593,
appeared on behalf of Epic.

A L S O   P R E S E N T
Catherine Valenzuela, Epic
* * * * *

## Page 3

I N D E X

Examination:                                  Page
By Mr. Finkel.................................   4
By Mr. Knutson.................................   152
By Mr. Finkel.................................   155

Exhibits Identified:                          Page
Exhibit 1 - The Offer Letter Ms. Long Received
            From Epic...................   7
Exhibit 2 - Ms. Long's Performance Review From
            February 8, 2012...................   16
Exhibit 3 - Ms. Long's Review From July of 2012..  18
Exhibit 4 - Ms. Long's Review From March of 2013.  19
Exhibit 5 - Ms. Long's Exit Interview............   20
Exhibit 6 - A Document Describing the Technical
            Writer Role.......................   23
Exhibit 7 - A Document Describing What Technical
            Writers Do.........................   25
Exhibit 8 - Document Describing Seven Teams......   27
Exhibit 9 - Ms. Long's Resume...................   28
Exhibit 10 - Epic "Documentation Care Package"
            Document...........................   85
Exhibit 11 - Epic "How to Be a Deliverable Owner"
            Document...........................   86
Exhibit 12 - Cover Letter for the 2012
            Documentation Care Package...........  103
Exhibit 13 - The Complaint Filed on Behalf of
            Ms. Long...........................  129
Exhibit 14 - Ms. Long's Interrogatories..........  140
            * * * * *
Disposition Of Original Exhibits: Attached To Original Transcript
            * * * * *

## Page 4

DAYNA LONG

TRANSCRIPT OF PROCEEDINGS

DAYNA LONG, called as a witness herein, having been first duly sworn on oath, was examined and testified as follows:

EXAMINATION

BY MR. FINKEL:

Q   Good morning, Ms. Long.  I am Noah Finkel.  I represent Epic.

Have you ever had your deposition taken before?

A   No.

Q   Have you ever testified in any kind of case before?

A   No.

Q   Well, what I'll be doing today, as I'm sure your attorneys have explained, is I'll be asking you questions that you'll be answering under oath.

If you don't hear one of my questions because I'm talking softly, just state so, and I'll repeat it in a louder voice; or if you don't understand it because I talk too fast, which I tend to do, just tell me that, and I'll slow down.

A   Okay.

Q   If you don't understand a question that I ask you,

## Page 5

DAYNA LONG

just tell me so, and I'll try to rephrase it in a manner that you can understand.

If you don't know or don't remember the information necessary to answer a question, just let me know that.

Please do your best to try to wait until I'm done with a question before you answer it, and I'll try to do my best to wait until you're done with an answer before I ask the next question so that the court reporter can take down everything that both of us said.

A   Okay.

Q   If you do answer the question, I'm going to assume that you heard it, you've understood it, and you've given me your best recollection.

I may ask you about conversations you've had with others in the past, specifically while employed by Epic; and when I ask you about that, what I'm interested in is what people actually said, not your interpretation of what was said.

Of course, if you don't remember what exactly people said, just tell me that, and I'll ask for your summary or your interpretation.

If you ever realize that an earlier

Page 6

DAYNA LONG

1
2  answer you gave was inaccurate or incomplete, just
3  tell me that, that you want to either correct your
4  answer or supplement it, and I'll allow you to do
5  that.
6        And then if there's any time you need a
7  break, just let me know and we can take one; we
8  can take one for any reason. The only time we
9  can't take one is when I've asked you a question
10 and you haven't yet given me your answer or there
11 might be a time when I'm just on a line of
12 questioning that I want to finish off and it will
13 only take me a question or two and then we'll be
14 done with it.
15 A  Okay.
16 Q  Do you understand the instructions I've given you?
17 A  Sure do.
18 Q  Are you on any drugs or medication that would
19    affect your ability to testify truthfully or to
20    the best of your recollection?
21 A  No.
22 Q  Did you review any documents in preparation for
23    your deposition today?
24 A  No.
25 Q  Other than your attorneys, did you talk to anyone

Page 7

DAYNA LONG

1
2  about your deposition today?
3  A  I told a friend I was being deposed.
4  Q  And that was it?
5  A  Yep.
6  Q  Let's get right into your employment with Epic. I
7     show you what I ask to be marked as Exhibit 1.
8        (Exhibit No. 1 was marked.)
9  BY MR. FINKEL:
10 Q  Ms. Long, you have in front of you Exhibit 1. Do
11    you recognize this as the offer letter you
12    received from Epic?
13 A  Yes.
14 Q  You started with Epic on July 5, 2001 -- 2011,
15    correct?
16 A  Yes.
17 Q  As a writer?
18 A  Yes.
19 Q  And another name for writer is technical writer?
20 A  Yeah.
21 Q  And the group was called Technical Communications;
22    is that correct?
23 A  Yes.
24 Q  And your starting salary was $40,000, right?
25 A  Yes.

Page 8

DAYNA LONG

1
2  Q  With a raise to 42,000 upon completion of the
3     certification process, correct?
4  A  Yep.
5  Q  And you did complete that, right?
6  A  I did.
7  Q  And so you received a raise to 42,000, correct?
8  A  I did.
9  Q  Did you receive any raises after that?
10 A  Yes.
11 Q  Do you recall when you received your first raise?
12 A  I think in October of 2012.
13 Q  And do you recall to what level that was?
14 A  I think 46,000, but I'm not positive.
15 Q  Okay. Any other raises after that?
16 A  I think it was just the one.
17 Q  And you were always paid salary instead of hourly,
18    correct?
19 A  Yes.
20 Q  So you did not receive any overtime pay, correct?
21 A  Correct.
22 Q  And you understood that you would receive the same
23    amount of salary every week, whether you worked 40
24    hours or 45 hours or 50 hours, correct?
25 A  Yes.

Page 9

DAYNA LONG

1
2  Q  Regardless how many hours you worked a week, you
3     would receive that same salary, correct?
4  A  Yes.
5  Q  How did you learn about the opportunity at Epic?
6  A  I think that there was a listing on my university
7     job board.
8  Q  This would have been at the University of
9     Illinois?
10 A  Yes.
11 Q  Was it for a specific position or just the company
12    in general? Do you recall more about it?
13 A  I think there were several positions listed, and I
14    applied for one and then interviewed for three.
15 Q  Which one did you apply for?
16 A  I think I applied to be a trainer, actually.
17 Q  And what were the three that you interviewed for?
18 A  Implementation, technical writing and training.
19 Q  What caused you to apply for the trainer position?
20 A  (No response.)
21 Q  In other words, what was attractive to you about
22    it?
23 A  I don't recall exactly. I think it involved some
24    communication skills, which I had, and I didn't
25    apply for a lot of jobs right after college, so it

Page 10

DAYNA LONG

1  was one of, maybe, a few.
2  Q  Okay.  And then how was it that you ended up
3  interviewing for three different ones?
4  A  Somebody called, either -- it was either during
5  the phone interview or before the phone interview
6  I spoke with somebody from human resources about
7  the fact that there were two other positions that
8  I might be interested in.
9  Q  Okay.  Those being implementation and technical
10  writing?
11  A  Yep.
12  Q  So this was after you applied, you were asked to
13  interview for these three, correct?
14  A  Yes.
15  Q  And did you come to Epic to interview for those,
16  or did you have a phone interview first?
17  A  I had a phone interview, and then I went to Epic
18  to interview in person.
19  Q  Was the interview in person still for all three
20  positions?
21  A  Yes.
22  Q  Was your interview about May 6th, 2011?
23  A  That sounds right.
24  Q  And do you recall who you interviewed with?

Page 11

DAYNA LONG

1  A  I don't anymore.  At some point I think I did sit
2  down with Rob.
3  Q  Rob Schampers?
4  A  Yeah, but other than that, no, I don't remember.
5  Q  And do you recall what you learned during the
6  interview about the technical writing position?
7  A  Not very well.  It's been a while.  I feel like I
8  got a basic idea of what would be involved in the
9  job.  I got a handout describing, you know, what a
10  week in the life of a technical writer might look
11  like.
12  Q  And you were given a writing test, correct?
13  A  Yes.
14  Q  Was that on May 6th, on the day of your interview?
15  A  I think I took a writing test before I interviewed
16  in person, and then I think I took more tests in
17  person at Epic.
18  Q  All right.  Once hired, you had a supervisor,
19  correct?
20  A  Yes.
21  Q  At Epic that's called a team lead, correct?
22  A  Yes.
23  Q  Or TL?
24  A  Yes.

Page 12

DAYNA LONG

1  Q  And I'll use the two interchangeably, and you can
2  too.
3  Who was your TL at Epic?
4  A  Primarily Cate.  I had another TL for about a
5  month, and then she went on maternity leave and
6  never came back, and then after that it was Cate.
7  Q  Who was the one for a month?
8  A  I think the one was Vickie Onsager.
9  Q  And by "Cate," Cate Valenzuela, for the record,
10  correct?
11  A  Yes.
12  Q  And at some point you became a TL, correct?
13  A  I did.
14  Q  When was that?
15  A  Maybe 13 months after I started.  It was right
16  around one year.
17  Q  So that would have been about August of 2012?
18  A  That sounds correct.
19  Q  And who told you you would be a TL?
20  A  Cate and I had a conversation about whether or not
21  I would be interested in being a TL.
22  Q  Cate tell you why she was asking you if you'd be
23  interested?
24  A  I think she described, you know, my strong

Page 13

DAYNA LONG

1  performance at Epic as -- is a factor for asking
2  me if I was interested in being a TL.
3  Q  And what aspects of her performance did she -- I'm
4  sorry, what aspects of your performance did she
5  describe?
6  A  We probably talked about my project management
7  skills.
8  Q  Okay.  What does that mean, "project management
9  skills," to you?
10  A  Being able to coordinate people in order to get
11  projects done; people, timelines, resources.
12  Q  What do you think are the important skills for a
13  project manager, or in project management, I
14  should say?
15  A  Strong communication skills, being able to think
16  through processes.
17  Q  Do you have to select a process, typically?
18  A  I guess I don't understand what you're asking.
19  Q  Okay.  We'll tackle it another way.
20  And when Cate asked you if you were
21  interested, you told her you were?
22  A  I thought about it for a few days, but yes.
23  Q  And then you did become a TL, or was there some
24  intermediate step before --

Page 14

DAYNA LONG

A   I became a TL.
Q   Okay.  And being a TL connotes having a team, correct?
A   Yes.
Q   And so you did have one?
A   Yeah.
Q   Who was your team?
A   Mallory and Brett.
Q   What was the function of this team?
A   They were also technical writers, so I worked with them to manage their technical writing workload.
Q   Was there a particular application or suite of products on which this team worked?
A   We were a revenue team; mostly revenue applications.
Q   What does that mean?
A   The applications at Epic that deal with revenue. We were writers for those applications.
Q   When you say "deal with revenue," what does that mean?  How would you explain that to a judge who's not at Epic?
A   So the products that an Epic customer would use to manage their billing or their health plans, their claims department, those products are revenue

Page 15

DAYNA LONG

products at Epic.
Q   Okay.  And Mallory's -- do you recall Mallory's last name?
A   McKnight.
Q   And what about Brett?
A   I don't remember.  I don't remember his last name.
Q   That's fine.  I know it's a couple years ago.
     Do you believe you allowed them leeway to make decisions on their own?
A   Yes.
Q   How so?
A   They were both capable of managing their own workload pretty independently, so I didn't spend a lot of time, you know, nit-picking their decisions about how they handled their workload.
Q   Did any of them ever complain that you micromanaged them?
A   I don't think so.
Q   I assume you don't think you ever micromanaged them?
A   I'm pretty sure I didn't.
Q   And you remained their TL until the end of your employment at Epic?
A   I did.

Page 16

DAYNA LONG

Q   And your employment at Epic ended because you resigned, correct?
A   Yes.
Q   And just for the record, do you recall the date of that?
A   The date that I resigned?
Q   Yeah.
A   I don't.
Q   The month or a year?
A   I think it was during June that I gave notice.
Q   June of 2013, correct?
A   Yes.
Q   So you were a TL roughly from August of 2012 to June of 2013?
A   Yes.
Q   I want to talk a little bit more about your relationship with your TLs.
     (Exhibit No. 2 was marked.)
BY MR. FINKEL:
Q   I'm showing you what's been marked as Exhibit 2. Do you recognize this document?
A   I do.
Q   This is your performance review of about February 8th, 2012?

Page 17

DAYNA LONG

A   Yeah.
Q   This was done about six months into your employment, correct?
A   Yes.
Q   And this has a number of things in it.  For example, at the beginning there's some things on your goals and goal planning, and then you do a self review; is that correct?
A   Yeah.
Q   And then you review your supervisor, right?
A   Yeah.
Q   Okay.  And what I want to focus on for now is just your reviews of your TL, your supervisor, so it's the last page of this document.  Could you turn to that, please?
     I should back up.  At the time your TL was Cate, correct?
A   Yes.
Q   And what you wrote on this page was your honest opinion about Cate, correct?
A   Yes.
Q   Okay.  That's all I needed to know.
     (Exhibit No. 3 was marked.)
BY MR. FINKEL:

Page 18

DAYNA LONG

Q   Do you recognize this as the review from July of 2012?

A   Yes.

Q   This is about a year into your employment, correct?

A   Yep.

Q   And Cate was still your TL at the time?

A   Yes.

Q   And if you turn to page 11, you see that?

A   Um-hm.

Q   Do you recall what you wrote here about Cate was your honest opinion?

A   Yes.

Q   And then one thing you wrote on here is you wrote under question No. 2, "Sometimes I worry that if I was transferred to a TL with a smaller team, I would suddenly find out that I'm doing a lot of things wrong.  With more oversight, would it suddenly come out that I'm not writing well or that I'm logging my time wrong or something?"

      What did you mean by that?

A   At the time Cate had a lot of team members, and she also oversaw a lot of team leads, and so she had a larger team than a lot of other TLs did at

Page 19

DAYNA LONG

the time; so it did seem to me, like, maybe if I had a TL who had fewer team members, it would be more clear, I don't know, where I had some weaknesses or something.

      I guess I wondered about how much attention, you know, she could gave compared to team leads with a smaller team.

Q   Meaning you don't think you had a ton of oversight from Cate at the time?

A   I mean, I go on to say under question 2 that, "Whenever I asked Cate for feedback, she gave me honest answers about my work."

      So I think there was oversight.  I think it was sort of a base listing that I was insecure about because she did know what I was doing and how I was doing.

      (Exhibit No. 4 was marked.)

BY MR. FINKEL:

Q   Showing you Exhibit 4.  Does this appear to be your review from March of 2013?

A   Yes.

Q   And on page -- the last page of this document, you reviewed your supervisor, correct?

A   Yes.

Page 20

DAYNA LONG

Q   And again, do you agree that what you wrote here was your honest opinion?

A   Yes.

Q   Okay.  And -- actually, I do have your resignation date now, June 28, 2013, or that was your last day of work; does that sound correct?

A   That does sound like my last date, correct.

Q   And when doing it, there's an exit interview process at Epic, right?

A   Yes.

Q   So I'm going to ask you to take a look at your exit interview.

      (Exhibit No. 5 was marked.)

BY MR. FINKEL:

Q   What was the process of the exit interview?

A   I think I just sat down with somebody in HR who asked a bunch of questions.  That's what I remember.

Q   Do you remember how long it took?

A   Maybe half an hour.

Q   The person from HR take notes, I assume?

A   She did.

Q   And are you aware that they generate a report?

A   I suspected, yes.

Page 21

DAYNA LONG

Q   Okay.  Have you ever seen this report before?

A   I haven't.

Q   Okay.  What I want to do now is just focus on page 4.  We'll go back to other things in a bit, but for right now it's just page 4.

      And if you could just read to yourself your -- basically, from the top down to the section that reads, "Stand Out Employee."

A   Okay.

Q   Do you think this accurately captures what you told the HR interviewer?

A   Yes.

Q   I'm sorry, I should say about your TLs?

A   Yes.

Q   Now, there is a number -- there is some others listed here for whom you've provided feedback.  There's Cate, obviously.

      How did you have information about these others?

A   I worked with them.

Q   Okay.  In what capacity?

A   It looks like most of these are other TLs that I worked with; a couple of implementers from my application and then my team members.

Page 22

DAYNA LONG

Q   Is it fair to say that you don't believe any TL
with whom you work micromanaged you?
      MR. KNUTSON:  Objection.  Vague.
      You can answer if you understand the
question.
      THE WITNESS:  Do you mean the TLs who
oversaw me or TLs who I worked with?  We were
peers.
BY MR. FINKEL:
Q   Well, let's do both.  Let's first talk about the
ones that oversaw you.  Which ones are those that
you list here?
A   Just Cate and Nikki.
Q   Okay.  Do you believe Cate or Nikki ever
micromanaged you?
      MR. KNUTSON:  Objection, vague.
      Go ahead and answer.
      THE WITNESS:  No.
BY MR. FINKEL:
Q   And then I have one question about your feedback
on Cate.  You wrote, "She's consistent with
sharing feedback and sent Dayna her POGIs
regularly."
      What are POGIs?

Page 23

DAYNA LONG

A   Epic has kind of a complex internal system for
tracking feedback from TLs, so that's just, like,
TLs giving feedback about other people's team
members, which happened, like, once a month or so
you would go through and give feedback on team
members, and Cate would always share feedback that
other TLs had given about me.
Q   Got it.
      (Exhibit No. 6 was marked.)
BY MR. FINKEL:
Q   You mentioned earlier that at some point during
the interview process, you saw a document that
described the technical writer role, and you also
remarked that it had something about a typical
week.
      Was it this document?
A   I think so.
Q   And I'll ask you to take a minute just to read
the -- to read the document.  Actually, just read
the first page.
A   Okay.
Q   And this describes a couple areas in which
technical writers worked.  You see the three
areas?

Page 24

DAYNA LONG

A   Yeah.
Q   In which one did you work?
A   I was an implementation writer.
Q   And do you think this accurately describes what
implementation writers do at Epic?
      MR. KNUTSON:  Objection.  Vague.
      Go ahead and answer if you can.
      THE WITNESS:  Yeah, I think so.
BY MR. FINKEL:
Q   And did you ever work in the support writing or
training writing areas?
A   I did not.
Q   Did you ever work with writers from those areas?
A   I did.
Q   In what way?
A   Sometimes if there were areas where we overlapped,
like implementation writers and support writers
who wrote for revenue applications, we might pitch
in on similar projects.
      We certainly met all the time with
writers from these different areas, especially in
the applications that we shared.
Q   Do you feel like you were able to know what they
did in their jobs?

Page 25

DAYNA LONG

A   Yes.
Q   Do you think that this document accurately
describes what support writing and training
writing technical writers do?
      MR. KNUTSON:  Objection.  Vague as to
time, but you can answer.
BY MR. FINKEL:
Q   During the period you were there.
A   Yeah, I think so.
      (Exhibit No. 7 was marked.)
BY MR. FINKEL:
Q   Showing you what's previously been marked as
Martin Exhibit 6.  Have you ever seen this
document before, or something like it?
A   I think so.
Q   Would this have been something that you, perhaps,
saw during the application or interview process?
A   It's possible, or while I was looking for jobs
while I was at Epic, I think I saw this.
Q   Do you think this accurately describes what
technical writers do?
      MR. KNUTSON:  Objection, vague.
      Go ahead and answer.
BY MR. FINKEL:

Page 26

DAYNA LONG

Q   I should say did during the period you worked
there.

A   Somewhat.

Q   Okay.  Why do you -- what doesn't it accurately
describe?

A   I think that there's some stuff that most
technical writers weren't involved in, like market
inquiries and proposals, for example.  I believe
that was a separate team.

     I mean, more or less.  It's a job
description.

Q   So other than those couple areas that writers
didn't do, you think this does accurately describe
what technical writers did at Epic while you were
there?

     MR. KNUTSON:  Objection.
Mischaracterizes her testimony, but you can answer
the question if you can.

     THE WITNESS:  Can you repeat the
question?

BY MR. FINKEL:

Q   So other than those areas you just described that
technical writers didn't do, which I think were --
I'm sorry, can you state again what those areas

Page 27

DAYNA LONG

were that you don't think they do?

A   I don't think that most technical writers get
involved in market inquiries and proposals.  I
think that's a separate team.

     And, I mean, not all writers do all of
these things, but, you know, as far as a good job
description, sure.  It's an okay, accurate job
description.

Q   Perfect.  Okay.  Thank you.
     (Exhibit No. 8 was marked.)

BY MR. FINKEL:

Q   I show you what's been marked as Exhibit 8.
     Have you seen this document before?

A   I don't remember seeing it before.

Q   This describes seven teams.  Was the way these
teams are described something that -- some of that
accurately represents how technical communications
was organized while you were employed at Epic?

A   It looks kind of different.

Q   How so?

A   I don't recognize "Feature Writing," "Escalations"
and "Promotions" from my time there so much.

Q   Um-hm.

A   It looks like that was split out from other teams.

Page 28

DAYNA LONG

     And also, like, I can guess at what
"Install & Improvement Writing" would be, but
that's not what we called it, I don't think.

Q   Okay.  So this doesn't sound like this was
something that accurately describes how teams were
organized while you were there?

A   Maybe.  I'm just not recognizing this so much.

Q   Okay.  The team you were on was revenue, correct?

A   That was my application team.

Q   Okay.  And you were on the IS team for that,
correct?

A   I was an implementation writer for the revenue
applications.

Q   Implementation and IS are kind of the same thing;
is that correct?

A   When you say "IS," I think of, like, actual
implementers and not implementation writers, but
sure.

Q   All right.  I can set this document aside, then.
     (Exhibit No. 9 was marked.)

BY MR. FINKEL:

Q   I'm showing you what's been marked as Exhibit 9.
This is the resume you produced in this case,
correct?

Page 29

DAYNA LONG

A   Yep.

Q   When did you create this?

A   Probably about a year ago.

Q   Okay.  So about April of 2015?

A   Yes.

Q   And that was after this lawsuit was filed?

A   No, I don't think -- was that right?  Yeah, I
guess it was after.

Q   Is this -- when did you last edit it?

A   I mean, I'm honestly not sure.

Q   Has this been edited since April of 2015?

A   It's possible.  I was applying to a lot of jobs
last year.  I might have edited it since then.

Q   Okay.  When did you write the section describing
your duties at Epic?

A   Probably at some point between October of 2014 and
really anytime before June of last year.

Q   And you think your description of what you did
accurately summarized your role, correct?

A   I think so.

Q   So you met with your team weekly to plan workload,
right?

A   I did.

Q   What did you do in that regard?

Page 30

DAYNA LONG

A   I would sit down with my team members one-on-one
and usually they would come with a list of
projects that they were working on and tell me how
they planned to spend their time.
          They would come to me with any questions
about different documents that they were working
on or projects that they were working on, and we
would talk it through together.
          Sometimes you would talk about things
that had happened at staff meeting or concerns,
stuff like that.
Q   Would you make suggestions on how they could best
spend their time?
A   Yeah, yeah.  I would help them prioritize
sometimes.
Q   And from what I read, your two team members did
pretty well in determining what they were going to
do, correct?
A   They were strong performers, um-hm.
Q   So you didn't need to spend too much time
directing them on what to do?
A   No.
Q   You also wrote that you planned large-scale
documentation projects across a team of writers?

Page 31

DAYNA LONG

A   Yeah.
Q   What was that?
A   There were a couple of occasions where I had an
opportunity to oversee, like, the production of,
you know, a bunch of documents.  There was really
only one time, like, the production of documents
from scratch.
          Another time we just changed templates
and, like, I oversaw the process of taking, like,
documents that were in one format and moving them
into a new format.
Q   Let's break those down a little bit.
          One is creating some documents from
scratch.  What was that?
A   There was one occasion where I think -- I think
Judy Faulkner had an idea about a document that
she wanted created, so I got some information
from, I think, some implementers that she had
communicated her plans to, and then, like, oversaw
the creation of this document.
          And then it's one of the only times I
can think of where, you know, we had to come up
with, like, a new doctype and have a bunch of
writers kind of create it from scratch.

Page 32

DAYNA LONG

Q   And Judy's head of the company, correct?
A   Yeah.
Q   So this was a pretty significant -- was this, in
your view, a pretty significant project?
A   You know, at the time it seemed significant.  I'm
not sure that it ever saw the light of day, but
yeah, it did feel like a big project at the time.
Q   And what was this document she wanted written?
A   It was called, like, Stars or something.  She just
wanted a synopsis, I think, of, like, features
within the software that people should, like,
strive to implement at their organizations.
Q   Was it called "Reach for the Stars"; does that
sound right?
A   That sounds right.
Q   Okay.  So, you know, this was something where Judy
wanted a document that basically described, if I
understand you correctly, would describe the
features of various applications that customers
should be using?
A   I think so.
Q   So did you decide what those features would be?
A   Definitely not.
Q   Okay.  Who decides that?

Page 33

DAYNA LONG

A   I think that implementers, like, in -- and these
were, like -- like leads in the implementation
team; and, like, developers of different
applications made those decisions.
          I think they gave us a list of the
things that they wanted.  I can't remember --
Q   When you say "they," who do you mean?
          MR. KNUTSON:  Hold on.  Were you done
with your answer when you got interrupted, or did
you have more to say?
          THE WITNESS:  I didn't realize I was
interrupted.
          MR. KNUTSON:  Go ahead.
          THE WITNESS:  I mean, developers and
implementers; like, leads on applications would
give us a list of things that they wanted
included.
BY MR. FINKEL:
Q   Did you include everything that they gave you?
A   I don't remember.
Q   Or did you have to pick and choose from among the
various things?
A   We wouldn't have been making decisions like that.
You know, it wouldn't have been left to writers to

DAYNA LONG

1
2  decide what features got included in
3  documentation.
4  Q   Why not?
5  A   Because we weren't experts on the software.
6  Q   Didn't you have to become an expert in the
7      software in terms of what you would need to
8      communicate to a customer?
9  A   In terms of how it worked, sure; but in terms of,
10     like, what customers should implement; like, what
11     decisions customers should be making at their
12     organizations, no. We wouldn't have been involved
13     in decisions like that.
14 Q   Did you have to weed out the various -- I mean, I
15     would assume, maybe I'm wrong here, but I would
16     think that developers and implementers may give
17     you a lot that you have to cull down to determine,
18     "How do we get across what they really need to
19     know?"
20         MR. KNUTSON: Hold on. I didn't
21     understand the question.
22         Was there a question?
23         MR. FINKEL: Yeah. She was about to
24     answer it.
25         MR. KNUTSON: Do you understand the

DAYNA LONG

1
2  question?
3         THE WITNESS: Could you repeat it?
4         MR. FINKEL: Can you repeat it, please?
5     (Whereupon, the following portion was
6  read.)
7         "Q. Did you have to weed out the
8     various -- I mean, I would assume, maybe I'm wrong
9     here but I would think that developers and
10    implementers would give you a lot that you have to
11    cull down to determine, 'How do we get across what
12    they really need to know?'"
13 BY MR. FINKEL:
14 Q   Is that correct?
15 A   You would get a lot from developers and
16     implementers, but at the end of the day, their
17     opinion about what should be included in a
18     document still trumped yours because you weren't
19     going to be a subject matter expert, per se.
20         You weren't working with customers, so
21     you wouldn't know what things customers really
22     needed.
23         So you could push back and, like, try
24     and work with the developer to prioritize what
25     things to include. You could try really hard to

DAYNA LONG

1
2  persuade somebody that something wasn't important
3  enough to go in a document, but ultimately, that
4  was not going to be your decision.
5  Q   So you would, if I understand you correctly, are
6      you saying that you would -- you could push back,
7      but your opinion wouldn't necessarily control?
8  A   Yes.
9  Q   Okay. Would it be fair to describe this as
10     ultimately a team decision?
11 A   No, because, like, you could try to convince
12     somebody that you couldn't put all 37 features of
13     the software in a document. You could try to tell
14     them that that was a bad idea, but ultimately,
15     they were in charge of what went into the various
16     documents, not just Stars but really all documents
17     that --
18 Q   I'm talking right now just about the "Reach for
19     the Stars" document.
20 A   That still wouldn't have been a writer decision,
21     what got included and what didn't.
22 Q   How long was this document?
23 A   I don't recall exactly. Maybe around 50 pages.
24 Q   And were there a certain number of pages that
25     would go to a certain application?

DAYNA LONG

1
2  A   I don't remember exactly how the document was
3      broken up.
4  Q   Okay. And was this something that you did just
5      for revenue, or was it broader than that?
6  A   It was across applications.
7  Q   Okay. So all Epic applications?
8  A   Most Epic applications, if they had a feature that
9      the decision makers wanted included in the Stars
10     document.
11 Q   Okay. And would -- was there any risk of
12     offending customers by listing some applications
13     that they should be using that they're currently
14     not, or features that they're using that they're
15     currently not?
16 A   I'm not sure. I didn't work with customers very
17     much.
18 Q   Was that risk ever communicated to you?
19 A   I don't remember specifically.
20 Q   So what was your role on Reach for the Stars?
21 A   It was mostly -- it was mostly just to get the
22     wheels turning. My role was to make sure that we
23     had, like, a prototype of a description of
24     software that other writers could then use to
25     create similar content, so I remember making that

Page 38

DAYNA LONG

1
2  happen.
3          It was my job to set up a timeline for
4  the project, which I did.  It was my job to make
5  sure that there is editing in place so the
6  document had been edited at a high level before it
7  went to Judy and people who were higher up on the
8  implementation and development teams to look at.
9  Q   Okay.  So did you have to develop the prototype?
10 A   I don't think that I did.  I think that we got
11     other writers to do that.  I think I just helped
12     get those writers in gear.
13 Q   You said this was a document that was created from
14     scratch, right?
15 A   Yeah.
16 Q   Okay.  And you planned it, right?
17 A   Yeah.
18 Q   Okay.  And you executed it, right?
19 A   Yeah.
20 Q   So what part was created from scratch?
21 A   There were a bunch of descriptions of different
22     features of the software, and they were, like,
23     maybe a paragraph long, so all of those had to be
24     written.
25          But we did reuse content, I remember.

Page 39

DAYNA LONG

1
2  Sometimes you would use, like, an executive --
3  like, an executive-level description that already
4  existed for that feature of the software, so we
5  would pull that into the document where we had it.
6  If we didn't have, like, an executive-level
7  description of a feature of software, we had to
8  write that from scratch.
9  Q   And if you did have an executive-level
10     description, would you modify that before putting
11     it into the document?
12 A   Maybe a little bit.  We might have tweaked it a
13     little bit.
14 Q   You would use your judgment to determine if it
15     needed tweaking?
16          MR. KNUTSON:  Objection, vague.
17          Go ahead and answer if you can.
18          THE WITNESS:  I guess so.
19 BY MR. FINKEL:
20 Q   And you had to set up a timeline, right?
21 A   Yeah.
22 Q   Did you set up the timeline?
23 A   I did, in consultation with other team leads.
24 Q   Of course.  And so you'd have to figure out what
25     steps would have to occur, right?

Page 40

DAYNA LONG

1
2  A   Yes.
3  Q   And when those steps would have to occur, correct?
4  A   Yes.
5  Q   What made sense to go -- you know, what step made
6      sense to go before the next step, right?
7  A   Yes.
8  Q   You'd have to figure out how much time, or at
9      least -- well, I shouldn't say.  You'd have to
10     estimate how much time someone would need for each
11     step; is that right?
12 A   Yes.
13 Q   You'd have to back that up against when the
14     project was due, right?
15 A   Yes.
16 Q   Did the project have a due date?
17 A   I think we had two weeks to complete it and turn
18     it around to the executive team.
19 Q   You said you would have to be sure editing was
20     performed, correct?
21 A   Yes.
22 Q   Can you describe that?
23 A   There was a team of editors who were pretty great
24     editors, and so we'd have them look at documents
25     that were going to executives.  We would want

Page 41

DAYNA LONG

1
2  their eyes on the document, so we would plan for
3  them to take a couple days to look at the
4  document.
5  Q   So it's just a question of -- I guess it's part of
6      in the project timeline is giving it to some
7      people to edit and making sure they had time to
8      edit; is that correct?
9  A   Yes.
10 Q   And then once you set all this up, what would you
11     do on it?
12 A   What do you mean?
13 Q   On the projects.  You know, you set up the
14     timeline.  What then?
15          It doesn't necessarily work, right?
16     You've got to actually make sure people are doing
17     what they are tasked with doing, correct?
18 A   Yeah.  I communicated the timeline to other
19     writers and got the right people involved to
20     complete the project.
21 Q   And did you have to manage how that worked?
22          MR. KNUTSON:  Objection.  Vague.
23          Go ahead and answer if you can.
24          THE WITNESS:  What do you mean exactly?
25 BY MR. FINKEL:

Page 42

DAYNA LONG

Q   Well, so, I mean, how would you make sure people
did what they were supposed to do?

A   I created a spreadsheet with a list of everything
that needed to be done, and I checked it off as it
was being done.  I think that's what I did.

Q   And did everybody do what they were supposed to do
by the date it was supposed to be done?

A   I'm pretty sure.

Q   Okay.  And how would you ensure that it was done?
I understand how you track it, but how
did you learn that it was all done?

A   Again, I communicated the timelines to people.

Q   And people sent you their materials?

A   Yes.

Q   And would you then put that into the document
itself?

A   I think I was responsible for copying and pasting
everything into the document, yes.

Q   And you would coordinate it all so it had a
similar look and feel; is that correct?

A   Yes, I think so.

Q   Okay.  And how often did you communicate with Judy
about this project?

A   I was never in touch with Judy.

Page 43

DAYNA LONG

Q   Okay.  Who were you -- who did you -- I take it
the project did get finished?

A   It did.

Q   And to whom, then, did you transmit it?

A   There was -- I can't remember his role.  I think
he was, like, an executive assistant, and he and I
were in touch.
And I think that I gave the final copy
to him, and then he was responsible for making
sure that it got in front of Judy and maybe also
submit, but I don't remember who was looking at
it.

Q   Did you ever receive any feedback about it?

A   Not that I recall.

Q   Do you know what happened to the document after it
was completed?

A   I don't remember.

Q   When did this occur?

A   Sometime in the fall of 2012.

Q   Okay.  And then you described something with a
template; it was another large-scale document
project that you planned and executed.
What was that?

A   We had some validation documents that, like, one

Page 44

DAYNA LONG

was housed in an Excel spreadsheet.  The other one
was in a table in Microsoft Word, and then, like,
the other validation document was in Microsoft
Visio.
But we thought it made sense to
consolidate everything into one Microsoft Excel
workbook, so we came up with a template that would
fit the Microsoft Word table document and also the
Excel document, and we just put all of an
applications documents into an Excel workbook.

Q   Okay.  When you say "we," who are you describing?

A   Implementation writers.

Q   Okay.  And you were in charge of that project?

A   Yes.

Q   When was this project?

A   I think spring of 2013.

Q   Who assigned you this project?

A   I think I spoke with some implementers about it,
and one of them thought it was a good idea, so
then I kind of took it on.

Q   So fair to say, then, you assigned this yourself?

A   Yeah, in consultation with my team lead.

Q   Was there a -- you talked to an implementer about
it.  Was this a shortfall in documentation that

Page 45

DAYNA LONG

you sought?

A   I don't think so.

Q   No?

A   It had been brought up when I inherited the
document.
When, like, that type of document became
mine, the person who owned it before me talked
about it and said that it was something she had
heard from implementers, and she saw it as a
potential area for improvement.

Q   Did you agree it was a potential area of
improvement?

A   After I spoke with implementers, I agreed.

Q   And so you decided to do something about it?

A   Yes.

Q   And so you proposed a solution, right?

A   It wasn't my idea.  An implementer told me he
thought it would be nice if they would all be in
one workbook; but yes, I proposed it to the
writing team.

Q   And you didn't have to do what that implementer
said, right?

A   No.

Q   He's not your supervisor, right, or your team

Page 46

DAYNA LONG

lead?

A   No.

Q   And this workbook, tell me more about what this was. I'm not sure I'm understanding it.

A   So they were for validation documents, and it was just a table, basically, that an implementation team would sit down and go through with a hospital project team, for example, and, like, talk about how they wanted different work flows to look in Epic.

And they would just go, like, step by step through the table and reference, like, Epic's best practices, which were informed by implementers, and decide which ones worked for them.

Q   What is a validation document?

A   I just described it.

Q   It is a --

A   It's a document that project teams would go through and use to validate the setup that they wanted to implement.

Q   All right. And was the issue that these -- that there was no single place for validation steps an implementer was supposed to use when working with

Page 47

DAYNA LONG

a client?

A   There was a single place, but you would end up with this big collection of documents. You'd have, maybe, 13 Word documents and 13 Excel files and then these 13 Visio documents that you would have to sort of wrangle up for your validation session.

Whereas, we put, you know, the 13 -- at least 26 of those documents into one Excel workbook so that then they only had to download the workbook and the Visio files and do validation.

Q   And this was a way, I assume, that would make implementers more efficient?

A   Presumably, yes.

Q   And probably allow them to do their job better, too, so that they don't miss any steps; is that fair to say?

A   I think so.

Q   And this solution of putting them into one workbook was something that an implementer had suggested?

A   Yeah.

Q   Why wouldn't an implementer just do it?

Page 48

DAYNA LONG

A   Because I don't think that they had -- the documents still belonged to writers. It was our job, really, to maintain them and make sure that they were in good shape and ready to use, so an implementer couldn't, like, go in and make a bunch of changes to documentation.

Q   Okay. How long did this project take?

A   Maybe two months.

Q   And what does it entail? Why would something like that -- why would putting a couple of Excel spreadsheets together and one workbook take two months?

A   Because there were hundreds of them. Across all of the applications, there were hundreds of them, so we had to figure out how to do it efficiently, and then everybody had to take the time to go through these hundreds of documents and consolidate them.

Q   And did you plan out the way to do it efficiently?

A   Yes. With help.

Q   And you made sure that that plan was followed?

A   Yes.

Q   And the project was completed, right?

A   Yes.

Page 49

DAYNA LONG

Q   And I think on one of your reviews, you actually received some high marks for doing that, correct?

A   Yes.

Q   You also wrote that you "wrote technical and promotional content for Epic customers, both project team members and executives."

What are you referring to there?

A   The Stars document would have been executive facing.

And then, I think, the doc care package, which I also reference in my resume, was an executive-level document.

Q   And where do you reference the doc care package?

A   It's in the second bullet.

Q   That's the second bullet? Okay. All right. We'll do that a little later.

And then you wrote, "Analyzed Writing team processes around a specific type of documents, developed a new, more efficient process and led the implementation of the change to over 1,600 documents."

What is that?

A   It's the documents I was just describing to you that we consolidated into an Excel workbook.

Page 50

DAYNA LONG

Q   Okay.  When you say you "analyzed Writing team
processes around a specific type of documents,"
what does that mean?  What did you analyze?

A   I thought about the way that we edited them, the
way that we got reviewed from implementation, and
what order those steps were; whether or not it
could be better.

Q   And once you put things into this workbook, you
know, this was a process that would go forward?
It would continue afterwards, right?

It wasn't just you put them in a
workbook, and then you're done.  You have to
maintain that workbook, right?

A   Yeah.

Q   Did you develop a process for that?

A   I don't remember what changes we made to how those
were reviewed.

Q   Okay.  Well, you wrote that you developed a "more
efficient process."  What did you develop in that
regard?

A   I'm not entirely sure.  We might have changed the
way that implementers looked at them because
generally, the content of these documents was
driven by implementers who would look at it,

Page 51

DAYNA LONG

decide what it should say, make those edits, and
then we would go in, make those edits more
readable.

So maybe, like, the timeline around
implementer input; maybe the way that we edited
them.  Things had to change a little bit because
they were consolidated, which meant you couldn't
have multiple people working in the document at
one time, so we had to have a plan for that.

Q   And did you come up with that plan?

A   Like, I said, I'm not entirely sure.  I don't
remember exactly what the process we developed
was, but I'm sure we came up with something like
that.

Q   Whatever it was, you developed the process?

A   Yeah.  I did have help from one of my team
members.  I got his input on the process too.

Q   Okay.  The second bullet point is about Document
Care Package, correct?

A   Yep.

Q   Or documentation care package, I should say; and
is the third bullet point also about that?

A   I think that's -- yeah.

Q   Okay.  And the rest of your resume is all correct?

Page 52

DAYNA LONG

A   Yes.

MR. FINKEL:  Why don't we take a break.
(Recess taken.)

BY MR. FINKEL:

Q   Just a couple more questions just to follow up on
what we were just talking about.

On the validation documents, you know,
if implementers came up with something crazy,
would you just put that in?

MR. KNUTSON:  Objection vague.
Go ahead and answer.

THE WITNESS:  What do you mean by
"crazy"?

BY MR. FINKEL:

Q   They came up with some idea in one of the
materials they gave you that you thought made no
sense and would be awful for a customer to put in.
You would push back, right?

A   It was my job to edit documents, so I would have
to verify whether or not it was ridiculous and
make sure that it made sense for customers before
I put it in, because --

Q   You wouldn't -- I'm sorry.  I didn't mean to
interrupt you.

Page 53

DAYNA LONG

A   It was my job to edit.

Q   You would not do whatever they said, necessarily?

A   I would -- I would have to talk with them about
it.  If an implementer put something wild in a
document, I would have to talk with them and
figure out what need they were trying to meet and
why they wanted to do it, because there might be a
good reason for it.

But I also couldn't just, like, cut it
and not talk with them about it.  I would have to
discuss it with them.

Q   And if they wanted to add something to it that you
felt was inappropriate, again, you could push back
on that, correct?

A   Like I said, I would need to talk with them about
it.  I couldn't just, you know, make the decision
independently that this was going to be cut.  I
would need to consult with them about it and
probably also talk with development and just see,
you know, what need they were trying to fill.

Because I would have to find some way to
fill that need.  That was my job too, is to listen
to them when they said, you know, we needed
something.

Page 54

DAYNA LONG

1
2    Q   And you'd have to have some understanding of what
3        customers would use this material for, correct?
4    A   Yes.
5    Q   And then in anything that you wrote, you would
6        need to make it more -- in something that a
7        developer or implementer gave you, you'd have to
8        make it more readable, correct?
9    A   Yes.  I would have to edit it.
10   Q   And you'd have to know something, then, about the
11       application, correct?
12   A   Yes.
13   Q   What would you have to know?
14           MR. KNUTSON:  Objection, vague.
15           Go ahead and answer, if you can.
16           THE WITNESS:  Can you be more specific?
17   BY MR. FINKEL:
18   Q   Yeah.  I mean, you would have to have an
19       understanding of the application itself, right,
20       and how it works?
21           MR. KNUTSON:  Objection.  Vague.
22           Go ahead.
23           THE WITNESS:  Yeah.  I would need to
24       understand how the application worked.
25   BY MR. FINKEL:

Page 55

DAYNA LONG

1
2    Q   And in fact, you were certified on two Epic
3        applications, correct?
4    A   Yes.
5    Q   EDI was one, correct?
6    A   I don't remember, but yeah, probably.
7    Q   Okay.  Tapestry was another?
8    A   Tapestry, yes.
9    Q   Tapestry was the main one you worked on?
10   A   Yes.
11   Q   And what is Tapestry?
12   A   Gosh.  It's an application for organizations with
13       their own health plans.
14   Q   And there is a certain suite of Epic applications
15       that apply to that program; is that correct?
16   A   Tapestry is the application.
17   Q   Okay.  And you became certified in that
18       application, right?
19   A   I did.
20   Q   What did you have to do to get certified on it?
21   A   I had to take a class.  I had to take a couple of
22       tests to prove that, you know, I'd been to the
23       class and understood.  I think I had to do a
24       project where I had to build out a Tapestry, like,
25       in a fake environment.

Page 56

DAYNA LONG

1
2    Q   When you say build that out, what does that mean?
3    A   Like, set it up the way that a customer project
4        team might according to, like, a list of
5        instructions that I was given in the class.
6    Q   And is a customer project team the same -- is that
7        a synonym for implementers?
8    A   No.
9    Q   It's different?
10   A   Yeah.
11   Q   How is it different?
12   A   A customer project team would be people at the
13       organization that was installing Epic who oversee
14       the implementation from their end; so the people
15       that implementers would work with when they went
16       to an organization.
17   Q   Got it.  I want to go back again to working with
18       IS.  We talked about the concept of pushing back,
19       right?
20   A   (Witness nods head.)
21   Q   Were you ever able to persuade IS that something
22       that they wanted to include in a document was a
23       bad idea?
24   A   I can't think of specific occasions, but probably.
25   Q   And on the Stars document that we talked about,

Page 57

DAYNA LONG

1
2        you testified that there were materials that you
3        pulled together, some of it was copy and paste,
4        right?
5    A   (Witness nods head.)
6    Q   You have to say "yes."
7    A   Oh, I think so.
8    Q   You have to give a verbal answer, because the
9        computer can't pick up a nod.
10   A   Right, of course.
11   Q   Who prepared those materials?
12   A   Probably writers at some point.
13   Q   Going back to Exhibit 8.
14           Take a look at the second page, and do
15       you agree with the description of how technical
16       communication helps customers?
17           MR. KNUTSON:  Go ahead and take some
18       time to look at the document and then answer.
19           THE WITNESS:  Are you talking about
20       point 4?
21   BY MR. FINKEL:
22   Q   No.  I'm talking about the first centered title,
23       "We help customers."
24   A   Oh.  Do I agree?
25   Q   Yes.

Page 58

DAYNA LONG

1
2    A   Yes.
3    Q   And then can you -- and take some time to read
4        this next section, but I also wanted to ask you if
5        you agree with the description in here of,
6        "Qualities of a Great Writer for Technical
7        Communications."
8    A   Yes.
9    Q   And do you think that also describes how you
10       approached your job as a technical writer at Epic?
11   A   On some points, yes.
12   Q   Which ones?
13   A   My customer support was pretty limited.  I didn't
14       work very directly with customers often.  I don't
15       think I ever answered document-related questions
16       with customers.  I supported some go-lives.
17           But, yeah, a lot of these others apply.
18   Q   Are there any, other than number 4, are there any
19       that you think do not apply to your job?
20   A   I think that number 3 gets muddled.
21   Q   How so?
22   A   I think that sometimes writers are the ones
23       prioritizing the projects most important to
24       customers in Epic.  I think other times other
25       roles prioritize what projects, you know, writers

Page 59

DAYNA LONG

1
2        should be working on.
3    Q   Okay.  Any others?
4    A   I don't think so.
5    Q   On number 4, did you ever go on a go-live?
6    A   I went on a few.
7    Q   How many?
8    A   I don't remember.
9    Q   More than one, though, right?
10   A   Yep.
11   Q   And when you go on a go-live, are you supporting a
12       go-live?
13   A   Yeah.
14   Q   Okay.  Can you please take out Exhibit 2.
15           Well, let me ask you this.  We were
16       talking about Tapestry.  That's the application
17       you supported, correct?
18   A   Yes.
19   Q   How many other technical writers supported that
20       application?
21   A   One other writer.
22   Q   Who was that?
23   A   Nick Stapleton.
24   Q   Okay.  And you were located in the Tokay building,
25       correct?

Page 60

DAYNA LONG

1
2    A   I was.
3    Q   T-O-K-A-Y.
4           That's a different spot than Epic's
5        Verona campus, correct?
6    A   Yes.
7    Q   Most Epic employees are in Verona, right?
8    A   Yes.
9    Q   And Tokay was where?
10   A   Near Whitney Way in Madison.
11   Q   And most technical writers are in Verona?
12   A   Yes.
13   Q   How many other technical writers were in Tokay
14       besides you?
15   A   I think just Nick.
16   Q   Did you ever move to Verona for your work
17       location?
18   A   I didn't.
19   Q   All right.  Let's look at this review now.
20           Please read pages 6 and 7.  We'll start
21       with that.
22   A   Okay.
23   Q   Would you agree this is a very positive review?
24   A   Yes.
25   Q   I'll ask you about a couple things.

Page 61

DAYNA LONG

1
2           First, there's a reference here that
3        says, "When the Visio issues cropped up, you
4        figured out the appropriate people to talk to and
5        followed up."
6           Do you know what is meant by "the Visio
7        issues"?
8    A   I think there was -- there were some issues when
9        we switched to a new version of Microsoft Office.
10       When you opened Visio files that were created in
11       the old version and the new version, I feel like
12       something funny happened.  I don't remember
13       specifically, but, like, it threw an error.
14   Q   And is it true that you figured out the right
15       people to talk to?
16   A   Yeah.
17   Q   And is it also true that you followed up?
18   A   Followed up with what?
19   Q   Well, I don't know.  Your supervisor told you that
20       you did.  Do you -- I'm asking you how you did
21       that.
22   A   I think that -- I mean, I don't remember what that
23       could have referred to.
24   Q   Okay.  It also says here that you "proposed
25       thoughtful solutions."

Page 62

DAYNA LONG

1
2      Do you agree with that?
3   A   Yes.
4   Q   What did you propose?
5   A   I don't remember specifically.  I don't remember
6      how we resolved the issue.
7   Q   Okay.  But it was something that you proposed a
8      solution to?
9   A   I think that I talked with IS and CATS, and we
10     came up with a couple of possible solutions, and
11     then I proposed which ones I thought would work
12     best for the writing team.
13  Q   And just for the record, CATS is an acronym,
14     correct?
15  A   Yeah.
16  Q   And do you know what CATS stands for?
17  A   I don't.
18  Q   Then there's a -- in the next paragraph it says
19     you've "been willing to do things outside of the
20     Writing role, such as model build."
21         What is that?
22  A   You work in the model environment.  I don't
23     remember specifically, it's been awhile, but you
24     do some work for the model environment of Epic.
25  Q   What is the model environment?

Page 63

DAYNA LONG

1
2   A   It's, like, Epic's internal environment that's
3      supposed to be, like, the model of what we would
4      want a customer to implement, I think.
5   Q   And what work did you do on it?
6   A   I don't remember.
7   Q   Okay.  Another one is the "Tapestry Do Good
8      Group"?
9         Do you recall what that was?
10  A   Yes.
11  Q   What was it?
12  A   It was sort of a volunteer group.  I think we
13     raised some money for breast cancer that year.
14  Q   And it says that you "helped with updates to the
15     Chronicles Data Dictionary."
16         What is that?
17  A   I don't remember.
18  Q   Okay.  In the fourth paragraph it says you've
19     "created a process for reviewing the Customer
20     Graduate Program materials."
21         What are the "Customer Graduate Program
22     materials"?
23  A   I really don't remember very well.  I think it was
24     some additional training that implementers
25     developed for their customers to go through.

Page 64

DAYNA LONG

1
2   Q   And what did you do on it?
3         You created a process for reviewing it.
4      What did you do?
5   A   I just made sure that they had writers ready to
6      review their projects.
7   Q   What did that entail?
8   A   Looking at content that implementers had created
9      and going through it to make sure that it met
10     Epic's style guide standards.
11  Q   And did you record this process anywhere so that
12     others would use it?
13  A   I don't remember.
14  Q   Okay.  Also says that you've "worked with the wave
15     process group to create and maintain processes for
16     IS and Writing."
17         What did you do in that regard?
18  A   I really don't remember.
19  Q   Do you remember what the "wave process group" is?
20  A   I have a vague, vague recollection.  I couldn't
21     tell you much about it.
22  Q   Okay.  What's the -- what is it that you remember?
23  A   I remember having a power point that had a wave in
24     it.  That's, honestly, what I can tell you about
25     it.

Page 65

DAYNA LONG

1
2   Q   Okay.
3   A   I don't remember.
4   Q   On the next page in the second bullet point under
5      No. 8 you're described as having a "thoughtful
6      approach to problem solving."
7         Would you agree with that?
8   A   Yes.
9   Q   And can you think of some examples as to how you
10     demonstrated that?
11  A   I think we talked about the Visio situation.
12     That's probably a good example.
13  Q   Okay.  Would you please go back to Exhibit 3.
14     It's your July review.  One second.
15         One thing I should ask you, is Tapestry
16     was part of the IS Writing team, correct?
17         Is that fair to say, on the
18     implementation writings?
19  A   No.
20  Q   No, it's not?
21  A   No.
22  Q   Okay.
23  A   Tapestry was a revenue application.
24  Q   All right.  Did you consider your work to be at
25     all part of the IS Writing team?

Page 66

DAYNA LONG

1
2  A   Absolutely.
3  Q   Okay.  So how would Tapestry relate to the IS
4      Writing team?
5  A   So you've got, like, all of the revenue
6      applications, right?  Like Tapestry, hospital
7      billing, they all fall under the "Revenue
8      Applications" umbrella.
9          Each of those applications has an
10     implementation writer, so there were
11     implementation writers for all of those
12     applications.  There were implementation writers
13     for every application.  Tapestry is just an
14     application that had an implementation writer.
15 Q   And do you know how many revenue teams there were?
16 A   I don't remember specifically.
17 Q   Okay.  And Tapestry works with some very large
18     customers; is that correct?
19 A   Yes.
20 Q   Includes Kaiser?
21 A   Yes.
22 Q   And that's its largest customer; is that correct?
23 A   I don't know for sure, but sure, I'll take your
24     word for it.
25 Q   Okay.  So then this review, let's take a look at

Page 67

DAYNA LONG

1
2      page 2.
3          Can you read this first "Goal, Plan and
4      Measure" that's listed on this chart about
5      WSO/MSO?
6  A   Okay.
7  Q   So first question is what is WSO/MSO?
8  A   I have no idea.  I'm sorry, I don't remember.
9  Q   You don't remember?
10 A   Yeah.
11 Q   Was it -- do you recall it being something where
12     an implementer for an application is supposed to
13     tell Tech Comm about updates?
14 A   That sounds likely.
15 Q   Okay.  Did they always do that?
16 A   I don't remember.
17 Q   Do you remember ever there being a problem with
18     expert implementers not telling Writing about
19     updates that they were making to the applications
20     on a consistent basis?
21 A   It seems like the kind of problem that would have
22     occurred.
23 Q   You know, your goal here was to "investigate
24     WSO/MSO education" and use your "findings to pilot
25     a more thorough preparation for the WSO/MSO role

Page 68

DAYNA LONG

1
2      as it pertains to documentation updates and
3      maintenance."
4          What does that mean?
5  A   I'm really not sure because I'm not remembering
6      the WSO/MSO role very well.
7  Q   And whatever it was, you came up with a plan for
8      it, right?
9          MR. KNUTSON:  If you can answer that
10     question.  Go ahead.
11 BY MR. FINKEL:
12 Q   I mean, let me back up.  You wrote this, correct?
13 A   Yeah.
14 Q   Okay.
15 A   I don't remember if I did or not.
16 Q   Is there any reason to think you didn't?
17         MR. KNUTSON:  Objection.  Other than her
18     testifying she doesn't remember?
19         Go ahead and answer.
20         THE WITNESS:  No.  I just don't remember
21     whether I did or not.
22 BY MR. FINKEL:
23 Q   Okay.  Do you have any reason to doubt that you
24     created the plan that is listed for that goal on
25     page 2 of this review?

Page 69

DAYNA LONG

1
2          MR. KNUTSON:  Objection.  Asked and
3      answered.
4          Go ahead and answer again.
5          THE WITNESS:  I don't remember.
6  BY MR. FINKEL:
7  Q   Do you have any reason to doubt?
8  A   Well, sure.  Like, I don't remember, so, you know.
9  Q   So you think --
10 A   I would say that's enough for doubt, is that I
11     don't remember, yeah.
12 Q   So you might not have done that?
13 A   I might not have done it.
14 Q   Okay.  And do you think if you failed to do it,
15     your supervisor would have pointed that out in a
16     review?
17         MR. KNUTSON:  Objection.  Calls for
18     speculation.
19         Go ahead and answer if you can.
20         THE WITNESS:  It seems like something
21     that would have come up at our next review.
22 BY MR. FINKEL:
23 Q   And to your recollection, did that ever come up
24     with the next review?
25 A   I don't remember.

Page 70

DAYNA LONG

Q   You did report that you had completed this plan in this review, correct?

A   Excuse me, can you repeat that?

Q   You had reported in your review that you had completed this plan?

A   I set a date for myself to complete it by, yes.

Q   Well, in -- this review was signed by you on July 31, 2012, correct?

A   Yeah.

Q   And --

A   I mean, I guess if the date is there, I must have completed it.

Q   Right.  And I assume what you -- I mean, is it fair to say that what you -- let me back up again.
         You wrote Section A of this review, correct?

A   Yes.

Q   This is all you?

A   Yeah.

Q   And you -- what you wrote in here was -- in your own, you know, performance review, was accurate, right?

A   Yeah.

Q   But you don't remember what you did?

Page 71

DAYNA LONG

A   I don't.

Q   Okay.  Take a look at page 6, please.  This is your own self-review, correct?  Pages 6 and 7?

A   Yes.

Q   Why don't you take a minute to read these two pages, and then I'll ask you about them.

A   Okay.

Q   What you wrote was accurate, correct?

A   Yes.

Q   And I want to ask you about point No. 2.
         You wrote that, "I like that there are early opportunities for ownership and leadership."
         How was that the case?

A   Well, like, I owned a set of documentation pretty early, so I was responsible for maintaining it.

Q   What documentation was that?

A   Validation documents.

Q   And what does it mean to own and maintain validation documents?

A   Generally, that you're responsible for their wellbeing.  You're responsible for making sure that they work for the people who are using them, in this case implementers.

Q   Um-hm.

Page 72

DAYNA LONG

A   Making sure that instructions around them for updating them are clear.

Q   How do you -- how do you make sure -- when you're responsible for their wellbeing, what do you do?  How do you do that?

A   Well, like, for validation documents in particular, making sure that the SharePoint where they were stored wasn't a giant mess; that there weren't, you know, jumbles of files outside the folders they were supposed to be in, stuff like that.

Q   And what would happen if there were?

A   It would be more difficult for writers and implementers to access them and find what they need.

Q   And if you see something like that, what do you do?

A   Try to assess what's going wrong.
         Why are there -- you know, why is it a mess?  What could be better?

Q   And are you responsible for figuring out what's going to be better?

A   You're responsible for working with other stakeholders; so in my case, definitely

Page 73

DAYNA LONG

implementers would need to be involved in any kind of decision, but yeah, figuring out how to make improvements.

Q   And you then proposed the improvement?

A   Yes.

Q   You also wrote that you "have a lot of room for brainstorming and coming up with your own project ideas."
         How so?

A   I don't remember specifically what kind of projects I was thinking about at the time, but that was true in general.

Q   As you sit here now, you can't think of one like that?

A   From this particular time period, no.  I don't remember when I started working on improvements and validation documents, like, in relation to this review.
         But, I mean, that was the big one, you know; there was room to make a plan about how to fix validation documents.

Q   Okay.
         MR. FINKEL:  I'm sorry, can you repeat that?

Page 74

DAYNA LONG

(Whereupon, the following portion was read.)

"A. From this particular time period, no. I don't remember when I started working on improvements and validation documents, like, in relation to this review.

But, I mean, that was the big one, you know; there was room to make a plan about how to fix validation documents."

BY MR. FINKEL:

Q   So do you believe you're the one who came up with the plan to fix validation documents?

A   Yes.

Q   And what were you trying to fix, precisely?

A   I feel like I've explained this several times.

Q   I'm still not sure I understand exactly what the problem was.

A   There were too many documents.

Q   Is it too many?  Okay.

A   They were a mess, so this consolidated them.

Q   All right.  It's not that the documents themselves were a mess; it was they were in a lot of different places?

A   They weren't well organized, and they were less

Page 75

DAYNA LONG

usable.

Q   Okay.  Thank you.

All right.  Let's look at page 8 and 9. This section was prepared by your team leader, so can you please read this?

A   Okay.

Q   All right.  Would you agree that this, again, is another positive review for you?

A   Yes.

Q   And I want to ask you about a couple things on here.

Under paragraph 3, or question 3, it states that you "took ownership of the IS Deliverable Owners Group."

What is that?

A   I think that refers to the group of implementation writers who owned implementation writer deliverables.

Q   Okay.  And what did you do in -- to take ownership of this group?

A   I don't remember specifically.  I probably set meetings in a -- it sounds like I coordinated efforts between the owners to keep the TLs informed.

Page 76

DAYNA LONG

Q   Okay.  And did anyone assign you with this?

A   I don't remember.

Q   Is it true that you often assigned yourself projects?

A   I would never just start doing a project.  I would have to talk with my TL and make sure that was a valid use of my time and, really, get permission first.

But sure, if I saw a project that I was interested in, I could talk with my TL about it and then see if that was something I was allowed to start working on.

Q   And did you, in fact, do that?

A   I did.

Q   It also states you were a "Writing's representative to the IPO meeting."

What is that?

A   I think that that was implementers who were, like, the heads of their application, like.  I don't remember their exact position, but they were important on their applications implementation team.

Q   Okay.  And what would Writing's representative to that meeting be?

Page 77

DAYNA LONG

A   I was just there to see if there were any projects that they had coming up that were relevant to our interests as the writing team, or if they needed anything from us.

Q   All right.  Otherwise, they could decide to do things, but if -- Writing would not know unless you were there, right?

A   It was just good for us to have some idea of what they were talking about.

Q   And then the next one it states that you were "the validation doc owner," right?

A   Yep.

Q   You agree with that statement?

A   Yes.

Q   And we've talked about the validation document ownership?

A   Yes.

Q   It also said, "We've also seen that you were a strong process creator."

Do you agree with that?

A   Yes.

Q   Can you give me an example of how you're a strong process creator?

A   I mean, we've talked about a couple.  Coming up

Page 78

DAYNA LONG

1
2  with processes for different documents to get
3  edited; coming up with the process to get the
4  Stars' document finished.
5  Q  Okay.  And then there's reference down at the end
6  of this paragraph.  "I appreciate you find ways to
7  make things easier for other writers, such as
8  relabeling primary/secondary apps on diagrams
9  instead of having all the writers do it."
10     Would that be another example?
11  A  That doesn't sound like a process thing to me,
12  that sounds pretty rote; opening up a document and
13  typing something on it.
14  Q  What does this mean, re -- what does this mean,
15  "relabeling primary/secondary apps on diagrams"?
16  A  So, like, a workflow diagram would be, like, how a
17  workflow is completed in an application, so there
18  might have been more than one application involved
19  in a particular workflow.
20     So, I guess, if there were two
21  applications, we would need to put the application
22  that was the main application for the workflow,
23  and then the secondary application probably also
24  needed to be on the workflow.  I'm guessing that
25  that's what that refers to.

Page 79

DAYNA LONG

1
2  Q  And so who would be doing the relabeling, then,
3  instead of having all the writers do it?
4  A  I think it was me and my mentee.
5  Q  So you did it for the others?
6  A  Yes.
7  Q  Said you "recently gave an informing and engaging
8  IS Writing update at the All Writer meeting."
9     What's the "All Writer meeting"?
10  A  That's when all of the different types of writers
11  would come together and meet.
12  Q  How frequent are those?
13  A  I don't remember.
14  Q  And what was the "IS Writing update" that you
15  gave?
16  A  I think it was about badgering implementers to
17  update validation documents.
18  Q  Okay.  How long was the -- I take it this was a
19  oral presentation that you gave?
20  A  Yep.
21  Q  How long was it?
22  A  I have no idea.
23  Q  Did you decide to provide that update at the All
24  Writer meeting?
25  A  I was probably asked to.

Page 80

DAYNA LONG

1
2  Q  Did you decide what went into the IS Writing
3  update?
4  A  I doubt it.  It was probably suggested as a topic.
5  Q  Okay.  Do you remember by whom?
6  A  I would guess my TL or another implementation
7  writing TL.
8  Q  Did you decide what to say?
9  A  Yes.
10  Q  The next paragraph it says that you do a "great
11  job of seeing possible problems early so they can
12  be addressed.  I appreciate that you don't only
13  smell smoke, but also escalate and take
14  appropriate action."
15     Do you agree with that?
16  A  Yes.
17  Q  Can you give any examples of how you've done this?
18  A  I think what we talked about earlier with the
19  Visio issues is applicable here.
20  Q  And at the bottom of question 3, it says you
21  have -- "you took the initiative to help Tapestry
22  IS to improve their testing scripts post-Voltron
23  conversion."
24     What does that mean?
25  A  I don't remember.

Page 81

DAYNA LONG

1
2  Q  Do you remember what Voltron was?
3  A  Yeah.
4  Q  What was that?
5  A  It was a -- I think it was a format change to
6  testing tool kits.
7  Q  Okay.  So would the testing scripts need to change
8  to comply with Voltron?
9  A  This sounds more like Tapestry scripts were in
10  rough shape, and we spent some time on them.
11  Q  And what would you do on them?
12  A  Probably look at them after IS worked on them.
13  Q  And you would improve them, it sounds like?
14  A  I think that the implementers improved them, and
15  then I edited them and made sure they were ready
16  for production.
17  Q  It says you "took the initiative to help Tapestry
18  IS to improve them."
19     What did you do to help them?
20  A  I edited the documents and made sure they were
21  ready for publication.
22  Q  Okay.  Question 7, there is a reference says you
23  "appropriately deprioritized your goals to work on
24  publication."
25     Do you know what that means?

Page 82

DAYNA LONG

A   Sometimes you would set a goal, and then something
would come up, like publication, for example,
while you were working on your goal, and so you
wouldn't meet your goal, like, by the date you'd
assigned.

Q   So what did you do to deprioritize your goals?

A   I assume that means I stopped working on one of my
goals.

Q   You decided to do that in order to work on
publication?

A   I would have discussed it with my team lead pretty
thoroughly. We would have had a long conversation
about, "Hey, I'm going to drop this work or I'm
not going to hit this deadline," just to get her
input on whether or not that was inappropriate,
you know, reprioritizing of my workload.

Q   But you proposed that prioritizing?

A   I don't remember specifically, but I'm sure we
discussed it and that's what happened.

Q   But do you think you were the one who proposed it?

MR. KNUTSON: Objection. Asked and
answered.

Go ahead and answer again.

THE WITNESS: I don't remember.

Page 83

DAYNA LONG

BY MR. FINKEL:

Q   And the paragraph above that it says that you've
"taken on additional responsibilities, including
deliverable owners group leader"?

A   Yes.

Q   What was that?

A   I believe we talked about that on the last page,
the same thing that you asked about in question 3,
first paragraph.

Q   You're right, we did. Thank you.

One said owner, one said leader. I
don't think there's a difference, is there?

A   Un-hn.

Q   Let's go back to Exhibit 4. This is your March
2013 review, correct?

A   Yes.

Q   And on the first -- you wrote the first page,
Section A, your goal progress since the last
review?

A   Yes.

Q   And we've talked about Reach for the Stars?

A   Yes.

Q   And then you wrote, "I'm currently working with
Michelle Johnson and Brett O'Neal to make major

Page 84

DAYNA LONG

changes to validation documents."

Who was Michelle Johnson?

A   I think Michelle was transitioning into ownership
of the validation documents. She was another
implementation writer.

Q   And Brett O'Neal is the writer for whom you are a
TL, correct?

A   He was my team member.

Q   And so they worked with you on changing the
validation documents?

A   Yes.

Q   And it says that -- it makes reference to you
completing the Document Care Package, correct?

A   Um-hm. Yes.

Q   We've talked a bit about that, right?

A   Yes.

Q   Okay.

(Exhibit No. 10 was marked.)

BY MR. FINKEL:

Q   Have you seen this document before?

A   Probably.

Q   Why don't you take a look -- take a minute to read
it.

A   Okay.

Page 85

DAYNA LONG

Q   So I don't know if it helps, but you said before
you probably have seen it. Is this still
something you probably think you have seen, or --

A   I'm honestly not sure. Yeah, I'm not sure whether
I've seen it or not.

Q   Okay. So I take it -- I was going to guess maybe
you wrote it, but you did not?

A   I don't think so.

Q   Do you agree with the description in the first
paragraph of what a Document Care Package is?

A   Yes.

Q   And then you were listed as being a co-owner of
the 2012 release, correct?

A   Yes.

Q   We've talked about that.

(Exhibit No. 11 was marked.)

BY MR. FINKEL:

Q   I'm showing you what's been marked as Exhibit 11.
Have you seen this document before?

A   I'm not sure.

Q   Okay. Why don't you take a minute to read, say,
the first couple pages of it, or as much as you
think you need to in order to refresh your
recollection as to whether you've seen it.

Page 86

DAYNA LONG

A   I don't remember if I've seen it or not.

Q   Okay.  Would you agree with the definition at the beginning of the document that says, "A deliverable owner is the person responsible for the overall success of a documentation deliverable"?

A   Yes.

Q   And how would you define "a documentation deliverable"?

A   One of the types of documents that writers worked on.

Q   Okay.  What were the others that writers worked on?

A   I'm sorry, I don't understand the question.

Q   You said it was one of the types of documents that writers worked on.  What are the others?

A   I'm saying the documentation deliverables were the types.

Q   Oh, they are the types?

A   Yes.

Q   So not one of; they are the type?

A   Yeah.

Q   Okay.  And do you agree with these, the description of the three keys to success?

Page 87

DAYNA LONG

A   Yes.

Q   And then there is a reference to -- or at the beginning about whether -- customer happiness, do customers like it.

Do you believe that "customers" here refer to as being just external customers or internal customers of Tech Comm Communications as well?

A   I'm not sure.

Q   Okay.  In the second key it says you "need to ensure the deliverable is well written."

How would you do that?

A   I mean, you would need to make sure the deliverables had editing.

Q   And then they have to be well-designed, correct?

A   Yes.

Q   How would you ensure that it was well-designed?

A   I guess you would try to get feedback from the people who were using your document, if you could.

Q   Okay.  And then try to look at it from their perspective as to whether the document makes sense for them?

A   Sure, yes.

Q   And then you have to make sure that it's accurate,

Page 88

DAYNA LONG

right?

A   Yes.

Q   How would you do that?

A   You would get subject matter experts -- people who really knew the software -- to look at it, review it for you.

Q   Okay.  Then you'd have to make sure it's "consistent across applications"?

How would you do that?

A   Well, generally, for most deliverables there was a template, and everybody for every application would use the template for their deliverable, for that type of deliverable.  That way they were the same; they were a standard set.

Q   Okay.  Going back to the bullet point above that about customer happiness, it states that, you know, you have to ask, "Do customers like it?  Are they using it?  Is it helping the target audience accomplish their goal?  And as an owner, it's your job to make sure the answer to those questions is yes."

How would you do that?

MR. KNUTSON:  Objection.  Foundation and vague.

Page 89

DAYNA LONG

Answer if you can.

THE WITNESS:  I mean, as a deliverable owner, I didn't spend very much time working with customers, like, about my deliverable.  I don't know that I ever talked with a customer about validation documents; I don't remember if I did.

So you would rely on feedback from people who did have direct customer interaction, like implementers, some developers would have that interaction.  I relied a lot on implementers for that information.

BY MR. FINKEL:

Q   So would you seek out that information from them?

A   Yes.

Q   And then it says, "The last key is establishing an efficient system for producing the deliverable."

How did you do that?

Well, let me back up.  Did you do that?

A   Yes.

Q   And how did you do that?

A   We've talked about the validation documents thing pretty repeatedly, so that type of thing.

Q   And we do agree that you would have to set up, organize a sustainable process for creating,

Page 90

DAYNA LONG

1
2  reviewing, updating and publishing?
3  A  If there wasn't already one set up when you
4     inherited the deliverable, yes.
5  Q  And if there was one set up, would you have to
6     update it?
7  A  If it needed updating, yes.
8  Q  How would you know if it needed updating?
9  A  It was your job to get feedback from writers and,
10    you know, from other roles on how that was going.
11 Q  And would you use your own judgment, too, as to
12    whether a process needed updating?
13 A  You would, but you'd be using your judgment based
14    on feedback from other areas.
15 Q  Okay.
16 A  Like, you wouldn't just decide on your own, "Oh,
17    this process needs to be changed."  You would need
18    to hear from other writers or other roles that
19    something was wrong, and then you could use your
20    judgment to decide whether or not a process needed
21    to be changed.
22        And then, of course, you would make a
23    proposal, and somebody would decide whether or not
24    your proposal could go forward.
25 Q  Okay.  Well, when you're the owner, who would you

Page 91

DAYNA LONG

1
2  send your proposal to?
3  A  Usually team leads.
4  Q  Yeah?  Well, and you were one.
5  A  I still had to submit my proposal to other team
6     leads.  I didn't decide on my own to make a
7     change.  I had to, you know, suggest the change
8     and wait for approval.
9  Q  Okay.  Now let's look at the "Responsibilities" on
10    "Deliverables."
11        Second page is one about "Template and
12    Writing Guidelines"?  You can review that before I
13    ask you about it.
14 A  Okay.
15 Q  All right.  So there's references to a Doc Design
16    group.  What was that?
17 A  It was a group of writers who maybe had a knack
18    for design, so they would look at designs for
19    documents sometimes.
20 Q  Okay.  This was something some writers did, but --
21    I'm sorry, this was a group that -- I'm sorry,
22    this was a task some writers had?
23 A  It was something that some writers could be
24    involved in if they wanted to.
25 Q  But not all writers would be?

Page 92

DAYNA LONG

1
2  A  No.
3  Q  And as a deliverable owner, you might create a
4     template and send it to Doc Design for review,
5     right?
6  A  You might.
7  Q  Or you might give them a concept and let them try
8     it out, right?
9  A  You might.
10 Q  Or you might take something that's already
11    established, right?
12 A  Yes.
13 Q  You told me about that.  You decide what you're
14    going to send to Doc Design, right, as the owner?
15 A  I'm sorry, I don't understand.
16 Q  As the deliverable owner, you're deciding what
17    template to send to Doc Design?
18 A  You're getting feedback from other roles, but
19    yeah; ultimately, yes.
20 Q  And then you would have to establish writing
21    guidelines for the deliverable?
22 A  If there weren't already guidelines.
23 Q  Sometimes there were?
24 A  Yes.
25 Q  And sometimes there weren't?

Page 93

DAYNA LONG

1
2  A  Occasionally, yeah.
3  Q  Okay.  If there were, would you have to determine
4     if they're still appropriate?
5  A  Writing guidelines?  There were really
6     well-established writing guidelines available.  I
7     don't remember having to make any changes to
8     writing guidelines in my deliverables.
9  Q  One thing you're supposed to do is determine if
10    your deliverable needs to deviate from the style
11    guide; is that correct?
12 A  Yes.
13 Q  Did you ever make that determination, that there
14    needs to be a deviation?
15 A  I don't remember.  I don't think so.
16 Q  You were aware, though, that you could do that?
17 A  I don't remember thinking about it one way or the
18    other.
19 Q  Okay.  Then you would have had to "Create a page
20    on the Deliverables wiki to document information
21    about how to write your deliverable"; is that
22    correct?
23 A  If it wasn't already there.  A lot of deliverables
24    were already pretty well established; you weren't
25    having to create, you know, brand-new stuff.

Page 94

DAYNA LONG

Like, I'm pretty sure there was already validation
documents wiki when I owned them.
Q   But you were making changes to them, right?
A   Yeah.  If processes were changing, yes.
Q   And so wouldn't you also have to, perhaps, change
the page on the Deliverables wiki to document
how -- information about how to write the
deliverable?
A   Yes, you might.
Q   And it describes things that the wiki should
include, right?
A   Yes.
Q   And you decide the content under each of those
headings, right?
A   Yeah, I guess so.
Q   Okay.  And then the next step is "Review"?  You
want to take a look at that, what's under that
heading?
A   Okay.
Q   You would "Establish the review process to ensure
the deliverable is well-written and accurate,"
right?
A   Yes.
Q   And you'd "Decide which rounds of review are

Page 95

DAYNA LONG

appropriate based on your audience," right?
A   Yes.
Q   You'd "figure out a timeline for each type of
review," correct?
A   Yes.
Q   And then the next one is "Publication"?
A   Okay.
Q   You see that?  You can read that before I ask you
about it.
A   Okay.
Q   So you would be the one to "Establish a
finalization on publication process to prepare the
document for release," right?
A   Yes.
Q   And you'd do that in conjunction with others,
right?
A   Yes.
Q   And would you agree that this wiki describes the
process that you should go through to achieve
publication?
A   Yeah, I think so.  You get feedback from the team
leads who are overseeing everyone's work; you get
feedback from the people who are in charge of
publication, yeah.

Page 96

DAYNA LONG

Q   You'd talk to your area's release coordinator?
A   Yes.
Q   And what is a release coordinator?
A   You know, I don't remember specifically.
Q   All right.  And then there is a section on
"Education"?  Would you agree that you needed to
train writers and develop a plan for that?
A   Yeah, depending on how involved your deliverable
was.
Q   Okay.
    MR. KNUTSON:  You need a break, or are
you good to keep going?
    THE WITNESS:  I'm okay.
    MR. FINKEL:  We can take a break.
Actually, I could use a break.  It won't be long.
    MR. KNUTSON:  Okay.
    (Recess taken.)
BY MR. FINKEL:
Q   I had a follow-up question on go-lives.  How many
did you go on; do you recall?
A   I think I told you I don't remember.
Q   Okay.  Do you remember what you did on them?
A   A lot of walking around and kind of standing
behind end users to see if they needed help.

Page 97

DAYNA LONG

Q   And did they?
A   Occasionally.
Q   What would you do when they needed help?
A   Honestly, a lot of times I would find somebody
more qualified than myself to help them, because I
couldn't answer their questions a lot.
Q   You wanted to go on go-lives, right?
A   In the beginning.  Towards the end I was less keen
on go-lives.
Q   What was it about the beginning that made you want
to go?
A   It's fun to travel.
Q   Do you remember where you went?
A   I know that I went to LA once.  I went to
Sacramento one time, I think.  Sauk City; that was
glamorous.  I don't remember where else.
Q   Another thing we talked about briefly was model
build, which I don't think you recalled much
about.
A   No.
Q   Do you remember what you did on model build?
A   I don't.
Q   It was working in software, right?
A   I think so, yeah.

1          DAYNA LONG
2  Q   And how long -- do you remember how long that
3      project lasted?
4  A   I don't remember.
5  Q   One thing on being a deliverable owner with
6      templates, once you create one, are you also, as a
7      deliverable owner, responsible for ensuring that
8      the templates are being used?
9          MR. KNUTSON:  I just don't know what you
10     mean by "one."  Do you mean the template or the
11     deliverable?
12         MR. FINKEL:  Can you repeat the
13     question?  Thanks.
14         (Whereupon, the following portion was
15     read.)
16         "Q.  One thing on being a deliverable
17     owner with templates, once you create one, are you
18     also, as a deliverable owner, responsible for
19     ensuring that the templates are being used?"
20 BY MR. FINKEL:
21 Q   Are you responsible for making sure the template
22     is being used?
23 A   You would spot-check documents to make sure that
24     they looked right, yeah.
25 Q   And another thing you've referred to many times is

1          DAYNA LONG
2      editing.
3          What do you mean by that?
4  A   Looking at content and making sure that it adheres
5      to Epic's style guide.
6  Q   Do you also have to make sure that the content --
7      you have to validate the substance of it too?
8  A   Yeah.
9  Q   And what would qualify you to do that?
10 A   I mean, you're certified in your application, so
11     you would evaluate it from that standpoint.
12 Q   Okay.
13 A   Use your understanding of the Epic style guide.
14     If it got really technical and you weren't sure,
15     you would want to get a subject matter expert,
16     like, a software developer or somebody to look at
17     it too.
18 Q   Would you also want to try to read it from the
19     perspective of how a customer would read it?
20 A   Yeah.
21 Q   And you would do that, right?
22 A   Yeah.
23 Q   And you could edit a document based on that
24     perspective, right?
25 A   Yes.

1          DAYNA LONG
2  Q   Let's go back to Exhibit 3 for a minute, page 8.
3      Under No. 4, you were told by your supervisor,
4      "Your instincts are usually right.  You can do
5      what you think is right without waiting for
6      validation from me or another TL."
7          Do you remember that?
8  A   Yeah.
9  Q   After receiving that feedback, what did you do?
10     Let me ask you:  What did you do with that
11     feedback?
12 A   I didn't wait so long to check in before making
13     the next move with the project.  Like, I could
14     make some decisions by myself and then validate
15     them later with my TL rather than waiting for her
16     approval every time.
17 Q   Had you ever waited for your TL's approval on
18     everything?
19 A   Definitely.
20 Q   Really?
21 A   Yeah.
22 Q   Okay.  Let's go back to Exhibit 10.  This is the
23     "Documentation Care Package" wiki.
24         Do you agree that the last page of the
25     first -- I'm sorry, the last sentence of the first

1          DAYNA LONG
2      paragraph accurately described what was in the
3      Document Care Package for which you were the
4      deliverable owner?
5  A   I mean, I don't remember it very well, but it
6      sounds right.
7  Q   Okay.  All right.  And one thing you had to do was
8      a -- well, you had to do a -- well, there was a
9      Epic 2012 Highlights document?
10 A   Yeah.
11 Q   Do you remember what that was?
12 A   Vaguely.
13 Q   What is your vague recollection of it?
14 A   I think it was, like, a one-page document with
15     some of, like, the shiniest features from the 2012
16     release on it.
17 Q   Okay.  And did you prepare that letter -- I'm
18     sorry, that Highlights document?
19 A   I don't remember if I did or not.  I don't
20     remember what my involvement with that document
21     was.
22 Q   Okay.  Well, as the deliverable owner, you had
23     some involvement in it, right?
24 A   Yeah.
25 Q   You just don't remember what that was?

Page 102

DAYNA LONG

A  I really don't.  I would need to see it.

Q  Okay.  Someone had to determine what was -- what
those shiny highlights were, right?

A  Sure.

Q  Do you remember who made that determination?

A  I'm guessing that the final determination was
probably made by somebody pretty high up in
development.

Q  Who would make the proposal of what -- who would
prepare the proposal for what goes into it?

A  Probably writers in consultation with their
application developers.

Q  Wouldn't that be you as the deliverable owner?

A  I don't remember.

Q  And what would -- what factors would someone
consider in making the determination of what goes
into that Highlights document?

A  As someone who didn't make those determinations, I
don't recall making those determinations, I
couldn't say.

Q  All right.  And there also was a cover letter from
Carl, correct?

A  Yes.

Q  That's Carl Dvorak, D-V-O-R-A-K?

Page 103

DAYNA LONG

A  Yes.

Q  And what is Carl's position?

A  I think he's the president.

(Exhibit No. 12 was marked.)

BY MR. FINKEL:

Q  Have you seen this document before?

A  I sure have.

Q  What is it?

A  This is the cover letter.

Q  For the documentation care package in 2012?

A  Yes.

Q  And did you draft this?

A  Yes.

Q  And how did you go about drafting it?

A  With many, many, many levels of input and
feedback.  Lots of iterations.  I went to Writing
leads repeatedly and got their edits.  It went to
Carl a couple different times and got his edits.

So, I mean, if this is the final draft,
this is after many, many iterations.

Q  Okay.  But you did prepare the draft, correct?

A  The original draft, yes.

Q  And when you prepared that, you did it based on
what other deliverable owners thought were the

Page 104

DAYNA LONG

things that should go into this letter?

A  And past cover letters, yes.

Q  And did you interview Carl first to determine --

A  I don't remember.

Q  Okay.  You listened to what he was stressing in,
like, town halls and things like that?

MR. KNUTSON:  Objection.  Foundation.
Answer if you can.

THE WITNESS:  I don't know anything
about town halls and Carl.

BY MR. FINKEL:

Q  Okay.  Can you take a look back at Exhibit 10
again?

At the bottom there is a section that
starts "Planning"?

A  Um-hm.

Q  And then it says, "Make a timeline and stick to it
as close as you can."

You see that?

A  Yep.

Q  "We recommend building in a lot of buffer time for
getting and incorporating Carl's review."

You see that?

A  Yes.

Page 105

DAYNA LONG

Q  And then it says, "Watch Carl's past UGM sessions
to get an idea of his tone and voice so you can
mimic it as much as possible in the cover letter"?

A  Yeah.

Q  So did you do -- did you watch UGM sessions?

A  I don't remember if I did or not.

Q  Let's go back to the first page of this document
too.  There is a "General Project Outline."

Do you see this?

A  Yep.

Q  Were you the one responsible for following this
general project outline?

A  Yes.

Q  So would you, then, be the one to identify
deliverables to include in the Document Care
Package?

A  Yes.

Q  How did you do that?

A  I don't remember.

Q  And then you would gather info sheet drafts from
deliverable owners; is that right?

A  Yes.

Q  And then you would revise them?

A  Yes.

Page 106

DAYNA LONG

Q   Okay.  Do you remember how you revised them?

A   I remember that I wasn't the only one looking at them.  We got lots of revisions from different writers including the writing leads at the time.

Q   And you'd also draft the cover letter, right?

A   Yep.

Q   And in doing so, did you try to capture Carl's tone of voice?

A   Yes.

Q   And you would compile customer contact information and clean it up; is that correct?

A   Yes.

Q   How would you do that?

A   I don't remember exactly.  I think that there was somebody in an administrative assistant role or something like that who we hit up for contact information.

Q   And then you would send the Document Care Package and the cover letter to Matt Becker for review.  Do you see that?

A   Yes.

Q   And who was Matt Becker?

A   He was one of the writing leads.

Q   And it says, "and revise and get his signoff."

Page 107

DAYNA LONG

What does that mean?

A   Take Matt Becker's edits, incorporate them into the document, send it back to Matt Becker, wait for him to approve to move on to the next step.

Q   Do you recall how many edits Matt Becker had?

A   I don't remember.

Q   Do you remember how substantial they were?

A   Pretty substantial.

Q   Yeah?  Did you agree with all of them?

A   I don't remember.

Q   Did you incorporate all of them?

A   I couldn't say for sure.

Q   You would decide whether it was appropriate to incorporate or not?

A   I mean, I was waiting on Matt's signoff, so I'm assuming I needed to incorporate his edits; but like I said, I don't remember.

Q   Do you recall whether you pushed back on any of those edits?

A   I don't remember.

Q   And then the Document Care Package and cover letter would be sent to "high-profile document review."  What is that?

Page 108

DAYNA LONG

A   I talked about it a little bit earlier.  When a document is going to an executive or Carl or Judy, you would want really great editing, and there are a team of people who were pretty good editors who were willing to take a look at high-profile documents.

Q   Do you recall who that was for this Document Care Package?

A   I don't remember.

Q   Do you remember if there were substantial revisions at this stage?

A   I don't remember.

Q   And then the letter would be sent to Carl for review, right?

A   Um-hm.

Q   And do you remember -- and the Document Care Package itself also, correct?

A   Yes.

Q   And do you recall how substantial his edits were?

A   Very substantial.

Q   Do you remember what they entailed?

A   They entailed getting an entire new design; a couple new designs for the document.  He was really unhappy with the first ones that we showed

Page 109

DAYNA LONG

him.  And then there were some other revisions as well, I don't remember; but I do remember we had to make big changes after the first time he saw the document.

Q   And did you, in fact, do the design change?

A   I didn't do the design change.  The designer did the design change, but I communicated what changes were needed to the designer.

Q   And you make sure that those design changes were made in a manner that you thought would be satisfactory to Carl?

A   Yeah.

Q   And the Document Care Package and this cover letter are sent to the CIOs of all of Epic's customers, right?

A   Yes.

Q   And do you know how often the Document Care Packages come out?

A   I don't remember.  I'm sure it says in that wiki.

Q   All right.  Let's go back to Exhibit 4, please.  It's your March 2013 review.  Under the goal of "Improve Validation Documents"?

Page 110

DAYNA LONG

A   What page are we looking at?

Q   I'm sorry.  Page 2.

And I know we've talked about validation documents, but I had some other questions on this.

You wrote -- I'm sorry, I should back up a little bit.  You wrote this page, right?

A   Yeah.

Q   And you wrote, "We're totally overhauling the current template for validation documents to make them easier for ACs and more appealing to our customers"?

Who are ACs?

A   They're implementation team members for a customer.

Q   Okay.  So it's on the customer side?

A   No.

Q   No?

A   They're Epic people.

Q   All right.  And more appealing to customers?

A   Yeah.

Q   Okay.  So how would the validation document project that you were describing be important to customers?

MR. KNUTSON:  Objection.  Foundation.

---

Page 111

DAYNA LONG

That's also vague.

Answer if you can.

THE WITNESS:  Can you repeat the question, please?

BY MR. FINKEL:

Q   Yeah.  You've told me how change in the template for validation documents would make it easier for IS.  My question is, how would doing so make it "more appealing to our customers"?

MR. KNUTSON:  Objection.  Foundation.  Speculation.  It's also vague.

Go ahead and answer.

THE WITNESS:  I think that they looked a little bit nicer after they were in the Excel workbook.

BY MR. FINKEL:

Q   These are documents that Epic's customers would see?

A   Very specific sets that the customer would see it.  It wasn't going around to, like, doctors and nurses, but, like, the analyst at a customer site who were working with implementation on the project might see validation documents.

But first they would be tweaked by

---

Page 112

DAYNA LONG

implementers first to make it look applicable to their customer.

Q   And what did you mean by the sentence, "This change will also allow me to retool the process for updating and publishing validation documents"?

A   A little boring stuff related to the SharePoint on which the validation documents were stored.

Q   Okay.  At the risk of being bored, can you describe that for me?

A   Sure.  I don't remember too specifically, but I think the way it used to work, implementers had to, like, upload the newly-updated documents, and the upload process wasn't always neat, and it didn't always go to the folder it was supposed to.

I think it was harder for implementers to put documents in the right place, so it was, like, a file structure issue, mostly.

Q   And then you wrote, "We're going to completely eliminate the WSO Upload site, which I think will reduce a lot of confusion and make updating the documents more intuitive for WMSOs."

What's the WSO Upload site?

A   I think it was, like, a second side of the SharePoint side or something that, like,

---

Page 113

DAYNA LONG

implementers would use to upload the documents.

I don't remember specifically, but I think that's what it was.  I think it was, like, where they would go.  It was, like, the implementation facing side for them to upload updated documents.

Q   Did you propose to eliminate the WSO Upload site?

A   Yes.

Q   And it was, in fact, eliminated?

A   I think so, yeah.

Q   Okay.  And do you believe it resulted in reducing confusion?

A   There were -- yes.

Q   Okay.  And then it says that "This will also accomplish the goal of updating the -- make updating the documents more intuitive for WMSOs."

What are WMSOs?

A   I don't remember.

Q   All right.  Is that kind of a subject matter expert for documentation?

A   I want to say it was, like, a workflow owner so on the implementation side.  It was an implementer who knew that workflow and was responsible for the set of documents that went with that workflow.

Page 114

DAYNA LONG

Q   Okay.  Let's turn to page 3, please.  The first
goal is to "Increase knowledge of Tapestry's
integrated areas and improve related
documentation."
        You see that?
A   Yes.
Q   Is this a document you decided -- well, let me
back up.
        Is this a document you proposed to set
for yourself?
A   A goal that I proposed to set for myself?
Q   Yeah, as opposed to someone else setting it for
you?
A   That's how goals worked.  You would set your own
goals, yes.
Q   So you set this goal?
A   Yes.
Q   How is it that you decided to make this your goal?
A   Like I say in the goal, it was a known issue in
Tapestry's implementation team, so in my
conversations with implementers for Tapestry, we
talked about this as an issue with their
documentation.
Q   What was the issue?

Page 115

DAYNA LONG

A   Tapestry integrated with other applications, but
there wasn't a lot of documentation around those
areas of integration.
Q   Okay.  All right.  And is that a problem you
perceived?
A   No.  It was a problem that was reported to me by
the implementation team.
Q   Okay.  And you decided that this would be
something that you were going to solve?
A   I wanted to work on fixing it, yes.
Q   Okay.  And did you decide the plan that you
would -- with which you would tackle this issue?
A   Yes.  That's how goals worked.  You would set your
goals and set your plan, and then you and your
team lead would sit down and talk through the plan
and make sure that it made sense.
Q   Okay.  Was there already an implementation
handbook at the time?
A   For Tapestry?
Q   Yes.
A   I don't think that there was.
Q   Okay.  So you proposed to create an implementation
handbook?
A   Yes.

Page 116

DAYNA LONG

Q   And did you, in fact, do that?
A   I don't remember.  I left pretty shortly after
this, so I don't know.
Q   Did you start on it?
A   I don't remember.
Q   Third goal that you have on pages 3 and 4 was
"Work with the Tapestry management group to
continue our 2012 goal of putting Tapestry on the
map."
        That's a goal you created?
A   Yes.
Q   And what does that mean, put "Tapestry on the
map"?
A   Well, there is, like -- there's generally
misunderstanding at Epic about what Tapestry was.
It's sort of -- it was a smaller piece of software
in a smaller team, so as manager with the rest of
the manager group, that was something that we were
focused on.
Q   Okay.  And you decided how you would try to help
put Tapestry on the map?
A   Yes.
Q   Okay.  And you decided how you would do it, right?
A   Yes.  Like I said earlier, you would write your

Page 117

DAYNA LONG

goals and come up with a plan, and then you would
share them with your TL, who would help you think
through the plan, whether or not that made sense.
Q   And how much of this plan did you accomplish
before your departure?
A   I don't remember.
Q   I want to go back to page 2 for a minute, if we
can, on improving validation documents.
        Would it be -- would you agree that you
came up with the plan to overhaul the current
template for validation documents?
A   Yes.
Q   Let's move on to page 6.
        Am I correct that you wrote your
favorite part of your job is "planning and
managing projects"?
A   Yes.
Q   I mean, would you agree that you come up with
process-oriented solutions to problems?
A   Yes.
Q   And there is an example here of "Coming up with a
regular way for writers to give feedback on WMSOs
to their application's WMSO manager to ensure the
best people are being staffed to those roles and

Page 118

DAYNA LONG

1
2   not just the most tenured."
3       What does that mean?
4   A   I don't remember this particularly well, but I'm
5       guessing it was whether or not implementers
6       reviewed their documents that they were
7       responsible for updating in a timely fashion and
8       making sure that the WMSO manager for their
9       application knew that about them.
10      That way, if somebody, you know, didn't
11      update their documents on time or didn't review
12      very well, you could communicate that to the
13      manager and maybe they could find somebody who
14      would do a better job.
15  Q   Okay.  And what does this mean that -- this clause
16      about "ensuring the best people are being staffed
17      for those roles and not," what you italicized,
18      "just the most tenured."
19      What did you mean by that?
20  A   Again, I don't remember this too particularly.
21      I'm sure I had somebody specific in mind, but just
22      making sure the people who could meet timelines
23      were the ones who were responsible for reviewing
24      the documentation as opposed to somebody who had
25      been on the application longer.

Page 119

DAYNA LONG

1
2       Like, you'd want the more responsible
3       person to be in that role rather than, you know,
4       just anybody.
5   Q   Okay.  And you came up with the way for that to
6       happen?
7   A   I don't know if I came up with it or not, or if it
8       was something that I was planning on working on.
9   Q   Okay.  And in your self-review you talk about how
10      you manage Brett and Mallory, correct?
11  A   Yes.
12  Q   Did you have to find projects for them?
13  A   Yes.
14  Q   You had to make sure you're picking the right ones
15      for them, right?
16  A   Yeah.
17  Q   What kind of factors would you have to consider in
18      making that decision?
19  A   I'd have to take their interests into account; how
20      much time it seemed like they had for more stuff
21      on their plate; how much more stuff they would be
22      willing to accept; whether or not they'd be
23      excited to take on the new project and whether or
24      not it would grow their skills.
25  Q   And you, in fact, considered all those factors

Page 120

DAYNA LONG

1
2       before making a decision?
3   A   Yeah.
4   Q   At the top of page 7, you wrote, "I think I've
5       become much more confident about making decisions
6       that have a team-wide impact."
7       Do you agree you made decisions having a
8       team-wide impact?
9   A   I never made the decisions on my own.  I would
10      consult with somebody else first; but yeah, I came
11      up with ideas that would have a team-wide impact.
12  Q   You wrote you trust your own judgment more than
13      you did in the past, which allows you to move more
14      quickly to execute a plan.
15      Do you agree that you did that?
16  A   Yes.
17  Q   How so?
18  A   Well, for example, the validation document change,
19      it didn't take me as long to come up with a
20      proposal to submit to team leads and other subject
21      matter experts as it might have in the past,
22      because I trusted that I was on the right track
23      and that I had solid ideas, so I didn't spend too
24      much time thinking about it and going over it and
25      over it again before getting approval.

Page 121

DAYNA LONG

1
2   Q   Okay.  And at the bottom of the page you were
3       asked to describe your "management leadership
4       accomplishments that you have achieved since your
5       last review," and those -- what TL achievements
6       you're most proud of.
7       And you wrote that, "In terms of
8       leadership accomplishments that I'm most proud of,
9       coordinating the creation of a Reach for the Stars
10      document definitely takes the cake."
11      Why is that?
12  A   It was really challenging and exciting; had a
13      really tight timeline.  That was probably the most
14      fun thing for me, is working under the really
15      tight timeline.  I always like
16      putting-out-fire-type situations, and those didn't
17      come up very often, so I enjoyed that the most.
18  Q   What was challenging about it?
19  A   It was one of the only times that, you know, we
20      really had to create this one-up document without
21      a lot of input.
22      So figuring out, you know, what Judy
23      wanted based on her communications through these
24      implementers and just making sure all the right
25      pieces were in place in this extremely tight

Page 122

DAYNA LONG

1
2    timeline was challenging.
3  Q  Okay.  And you've told me about what you did on
4     that?
5  A  Um-hm.
6  Q  I can't remember if I asked you.  Were you
7     aware -- are you aware of the extent to which that
8     document was -- has been used by Epic?
9  A  No.
10 Q  What's an immersion trip?
11 A  It's a trip that you could take to sort of, like,
12    sit in and see how a project got set up at a
13    customer site.
14       So you could, like, go be there for part
15    of the implementation or some other thing.  Like,
16    maybe you could go and sit with a customer while
17    they did their day-to-day work just to see, like,
18    how they were using the software.
19 Q  And did you go on any of those?
20 A  I don't remember if I did.
21 Q  Customers sometimes visit Epic for training,
22    correct?
23 A  Yes.
24 Q  Did you ever see any of the customers you worked
25    with on Epic's property?

Page 123

DAYNA LONG

1
2       MR. KNUTSON:  Objection.  Foundation.
3     Answer if you can.
4       THE WITNESS:  Probably.
5  BY MR. FINKEL:
6  Q  And did you work with them at those times at all,
7     answer questions?
8  A  I didn't work one-on-one with customers ever, that
9     I recall.
10 Q  Ever do any web demos with customers?
11 A  I don't think so.  I sat in on ones, maybe.
12 Q  Did you ever e-mail customers for feedback on
13    things you wrote for them?
14 A  I don't remember.
15 Q  Go back to Exhibit 5.  Please take a look at page
16    3.  We've only gone through part of page 4, but if
17    you could read page 3, that would be -- actually,
18    I'm only going to ask you first about the first
19    paragraph.
20 A  Okay.
21 Q  All right.  You read it?
22 A  Yeah.
23 Q  Okay.  So the first thing you wrote is that you
24    liked the "opportunities to do project management
25    and figure out logistics for big projects."

Page 124

DAYNA LONG

1
2       What was it you were thinking of when
3     you -- well, actually, let me back up.
4       Did you, in fact, tell the interviewer
5     that?
6  A  Yes.
7  Q  And what were you thinking of when you reported
8     that to the interviewer?
9  A  I mean, probably validation doc changes and Reach
10    for the Stars.
11 Q  Okay.  And did you tell the interviewer that Epic
12    recruits fantastic, supersmart people?
13 A  Yes.
14 Q  And I take it you would include all technical
15    writers as the supersmart people?
16 A  More or less.
17 Q  More or less, yeah.
18       And then at the bottom of the paragraph,
19    did you tell the reviewer that you thought Tech
20    Comm should be an hourly role?
21 A  Yes.
22 Q  And that so you'd get compensated more for putting
23    in all hours?
24 A  For putting in more hours, yes, that's what I
25    said.

Page 125

DAYNA LONG

1
2  Q  And did you tell the interviewer anything else in
3     that regard?
4  A  I don't remember specifically.
5  Q  All right.  And were there other roles you thought
6     that should be compensated more for putting in
7     more hours?
8  A  I mean, I tend to think that all roles should be
9     compensated more for putting in more hours.
10 Q  Okay.  And then on -- at the top of page 4, did
11    you tell the interviewer that your recollection is
12    that you worked 48 hours per week?
13 A  I don't remember saying that, but if that's what
14    she wrote down, I assume that's right.
15 Q  And do you remember -- I mean, sometimes, you
16    know -- that's an average?  Is that an average
17    number?
18 A  Like I said, I don't remember, but I'm assuming if
19    that's the way she asked the question, what I
20    thought on average.
21 Q  Okay.  I'm asking you if you remember what --
22 A  I don't remember.
23 Q  -- if she asked it this way?
24    (Witness shrugs shoulders.)
25 Q  Okay.  And do you recall whether this would

Page 126

DAYNA LONG

2   include weeks where you took vacations or were
3   sick or anything like that?
4   A   Whether I counted those as 46-hour weeks or 48
5   hours?
6   Q   Whether you counted those, period, in reporting 48
7   hours worked?
8   A   I don't know.
9   Q   Okay.  And then there's a entry entitled "Average
10   From TLG."
11        You see that?
12   A   Yeah.
13   Q   And that's 46?
14   A   Yeah.
15   Q   What is "TLG"?
16   A   It's their time logging system at Epic.
17   Q   And you would log your time into that?
18   A   Yes.
19   Q   And how often would you log your time?
20   A   I think every week or every other week.
21   Q   Okay.  And would you include everything that you
22   did?
23        MR. KNUTSON:  Objection.  Vague.
24        Answer if you can.
25        THE WITNESS:  I think so.

Page 127

DAYNA LONG

1   BY MR. FINKEL:
3   Q   Okay.  Everything that you considered to be work?
4   A   Yeah, I think so.
5   Q   Do you remember how you were instructed to enter
6   your time into TLG?
7        MR. KNUTSON:  Objection.  Foundation.
8   Vague.
9        Answer if you can.
10        THE WITNESS:  I don't remember very
11   well.
12   BY MR. FINKEL:
13   Q   Do you dispute that your average from TLG is 46
14   hours a week?
15        MR. KNUTSON:  Objection.  Foundation.
16        Go ahead and answer if you can.
17        THE WITNESS:  No.
18   BY MR. FINKEL:
19   Q   Why do you think there is a difference between the
20   48 hours for the recollection of hours worked and
21   the 46 from the average from TLG?
22   A   Because I'm a person and not a computer.
23   Q   Meaning?
24   A   So no, my recollection wasn't perfect.  The same
25   way that, you know, my logging it into a computer

Page 128

DAYNA LONG

2   was perfect.
3   Q   Okay.
4   A   So --
5   Q   Okay.
6   A   And I will also say that sometimes hours at Epic
7   felt longer, so if it felt like 48, it was over
8   46, I'm not surprised by that.
9   Q   And have you formed an opinion on which number
10   would be more accurate?
11   A   I'm going to assume the time logging was more
12   accurate.
13        MR. FINKEL:  Okay.  Why don't we take a
14   break, a lunch break.
15        MR. KNUTSON:  How much time do you want?
16        MR. FINKEL:  Let's take -- let's just
17   take an hour.
18        MR. KNUTSON:  Okay.  Be back at 1:00?
19        MR. FINKEL:  Yeah, let's just do 1:00
20   o'clock.  That's 55 minutes.
21        MR. KNUTSON:  All right.
22        (Recess taken for lunch.)
23   BY MR. FINKEL:
24   Q   Ms. Long, I have a couple follow-up questions on
25   Exhibit 10, which is the Document Care Package

Page 129

DAYNA LONG

2   wiki?
3   A   Okay.
4   Q   One of the boxes that we talked about along the
5   bottom, there was one for sending Document Care
6   Package/cover letter to high profile doc review.
7   Do you remember that?
8   A   Yeah.
9   Q   Who are the high-profile document reviewers?
10   A   I believe we've covered this several times.
11   Q   Did we?
12   A   Yep.  It was a team of writers who were pretty
13   good at editing, so we asked them to do the
14   high-level editing.
15   Q   All right.  Thank you.
16        And did you -- I can't remember if I
17   asked you whether on this Document Care Package
18   process you ever met with Carl?
19   A   Yes.
20   Q   You did?  How many times?
21   A   I think twice.  I'm not sure if it was more than
22   that.
23        (Exhibit No. 13 was marked.)
24   BY MR. FINKEL:
25   Q   Do you recognize this as the complaint that was

Page 130

DAYNA LONG

1
2  filed on your behalf?
3  A  Yes.
4  Q  And when did you first consider filing a lawsuit
5     against Epic?
6        MR. KNUTSON:  Objection.  Relevance.
7        Answer if you can.
8        THE WITNESS:  Sometime towards the end
9     of 2014, I think.
10 BY MR. FINKEL:
11 Q  And why?
12       MR. KNUTSON:  Objection.  Relevance.
13       Answer if you can.
14       THE WITNESS:  Because I do feel strongly
15    that people should be paid for the hours that they
16    work.
17 BY MR. FINKEL:
18 Q  Okay.  And you believe everything in the complaint
19    to be true, correct?
20 A  Yeah.
21 Q  Take a look at paragraph 12, please.
22       It states that you "and putative class
23    members shared a primary duty of preparing
24    'Deliverables,' or standard documents."
25       Do you see that?

Page 131

DAYNA LONG

1
2  A  Yes.
3  Q  Do you think that was your primary duty?
4  A  Yes.
5  Q  And how much time do you think you spent on that?
6        MR. KNUTSON:  Objection.  Vague.
7        Answer if you can.
8        THE WITNESS:  I would say the majority
9     of my time.
10 BY MR. FINKEL:
11 Q  And you've told me how you defined "Deliverables."
12    What would you do on preparing a deliverable?
13       MR. KNUTSON:  Objection.  Vague.
14       Go ahead and answer.
15       THE WITNESS:  Maintaining deliverables,
16    editing the deliverables, publishing the
17    deliverables.
18 BY MR. FINKEL:
19 Q  Is that a -- are you describing a process or three
20    different things that you would do, depending on
21    what the deliverable was?
22 A  Those are examples of things that I would do in,
23    you know, the preparing of deliverables.
24 Q  Okay.  And so on any given deliverable, you would
25    be doing one or more of these three things?

Page 132

DAYNA LONG

1
2  A  Yes.
3  Q  And the same goes for other technical writers too,
4     you believe?
5  A  Yes.
6  Q  And it would depend on what a deliverable is for
7     what you would need to do with it, right?
8  A  Yes.
9  Q  And it says in the complaint, "Deliverables are
10    prepared using Cumulus, as well as Epic style
11    guide and internal wiki"?
12 A  Yes.
13 Q  Do you believe Cumulus was used to prepare all
14    deliverables?
15 A  I think that you could not publish a document
16    without using Cumulus.
17 Q  Does that apply to Testing Toolkits?
18 A  I'm pretty sure that you still needed a file from
19    Cumulus to publish Testing Toolkits.
20 Q  Did that apply to Validation Documents?
21 A  I think so.
22 Q  Visios?
23 A  I'm pretty sure you still needed a file from
24    Cumulus in order to publish Validation Documents.
25 Q  And same goes with Implementation Handbooks?

Page 133

DAYNA LONG

1
2  A  Yes, I think so.
3  Q  And did you prepare Release Notes?
4  A  No.
5  Q  Did you prepare Setup and Support Guides?
6  A  I worked on Setup and Support Guides, yes.
7  Q  Did you prepare Implementation Handbooks?
8  A  Yes.
9  Q  Did you prepare Testing Toolkits?
10 A  I did.
11 Q  And you prepared Validation Documents?
12 A  I did.
13 Q  And then did you discuss joining this lawsuit with
14    any other technical writers with whom you worked?
15       MR. KNUTSON:  Objection.  Relevance.
16       Answer if you can.
17       THE WITNESS:  Yes.
18 BY MR. FINKEL:
19 Q  Who?
20 A  Excuse me?
21 Q  Who?  Who were they?
22 A  Who were the technical writers?
23 Q  Yes.
24 A  People I was friends with on the technical writing
25    team.

Page 134

DAYNA LONG

Q   What are their names?

MR. KNUTSON:  Objection.  Relevance.
Intending to harass.

Can you just describe to me why you need
their names?

BY MR. FINKEL:

Q   Well, why don't we go through person A, B, C, D,
E.

Who is person A; what did they do?

A   You want their name, or --

Q   Eventually I want their names, but depending on
what you said to them, in some cases I don't care,
but in other cases I might.

MR. KNUTSON:  He's graciously allowing
you to use a pseudonym for the people you have in
mind.

THE WITNESS:  Okay.  Person A, we're
good friends outside of work.

BY MR. FINKEL:

Q   What did this person do?

A   It's a technical writer at Epic.

Q   Okay.  What kind?

A   A support writer.

Q   And when did you talk about joining this suit with

Page 135

DAYNA LONG

that support writer?

A   At the end of 2014.

Q   And who said what to whom?

A   I probably said, "Hey, I think this is a thing
that could be going on.  Are you interested in
knowing more about it?"

Q   And what did they say?

A   "Yeah, I'm interested in knowing more about it."

Q   Okay.  And then what?

A   I don't know.  I'm assuming that she reached out
to share information about her duties and --

Q   Well, did you have any further conversation with
this person about that?

When they said they're interested in
knowing more about it, did you tell them more
about it?

A   Yeah.

Q   What did you tell them about it?

A   I said I --

MR. KNUTSON:  Let me just caution real
quickly.

So you don't have to share the contents
of anything that derived from a conversation with
a lawyer.  So if you learned something from a

Page 136

DAYNA LONG

lawyer and then you told that to someone else, if
it's something that you learned from a lawyer, it
may be protected; but if it's just something that
you knew from some other source, go ahead and
share it with him.

THE WITNESS:  Okay.  Well, it would fall
under the category of something I learned from a
lawyer.

BY MR. FINKEL:

Q   This is something you shared with this person?

A   Yeah.

Q   Was this person involved in the lawsuit at the
time?

A   I don't think so.

Q   Actually, I think you do have to tell me about
what you told them.

Don't tell me what your lawyer said, but
if there's information you provided, if it came
from a lawyer ultimately, I still think that's
something we're entitled to know that you passed
on.

A   I don't remember the specifics, but, you know, I
talked about what I knew about our situation; that
it sounded like we were entitled to overtime and

Page 137

DAYNA LONG

that Epic hadn't been paying overtime that it
really should have been paying us.

Q   Okay.  Anything else?

A   No.

Q   What did they say in response?

A   Not surprised to hear that; glad to hear it.
Wanted to know how to get in touch so she could
also share information with the attorney who was
talking with me about it.

Q   And do you know if this person has joined the
lawsuit?

A   I don't.

Q   Okay.  Let's go to person B.

A   Person B was also a technical writer at Epic.  We
were friends outside of work.

Q   Okay.  What kind of technical writer?

A   A support writer.

Q   And when did you have the conversation with them?

A   After both of us had joined the lawsuit.

Q   And do you recall who said what to whom?

A   No, I really don't.

Q   What about person C?

A   I think person C sent me an e-mail at one point
asking if I knew about it.  I already did.

Page 138

DAYNA LONG

Q   What do you mean by that?

A   Like, did I know that this -- that there was potentially a lawsuit.

Q   Potentially a lawsuit or that there already was a lawsuit?

A   I don't remember specifically the e-mail.

Q   Okay.  And do you recall when they sent you the e-mail?

A   No.

Q   And was this a technical writer?

A   Former technical writer.

Q   Is this someone who has joined the lawsuit?

A   I'm not sure.

Q   And did you respond back to this person?

A   I think I just said, "Thanks."

Q   So no discussion about whether to join or the merits of the case or anything like that?

A   No.

Q   Okay.  Do you still have that e-mail?

A   I doubt it.

Q   What would have happened to it?

A   I can't remember if it was an e-mail or if it was, like, a Facebook message, but I clean them out pretty regularly.

Page 139

DAYNA LONG

Q   Okay.  And I'm sorry, you told me you can't remember when this happened?

A   Yeah, I don't remember.

Q   You can't remember if it was before or after the lawsuit was filed?

A   I think it was after.

Q   Have you cleaned out other e-mails or Facebook messages about the lawsuit?

A   I don't think so.

Q   Just that one?

A   I'm not sure.

Q   Okay.  Do you think that there was more than one message about the lawsuit that you've cleaned out?

A   I don't think so.

Q   So this would be the only one, then?

A   Yeah.

Q   What about person D?

A   There wasn't a person D.

Q   All right.  Are you -- do you receive overtime in your current position?

        MR. KNUTSON:  Objection.  Relevance.
        Answer.
        THE WITNESS:  Yeah.

BY MR. FINKEL:

Page 140

DAYNA LONG

Q   Okay.  Paid time-and-a-half of your regular rate?

A   I think so.  I'm not expected to work overtime very often.  Really nice work/life balance there.
        (Exhibit No. 14 was marked.)

BY MR. FINKEL:

Q   Showing you what's been marked as Exhibit 14.  Do you recognize these as the interrogatories you answered?

A   Yep.

Q   Before I get into this, why do you -- why do you think you should have been -- why do you think you should have received overtime while employed at Epic?

        MR. KNUTSON:  Objection to the extent it calls for a legal conclusion.
        If you can form an answer, go ahead and share it with him.
        THE WITNESS:  Can you repeat the question?

BY MR. FINKEL:

Q   Why do you think you should have received overtime pay when employed by Epic?

        MR. KNUTSON:  Same objection.
        Go ahead.

Page 141

DAYNA LONG

        THE WITNESS:  I think the people should be compensated for the hours that they work.

BY MR. FINKEL:

Q   Any other reason?

A   No.  That pretty much sums it up.

Q   Are you aware of the concept of exemptions to overtime pay?

A   Sure.

        MR. KNUTSON:  Let me just interrupt.
        Again, anything you learned through conversations with one of your lawyers is protected, okay?
        THE WITNESS:  Okay.
        MR. KNUTSON:  If it comes from some other source, you can share it with him.
        THE WITNESS:  Okay.

BY MR. FINKEL:

Q   So you have some knowledge of those?

A   Yes.

Q   And why is it that you think that your role at Epic does not fall into one of those exemptions?

        MR. KNUTSON:  Objection.  Foundation.
        Also calls for a legal conclusion.
        To the extent that you can answer, go ahead.

Page 142

DAYNA LONG

1
2      THE WITNESS: I don't think I can answer
3 that question without relying on conversations
4 I've had with my attorney.
5 BY MR. FINKEL:
6 Q  I'm not asking you to reveal anything you had with
7 your attorney, but tell me your belief as to why
8 you think you would not be exempt.
9      MR. KNUTSON: That's impossible for her
10 to separate out those conversations.
11      So if you can do it, please do; but if
12 you can't give an answer without revealing things
13 you learned from your lawyer, then don't.
14      THE WITNESS: I don't think I can.
15 BY MR. FINKEL:
16 Q  You understand you're a class representative in
17 this case?
18 A  Yeah.
19 Q  And you can't articulate for me why you think
20 you're not properly classified, or were not?
21      MR. KNUTSON: That's not what she just
22 testified to.
23 BY MR. FINKEL:
24 Q  Can you?
25      MR. KNUTSON: The question you asked her

Page 143

DAYNA LONG

1
2 calls for her to reveal attorney-client privileged
3 information, and you know she can't do that.
4      MR. FINKEL: I think she can tell me why
5 she thinks she was not exempt.
6      MR. KNUTSON: She can't tell you that
7 without relying on conversations she's had with
8 her lawyers, and the allegations are laid out in
9 the complaint and through discovery, I'm sure,
10 briefing as well.
11      So if your client is truly confused
12 about why she thinks she's entitled to overtime,
13 we can probably rebrief it.
14      MR. FINKEL: Well, there will be a time
15 to brief it, I'm sure, but I'm asking the witness
16 right now.
17      MR. KNUTSON: You can ask her again, and
18 I'm going to make the same objection.
19      And if this time she says, "You know
20 what? I can answer it without relying on
21 attorney-client conversations," that's great, but
22 I doubt she'll be able to.
23 BY MR. FINKEL:
24 Q  I don't want you to reveal any attorney-client
25 privilege -- any attorney-client communications.

Page 144

DAYNA LONG

1
2      What I want you to do is tell me in your
3 own mind -- you know, not Jason's mind or anyone
4 else's -- but your own mind why you think you're
5 not exempt.
6      Don't tell me, "My lawyer said this,"
7 but tell me what it is in your view made you a
8 nonexempt employee at the time?
9      MR. KNUTSON: Same objection.
10      If you can do that without giving him
11 opinions that were based in any part upon
12 information you learned from your lawyers, you
13 can. Otherwise, you cannot.
14      THE WITNESS: I feel like I can't answer
15 the question without reiterating conversations I
16 had with my attorney.
17      MR. FINKEL: Jason, I don't think that's
18 a standard for maintaining something that's
19 privileged.
20      MR. KNUTSON: I understand. It sounds
21 like something that we may just need to compel,
22 then.
23      She'll be able to also get back to you
24 on whatever other answer you want. If you want to
25 redepose her, you can.

Page 145

DAYNA LONG

1
2      MR. FINKEL: Would you agree to do it
3 telephonically?
4      MR. KNUTSON: Absolutely.
5      MR. FINKEL: Okay. If we need to do
6 that, that's what we'll do.
7 BY MR. FINKEL:
8 Q  So tell me, then, on your answer to interrogatory
9 No. 1, you identified, "Plaintiff's manager, Cate
10 Valenzuela." She "may acknowledge relative to
11 Plaintiff's and putative class member's claims."
12      And you said, "Other management
13 employees in Technical Communications Department
14 may also have information regarding Technical
15 Writers' job duties and work hours."
16      Do you think any of those management
17 employees would have information regarding
18 technical writers' job duties that you think would
19 render those duties nonexempt?
20      MR. KNUTSON: Objection to the extent it
21 calls for a legal conclusion.
22      If you understand the question, go ahead
23 and answer.
24      THE WITNESS: I don't think so.
25 BY MR. FINKEL:

Page 146

DAYNA LONG

1
2  Q   You don't think so.  You don't think you can
3     identify anyone like that?
4  A   No, I don't think so.
5  Q   All right.  Can you take a look at interrogatory
6     No. 3, please.
7         Have you had -- other than
8     communications with your lawyers or with the
9     persons A, B and C that you identified earlier,
10    have you had any discussions with anyone regarding
11    the allegations of the complaint?
12 A   No.
13 Q   Are you aware of any facts that you think means
14    that Epic knew or showed reckless disregard for
15    the fact that it failed to pay you overtime
16    compensation?
17        MR. KNUTSON:  Objection.
18        In as much as it calls for a legal
19    conclusion, if you can answer, please do.
20        THE WITNESS:  Can you repeat the
21    question?
22 BY MR. FINKEL:
23 Q   Yeah.  Do you have any facts -- if it helps to
24    look at interrogatory No. 5, you can.
25        Do you have any facts that support your

Page 147

DAYNA LONG

1
2     allegation that Epic knew or showed reckless
3     disregard for the fact that it failed to pay you
4     overtime in violation of the FLSA?
5  A   I'm under the impression that Epic has already
6     been subject to an overtime lawsuit.  I feel like
7     that should have made it pretty clear.
8  Q   Anything else?
9  A   Not that I can think of.
10 Q   And that lawsuit was with regard to a different
11    position than your position, correct?
12 A   Yes.
13 Q   Can you tell me any facts that support your
14    allegation that Epic willfully failed to pay you
15    overtime in violation of Wisconsin law?
16        MR. KNUTSON:  Same objection to the
17    extent it calls for a legal conclusion.
18        But you can answer if you can.
19        THE WITNESS:  I would reiterate my same
20    answer from the last question.
21 BY MR. FINKEL:
22 Q   Okay.  Are you aware of any witness to any --
23    witness statements, any signed documents from
24    anybody that relate to the facts alleged in the
25    complaint?

Page 148

DAYNA LONG

1
2  A   Can you repeat the question?
3  Q   Are you aware of any documents from anyone else
4     that relate to the facts alleged in the complaint?
5  A   I don't think so.
6  Q   Including, like, a statement that they wrote; like
7     an affidavit or declaration?
8  A   That someone else wrote?
9  Q   Yeah --
10 A   No.
11 Q   -- other than you?
12        Do you have any social media accounts?
13 A   Yes.
14 Q   Which ones?
15 A   Do you want a whole list?
16 Q   Sure.
17 A   Facebook, Twitter, Instagram.
18 Q   Any others?
19 A   I think that's about it.
20 Q   Okay.  Have you discussed any aspect of your job
21    at Epic on any of those accounts?
22 A   It's possible.
23 Q   Okay.  Do you know which account that would have
24    been possible for?
25 A   When I was working there, it's possible that I

Page 149

DAYNA LONG

1
2     posted something about, you know, my life at work
3     on Facebook.
4  Q   Have you searched for that?
5  A   No.
6  Q   Have you searched any other social media accounts
7     for anything that you posted regarding work?
8  A   No.
9  Q   Have you removed anything on those accounts about
10    work?
11 A   I don't think so.  I wasn't looking back at it,
12    so --
13        MR. FINKEL:  All right.  We might be
14    done.
15        MR. KNUTSON:  Thanks.
16        (Recess taken.)
17 BY MR. FINKEL:
18 Q   We were talking a little bit earlier about
19    Cumulus.  To what extent would you use Cumulus to
20    create content for the deliverables that were
21    discussed in paragraph 12 of the complaint?
22 A   It depends on which deliverable you're talking
23    about.
24 Q   Okay.  How about Release Notes?
25 A   I didn't write Release Notes.  My understanding is

Page 150

DAYNA LONG

2  that you used EMC2 with the Release Notes, but
3  Cumulus was still a part of publishing Release
4  Notes.
5  Q  All right.  To what extent would you use Cumulus
6      to create content for Setup and Support Guides?
7  A  You would spend almost all of your time in
8      Cumulus.
9  Q  What about for implementation of handbooks?
10  A  I think those started as Word documents that got
11      moved to Cumulus, so now they're more like Setup
12      and Support Guides.
13          But either way, you would still use
14      Cumulus to publish them in the end.
15  Q  When you were there, did you use Cumulus to create
16      content for Implementation Handbooks?
17  A  I can't remember.
18  Q  Would you use Cumulus to create content for
19      Testing Toolkits?
20  A  No.
21  Q  And would you use Cumulus to create content for
22      Validation Documents?
23  A  No.
24  Q  All right.  Did you, other than this lawsuit, did
25      you ever complain to anyone at Epic about not

Page 151

DAYNA LONG

2  receiving overtime pay?
3  A  I don't think so.  I, obviously, hinted at that in
4      my exit interview as being pretty dissatisfied,
5      but other than that, I don't think so.
6  Q  And I neglected to ask you about documents that --
7      you're aware Epic served you with a request for
8      documents?
9  A  (Witness nods head.)
10  Q  Is that a "yes"?
11  A  Yes, I'm aware.
12  Q  And you did search for documents, correct?
13  A  Yes.
14  Q  And other than your resume, you didn't find any?
15  A  No.
16  Q  And that includes searching your computer?
17  A  Yes.
18  Q  And were you instructed -- have you been
19      instructed to make sure you don't get rid of any
20      documents?
21  A  Yes.
22  Q  Okay.  Including on your computer?
23  A  Yes.
24  Q  And including on social media accounts?
25  A  Yes.

Page 152

DAYNA LONG

2  Q  And on e-mail?
3  A  Yes.
4          MR. FINKEL:  All right.  Nothing
5      further.
6          MR. KNUTSON:  Thanks.  I think I just
7      have two, maybe three questions for you.
8          EXAMINATION
9  BY MR. KNUTSON:
10  Q  Earlier this morning you testified that you did
11      not feel like you were micromanaged as an employee
12      at Epic.  Do you remember that?
13  A  Yes.
14  Q  Can you just elaborate on how you would describe
15      how you were managed as a technical writer at
16      Epic?
17  A  Sure.  You know, I -- I was allowed to present
18      ideas, but ultimately, most of my decisions were
19      informed by input from software developers and
20      implementers who knew the software better and
21      understood, you know, customer needs better.
22          And I never made independent decisions.
23      I always needed to consult with a TL whenever it
24      came to a decision that was significant or would
25      have a significant impact or really make a change

Page 153

DAYNA LONG

2  to a process or a deliverable.
3          So ultimately, you know, I was
4      managed -- I wasn't making the final
5      discrimination about how I spent my time.
6  Q  Okay.  Thanks.  You were also asked some questions
7      about the two team members on your team when you
8      were a team lead, and I think you said something
9      like they were able to make some decisions on
10      their own.
11          Is the level of supervision you just
12      described for yourself similar to the level of
13      supervision that would have been applied to your
14      team members?
15  A  Yes.  My team members could determine when they
16      would work on things; like, I wasn't deciding for
17      them exactly how their day was going to look or
18      how their week was going to look.
19          But ultimately, when it came to how they
20      were spending their time or what tasks they were
21      working on, that was something they needed to
22      consult with me, their team lead, about, and that
23      needed to fit in with the bigger mission of the
24      team as dictated by writing leads to team leads,
25      and writing leads, you know, were taking their

## Page 154

DAYNA LONG

cues from the executive level.

So all of that was sort of handed down, and then we would, you know, help team members make determinations based on what we were told was a priority.

Q   Okay, thank you.  We spent time talking about this.  What was the Star letter or Star document called?

A   Reach for the Stars.

Q   Reach for the Stars, thank you.

Are you able to give us any idea of what percentage of your time as a technical writer at Epic was spent doing a project like that versus producing deliverables, generally?

MR. FINKEL:  I'm going to object.  The question's vague.

BY MR. KNUTSON:

Q   Go ahead and answer if you can.

A   Reach for the Stars was a pretty rare type of project, and that's part of what made it so big and exciting at the time.

You weren't usually spending your time on an ad hoc document that nobody had ever seen before where you had to create original content.

## Page 155

DAYNA LONG

That was extremely rare, and that project in particular was only on my plate for about two weeks and then, you know, went back to the regular standard documentation, and that was how I spent the majority of my time.

MR. KNUTSON:  Okay.  Thank you.  Attorney Finkel may have some follow-up questions for you now.

EXAMINATION

BY MR. FINKEL:

Q   Did your team members propose their own goals?

A   Yes.

Q   And they proposed a plan for achieving them?

A   Yes, and I got to look at the plan and decide if that made sense and give them input and feedback on how that fit into our teams' priorities.

MR. FINKEL:  Okay.  That's all I have.

MR. KNUTSON:  That means you're done.  Thanks.

MR. FINKEL:  Thank you very much.

(Proceedings concluded at 1:47 p.m.)

## Page 156

STATE OF WISCONSIN )
                   ) SS:
COUNTY OF MILWAUKEE )


I, TRICIA P. TREXELL, Court Reporter and Notary Public in and for the State of Wisconsin, do hereby certify that the above deposition of DAYNA LONG was recorded by me on April 26, 2016, and reduced to writing under my personal direction.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, or a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

In witness whereof I have hereunder set my hand and affixed my seal of office at Milwaukee, Wisconsin, this 7th day of May, 2016.


_____
                Notary Public
         In and for the State of Wisconsin
My Commission Expires:  September 15, 2018

## Page 157

J U R A T

I,         , do hereby certify under penalty of perjury that I have read the foregoing transcript of my deposition taken on         ; that I have made such corrections as appear noted herein in ink, initialed by me; that my testimony as contained herein, as corrected, is true and correct.

DATED this ____ day of _____, 20 , at _____,      .



_____
SIGNATURE OF WITNESS