UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

LONG, D.,
individually and on behalf of all
others similarly situated,

        Plaintiffs,

    v.                                      Case No. 3:15-cv-00081

EPIC SYSTEMS CORPORATION,

        Defendant.

## DEFENDANT'S MOTION TO DECERTIFY PLAINTIFFS' COLLECTIVE ACTION AND SUPPORTING MEMORANDUM OF LAW

Named Plaintiff Dayna Long ("Long") was employed by Defendant Epic Systems Corporation ("Epic") in its Technical Communications ("Tech Comm") group.  (Dkt. 1, ¶ 1.) She alleges that she and a putative class of Tech Comm employees were misclassified as exempt from overtime wages under state and federal laws.  (*Id.* ¶¶ 1, 20-21.)  The parties stipulated to conditional certification of the collective action claims and Court-authorized notice (Dkt. 23), and 14 others have submitted notices of consent to join the lawsuit (collectively with Long, the "Plaintiffs").

Plaintiffs cannot meet the requirements for collective adjudication of their claims because resolution of those claims requires a series of individualized determinations that cannot be satisfied through representative proof.  Specifically, due to the dissimilarities in the work performed by each of the Plaintiffs, the fundamental question in this case—whether each individual performed work that is exempt or non-exempt from earning overtime wages—cannot be answered on the collective basis that the Plaintiffs urge.

Accordingly, pursuant to the Court's order (Dkt. 45), Epic hereby seeks decertification of the Plaintiffs' Fair Labor Standards Act ("FLSA") collective action.

## I.       PROCEDURAL BACKGROUND

Long filed her Complaint and notice of consent on February 10, 2015.  (Dkt. 1.)  The Complaint included claims brought on behalf of a putative "Collective Class" defined as "[a]ll persons who were employed by Epic as Technical Writers during the statutory period, whose employment ended prior to April 2, 2014, and who have not been compensated at a rate of one and one-half times their regular rate of pay for hours worked over 40 in a work week during their employment as a Technical Writer."  (*Id. ¶* 20.)

In the days after the Complaint was filed, several members of the putative Collective Class filed notices of consent to join the lawsuit.  (Dkt. 10, 12-15, 19, 24.)

On April 13, 2015, Epic filed its Answer and affirmative defenses.  (Dkt. 21.)  Epic denied that Long or any other members of the Tech Comm group were misclassified under the FLSA or that their claims are appropriate for class or collective action treatment.  (*Id.*)  Among its affirmative defenses, Epic alleged that Long and the putative class are exempt from the FLSA's overtime provisions.  (*Id.*)

On April 17, 2015, to avoid incurring the expense and time of discovery and briefing, the parties submitted a Joint Stipulation To Stay and For Conditional Collective Action Certification and Court-Authorized Notice.  (Dkt. 23 (the "Stipulation").)  The Stipulation expressly provided that "[a]lthough Defendant agrees to the defined group as being similarly situated for the purpose of conditional certification and judicial notice in this case, Defendant reserves the right to move to decertify the Collective Class at some later point in this litigation."  (*Id.*)  The Court approved the Stipulation on May 6, 2015.  (Dkt. 25.)

Pursuant to the Stipulation, Plaintiffs' counsel issued the Court-authorized notice to all persons who were employed by Epic as a Technical Writer at any time on or after April 17, 2012 whose employment ended prior to April 2, 2014. Following the notice, additional individuals filed notices of consent to join the lawsuit. (Dkt. 26, 30-31, 35-37, 39.) Including Long, there are presently 15 Plaintiffs in the Collective Class.

## II. STATEMENT OF RELEVANT FACTS

### A. Defendant Epic.

Epic makes software for mid-size and large medical groups, hospitals and integrated healthcare organizations – working with customers that include community hospitals, academic facilities, children's organizations, safety net providers and multi-hospital systems. Epic's applications are developed, installed and supported by its employees.

Three Epic application areas are applicable to the Plaintiffs: Clinical Inpatient; Clinical Ambulatory; and Revenue & Reporting. Clinical Inpatient applications are those related to providing care in an inpatient setting, while Clinical Ambulatory applications are those related to providing care in an outpatient setting.[1] (Apfel Decl. ¶ 6; Kroninger Decl. ¶ 10.) Revenue & Reporting applications are those related to billing, accounting, and practice management activities like scheduling, checking in and out, or completing forms. (Long Dep., pp. 14-15.) Epic's customers may use applications from any or all of these groups.

### B. The Plaintiffs Did Not Perform The Same Types Of Work.

While each of the Plaintiffs were members of the Tech Comm group, the work that each performed varied widely based on a number of factors.

---

[1] Epic has filed contemporaneously with this Motion the Declaration of Dana Apfel ("Apfel Decl."); Declaration of Mandy Kroninger ("Kroninger Decl."); Declaration of Kim Seffrood ("Seffrood Decl."); and declaration of Tom Hawes ("Hawes Decl."). A transcript of the deposition of Dayna Long conducted on April 26, 2016 ("Long Dep."), was previously filed with the Court. *See* Docket 53.

Tech Comm members generally focus their work within one of the groups of software applications described above (Clinical Inpatient, Clinical Ambulatory, and Revenue & Reporting). (*See, e.g.*, Kroninger Decl. Ex. 1-2.) Individual Tech Comm members are further specialized on the types of work they perform in support of those applications. (*Id.*) For example, Implementation Writers (formerly "IS Writers") prepare written materials related to setting up Epic's software for a customer. (*Id.* ¶ 11.) The audience for Implementation Writers typically is comprised of analysts (often IT personnel) working on behalf of Epic's customer to install the software. (*Id.*)

Support Writers are responsible for developing written materials for customers who have already installed and begun to use Epic applications. (Apfel Decl. ¶¶ 7-8.) The audience for Support Writers typically are customer analysts (again often IT personnel) charged with maintaining the application as Epic makes changes to the software over time. (*Id.*)

Training Writers are responsible for developing materials that teach end-users, such as clinicians or administrators, to use the applications with confidence. (Apfel Decl. ¶ 25.)

In addition, some members of the Tech Comm group may take on special projects, assume responsibility for writing about particular software features that are common to multiple applications, become Team Leads ("TLs") responsible for managing other group members, or otherwise be engaged in unique work.

To illustrate these differences, the job duties of several Plaintiffs are described below.

      1.    <u>Dayna Long</u>

Long was employed by Epic from July 5, 2011 to June 28, 2013, working out of Epic's office on Tokay Boulevard in Madison, Wisconsin. (Long Dep., pp. 7, 20, 59-60.) Her Team Lead was Cate Valenzuela. (*Id.*, pp. 11-12.)

Long was responsible for Implementation writing in connection with Revenue applications. (Long Dep., pp. 14-15, 24.) In particular, Long worked on the Tapestry application, which is used by health plan payors to streamline operations such as billing, benefit plan designs, and referrals. (*Id.*, p. 55.)

Beginning in August 2012 and continuing until the end of her employment, Long was a Team Lead ("TL") responsible for overseeing the work of two Technical Writers. (Long Dep., pp. 12-16.) Her management duties are supported by time keeping entries she made in Epic's TLG system, which show that she spent more than 215 hours performing general management duties. (Hawes Decl. ¶ 5.) After becoming a Team Lead, Long noted in a self-evaluation that "the way I look at my projects is starting to shift so that I'm not just thinking up lists of discrete tasks for myself but am also considering how some of our newer team members can own sections of a project."[2] (Seffrood Decl. Ex. 1 at EPICVLONGD004502.)

Throughout her tenure, Long was a strong performer, and she was frequently given special projects. (Apfel Decl. ¶ 28.) Indeed, she devoted the largest percentage of her time (21%) to such projects. (Hawes Decl. ¶ 5.) For example, Epic's founder and CEO Judy Faulkner initiated a "significant" project, named internally as "Reach for the Stars." (Long Dep., pp. 31-33.) Long described the goal of the project as creating, "from scratch," a "synopsis. . . [of] features within the software that people [customers] should. . . strive to implement in their organizations. (*Id.*) Long was charged with overseeing "a bunch of writers" working to create the document. (*Id.*) In her performance review, Long described that she "led the Reach for the Stars doc initiative" and reported that "[i]n terms of leadership accomplishments that I'm most

---

[2] During the time period at issue, Technical Writers were asked to set their own annual goals, in consultation with their Team Leads, as part of the annual review process. (Apfel Decl. ¶ 31.)

proud of, coordinating the creation of a Reach for the Stars document definitely takes the cake." (Seffrood Decl. Ex. 1 at EPICVLONGD004498, EPICVLONGD004503.)

Another notable project spearheaded by Long was a months-long effort to streamline validation documents.  (Long Dep., pp. 45-49.)  Epic's implementation teams meet with customer project teams to work step-by-step through how the customer would like certain processes to flow.  (*Id.*)  The Epic team supports customers as they "validate" these decisions through documents that reflect the company's experience implementing the software and best practices that have been developed.  (*Id.*)  But over time, "hundreds" of validation documents had been created, in a variety of formats, making it time consuming and difficult for implementers to find the correct documents.  (*Id.*)  Long helped to devise a plan to efficiently go through these hundreds of documents and consolidate them into a single workbook, then made sure that the plan was followed to completion.  (*Id.*)  In a self-assessment, Long described the project as "totally overhauling the current template for validation documents to make them easier for AC's and more appealing to our customers."  (Seffrood Decl. Ex. 1 at EPICVLONGD-004498.)  Long received high marks for her efforts.  (*Id.* at EPICVLONGD004506.)

2. <u>Michelle Vanderwist</u>

Vanderwist was employed by Epic from August 1, 2011 to June 15, 2012 at Epic's main campus in Verona, Wisconsin.  (Apfel Decl. ¶ 18.)  Her Team Lead was Eric Szakacs.  (*Id.*)

During her employment, Vanderwist worked primarily on Clinical Inpatient applications, doing Support writing.  (Apfel Decl. ¶ 19.)  According to her TLG time keeping entries, Vanderwist spent nearly 60% of her time creating DLG documentation in this area.[3]  (Hawes

---

[3] Epic's software developers and testers record changes to an application in a development log, known as the "DLG."  (Apfel Decl. ¶ 8.)  Support writers evaluate the changes to decide if the changes need to be communicated to customer analysts.  (*Id.*)  If so, the Support writer creates a document to describe the change.  (*Id.*)  Sometimes a description of the change also needs to be added to a standard guide for the

Decl. ¶ 9.)  Vanderwist worked with two applications used in operating rooms: Op Time, (used by surgeons) and Anesthesia (used by anesthesiologists) to support pre-procedure, intra-procedure, and post-procedure processes.  (Apfel Decl. ¶ 20.)  She also worked with EpicCare Inpatient, an application that spans departments and roles within hospitals.  (*Id.*)

In addition, Vanderwist was the owner for NoteWriter, a feature in several applications, that allows a clinician to enter data by selecting buttons rather than typing, which then generates a note in narrative form.  (Apfel Decl. ¶ 21.)  As owner, when changes were made to this feature, Vanderwist was responsible for creating documents for customers to explain the changes and any impact those changes might have for them.  (*Id.*)

In her self-assessment, Vanderwist explained that she had "gotten much better at determining what my audience is and, more importantly, how to write for that particular group of people."  (Seffrood Decl. Ex. 4 at EPICVLONGD004953.)  She also expressed an interest in "volunteer[ing] for more ad hoc projects to mix up my work day" and "get[ting] good enough at something to teach (or help teach) a class at some point."  (*Id.* at EPICVLONGD004954.)

        3.    <u>Caitlyn Paley (Miller)</u>

Paley was employed by Epic from March 5, 2012 to February 15, 2013 at the Verona campus.  (Apfel Decl. ¶ 4.)  When Paley began working at Epic, her Team Lead was Dana Apfel.  (*Id.* ¶ 5.)

Like Vanderwist, Paley's work was primarily on Clinical Inpatient applications, doing Support writing.  (Apfel Decl. ¶ 5.)  According to her TLG time keeping entries, Paley spent about 27% of her time (less than half that spent by Vanderwist) creating DLG documentation in this area.  (Hawes Decl. ¶ 7.)  But Paley's work focused on different software applications, like

---

application.  (*Id.*)  In the case of significant changes, it can even be necessary to create an entire guide.  (*Id.*)

Beaker, an application used by clinical and pathology laboratories to track specimens at the point of collection and within and across sites. (Apfel Decl. ¶ 9.) Indeed, even within the Beaker application, Paley was more specialized than most writers. (*Id.* ¶ 10.) Laboratories often have specialized lab instruments that run non-Epic software. (*Id.*) Beaker can be made to interact with other software with the assistance of Epic's Electronic Data Interchange ("EDI"), a division of the company that is responsible for creating and supporting interfaces with non-Epic products. (*Id.*) Paley attended technical EDI training so that she could create materials that explained to clinicians and other customers how to use Beaker with non-Epic software. (*Id.*) By way of comparison, Paley's fellow Plaintiff Rachel Keranen also performed writing for the Beaker application but did not receive the EDI training or write about how EDI could be used to connect Beaker with non-Epic software applications. (*Id.* ¶ 11.)

Paley had a particular interest in learning and education, and she was active in new staff orientation and training, devoting about a quarter of her time to this type of work. (Apfel Decl. ¶ 12; Hawes Decl. ¶ 7.) For example, she mentored a new Technical Writer during his first four months of employment. (Apfel Decl. ¶ 12.) She also was part of Epic's Writer Education Group ("WEG") and helped to create new training materials and processes for writers. (*Id.*) Again by way of comparison, Paley's fellow Plaintiff Rachel Keranen was not a mentor and did not contribute to WEG. (*Id.* ¶ 13.)

Paley also devoted a sizeable portion of her time (about 11%) to special projects. (Apfel Decl. ¶ 14; Hawes Decl. ¶ 7.) For example, Paley wrote a guide for Rover for Lab. (Apfel Decl. ¶ 14.) Rover for Lab is like Beaker, allowing clinicians to perform some Beaker workflows on a handheld device. (*Id.*) It is typically used by nurses, and when information is inputted through the device, it flows automatically back into a patient's main chart. (*Id.*) Paley also was one of a

small group of people who worked on the Documentation Design group and used design programs to layout and design the way certain documents would look when published out of Epic's content management system.  (*Id.* ¶ 15.)

Paley also played a key role on an Inpatient Focus Group document.  (Apfel Decl. ¶ 16.) Before a large conference, Epic asked customers to submit requests for features they would like to see added to the applications.  (*Id.*)  Many of the requests were things that Epic applications already could do.  (*Id.*)  Paley was responsible for managing a subset of those hundreds of requests, identifying which ones to highlight for customers, and devising the best way to communicate this information to customers.  (*Id.*)

Paley also helped to create documents that helped share new ideas with customers. (Apfel Decl. ¶ 17.)  For example, Epic sometimes learned that its customers had been successful using Epic applications to achieve a particular clinical outcome.  (*Id.*)  Paley reached out to those customers, talked to them about their considerations and how they built out the software to achieve their goal, then prepared documents that could help other customers implement the same ideas.  (*Id.*)

4.      Steven Yenzer

Yenzer was employed by Epic from July 5, 2010 to May 31, 2013 at the Verona campus. (Apfel Decl. ¶ 22.)  Like Long, Yenzer worked primarily on Revenue and Cogito applications. (*Id.* ¶ 23.)  But his focus was on Training writing, creating training materials directed to end users at Epic's customers, such as doctors and nurses.  (*Id.*)  In particular, Yenzer worked on the Resolute Professional Billing application, which is used in clinic settings (as distinct from a different application used in hospital settings), and Cadence, software that is used to schedule appointments with providers.  (*Id.* ¶ 24.)

In addition to Training writing, Yenzer also wrote blog posts that were published to the entire Epic community.  (Apfel Decl. ¶ 26.)  The goal of the blog posts typically is to convey information to all Epic employees without sending a company-wide email every day.  (*Id.*)  There is an emphasis on creativity in blog writing in order to get people interested and engaged while also conveying something meaningful to them.  (*Id.* ¶ 27.)  For example, the purpose of the message might be to remind employees of a blood drive that is being held, or that vendors will be on-site to give advice about their 401(k) plans.  (*Id.*)  Blog writers start from a blank slate and have wide latitude to create something that is unique but also gets the message across.  (*Id.*)

In addition to his application work, Yenzer liked that he had "freedom to make suggestions for big changes and the opportunity to run them if they get approved."  (Seffrood Decl. Ex. 5 at EPICVLONGD005320.)

### 5.    Jennifer Phelps (Pitterlee)

Phelps was employed by Epic from January 3, 2011 to January 16, 2013 at the Verona campus.  (Kroninger Decl. ¶ 6.)  Her Team Leads were Megan Myers, Mandy Kroninger, and Matt Becker.  (*Id.* ¶¶ 6-8)  She worked primarily on Clinical Ambulatory applications, doing Implementation writing.  (*Id.* ¶ 9.)

Like Long, Phelps rose to become a Team Leader.  (Kroninger Decl. ¶ 7.)  In fact, she recorded a plurality of her time (22%) to management activities.  (Hawes Decl. ¶ 7.)

Phelps also had other unique responsibilities.  Epic's software can be tailored to specific types of clinical practices or care, such as obstetrics or internal medicine.  (Kroninger Decl. ¶ 13.)  While she was at Epic, Phelps was the sole "Specialty Writer" for these specialized installations.  (*Id.*)  Phelps was asked to take responsibility for Specialty writing when the prior writer announced she was leaving, based on Phelps' skills at project management and establishing good relationships with others both internally and externally.  (*Id.* ¶ 15.)

10

In order to create Specialty documents, Phelps had to know the ins and outs of each specialty medical practice, how each practice used Epic's software, and the needs of each practice. (Kroninger Decl. ¶ 16.) Phelps gained some of that knowledge through immersion trips to customer sites to observe how they worked and through calls with customers. (*Id.*) She also engaged in lots of internal knowledge gathering by talking with Epic's implementers and physicians. (*Id.*)

Phelps was responsible for creating and maintaining "Validation Guides" that customers would use in advance of an installation to plan their approach to identifying the features to be installed and the flow of work; "Starter Sets" to outline available features and workflows and explain the basics of installing the applications; and a "Success Guide" that provides tips and tools for specialists to maximize their use of Epic software. (Kroninger Decl. ¶ 14.) Phelps decided the structure of the Specialty documents she created, based on her understanding of the audience she was writing for and their needs, and ensured that the content included the necessary information. (*Id.* ¶¶ 17, 21-22.) When there was disagreement among Epic employees about the content or approach of a document, Phelps was diplomatic in her relationships and effective at reaching consensus. (*Id.* ¶¶ 23-24.) While her TLs edited the documents to ensure they were written clearly, they relied on Phelps' judgment about what should be included and her knowledge of the substantive content. (*Id.* ¶ 17.) Under Phelps' control, the Specialty documents were made more interesting and easier to understand than under her predecessor. (*Id.*)

Phelps was elevated to the Team Lead position in recognition of her organization, efficiency, people skills, and ability to influence people to get things done. (Kroninger Decl.

¶ 18.)  As Team Lead, Phelps was responsible for managing two or three Technical Writers and continued to be responsible for Specialty documents.  (*Id*. ¶ 19.)

Phelps also did work related to recruiting new members of the Tech Comm group. (Kroninger Decl. ¶ 20.)  Incoming candidates take a writing test, and Phelps was one of a small number of people who graded those tests to evaluate candidates' writing abilities.  (*Id*.)

### 6.    Lope Lopez

Lopez was employed by Epic from February 6, 2012 to June 21, 2013 at the Verona campus.  (Apfel Decl. ¶ 29.)  His Team Lead was Sarah Savage.  (*Id*.)  Lopez's work was primarily on Clinical Inpatient applications, doing Training writing.  (*Id*. ¶30.)

According to his performance reviews, Lopez had a particular interest in helping to improve the quality of translations from English to Spanish of software documentation. (Seffrood Decl. Ex. 2 at EPICVLONGD004883, EPICVLONGD004893.)  His tenure at Epic was relatively brief, so a significant portion of his time (17%) was spent receiving internal training.  (Hawes Decl. ¶ 6.)  Nonetheless, he also spent significant time (about 43%) creating quick start guides and tip sheets, reviewing, proofing, editing and testing, and engaged in general writing duties, and he reported being "happy [to have] begun to be able to make critical decisions about how to write and review documents."  (Seffrood Decl. Ex. 2 at EPICLONGD004885.)  In contrast to other Tech Comm members described above, Lopez believed that he needed "to get more involved in ownership of documents or projects so I can feel more like a part of my team." (*Id*. at EPICVLONGD004892.)

## III.    ARGUMENT

The fundamental inquiry in determining whether a collective action under Section 216(b) is whether Plaintiffs are "similarly situated."  29 U.S.C. § 216(b).  On a motion to decertify, the bear falls to the Plaintiffs to prove that class members are similarly situated and must

demonstrate a reasonable basis for their claim of class-wide FLSA violations. *Grayson v. K-Mart Corp.*, 79 F.3d 1086, 1096-97 (11th Cir. 1996). *See also Beauperthuy v. 24 Hour Fitness USA, Inc.*, 772 F. Supp. 2d 1111, 1118 (N.D. Cal. 2011) ("[I]n order to overcome a motion to decertify, 'it is plaintiffs' burden to provide substantial evidence to demonstrate that they are similarly situated.'"); *Briggins v. Elwood Tri, Inc.*, 882 F. Supp. 2d 1256, 1267 (N.D. Ala. 2012) (decertifying an FLSA collective action where plaintiffs failed to "show liability on a class-wide basis."); *Lugo v. Farmer's Pride*, 737 F. Supp. 2d 291, 303 (W.D. Pa. 2010) (decertifying an FLSA collective action and explaining that "this case differs from those where liability can be proven on a class-wide basis").

To determine whether members of the proposed class are similarly situated, courts consider "(1) whether the factual and employment settings of the individual plaintiffs are similar or dissimilar; (2) whether the defendants may assert various defenses that appear to be individual to each plaintiff; and (3) whether fairness and procedural considerations support proceeding as a collective action." *Espenscheid v. DirectSat USA, LLC*, No. 09-cv-625-bbc, 2011 WL 2009967, *4 (W.D. Wis. May 23, 2011), aff'd 705 F.3d 770 (7th Cir. 2013). The standards for certification of an FLSA collective action and a Rule 23 class action have "largely merged. . . though with some terminological differences." *Espenscheid*, 705 F.3d at 772. Accordingly, courts applying FLSA standards have relied on the "commonality" analysis that the Supreme Court developed in *Wal-Mart Stores, Inc.  v. Dukes*, 131 S.Ct. 2541, 2551 (2011), namely, that a "rigorous analysis" be conducted to determine whether a case contains the capacity "to generate common answers apt to drive the resolution" of an "issue that is central to the validity of each one of the claims in one stroke." The Plaintiffs cannot satisfy this standard or these factors.

## A.    The Factual And Employment Settings Of The Plaintiffs Are Dissimilar

When assessing decertification, courts consider the degree of similarity among the Plaintiffs factual and employment settings — whether they worked in the same geographic regions and whether they shared the same job duties and supervisors.  *See, e.g.*, *Reed v. County of Orange*, 266 F.R.D. 446, 450 (C.D. Cal. Jan. 8, 2010) ("[d]ecertification is appropriate where plaintiffs are subject to varying work conditions in different work locations or under different supervisors"); *Moss v. Crawford & Co.*, 201 F.R.D. 398, 409 (W.D. Pa. 2000) ("first factor assesses the opt-in plaintiffs' job duties, geographic location, [and] supervision"); *Molina v. First Line Solutions LLC,* 566 F. Supp. 2d 770, 787 (N.D. Ill. 2007) (considering "whether plaintiffs had differing job titles or assignments, worked in different locations, [and] were under different supervisors or decision makers").

Here, there are plain differences among Plaintiffs, particularly with respect to their job duties.[4]  As detailed above, Plaintiffs worked on different types of Epic applications:

| Plaintiff | Application |
|-----------|-------------|
| Long | Revenue (Tapestry) |
| Lopez | Clinical Inpatient |
| Paley | Clinical Inpatient (Beaker, Rover Lab, EDI)[5] |
| Phelps | Clinical Ambulatory (Specialty) |
| Vanderwist | Clinical Inpatient (Optime, Anesthesia) |
| Yenzer | Revenue (Resolute Professional Billing, Cadence) |

Plaintiffs also were responsible for different types of writing, directed toward different audiences with different needs and goals:

| Plaintiff | Writing Type (Audience) |
|-----------|-------------------------|
| Long, Phelps | Implementation (analysts installing Epic software) |

---

[4] There are also differences in supervision (compare the different Team Leads to which the Plaintiffs reported) and work location (compare Long, at the Tokay location, to the others based at the Verona campus).  (Section II.B, *supra*.)

[5] Paley's co-worker and fellow Plaintiff Keranen also wrote for the Beaker application but, unlike Paley, did not receive EDI training.  (Section II. B.3.)

| Plaintiff | Writing Type (Audience) |
|-----------|--------------------------|
| Paley, Vanderwist | Support (analysts improving and maintaining Epic software after installation) |
| Lopez, Yenzer | Training (end users of Epic applications, such as clinicians, administrators, and executives) |

The amount of time that each Plaintiff devoted to writing regarding these applications and to these audiences varied widely.  For example, Vanderwist reported spending about 60% of her time on this work, while Paley reported less than half that amount of time on the same work.  (Section II.B.2-3.)

The time spent on other activities further illustrates the notable differences among the Plaintiffs.  Long and Phelps were Team Leads who had management responsibility over Technical Writers that none of the other Plaintiffs had.  (Section II.B.1, 5.)  Long devoted a significant portion of her time to special projects - including a project for Epic's founder and CEO - as did Paley.  (Section II.B.1, 3.)  Paley took a special interest in training other Tech Comm members and devoted about a quarter of her time to those efforts.[6]  (Section II.B.3.) Yenzer had creative freedom to write an internal blog.  (Section II.B.4.)  Lopez contributed to creating Spanish language translations of documents.  (Section II.B.6.)

In the absence of a set of job duties common to all Plaintiffs, the fact-finder would need to conduct a fact-intensive examination into what type of work each person performed and how much time was spent performing each type of work.  The Plaintiffs are not similarly situated with respect to these questions.

---

[6] Keranen, though she worked on Clinical Inpatient applications doing Support writing like Paley, nonetheless differed from her colleague in that she was not a mentor and did not contribute the Writer Education Coordination Group.  (Section II.B.3.)

**B.** **The FLSA Collective Action is Subject to Individualized Defenses**

A second factor courts consider when evaluating whether to decertify a collective action is whether the defendant has individual defenses as to each member of the collective action. *Espenscheid*, 2011 WL 2009967 at*4. That is the case here.

As discussed above, Epic plans to assert a variety of defenses to the Plaintiffs' claims, including the fundamental question of whether Plaintiffs performed exempt work. Epic's defenses to Plaintiffs claims would also require individualized inquiries.

For example, one basis for Epic's defense is that Plaintiffs qualify for the administrative exemption. To answer this, the Court must determine whether each employee (1) is compensated on a "salary basis;" (2) has a primary duty of performing "office or non-manual work directly related to management or general business operations of the employer or the employer's customers;" and (3) has a primary duty that includes "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a).

"[T]he title of 'technical writer' holds no talismanic importance in determining whether to classify an employee as exempt or non-exempt. Rather, in each case, some level of rigorous fact-finding -- either at the summary judgment stage or by trial -- was required to determine whether the employee fell within the professional or administrative exemptions." *Drexler v. Tel Nexx, Inc.*, 25 WH Cas.2d 907, 917 (D. Mass. Aug. 28, 2015). Recognizing that application of the administrative exemption necessarily requires highly individualized proof going beyond mere job titles or perfunctory job descriptions, courts routinely refuse to allow cases involving that exemption to proceed collectively. *See, e.g., Forney v. TTX Co.*, No. 05-C-6257, 2006 WL 1030194, *3 (N.D. Ill. Apr. 17, 2006) (denying certification of misclassification claim under administrative exemption because "certification of a collective action would require determination on whether each potential claimant's qualifications satisfy the regulatory

requirements").  "Determining whether an employee is exempt is extremely individual and fact-intensive, requiring a detailed analysis of the time spent performing administrative duties and a careful analysis of the full range of the employees' job duties and responsibilities."  *Mike v. Safeco Ins. Co. of Am.*, 274 F. Supp. 2d 216, 220 (D. Conn. 2003) (internal quotations and citation omitted); *Keef v. M.A. Mortenson Co.*, No. 07-cv-3915, 2009 WL 465030, at *2 (D. Minn. Feb. 24, 2009) (denying certification because administrative exemption "regulations clearly contemplate an individualized inquiry into each plaintiff's job responsibilities").

Here, Plaintiffs did not perform uniform job duties.  Rather, the evidence reflects significant variations in how Plaintiffs spend their time and perform their duties, and exercise discretion and independent judgment (*see, e.g.,* Long's self-described "leadership accomplishments" on a significant project initiated by Epic's founder and CEO and her description of leading a project that "totally overhaul[ed] the current template for validation documents" - reducing hundreds of documents to just one - "to make them easier for AC's and more appealing to our customers" (Section II.B.1.); Phelps' sole responsibility as Specialty Writer to learn about and communicate with clinicians in specialty medical practices (Section II.B.5); and Vanderwist's hope that she might later have more "ad hoc projects" or become "good enough at something to teach (or help teach) a class at some point."  (Section II.B.2).  As a result, the Court will need to evaluate the job duties for each Plaintiff to determine whether the second and third criteria of the administrative exemption as satisfied.

Given the inability of representative testimony or evidence to address these defenses, a collective trial is not viable.  *See Beauperthuy*, 772 F. Supp. 2d at 1134 (where defenses asserted would "necessitate individualized inquiries," this fact "weighs heavily in favor of decertification"); *Smith*, 2007 U.S. Dist. LEXIS 60729 at *23-24 (decertifying while noting

multiple defenses that "must, by their nature, be individualized"); *Douglas v. First Student, Inc.*, 888 F. Supp. 2d 929, 936 (E.D. Ark. 2012) (decertifying a conditionally-certified FLSA class based on off-the-clock work in light of the defendant's individualized defenses which included whether individual plaintiffs actually worked overtime without compensation); *Kuznyetsov v. West Penn Allegheny Health Sys.*, 2011 U.S. Dist. LEXIS 146056, at *24-27 (W.D. Pa. Dec. 20, 2011) (decertifying collective action and finding that collective treatment would leave defendants unable to employ their various defenses it would be necessary to consider whether each plaintiff worked through a meal break, whether defendants had knowledge that plaintiff worked through the meal break, whether the meal break deduction was cancelled, how it was cancelled, whether that plaintiff was compensated for the time, if not, whether defendants had knowledge that plaintiff was not properly compensated).

## C.     Collective Adjudication Under the FLSA Would be Neither Manageable Nor Fair

The final decertification factors are substantive and procedural fairness.  *Espenscheid*, 2011 WL 2009967 at*4.  Many class action arguments concerning commonality, predominance, and manageability problems apply with equal force to these factors under the FLSA.  A key consideration is whether a collective trial would unfairly prejudice the parties:

> [T]he Court must … determine whether it can coherently manage the class in a manner that *will not prejudice any party*.  In other words, the court must balance the benefits of a reduction in the cost to individual plaintiffs and any increased judicial utility that may result from the resolution of many claims in one proceeding with the cost of any potential detriment to the defendant and the potential for judicial inefficiency that could stem from collective treatment.

*Beauperthuy*, 772 F. Supp. 2d at 1127 (citations omitted, emphasis added).  Here, a collective trial would prejudice everyone.

This is not a case where the Plaintiffs can establish liability and then present sound estimates of damages.  Rather, this is a case where only individualized proofs could establish any liability at all and where common proof of damages is absent.  Further, even if one could find that representative proof existed and extrapolate that proof to every Opt-In, Epic could not put on its defenses through representative proof, because each claim presents varying circumstances that would require individualized scrutiny.  *See, e.g.*, *Johnson v. Big Lots Stores, Inc.*, 561 F. Supp. 2d 567, 587-88 (E.D. La. 2008) (decertifying collective action during trial; "[defendant] cannot be expected to come up with 'representative' proof when the plaintiffs cannot reasonably be said to be representative of each other"; "collective action device does not effect its salutary purposes when it only puts the defendant between a rock and a hard place").

Under such circumstances, a collective trial would create an unfair "all or nothing" decision for the fact-finder.  *Espenscheid* stresses this point:

> Were the jury to rule in plaintiffs' favor under its proposed plan the jury would have to do so on the basis of proof that is not representative of the whole class, and defendants would be deprived of the opportunity to assert their individualized defenses.  On the other hand, a verdict for defendants would extinguish all of plaintiffs' and the class members' claims and would be unfair to those [plaintiffs] who were denied pay in violation of federal and state law.  *Under such circumstances, the case must be decertified*.

*Id.* at *23 (emphasis added).

Lastly, common proof could not fairly and accurately account for how Plaintiffs' job duties changed over time.  Long and Phelps, for example, rose to the position of Team Lead, supervising other Technical Writers.  (Section II.B.1, 5.)  Their qualification for the administrative exemption may change with their assumption of those duties.  Likewise, the type and amount of special project work performed by various Plaintiffs might affect whether and when they qualified for the administrative exemption.  In short, there is no way to settle

questions about an individual's exempt status except through individualized inquiries. *See, e.g.*, *Mathis v. Darden Rests.*, 2014 U.S. Dist. LEXIS 124631, *13 (S.D. Fla. Sept. 1, 2014) (decertifying an off-the-clock and tip credit collective action where "the Opt-In Plaintiffs var[ied] in terms of asserting a single claim or combination of claims," the Court would be required to inquire into each employee's claims and the extrapolation methods proposed by Plaintiffs' expert did not reliably account for the individualized circumstances for each Plaintiff and would have resulted in windfalls for some Plaintiffs and shortchanging for others).

Given the differences among the Plaintiffs' experiences, the case could not be efficiently tried with a smaller subgroups of Plaintiffs. *See Lindsay v. Clear Wireless LLC*, 2016 U.S. Dist. LEXIS 31663, *15-16 (D. Minn. Mar. 10, 2016) (holding that off-the-clock claims could not be managed on a class-wide basis, even if divided into smaller subgroups, because the court "would have to determine whether and under what circumstances each plaintiff performed uncompensated overtime work, the kind of work performed, and whether defendants, rather than individual supervisors, knew or should have known of that unpaid work" requiring it to hold "mini-trials for each plaintiff to determine liability on these bases" which "would be cumbersome and unmanageable"). Put simply, the Plaintiffs are not similarly situated and there is no way to cobble together a manageable or effective adjudication of the Plaintiffs' claims on a collective basis.

## IV.   CONCLUSION

The Plaintiffs should not be permitted to try their claims collectively because they performed different job duties, including by working on different applications, writing for different audiences, managing different special projects, among other things. Further, because Epic's defenses require an individualized assessment of each claim, fairness and procedural

considerations would disqualify any trial by formula or representative testimony and require

decertification.  Accordingly, the Court should decertify the Collective Class.

**Dated:  May 13, 2016**                                     Respectfully submitted,

                                                            EPIC SYSTEMS CORPORATION


                                                            By s/ Andrew Scroggins
                                                                   One of Its Attorneys

Noah A. Finkel (nfinkel@seyfarth.com)
Andrew Scroggins (ascroggins@seyfarth.com)
SEYFARTH SHAW LLP
131 South Dearborn Street, Suite 2400
Chicago, Illinois 60603
(312) 460-5000

## <u>CERTIFICATE OF SERVICE</u>

The undersigned attorney certifies that on May 13, 2016, he caused a true and correct copy of the foregoing to be served upon the following counsel of record via the Court's electronic filing system:

William Parsons
wparsons@hq-law.com
David C. Zoeller
dzoeller@hq-law.com
Caitlin M. Madden
cmadden@hq-law.com
Hawks Quindel, S.C.
222 West Washington Avenue, Suite 450
Madison, Wisconsin 53701-2155

Daniel A. Rottier
rottier@habush.com
Jason Knutson
jknutson@habush.com
Breanne L. Snapp
bsnapp@Habush.com
Habush Habush & Rottier, S.C.
150 East Gilman Street, Ste. 2000
Madison, Wisconsin  53701

　　s/ Andrew Scroggins

26865577v.2