**EXHIBIT 48**

🚩 KeyCite Yellow Flag - Negative Treatment

**Declined to Follow by**   Ticknor v. Rouse's Enterprises, LLC,   E.D.La.,   May 2, 2014

2011 WL 1197537
Only the Westlaw citation is currently available.
United States District Court,
E.D. Wisconsin.

Chris ARMES, Plaintiff,

v.

SOGRO, INC., d/b/a Budget Host Diplomat Motel, Defendant.

No. 08–C–0244.
|
March 29, 2011.

**Attorneys and Law Firms**

Allison A. Krumhorn, Lance A. Raphael, Stacy M. Bardo, Chicago, IL, Paul F. Markoff, Markoff Law Firm LLC, Chicago, IL, for Plaintiff.

David O. Yuen, James K. Borcia, Tressler LLP, Chicago, IL, for Defendant.

DECISION AND ORDER GRANTING MOTION FOR CLASS CERTIFICATION (DOCS.30, 62)

C.N. CLEVERT, JR., Chief Judge.

**\*1**   Chris Armes sues Sogro, Inc., claiming that Sogro unlawfully generated customer receipts displaying more than the last five digits and expiration dates of credit cards, in violation of the Fair and Accurate Credit Transaction Act ("FACTA"), 15 U.S.C. § 1681c(g). Armes asserts that on April 30, 2007, at the Budget Host Diplomat Motel in Lake Geneva, Wisconsin, Sogro violated FACTA by printing a receipt on which his entire credit card number was displayed. Because Sogro's standard practice in issuing credit card receipts was uniform, Armes filed a class action lawsuit seeking to represent all consumers who received receipts from Sogro in violation of FACTA. Sogro estimates that it processed 2500 credit and debit card transactions between December 4, 2006 (the date FACTA became effective) and March 24, 2008, when it learned of FACTA and immediately acted to conform its receipts to FACTA demands. (Def.'s Opp'n at 3.)

FACTA, an amendment to the Fair Credit Reporting Act, provides that "no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits of the card number or the expiration date upon any receipt provided to the cardholder at the point of the sale or transaction." 15 U.S.C. § 1681 c(g)(1). Failure to comply with § 1681c(g) subjects a person to actual damages or statutory damages from $100 to $1000 for willful violation of the statute. 15 U.S.C. § 1681 n(a)(1)(A); *see also Killingsworth v. HSBC Bank Nev., N.A.,* 507 F.3d 614, 622 (7th Cir.2007). For cash registers in use prior to January 1, 2005, § 1681 c(g)(1) became effective December 4, 2006. *See* 15 U.S.C. § 1681 c(g)(3)(A).

Presently before the court is Armes's motion for class certification, [1] in which he seeks certification of the following class: "All persons to whom Sogro, Inc. d/b/a Budget Host Diplomat Motel provided an electronically printed receipt at the point of sale or transaction, in a transaction occurring after December 4, 2006, which receipt displayed more than the last five digits of the person's credit card or debit card number." (Pl.'s Mem. of Law in Supp. at 2; *see* Compl. ¶ 15.)

A plaintiff seeking class certification bears the burden of satisfying the four requirements of Fed.R.Civ.P. 23(a) and one of the subsections of Fed.R.Civ.P. 23(b). Fed.R.Civ.P. 23; *Oshana v. Coca–Cola Co.,* 472 F.3d 506, 513 (7th Cir.2006); *Armes v. Shanta Enter., Inc.,* No. 07 C 5766, 2009 U.S. Dist. LEXIS 58385, at *6, 2009 WL 2020781 (N.D.Ill. July 8, 2009) (Kapala, J.). Under Rule 23(a), Armes must show (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) his claims or defenses as representative party are typical of the claims or defenses of the class, and (4) he will fairly and adequately protect the interests of the class. Armes seeks certification under Rule 23(b)(3), which requires a plaintiff to establish that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3).

**\*2**  The district court has broad discretion in determining whether class certification is appropriate. *Keele v. Wexler,* 149 F.3d 589, 592 (7th Cir.1998); *Cicilline v. Jewel Food Stores, Inc.,* 542 F.Supp.2d 831, 835 (N.D.Ill.2008) (Dow, J.). The court does not presume that all well-pleaded allegations are true for purposes of deciding the certification question. *Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672, 676–77 (7th Cir.2001). Rather, it should "look[ ] beneath the surface of a complaint to conduct the inquiries identified in [Rule 23] and exercise the discretion it confers." *Id.* at 677. Nevertheless, the court does not delve into the merits of the ultimate issues, which do not affect class certification. *Cicilline,* 542 F.Supp.2d at 835.

A. Rule 23(a)

Sogro does not challenge Armes on the numerosity and commonality requirements. Instead, it attacks typicality, adequacy, and both Rule 23(b)(3) requirements. Regardless, the court must ensure that all requirements are met, notwithstanding Sogro's concession on numerosity and commonality. *Shanta Enter., Inc.,* 2009 U.S. Dist. LEXIS 58385, at *5–*6, 2009 WL 2020781.

1. Numerosity

Rule 23(a)(1) requires that a proposed class be so numerous that joinder is impractical. The Seventh Circuit has indicated that a group as small as forty may satisfy the numerosity requirement. *Swanson v. Am. Consumer Indus., Inc.,* 415 F.2d 1326, 1333 n. 9 (7th Cir.1969); *Shanta Enter., Inc.,* 2009 U.S. Dist. LEXIS 58385, at *6, 2009 WL 2020781; *Beringer v. Std. Parking Corp.,* No. 07 C 5027, 2008 U.S. Dist. LEXIS 72873, at *4 (N.D.Ill. Sept. 24, 2008) (Pallmeyer, J.). In *Shanta Enterprise* the district court found that a class of at least 100 and up to 5330 members met the numerosity requirement. 2009 U.S. Dist. LEXIS 58385, at *6, 2009 WL 2020781.

Sogro admits it provided approximately 2500 receipts that were not compliant with FACTA during the proposed class period. (Def.'s Opp'n at 3.) Thus, the class may contain 2500 persons. Hence, the court is satisfied that the numerosity requirement is met.

2. Commonality

Rule 23(a)(2) next requires that there be "questions of law or fact common to the class." All that is necessary is a showing of "a common nucleus of operative fact." *Keele,* 149 F.3d at 594; *Beringer,* 2008 U.S. Dist. LEXIS, at *5. Here, Armes and all proposed class members received receipts from Sogro containing more than five digits of a credit card, allegedly in violation of § 1681c(g)(1). Moreover, it appears that Sogro's practice was uniform as to all proposed class members, creating a nucleus of operative fact. Further, whether Sogro's practice violated FACTA will be a common legal question. Thus, the commonality requirement is met.

3. Typicality

"A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Keele,* 149 F.3d at 595 (internal citations omitted). Armes's claim arises from the same alleged practice or course of conduct as the claims of other class members. All members

of the proposed class, including Armes, received allegedly noncompliant credit card or debit card receipts from Sogro after FACTA went into effect.

**\*3** Sogro submits that Armes does not meet the typicality requirement because his debit card was used to pay for overnight accommodations while he was on business. Sogro contends that because the transaction was a business expense and/or because Armes was reimbursed by his company, Armes is not a consumer as required by FACTA.

This argument is unconvincing. Armes used his personal debit card in the credit transaction at issue; thus, his personal card information was subject to identity theft. Personal debit cards are personal debit cards no matter the purpose of the expense or whether someone's mother, friend, or employer ends up paying the bill or reimbursing the cardholder. As an individual using his own personal debit card, Armes was the same as any other individual class member who used a personal credit or debit card.

Moreover, Sogro provides no evidence that Armes was reimbursed by his employer; indeed, Armes says he was not reimbursed for out-of-pocket business expenses as he was working on commission. (Pl.'s Reply, Ex. A at 23–24.)

Sogro may be correct that among its transactions from December 2006 to March 2008, some corporate credit cards were used, and corporations may not be consumers under FACTA for purposes of this case. However, the class definition is of "persons" using "the person's" credit or debit card. Moreover, District Judge Pallmeyer recognized in *Beringer* that later identification of corporate cardholders was not a problem for the purpose of class certification: "the court is not yet persuaded that this problem is insurmountable." 2008 U.S. Dist. LEXIS 72873, at \*16. A magistrate judge in the Northern District of Illinois observed that whether corporate purchasers exist goes to the right of putative class members to participate in any class recovery, not to the threshold question of whether a class should be certified. *Harris v. Circuit City Stores, Inc.,* No. 07 C 2512, 2008 U.S. Dist. LEXIS 12596, at \*19, 2008 WL 400862 (N.D.Ill. Feb. 7, 2008) (Schenkier, M.J.). Accordingly, Armes has satisfied the typicality requirement.

### 4. Adequacy of Representation

Rule 23(a)(4) requires Armes to show that he "will fairly and adequately protect the interests of the class." A plaintiff must show that: "(1) the representative does not have conflicting or antagonistic interests compared with the class as a whole; (2) the representative is sufficiently interested in the case outcome to ensure vigorous advocacy; and (3) class counsel is experienced, competent, qualified and able to conduct the litigation vigorously." *Cavin v. Home Loan Ctr. Inc.,* 236 F.R.D. 387, 392–93 (N.D.Ill.2006) (citing *Sec'y of Labor v. Fitzsimmons,* 805 F.2d 682, 697 (7th Cir.1986)).

Sogro contends that Armes will not adequately protect the interests of the class because he is not sufficiently interested in the case outcome to ensure vigorous advocacy. However, to the contrary, Armes has demonstrated vigorous advocacy in two other FACTA cases that have been filed in his name. *See, e.g., Shanta Enter., Inc.,* 2009 U.S. Dist. LEXIS 58385, 2009 WL 2020781. His pursuit of this case demonstrates that he is more than sufficiently interested in the outcome of the proceeding: he says he has reviewed the complaint, participated in discovery, and monitored the litigation, and he has been deposed. (*See* Pl.'s Reply, Ex. A.)

**\*4** Sogro also is concerned that Armes's interest may conflict with a class member who has suffered actual damages, as he has asserted only statutory damages. As discussed below, this may become a nonissue if those with substantial actual damages opt out. But, "concerns about different interests that arise only at the damages stage generally do not prevent certification of a class for the purpose of proving liability." *Beringer,* 2008 U.S. Dist. LEXIS 72873, at \*7.

In addition, Sogro suggests that although Armes professes a motivation to protect others from identity theft, he never warned Sogro or otherwise alerted anyone, other than his attorney, of Sogro's violations. Sogro says that although Armes claims he was fearful of identity theft, he did not contact his credit card company or shred his receipt. How Armes's failure to inform Sogro of the fact that its conduct was violating FACTA translates into inadequacy toward the class is unclear, and Armes cannot be penalized for failing to shred evidence of a possible FACTA violation.

Sogro does not challenge the adequacy of Armes's counsel. Notably, Armes is represented by attorneys from The Consumer Advocacy Center in Chicago and Paul Markoff, all of whom represented Armes in *Shanta Enterprise. See Shanta Enter., Inc.,* 2009 U.S. Dist. LEXIS 58385, 2009 WL 2020781. Sogro has not suggested that attorneys from The Consumer Advocacy Center are not adequate for this FACTA case, and the court sees nothing in the record supporting a finding that Armes's attorneys are unable to provide adequate services in this case. Therefore, the court finds that the adequacy requirement has been met.

**B. Rule 23(b)(3)**

Rule 23(b)(3) specifies two requirements: (1) "that the questions of law or fact in common to class members predominate over any questions affecting only individual members," and (2) "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Considerations pertinent to these requirements include the class members' interests in individually controlling separate actions, the extent of any litigation already begun by class members, the desirability of concentrating the litigation in this forum, and likely difficulties in managing a class action. Fed.R.Civ.P. 23(b)(3)(A)-(D). No one suggests that any proposed class members have already sued Sogro, and concentrating litigation in this forum is desirable, as Sogro is located in this district. However, Sogro's challenges focus more on considerations of individuality.

Sogro's primary opposition to the class certification motion is directed to Rule 23(b)(3) requirements. But, Sogro relies mainly on caselaw from district courts in California for points that have been rejected by the Seventh Circuit. Of course, this court must follow Seventh Circuit precedent.

**1. Common Questions Predominate**

Predominance "goes hand in hand with the commonality requirement," *Cicilline,* 542 F.Supp.2d at 838, which Sogro did not challenge. Yet, the predominance requirement is more demanding than the commonality requirement. *Beringer,* 2008 U.S. Dist. LEXIS 72873, at *10.

 **\*5** Nevertheless, both requirements are usually satisfied when defendant's conduct toward proposed class members was standardized. *Cicilline,* 542 F.Supp.2d at 838; *accord Shanta Enter., Inc.,* 2009 U.S. Dist. LEXIS 58385, at *15, 2009 WL 2020781 (stating that usually "when a class challenges a uniform policy or practice, the validity of that policy or practice tends to be the predominant issue"). In *Beringer,* Judge Pallmeyer found that the creation of a computer-generated receipt was completely standardized, meaning that individual questions would be nonexistent at the liability stage. Judge Pallmeyer found that whether the common, routine practice violated FACTA was the predominant matter for the litigation. 2008 U .S. Dist. LEXIS 72873, at *12–13. In *Cicilline,* Judge Dow held that Jewel's issuance of credit card receipts bearing prohibited information predominated over issues affecting individual members. 542 F.Supp.2d at 838–39.

Here, common issues of fact and law predominate over issues affecting individual members. Sogro allegedly issued credit and debit card receipts bearing prohibited information to class members pursuant to a standardized practice, in violation of FACTA. The focal point will be Sogro's alleged standardized course of conduct and whether that course of conduct violated FACTA.

Sogro maintains that the predominance requirement is not satisfied because individualized inquiry is necessary regarding actual injury. However, Armes has not alleged actual harm for the plaintiff class; he seeks a statutory remedy for the class.

The Seventh Circuit has stated in a Fair Credit Reporting Act case that "[u]nless a district court finds that personal injuries are large in relation to statutory damages, a representative plaintiff must be allowed to forego claims for compensatory damages in order to achieve class certification." *Murray v. GMAC Mortg. Corp.,* 434 F.3d 948, 953 (7th Cir.2006). In the event a few class members have sustained and want to pursue actual injury, they can opt out and litigate separately. *Id.* Their existence does not call for denial of class certification unless all or almost all of the actual-damage claims are likely to be large enough to warrant individual litigation. *Id.* Thus, the Seventh Circuit has rejected this very argument.

**Armes v. Sogro, Inc., Not Reported in F.Supp.2d (2011)**
Case: 3:15-cv-00081-bbs    Document #: 58-49    Filed: 05/13/16    Page 5 of 112
2011 WL 1197537

Also, Sogro contends that individualized inquiry is required with respect to willfulness, which must be proved before statutory damages may be awarded. It further contends that each class member would need to be questioned as to whether he or she notified Sogro of its FACTA violation. Why such inquiry may be necessary is unclear unless plaintiffs base a willfulness argument on direct notification by certain customers—and if that were the case Sogro would need to depose only the customers who assert they notified it, not the entire class. The record indicates that Armes does not contend that Sogro was notified by some class member; he contends that Sogro was notified of FACTA requirements by other parties prior to December 4, 2006. (Pl.'s Reply at 10.) Sogro's position is that it did not learn about FACTA until the filing of this suit, not that any particular customer put Sogro on notice. So the present position of both sides is that none of these customers notified Sogro of the FACTA violation at issue. Moreover, the court is unpersuaded that a question about *Sogro's* culpability translates into individualized inquiries of Sogro's *customers*. Sogro can investigate its willfulness with its own management and employees.

 **\*6** Sogro's argument that predominance is not met because each cardholder must be asked whether the transaction was for a personal or business purpose or whether the card was an individual or corporate card is rejected for the reasons discussed above concerning typicality. The suggestion that individuals must be quizzed as to whether the person who received the receipt was in fact the cardholder is not persuasive, either. The proposed class is comprised of persons to whom Sogro provided a receipt that displayed more than five digits of that persons' credit or debit card number. Those who were using someone else's credit card (such as those using stolen credit cards) would not be members of the class.

## 2. Superiority

As to the issue of superiority, "Rule 23(b)(3) was designed for situations such as this, in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate." *Murray,* 434 F.3d at 953. "Class certification is usually considered a superior method of adjudicating claims involving standardized conduct, even if there are individual issues that exist among class members (for example, on questions such as damages)...." *Cicilline,* 542 F.Supp.2d at 838. "FACTA claims are especially well-suited to resolution in a class action where, as here, potential recovery is too slight to support individual suits...." *Id.* at 839; *see also Harris,* 2008 U.S. Dist. LEXIS 12596, at \*27, 2008 WL 400862 ("Class treatment is the superior method for adjudicating the single act of conduct at issue in this case: whether defendant issued electronic receipts that violate FACTA to consumers during the relevant time period and did so willfully.").

Sogro submits that FACTA encourages individuals to file their own lawsuits because in addition to statutory damages, FACTA provides for recovery or attorneys' fees and punitive damages. (Def.'s Opp'n at 21.) This court disagrees. Where statutory damages may be $100 to $1000, how many individuals will spend $350 to file a federal action, expend time and effort in pursuing the case, and risk *owing* costs to the defendant? Few. *See Cicilline,* 542 F.Supp.2d at 840 ("[F]or most potential class members, there are no actual damages and the recovery would by tiny relative to the expense of litigation on an individual basis." (internal quotation marks omitted)).

Sogro adds that class certification should be denied when damages would be excessive. It argues that it is a small company facing damages of $2.5 million to $25 million and that the results of this class action could be annihilating. It also contends that the range of damages is disproportionate for such a "mere technical and unintentional violation" that may have caused no actual injury, violating due process. (*See* Def.'s Opp'n at 15.)

Sogro's annihilation argument fails factually and legally. Factually, the range of damages has been misstated ten-fold based on a multiplication error. The statutory violation range is $100 to $1000 and there are estimated to be 2500 class members; 100x2500=$250,000 and 1000x2500=$2,500,000. No evidence has been presented by Sogro to establish that it has no insurance coverage or other resources to pay potential damages that may be due.

 **\*7** Regardless, the extent of damages is of no relevance at this stage per controlling Seventh Circuit caselaw. In *Murray,* the Seventh Circuit rejected GMAC Mortgage's argument that it " 'would face potential liability in the billions of dollars for purely technical violations' " of the Fair Credit Reporting Act. 434 F.3d at 953.

The reason that damages can be substantial, however, does not lie in an "abuse" of Rule 23; it lies in the legislative decision to authorize awards as high as $1,000 per person, combined with GMACM's decision to obtain the credit scores of more than a million persons.

....

.... [I]t is not appropriate to use procedural devices to undermine laws of which a judge disapproves. Maybe suits such as this will lead Congress to amend the Fair Credit Reporting Act; maybe not. While a statute remains on the books, however, it must be enforced rather than subverted.

*Id.* at 953–54. Like *Murray,* here the amount of potential damages is a function of the statutory range set by Congress and of Sogro's own actions in not following FACTA for over a year. If Sogro has a concern about the statutory range and the lack of a cap on damages, its owner can contact his senators and congressman. It is not this court's place to subvert the will of Congress through denial of class certification. *See Shanta Enter.,* 2009 U.S. Dist. LEXIS 58385, at *23, 2009 WL 2020781 ("[T]he *Murray* court's reasoning is based upon the premise that the legislature, not the court, decides the magnitude of possible penalties a defendant could face for breaching a statute."). Moreover, Sogro's characterization of its own actions as "mere[ly] technical and unintentional" violations is irrelevant. If plaintiffs can prove Sogro committed willful conduct that Congress has prohibited, then the conduct was not merely technical.

As for Sogro's constitutional attack on FACTA's statutory penalty provision, in the class action context, the Seventh Circuit has rejected the argument. Moreover, the appellate court, in strong language, disapproved of the district court's hostility to class litigation and ordered the case reassigned upon remand.

Sogro attempts to distinguish *Murray* because the violation in *Murray* was "substantive in that the defendant purposefully violated the consumer's rights by gaining access to her credit reports for solicitation purposes" and the defendant stood to gain financially by its improper solicitation, while here Sogro "neither sought nor realized any conceivable financial gain." (Def.'s Opp'n at 18.) Nothing in *Murray* suggests that a defendant's intent in violating a consumer's rights has any bearing on class certification. Like this case, *Murray* involved statutory damages under a consumer credit protection statute. "FACTA is not designed to prevent the seller from getting a benefit. Rather, it seeks to protect the consumer from a detriment: exposure to the risk of identity theft." *Harris,* 2008 U.S. Dist. LEXIS 12596, at *30 -*31, 2008 WL 400862.

**\*8** Since *Murray,* numerous district judges in the Northern District of Illinois have certified class actions in FACTA cases, many of the judges rejecting, under *Murray,* similar annihilation and constitutional arguments. *See Shanta Enter., Inc.,* 2009 U.S. Dist. LEXIS 58385, at *4, *20, 2009 WL 2020781 (listing cases); *Beringer,* 2008 U .S. Dist. LEXIS 72873; *Cicilline,* 542 F.Supp.2d at 837–41; *Harris,* 2008 U.S. Dist. LEXIS 12596, 2008 WL 400862. In *Shanta Enterprise,* the district court certified a class defined in the same way as the present case (against a different defendant), [2] with the same class representative, Armes, and the same class counsel as the case at bar. This court, like the courts in the Northern District of Illinois, follows *Murray,* not decisions from district courts in California or elsewhere that have accepted such annihilation and excessive damages arguments. Also, assuming that the plaintiff class is awarded damages, any unconstitutionally excessive award may be reduced at that time. 434 F.3d at 954. Further, the possibility of excessive damages in FCRA or FACTA cases does not impact class certification in this circuit. "[C]onstitutional limits are best applied after a class has been certified." *Id.*

Finally, Sogro contends that its prompt compliance with FACTA after learning of the statute weighs against class certification, "as it nullifies any possible deterrent effect of a class action." (Def.'s Opp'n at 19.) The Seventh Circuit's rejection of the arguments in opposition to class certification in *Murray* leads this court to conclude that deterring violations is not a factor that impacts whether a class should be certified. Consequently, Armes has satisfied the superiority requirement of Rule 23(b)(3).

CONCLUSION

For the reasons stated above, the requirements of Rule 23(a) and (b)(3) have been met in this case. Therefore,

IT IS ORDERED that plaintiff's motion for class certification (Docs.30, 62) is granted.

IT IS FURTHER ORDERED that the parties confer regarding possible settlement of this case in light of this decision and notify the court in writing within seven days whether they desire a return to mediation before continuing with proceedings in this court.

IT IS ORDERED that during this seven day period briefing on the summary judgment motion (and deadline for the filing of a cross-motion) is stayed. In the event the parties do not desire a return to mediation, any remaining briefing deadlines will be extended by seven days automatically.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1197537

Footnotes

1    Last year the court denied the motion for class certification without prejudice when it appeared from the parties' numerous requests for extensions of time for briefing and discovery that they were not ready to proceed. The motion for class certification was reinstated this past October. In recent filings Sogro has suggested that in denying the motion without prejudice the court addressed the merits of the motion or suggested that the motion had little chance for success. However, the court did not at any time determine the merits of the motion for class certification. Questioning of plaintiff's counsel during the scheduling conference in April 2010 was aimed at determining the cause for delays rather than implying that the motion was not meritorious.

2    The certified class in *Shanta Enterprise* was: "All persons to whom Defendant provided an electronically printed receipt at the point of sale or transaction, in a transaction occurring after December 4, 2006, which receipt displayed more than the last five digits of the person's credit and/or debit card number." 2009 U.S. Dist. LEXIS 58385, at *2, 2009 WL 2020781.

**End of Document**                                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case: 3:15-cv-00081-bbc   Document #: 58-49   Filed: 05/13/16   Page 8 of 112

2015 WL 5749441
United States District Court,
D. Massachusetts.

Anna Maria Crowe, et al, Plaintiffs,

v.

Examworks, Inc., et al, Defendants.

CIVIL ACTION NO. 13-10249-DPW
|
Signed September 30, 2015

**Synopsis**

**Background:** Employees filed suit for violations of overtime requirements under Fair Labor Standards Act (FLSA) and Massachusetts law, breach of contract, and rescission or voiding of contracts waiving employees' rights under wage laws. Upon removal, both parties filed motions for summary judgment. Employees also moved for certification of class of current and former Clinical Quality Assurance Coordinators (CQACs) and Utilization Review Nurse Auditors (URNAs) who worked for employer during designated period of time.

**Holdings:** The United States District Court for the District of Massachusetts, Douglas P. Woodlock, J., held that:

[1] URNAs met salary requirements to come within "learned professional" exemption from overtime requirements under FLSA;

[2] URNAs' work duties required advanced knowledge and exercise of discretion and judgment;

[3] disputes of fact remained whether advanced knowledge required for licensed practical nurses to work as URNA was of type customarily acquired by prolonged course of specialized intellectual instruction;

[4] CQACs were not "learned professionals" exempt from overtime requirements;

[5] CQACs did not meet salary requirement for administrative exemption from overtime requirements FLSA following reclassification;

[6] CQACs came within administrative exemption to overtime requirements prior to reclassification;

[7] disputes of material facts remained regarding overtime hours worked by URNAs and CQACs following reclassification;

[8] proposed class met requirements for class certification on claims brought under Massachusetts overtime law;

[9] questions of law or fact common to proposed class of current and former CQACs and URNAs predominated over questions affecting only individual members, as required to obtain class certification on claim for violations of Massachusetts overtime requirements based on employer's alleged misclassification of exempt status; and

[10] questions of law or fact common to proposed class did not predominate over questions affecting only individual members, as required to obtain class certification on claim against for violations of Massachusetts overtime law based on employer's failure to pay overtime following reclassification to non-exempt status.

Employees' motion for summary judgment granted in part and denied in part; employer's motion for summary judgment granted in part and denied in part; motion for class certification granted in part and denied in part.

**Attorneys and Law Firms**

Daniel W. Rice, Glynn, Landry & Rice, LLP, Braintree, MA, Peter Francis Russell, Russell & Associates, Needham, MA, for Plaintiffs.

Christopher Cole, Sheehan, Phinney, Bass and Green, Manchester, NH, David L. Hansen, Mark J. Ventola, Sheehan Phinney Bass & Green, P.A., Boston, MA, for Defendants.

MEMORANDUM AND ORDER

DOUGLAS P. WOODLOCK, UNITED STATES DISTRICT JUDGE

**\*1** The plaintiffs here are a group of former and present employees of the defendants ExamWorks and MES Group, Inc., an entity that was acquired by ExamWorks in 2012. They allege that they were not paid for overtime work in violation of the federal fair labor standards and Massachusetts wage and hour law. The plaintiffs seek to represent a class of former and present employees of the defendants in Massachusetts. They now move for certification of the class, and both parties respectively move for partial summary judgment on various counts.

# I. BACKGROUND

## A. Factual Background

### 1. The Parties

ExamWorks is a national company with headquarters in Atlanta, Georgia, that provides independent medical examinations ("IMEs"), peer reviews, utilization reviews, and IME-related services. In 2012, through a stock purchase agreement, ExamWorks purchased substantially all the assets of MES Group, which provided similar services. ExamWorks now has—as had MES Group previously—an office in Norwood, Massachusetts, where employees perform peer review and utilization review work. Defendant Crystal Patmore served as Vice President of Human Resources at ExamWorks during the relevant time period.

The plaintiffs either work or previously worked for MES and/or ExamWorks in Norwood as Utilization Review Nurse Auditors ("URNAs"), Clinical Quality Assurance Coordinators ("CQACs"), and Clinical Coordinators ("CCs"). Plaintiff Anna Maria Crowe worked as an URNA from March 12, 2012 until June 2013; Plaintiff Joanne Clarke has worked as an URNA from November 2007 and continues to be employed in that capacity with the defendants; and Plaintiff Suzanne O'Rourke Chansky worked as an URNA from October 18, 2010 until August 2012. Plaintiff Kathleen O'Day worked as a CQAC from March or April 2007 until February 2013, and Plaintiff Diane Bowen worked a CQAC from July 2010 until September 2011. Plaintiff Tia Finley worked as a CC, but the summary judgment record does not provide the specific time period of her employment. [1]

The named plaintiffs in the URNA role—Crowe, Clarke, and Chansky—all hold bachelor's degrees in nursing and are registered nurses ("RNs"). In addition, before working for the defendants, Crowe had over six years of nursing experience; Clarke had over twenty years of nursing experience in various capacities, including as a nurse, nurse field supervisor, patient case manager, and utilization review specialist; and Chansky had over ten years of nursing experience.

2015 WL 5749441, 2015 Wage & Hour Cas.2d (BNA) 320,303

The named plaintiffs in the CQAC role—Bowen and O'Day—are both RNs with bachelor's degrees in nursing and clinical experience. The summary judgment record does not indicate whether Finley was an RN or what her background is; in any event, neither Finley nor the CC position is the subject of the summary judgment motions now before me.

2. The URNA and CQAC Positions

As a general matter, utilization review "concerns the quality of care provided to injured employees, including whether the service is appropriate and effective, the proper costs of services, and the quality of treatment." 452 Mass. Code Regs. 6.02; *see Clark* v. *Centene Co. of Tex.*, 44 F.Supp.3d 674, 676 (W.D.Tex.2014). In performing utilization review work, the defendants must comply with requirements promulgated by the Massachusetts Department of Industrial Accidents ("DIA") and by URAC (formerly the Utilization Review Accreditation Commission), through which they are accredited.

**\*2 URNAs**—Utilization Review Nurse Auditors—are tasked with reviewing requests for medical treatment from physicians or physical therapists for individuals who are eligible for worker's compensation. URNAs assess whether a proposed treatment or diagnostic test is medically necessary based on the patient's medical records and the applicable medical guidelines promulgated by various state agencies—in Massachusetts and other states—or third parties. Among the essential duties and responsibilities of the position, as defined by the job description, are "work[ing] directly with providers to identify level, intensity and duration of care"; documenting findings and "evaluat[ing] medical necessity for frequency, intensity and length of required care"; and ensuring that quality utilization reviews are "completed within the required client, federal and state or URAC mandated turnaround times."

After reviewing a patient's medical records—including x-rays, MRIs, CT scans, lab test results, provider notes, and prescribed drugs—an URNA must identify the applicable guideline related to the request and determine if the requested treatment is medically necessary under that guideline. An URNA can either approve the treatment request or refer a treatment request for review by a physician in the same licensure category as the requesting physician. When approving a request, the URNA prepares a summary paragraph called a guideline application that restates the medical provider's request, restates the provider's basis for making the request, cites to the applicable guideline or the provider's assertion as to why treatment is medically necessary, indicates that approval should be permitted, and states the URNA's rationale for approval. An URNA's determination—that is, approval or referral for review—is reviewed only for purposes of an audit or performance review; URNAs' determinations are not subject to regular review by a supervisor.

In reaching a determination, URNAs are also guided by the Massachusetts "10% Rule," under which an URNA may approve a proposed treatment for a case that falls outside of the particular guideline where the requesting physician deems the treatment necessary "in light of all circumstances presented by the injured employee and the needs and resources particular to the locality or facility." 452 Mass. Code Regs. 6.06(2). The impetus for this rule is the recognition that although the "Treatment Guidelines are meant to cover the usage of a vast majority of tests and treatments ... approximately 10% of cases will fall outside [the] guidelines and thus require a review on a case by case basis." [2]

To obtain an URNA position with the defendants, an individual must have graduated from "an accredited nursing program" and have a minimum of three to five years of direct professional patient care. He or she also must be registered and licensed as an active registered nurse ("RN"), licensed practical nurse ("LPN"), or licensed vocational nurse ("LVN"), and must have "strong knowledge of medical terminology, anatomy and physiology, treatment protocols, medications and laboratory values." Although there is apparently an internal policy under which LPNs working as URNAs are supervised by RNs in performing their duties, the plaintiffs contend that LPNs and RNs perform the same type of work without distinction when functioning as URNAs. The parties also dispute whether any third-party or government agency requirements direct additional supervision of LPNs. [3]

**\*3 CQACs**—Clinical Quality Assurance Coordinators—perform two functions. The first is assignment. When a case comes in for peer review from an insurance company client, a CQAC assigns the case to a particular peer reviewer, using a database

of physicians, and ensures that the case file has the appropriate documentation for the physician's review. These case files, like those reviewed by URNAs, contain a variety of medical documents, including MRI reports and provider notes.

The second CQAC function is quality assurance. CQACs ensure that peer review reports and other correspondence or supplemental reviews have been conducted by an appropriate board specialist; that the reviews contain "clear, concise evidence-based rationales ... in support of all recommendations and/or determinations," provider credentials and a signature, and "clinical citations and references when applicable," and that such references "are current and obtained from reputable medical journals and/or publications"; and ensure that "all client instructions and specifications have been followed" and "the content, format, and professional appearance of the reports are of the highest quality," among other tasks. In short, as the job description states, CQACs are responsible for ensuring that "Peer Review case reports are of the highest quality and integrity and in full compliance with client contractual agreement, regulatory agency standards and/or federal and state mandates."

CQACs employed by the defendants are not required to have any certificates, licenses, or registrations, but they must have at least "two years clinical or related field experience; or equivalent combination of education and experience," and they must have "strong knowledge of medical terminology, anatomy and physiology, medications and laboratory values."

### 3. Defendants' Reclassification of URNAs and CQACs

At MES, URNAs and CQACs had been classified as "exempt" from the overtime pay requirements imposed by state and federal law. However, shortly after ExamWorks acquired MES, it reclassified both positions as "non-exempt." CCs had been classified as "non-exempt" at MES, and their status did not change at any point in the relevant time period.

The CQACs were reclassified as non-exempt in April 2012 and informed by letter that effective April 16, 2012, they would be paid based on their actual hours worked—and not on the basis of a set bi-weekly amount—and that they would be eligible for overtime compensation. The URNAs were reclassified as nonexempt in September 2012 and similarly informed by letter that effective September 29, 2012, they would be paid based on their actual hours worked and would be eligible for overtime. Both letters stated that the change was the result of a review of the job duties "against the Federal Standards Labor Act [*sic*] exemption testing," after which it was determined that the "position and job duties no longer qualify ... as ... 'exempt' or 'salaried.' "

Defendant Crystal Patmore was responsible for determining employees' job classifications for purposes of overtime pay. To make these determinations, Patmore consulted the job duties of each position and referred to the Department of Labor website. Patmore testified at her deposition that she reclassified the URNAs because they worked "side by side" with the CQACs, and it was easier "to manage all the nurses that way."

### 4. Overtime Hours Worked by Plaintiffs

The parties dispute nearly all of the facts regarding plaintiffs' work in excess of forty hours per week during the time period in which the plaintiffs contend they were improperly classified as exempt, and during the time period in which they were classified as non-exempt. With reference to the period they were designated as non-exempt, the plaintiffs contend that CQACs and URNAs were scheduled for 8.5 hour daily shifts, but the defendants argue that these shifts included a 30-minute, unpaid meal break, as well as two 15-minute paid breaks. The parties also dispute whether during this period the CQAC and URNA plaintiffs, and other similarly situated employees, worked while they ate lunch, whether they worked beyond their shifts or on the weekend, and whether these activities were either known or encouraged by the supervisors.

**\*4** It is undisputed that before reclassification, the defendants did not keep time logs of when CQACs and URNAs worked. After reclassification of the positions as non-exempt, CQACs and URNAs were instructed to keep time logs and to clock in and out for their shifts and for any breaks. It is generally undisputed that, on at least several occasions, supervisors modified the timecards of these employees. [4] However, the parties dispute the reasons for these modifications, including whether they were undertaken to produce timecards showing a workweek of forty or fewer hours (with the purpose of avoiding having to pay overtime) or whether they were undertaken to correct legitimate entry errors.

### B. Procedural History

Plaintiff Anna Maria Crowe, on behalf of herself and a putative class, filed this action in Norfolk County Superior Court on January 8, 2013 asserting federal and state claims in four counts. The defendants removed the case to federal court on the basis of federal question jurisdiction under 28 U.S.C. § 1331.

The third amended complaint, which is the operative complaint here, was filed on behalf of six named plaintiffs: Crowe, O'Day, Clarke, Bowen, Chansky, and Finley. [5] The complaint asserts six counts: (I) violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 206, 207, by misclassification of the plaintiffs as exempt from the FLSA overtime pay requirement; (II) violation of the FLSA by deprivation of overtime pay for non-exempt employees; (III) violation of the Massachusetts overtime law, Mass. Gen. Laws ch. 149, § 148, by misclassification of the plaintiffs as exempt; (IV) violation of Mass. Gen. Laws ch. 150, §§ 1, 1A, by deprivation of overtime pay for non-exempt employees; (V) breach of contract through the failure to pay the plaintiffs for all hours worked and to provide a meal break; and (VI) rescission or voiding of contracts signed by plaintiffs waiving their rights under the wage laws.

The plaintiffs move for partial summary judgment on Counts I (FLSA misclassification), II (FLSA deprivation of overtime pay), and IV (Massachusetts deprivation of overtime pay). [6] The defendants move for summary judgment on Counts I (FLSA misclassification) and III (Massachusetts misclassification). Neither party moves for summary judgment on Counts V and VI.

**\*5** The plaintiffs also move for certification of a class of past and present Massachusetts CQAC and URNA employees of the defendants for the purposes of the state law claims raised in Counts III, IV, and V. To put the questions in context, I first address the summary judgment motions.

## II. MOTIONS FOR PARTIAL SUMMARY JUDGMENT

### A. Standard of Review

Summary judgment is appropriate when, based on the pleadings, discovery, and disclosure materials in the record, "there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c). A "genuine" dispute is one that, based on the supporting evidence, "a reasonable jury could resolve ... in favor of the non-moving party," and a "material" fact is one that has "the potential to affect the outcome of the suit under the applicable law." *Sanchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir.1996) (citations and quotation marks omitted). I view the facts "in the light most favorable to the non-moving party." *Zambrana–Marrero v. Suarez–Cruz*, 172 F.3d 122, 125 (1st Cir.1999).

Where, as here, both parties have moved for summary judgment, I consider each motion separately to determine whether summary judgment is warranted for either side. *Bienkowski* v. *Northeastern Univ.*, 285 F.3d 138, 140 (1st Cir.2002) (citation omitted). Summary judgment is appropriate if "either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Group, Inc.* v. *Ferré Dev., Inc.*, 241 F.3d 103, 107 (1st Cir.2001). If further "inquiry into the facts is ... desirable to clarify the application of the law," summary judgment is not appropriate. *Mandel* v. *Bos. Phoenix, Inc.*, 456 F.3d 198, 205 (1st Cir.2006) (citation omitted).

### B. Plaintiffs' Motion for Summary Judgment

#### 1. Count I: Misclassification Under FLSA

**[1]**    **[2]**    **[3]**   The FLSA requires that employers compensate employees for hours worked in excess of 40 per workweek, at a minimum rate of one and one-half times their regular rate of pay. 29 U.S.C. § 207(a)(1). However, the FLSA exempts from this overtime pay requirement employees who work "in a bona fide executive, administrative, or professional capacity." *Id.* §

213(a)(1). The employer bears the burden of demonstrating that an employee falls within an FLSA exemption, see *Idaho Sheet Metal Works, Inc.* v. *Wirtz*, 383 U.S. 190, 209, 86 S.Ct. 737, 15 L.Ed.2d 694 (1966), as defined by regulations promulgated by the Secretary of Labor. *See Reich* v. *Newspapers of New Eng., Inc.*, 44 F.3d 1060, 1070 (1st Cir.1995). "Exemptions are to be 'narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit.' " *Id.* (citations omitted). How an employee spends his or her time at work is a question of fact, but whether the particular activities subject the employee to an exemption from the FLSA overtime requirements is a question of law. *See Withrow* v. *Sedgwick Claims Mgmt. Serv.*, 841 F.Supp.2d 972, 975 (S.D.W.Va.2012) (citations omitted); *Edwards* v. *Audubon Ins. Grp.*, No. 3:02–CV–1618–WS, 2004 WL 3119911, at *4 (S.D.Miss. Aug. 31, 2004) (citing *Icicle Seafoods, Inc.* v. *Worthington*, 475 U.S. 709, 714, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986)).

The defendants argue that the URNAs are exempt under the learned professional exemption, and that the CQACs are exempt under the learned professional or administrative exemptions. I consider each in turn.[7]

### a. URNAs: Learned Professional Exemption

**\*6** To be considered a "professional" employee under the regulations and therefore exempt from the FLSA overtime requirement, two criteria must be satisfied: the employee must be "(1) Compensated on a salary or fee basis at a rate of not less than $455 per week ...; (2) Whose primary duty is the performance of work: (i) Requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction ...." 29 C.F.R. §§ 541.300, .301.

#### i. Salary Basis & Amount

**[4]** An employee is paid on a salary basis "if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.602(a); *see id.* § 541.300(b). A few types of deductions—such as for absences from work for personal reasons and certain unpaid leaves—are permitted. *Id.* § 541.602(b). Otherwise, "an exempt employee must receive the full salary for any week in which the employee performs any work without regard to the number of days or hours worked." *Id.* § 541.602(a).

It is undisputed that before reclassification, the named URNA plaintiffs were compensated at a rate higher than $455 per week, regardless of the number of hours they worked or the quality of their work. This is generally sufficient to satisfy the salary requirement. *See, e.g., Rieve* v. *Coventry Health Care, Inc.*, 870 F.Supp.2d 856, 862 (C.D.Cal.2012); *Withrow*, 841 F.Supp.2d at 976. However, the plaintiffs contend that the salary basis requirement is not met, because the defendants cannot produce affirmative evidence that there were not or could not be deductions from the plaintiffs' pay based on the quality or quantity of their work.

**[5]** An employer "lose[s] the exemption if the facts demonstrate that the employer did not intend to pay employees on a salary basis," as demonstrated by "[a]n actual practice of making improper deductions." 29 C.F.R. § 541.603(a).[8] The plaintiffs have not pointed to any specific practice on the part of the defendants that creates a genuine dispute whether the defendants had "an 'objective intention to pay its employees on a salaried basis.' " *Martinez* v. *Hilton Hotels Corp.*, 930 F.Supp.2d 508, 521 (S.D.N.Y.2013) (citation omitted).

**\*7** Although exemptions are to be construed against employers—and therefore the defendants bear the burden of demonstrating that the exemption is satisfied—the plaintiffs must offer evidentiary materials, not unsubstantiated allegations, to support their motion for summary judgment. *See Idaho Sheet Metal Works*, 383 U.S. at 209, 86 S.Ct. 737 (employer bears exemption burden). *See generally Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient"). The plaintiffs' assertions of improper deductions

prior to reclassification are merely hypothetical and are inadequate to create a genuine dispute. *See Medina–Munoz* v. *R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990). There are no grounds in the record before me on which a reasonable fact finder could conclude that the salary basis requirement was not satisfied for the time period prior to reclassification. [9] *Cf. Davis* v. *Lenox Hill Hosp.*, No. 03 Civ.3746 DLC, 2004 WL 1926087, at *4 (S.D.N.Y. Aug. 31, 2004) (salary element not satisfied at summary judgment because both parties submitted evidentiary material "rais[ing] questions of fact as to whether [plaintiffs and other RNs] were paid on an hourly basis").

### ii. Primary Duty Requirement

The primary duty requirement contains three elements, all of which must be satisfied for the learned professional exemption to apply: "(1) The employee must perform work requiring advanced knowledge; (2) The advanced knowledge must be in a field of science or learning; and (3) The advanced knowledge must be customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.301(a).

As a threshold matter, the parties make much of language in the regulations discussing the status of RNs and LPNs under the primary duty test. The regulations provide that "[r]egistered nurses who are registered by the appropriate State examining board generally meet the duties requirements for the learned professional exemption," but "[l]icensed practical nurses and other similar health care employees ... generally do not qualify as exempt learned professionals because possession of a specialized advanced academic degree is not a standard prerequisite for entry into such occupations." 29 C.F.R. § 541.301(e)(2). The defendants contend that because all of the named URNA plaintiffs are RNs, they should be presumptively exempt. The plaintiffs, for their part, argue first that the work URNAs perform is qualitatively different from the work RNs perform in clinical settings, and second, that because LPNs have served (and do currently serve) as URNAs, URNAs should be presumptively non-exempt, because the exemptions must contemplate the minimum requirements of the job.

That the named plaintiffs are RNs and that LPNs also serve as URNAs are relevant facts to the inquiry; but those facts do not end it. Instead, the regulations require a careful review of the job duties and responsibilities to determine whether the "primary duty" test is satisfied. 29 C.F.R. § 541.2; *see Rieve*, 870 F.Supp.2d at 863 ("the fact that Plaintiff holds an RN degree is not dispositive, nor is a conclusory statement from Plaintiff's deposition that she relied upon her RN training"; instead, "[a]n inquiry of whether Plaintiff's work required advanced knowledge necessitates a thorough examination of the tasks comprising Plaintiff's primary duties" (citing *Powell* v. *Am. Red Cross*, 518 F.Supp.2d 24, 39 (D.D.C.2007))); *see also Withrow*, 841 F.Supp.2d at 987.

### Prong 1: Work Requiring Advanced Knowledge

**\*8 [6]** The regulations define "work requiring advanced knowledge" as "work which is predominantly intellectual in character, and which includes work requiring the consistent exercise of discretion and judgment, as distinguished from performance of routine mental, manual, mechanical or physical work. An employee who performs work requiring advanced knowledge generally uses the advanced knowledge to analyze, interpret or make deductions from varying facts or circumstances." 29 C.F.R. § 541.301(b). Although "[t]he nature of 'discretion and judgment' in the context of the professional exemption does not receive further elaboration in the regulations," *Pippins* v. *KPMG, LLP*, 759 F.3d 235, 240 (2d Cir.2014), the First Circuit has employed the administrative exemption's definition of "discretion and independent judgment" to the same phrase in the learned professional exemption on at least one occasion. *See De Jesus–Rentas* v. *Baxter Pharm. Servs. Corp.*, 400 F.3d 72, 74 & n. 4 (1st Cir.2005). *But see Pippins*, 759 F.3d at 240–41 (collecting cases and identifying sufficient distinctions between exemptions to conclude that guidance under administrative exemption for "discretion and independent judgment" is not instructive for similar phrase in learned professional exemption). Accordingly, to the extent it provides some guidance, I will rely on the definition of "discretion and judgment" provided for the administrative exemption, *see* 29 C.F.R. § 541.202, recognizing that the Secretary of Labor has noted that the phrase imposes a "less stringent" standard in the context of the learned professional exemption. *See Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales*

2015 WL 5749441, 2015 Wage & Hour Cas.2d (BNA) 320,303

*and Computer Employees, the Preamble to the 2004 Final Rule*, 69 Fed. Reg. 22,122, 22,151 (Apr. 23, 2004) [hereinafter *Defining Exemptions*]. [10]

I begin with a review of the URNAs' duties. Although the parties characterize the responsibilities differently, there is no meaningful dispute regarding the substance of the URNAs' tasks. *Cf. Rieve*, 870 F.Supp.2d at 860; *Powell*, 518 F.Supp.2d at 40. The URNAs' primary duties entail identifying an applicable guideline for a given request for medical treatment, reviewing the medical records within the case file in relation to the guideline to determine if the guideline is met, deciding whether to approve the request or refer it for a physician's review based on this assessment, and then writing a summary statement using a template that includes a stated rationale for the determination (either approval or referral for review of the treatment). The URNAs consider a variety of medical records and circumstances, including a patient's diagnosis, treatment, and prescribed drugs, in comparing the patient's circumstances and the requested treatment to the applicable guideline. In conducting their duties, they operate with minimal supervision.

The plaintiffs contend that the URNA job consists exclusively of routine application of guidelines to medical files and does not require any advanced knowledge or the exercise of judgment and discretion because the result is dictated by the guidelines in every instance. The defendants, by contrast, argue that the job requires URNAs to apply their medical knowledge in assessing, on a case-by-case basis, whether under the applicable guidelines, the requested medical treatment or procedure is medically necessary. The summary judgment record supports the defendants' interpretation of the URNA duties. The URNA plaintiffs employ advanced, technical knowledge in the medical field to exercise independent judgment in determining whether a particular treatment request for a particular patient satisfied the applicable guidelines.

An excerpt from Clarke's testimony demonstrates the way in which URNAs apply their medical knowledge to reviewing case files and applying guidelines. When she received a request for a physical therapy evaluation from a physician, Clarke would look for the following in the case file:

> I would expect to see a diagnosis. We already get the date of injury from the adjuster, and that is the most accurate date of injury. We would expect to see—okay, he has decreased range of motion, say, in his lumbar spine. He has muscle spasm in that area. Let's see. Possibly they've already done an x-ray or an MRI. Are there any herniated disks? Whatever. It depends upon the timeframe also for that.

**\*9** If a request was unclear, Clarke would "either send out a request for additional information or pick up the phone" and call the provider's office, a task that others confirmed the URNAs perform. The resulting review is dictated by the information provided in the file and collected through the follow-up, and by the guidelines.

The case law supports the conclusion that individuals engaged in initial utilization review work must use advanced knowledge and discretion to complete this work. In *Withrow*, 841 F.Supp.2d at 986–87, Judge Goodwin determined that a utilization review nurse who was an RN "used her advanced knowledge to consistently exercise judgment in determining whether a treatment requested by a claimant was related to the compensable injury" and "used her discretion to decide whether a particular request required an independent medical evaluation." In that case, the plaintiff had eventually taken on additional duties as a telephonic case manager, through which she interacted with patients returning to work and communicated directly with employers regarding workplace accommodations for patients. *Id*. In this capacity, her "medical knowledge enabled her to examine claimants' conditions and provide advice on what to expect from treatments." *Id*. Although the opinion does not say so explicitly, it suggests that the plaintiff's duties as a utilization review nurse alone would be sufficient to satisfy the learned professional exemption. *Id*.; *see Rieve*, 870 F.Supp.2d at 864 (interpreting *Withrow* as finding plaintiff's duties as a utilization review nurse and her later duties as a case manager exempt).

Similarly, in *Rieve*, 870 F.Supp.2d at 860, a field case manager provided day-to-day case management services for employers and workers' compensation insurers, including monitoring whether patients were receiving care consistent with medical orders, documenting the costs of care, implementing the ordered medical services, and assessing whether the medical care that was being provided was appropriate. The plaintiff was guided by a manual in completing her duties and did not have the authority

to modify treatment, but it was within her duties to identify unnecessary procedures and treatments. *Id.* She reported that she spent more than fifty percent of her time communicating with doctors, patients, and claims adjustors in fulfilling her duties. *Id.* at 860, 863. Judge Carter concluded that the plaintiff's primary duties placed her in a similar position to that of a registered nurse, "such that Plaintiff should be afforded the same treatment under the law as registered nurses engaged in the practice of nursing." *Id.* at 863, 865. Among the parallels Judge Carter identified between the duties of registered nurses and those of the plaintiff were prioritizing patient health, "act[ing] as an intermediary between the patients and doctors and provid[ing] advice to patients." *Id.* In addition, the plaintiff "deal[t] with extremely individualized results—a care plan for each of her patients," and even when following a manual, "her decisions are fact-specific and tailored to each of her patient's individual situations." *Id.* at 865; *see id.* at 864 (reasoning that in both *Rieve* and *Withrow*, plaintiffs "utilized independent judgment and discretion in [their] duties of the type intended to be exempt from FLSA coverage").

**\*10** Finally, in *Powell*, 518 F.Supp.2d at 27–28, [11] a registered nurse serving as a wellness associate for the American Red Cross "collected and reviewed medical records for individuals being deployed to determine whether the individual met the medical requirements for deployment under the applicable military guidelines," briefed and debriefed deployed personnel, and performed a range of additional tasks relating to the physical well-being and health of Red Cross employees on-site. Judge Huvelle concluded that "based on the technical, medical nature of both the records and the guidelines involved," the "plaintiff used her advanced knowledge as a registered nurse in making these important determinations" during medical record review whether "an individual was deployable from a medical standpoint." *Id.* at 40–41. The plaintiff also exercised discretion and judgment in "requesting additional testing when necessary to evaluate an employee's medical condition and advising employees how to address health issues so as to ensure that they would be deployable." *Id.*

In *Withrow*, *Rieve*, and *Powell*, the plaintiffs had additional duties that informed the courts' ultimate decisions. However, in each case, the plaintiff performed medical review work substantially similar to that performed by the URNAs, and in each case the judge's reasoning suggested that the application of medical knowledge and discretion in performing these tasks alone was sufficient to satisfy the first prong of the duties test. *See Rieve*, 870 F.Supp.2d at 864 ("Plaintiff did not merely input routine data but engaged in activities that demonstrate she is a skilled health care professional."); *Withrow*, 841 F.Supp.2d at 987 ("As a utilization review nurse, [plaintiff] used her advanced knowledge to consistently exercise judgment in determining whether a treatment requested by a claimant was related to the compensable injury."); *Powell*, 518 F.Supp.2d at 40–41 ("plaintiff used her advanced knowledge as a registered nurse" in making individualized determinations of medical eligibility for deployment). These cases support the conclusion that the first prong is satisfied here.

None of the limitations the URNA plaintiffs identify require a different result. For example, the plaintiffs argue that it is the applicable guidelines that determine whether the requested treatment is medically necessary, not the URNAs themselves. This argument collapses an important distinction between the rule and the person who applies it. It is analogous to saying that the law decides what the outcome of a case should be, and therefore judges cannot be said to have discretion in applying the law to particular cases. But lawyers and judges are tasked with interpreting the law, assessing its application on a case-by-case basis, and reaching individualized determinations. The process in which URNAs engage is not different in kind. *Cf. Rieve*, 870 F.Supp.2d at 865 ("Even if Plaintiff follows the same routine for each patient based on the ... Manual ... her decisions are fact-specific and tailored to each of her patient's individual situations."); *Powell*, 518 F.Supp.2d at 41 ("reliance on ... guidelines does not, by itself, indicate the lack of professional discretion and judgment" (citation omitted)). Indeed, "[t]he use of manuals, guidelines or other established procedures containing or relating to highly technical, scientific, legal, financial or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption." 29 C.F.R. § 541.704. In contrast, "employees who simply apply well-established techniques or procedures described in manuals or other sources within closely prescribed limits to determine the correct response to an inquiry or set of circumstances" are not exempt. *Id.*

**\*11** I have reviewed the Massachusetts Treatment Guidelines—one of the sets of guidelines the URNAs apply—and am satisfied that they require the plaintiffs to make judgments using their medical knowledge to determine whether a particular treatment is medically necessary. [12] *Cf. Powell*, 518 F.Supp.2d at 41–42. Even leaving aside the 10% Rule, whose provision of

discretion to URNAs the parties dispute, [13] the Guidelines entrust both health care providers and those engaged in utilization review with "taking into account that appropriate care may vary on a case by case basis." 452 Mass. Code Regs. 6.06(2). Indeed, the Massachusetts Office of Health Policy emphasizes in its guidance on the Guidelines that it provides "guidelines, not mandates," and that it is up to the URNA to provide "the clinical rationale to support the determination." *See* 452 Mass. Code Regs. 6.04(5).

That the URNAs cannot deny a request for treatment—another limitation emphasized by the URNA plaintiffs—is also not dispositive. The URNAs have two choices: they may approve the request or refer it for peer review by a physician in the same specialty. This determination to approve or refer for further review requires an exercise of discretion and judgment. That the ultimate decision-making authority is held by someone else does not strip the plaintiffs of using their own judgment to issue a recommendation. Indeed, "[t]he decisions made as a result of the exercise of discretion and independent judgment may consist of recommendations for action rather than the actual taking of action." *See* 29 C.F.R. § 541.202(c) ("employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level. ... The fact that an employee's decision may be subject to review and that upon occasion the decisions are revised or reversed after review does not mean that the employee is not exercising discretion and independent judgment."). For this reason, other courts have similarly given little weight to the fact that the universe of a plaintiff's possible decisions is limited to recommending modification or cancellation of treatment, if the plaintiff uses advanced knowledge and discretion in preparing the recommendation. *See, e.g.*, *Rieve*, 870 F.Supp.2d at 860, 864; *Powell*, 518 F.Supp.2d at 41. I conclude that this prong is satisfied.

*Prongs 2 and 3: Advanced Knowledge in a Field of Science or Learning Acquired Through Prolonged, Specialized Instruction*

**\*12**  **[7]**   The parties do not seem to dispute that if advanced knowledge is required for the URNA job, it is in a field of science or learning, as the term is defined by the regulations. *See* 29 C.F.R. § 541.301(c) (" 'field of science or learning' includes the traditional professions of ... medicine, ... various types of physical, chemical and biological sciences, pharmacy and other similar occupations that have a recognized professional status").

 **[8]**   They do, however, dispute whether the advanced knowledge required for the URNA position is of the type "customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.301(a)(3). [14] To determine whether this prong is satisfied, courts look to the qualifications required by the job rather than the education or credentials of the particular plaintiff employee. *See Dybach* v. *State of Fla. Dep't of Corrs.*, 942 F.2d 1562, 1565 (11th Cir.1991) ("[T]he determinative factor is the job requirement and not the education in fact acquired by the employee."); *Mudgett* v. *Univ. of Pittsburgh Med. Ctr.*, Civ. Action No. 09–254, 2010 WL 1838413, at \*5 & n. 5 (W.D.Pa. May 6, 2010) ("Although a job description is not dispositive of the question regarding professional status ... the qualifications, duties and responsibilities set out by the employer" are central to the determination whether the advanced knowledge necessary for the job must be "acquired by prolonged specialized instruction and study" (citation omitted)).

To obtain a job as an URNA, an individual must have graduated from an "accredited nursing program" and have a minimum of three to five years of clinical experience. He or she must also be licensed as an RN, LPN, or LVN. In this case, all of the URNA plaintiffs hold bachelor's degrees in nursing and RN licenses. If URNAs were *required* to have the plaintiffs' credentials, then this prong surely would be satisfied. *See Rieve*, 870 F.Supp.2d at 862 (advanced knowledge RN possesses is "acquired by a prolonged course of specialized intellectual instruction"); *Mudgett*, 2010 WL 1838413, at \*4–5 (job requiring "satisfactor[y] complet[ion] [of] formal training in an accredited professional school of nursing" and "minimum of three years nursing experience," along with preference for those holding a bachelor of science degree in nursing, satisfied professional exemption); *Powell*, 518 F.Supp.2d at 39 (noting absence of cases finding that a registered nurse does not satisfy duty test); *see also* 29 C.F.R. § 541.301(e)(2) ("Registered nurses ... generally meet the duties requirements ....").

However, I must look at the minimum requirements of the job to determine whether a course of prolonged instruction is needed to acquire the advanced knowledge that is required. *See Clark*, 44 F.Supp.3d at 679, 681 (focusing on "the minimum requirements

for the job," because "[e]ven though many Plaintiffs are RNs and hold advanced degrees and certificates, the ... job does not *require* those advanced qualifications"). As the plaintiffs emphasize, LPNs may also serve as URNAs. Although the defendants submit an internal policy indicating that LPNs are subject to more supervision than RNs in the same capacity, this argument does not change the fact that LPNs are permitted to work as URNAs, and at least one LPN did so during the relevant time period. [15] Geraldine Dolan, the director of operations for utilization management and the URNAs' supervisor, testified that LPNs working as URNAs had a different amount of supervision because of state requirements, and that for this reason the preference was to hire RNs over LPNs, but she also indicated that LPNs and RNs working as URNAs did not have different job duties. Standing alone, the minimum requirements of being an LPN and having three to five years of clinical experience would not be enough to satisfy this prong. *See* 29 C.F.R. § 541.301(e)(2) (LPNs "and other similar health care employees ... generally do not qualify as exempt learned professionals because possession of a specialized advanced degree is not a standard prerequisite for entry into such occupations"); *see also Clark*, 44 F.Supp.3d at 679 (where minimum requirements for job were LVN or LPN license and two or three years of practical experience, third duties prong not satisfied, because LVNs and LPNs do not generally require "a specialized advanced academic degree" and are presumptively nonexempt).

**\*13** The requirement of graduation from an accredited nursing program introduces a vital wrinkle. Neither party has offered a definition of "accredited nursing program" or explained whether graduation from such a program is a credential that exceeds that already held by an LPN or LVN, such that it requires URNAs to have completed a "prolonged course of specialized intellectual instruction" that they would not have as an LPN or LVN alone.

If the accredited nursing program—as contemplated by the URNA job description—provides skills-based practical training for LPNs, but nothing more, then it is unlikely that it would rise to the level of the prolonged academic study contemplated by the regulations. This reading would be consistent with an understanding of the other educational requirements in the URNA job description—a high school diploma or the equivalent, with a preference for, but no requirement of, a bachelor's degree—as representing the highest required educational attainment. *See* 29 C.F.R. § 541.301(b) ( "[a]dvanced knowledge cannot be attained at the high school level").

If, however, the accredited nursing program offers something more—for example, an effective alternative to earning a bachelor's degree that provides a comparably formal, academic experience—it would likely constitute "advanced intellectual instruction" that would satisfy this prong of the duty test. *See* 29 C.F.R. § 541.301(d). Such a requirement would not be inconsistent with the other educational requirements for the job, but would merely impose an additional, further qualification.

This distinction is determinative for the URNAs, but it cannot be made on this record. *See* 29 C.F.R. § 541.301(d) (regulations "restrict [ ] the exemption to professions where specialized academic training is a standard prerequisite for entrance into the profession"). With a more fully developed record that defines the nature of the accredited nursing program whose completion is required for the URNA position, the question whether the job requires prolonged, specialized instruction could possibly be resolved as a matter of law. But the present record does not permit a resolution either way.

Accordingly, neither party has satisfied its evidentiary burden on the URNA position's exemption status; and I will deny summary judgment for both parties on Count I as to the URNA plaintiffs' claims.

### b. CQACs: Learned Professional Exemption

**[9]** I pass for the moment addressing the salary element or elaborating on the duties of the CQAC position, because it is clear on its face that the CQAC position cannot satisfy the third prong of the primary duty requirement for the learned professional exemption that the position require "advanced knowledge ... customarily acquired by a prolonged course of specialized intellectual instruction." 29 C.F.R. § 541.301(a). As noted above, even though all of the CQAC plaintiffs are RNs, the relevant inquiry is what qualifications the position requires, and the relevant measure is the minimum criteria. *See Clark*, 44 F.Supp.3d at 679, 681. The required qualifications for the CQAC position are not as extensive as those for the URNA position. CQACs need only have a high school diploma or the equivalent, at least two years of clinical or related field experience, or

an equivalent combination of education and experience. The regulations make clear that a high school diploma and advanced knowledge that can be obtained through practical/occupational experience are not enough to satisfy this prong. *See* 29 C.F.R. § 541.301(d). Where "a specialized advanced academic degree is not a standard prerequisite for entry into [the] occupation [ ]," 29 C.F.R. § 541.301(e)(2), the professional exemption cannot apply. *See, e.g.*, *Hashop* v. *Rockwell Space Operations Co.*, 867 F.Supp. 1287, 1296 (S.D.Tex.1994) ("broadcast journalists are not 'professionals' for FLSA purposes because the study of journalism is not required to become a competent journalist," even if plaintiff holds college degree in journalism (citing *Freeman* v. *Nat'l Broad. Co.*, 846 F.Supp. 1109, 1154–55 (S.D.N.Y.1993)); *Defining Exemptions*, 69 Fed. Reg. at 22,153-54 (paralegals are generally non-exempt because "a four-year specialized paralegal degree is [not] a standard prerequisite for entry into the occupation," even though "many paralegals possess a Bachelor's degree").

**\*14** Here, by the terms of the job description, the CQAC position does not require a specialized advanced academic degree. The defendants do not argue that, in practice, they impose greater qualification requirements on CQACs than the job description provides. To the contrary, Patricia Troiano, a CQAC supervisor, testified that CQACs need not have a nursing license, and that even though many of the CQACs were RNs, not all of them were nurses. In addition Michelle Bolstad, Troiano's supervisor, testified that among the CQACs were a radiation therapist, an EMT, and a "manager" with industry experience. When hiring CQACs, Troiano and Bolstad looked for "clinical knowledge," that is, clinical or medical experience. Although licensure was valuable, it was not necessary. Accordingly, the CQAC plaintiffs are not eligible for the learned professional exemption.

### c. CQACs: Administrative Exemption

The defendants argue in the alternative that the CQAC position satisfies the administrative exemption. To qualify as an "administrative" employee, the employee must be "(1) Compensated on a salary or fee basis at a rate of not less than $455 per week ... ; (2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and (3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200.

### i. Salary Basis & Amount

**[10]** As with the URNA plaintiffs, it is undisputed that before reclassification, the named CQAC plaintiffs were compensated at a rate higher than $455 per week, regardless of the number of hours they worked or the quality of their work. As discussed above, the plaintiffs' argument regarding the defendants' burden on this prong is unpersuasive. The plaintiffs have not presented any evidence on which a reasonable fact finder could conclude that the salary basis requirement was not satisfied prior to reclassification.

Following reclassification, however, the salary basis requirement is not met. As I noted *infra* at note 9, the reclassification letter sent to the CQACs explicitly states that the employees were reclassified as "hourly," meaning that they would "be paid based on ... actual hours worked and not a set bi-weekly amount." *Cf. Kennedy* v. *Commonwealth Edison Co.*, 410 F.3d 365, 370 (7th Cir.2005) (plaintiffs was "identified as 'salaried' on [defendant's] payroll and receive[d] salaried employee benefits," and accordingly were paid on salary basis). Regardless of whether the defendants' reclassification decisions were proper, these letters reflect a clear intention on the part of the defendants to pay the CQACs on an hourly basis rather than a salary basis. The intention of the employer is a critical factor. *See* 29 C.F.R. §§ 541.602(a), 541.603(a); *see also Kennedy*, 410 F.3d at 372 ("the employer may take advantage of the regulation only if it objectively intended to pay its employees on a salary basis"); *Martinez*, 930 F.Supp.2d at 521 ("The overarching inquiry is whether the employer's practices reflect an 'objective intention to pay its employees on a salaried basis.' " (citation omitted)). Clearly, the defendants did not intend to pay the CQACs "a predetermined amount ... not subject to reduction because of variations in the ... quantity of the work performed." [16] 29 C.F.R. § 541.602(2); *see McBride* v. *Peak Wellness Ctr., Inc.*, 688 F.3d 698, 705 (10th Cir.2012) ("exempt employees are not paid by the hour"). Accordingly, if CQACs are exempt under the administrative exemption, they may be considered exempt only for the time period prior to reclassification.

*ii. Primary Duty Requirement*

**\*15**  Although the parties dispute the primary duties of the CQACs, here again the dispute is one of characterization rather than one of fact. The CQAC position consists of two responsibilities: assignment and quality assurance. Assignment entails reviewing a medical file and assigning a physician reviewer based on the particular medical issue. Quality assurance involves reviewing a report from a physician reviewer before sending it back to the insurer. The job description states that CQACs ensure that "Peer Review case reports are of the highest quality and integrity and in full compliance" with what the clients expect and what the applicable regulations require. Bowen, one of the CQAC plaintiffs, confirmed that the job description accurately reflects her actual duties. *Cf. McGowen* v. *Four Directions Dev. Corp.*, No. 1:12–CV–00109–JAW, 2014 WL 916366, at \*18 (D.Me. Mar. 10, 2014) (finding persuasive plaintiff's acknowledgment that job description was accurate summary of duties).

The quality assurance duties are explained more fully through the testimony of the CQAC plaintiffs and their supervisors. O'Day, one of the CQAC plaintiffs, testified that she would review the report from the reviewing physician to "make sure it answered the questions, was in the proper format, was grammatically correct, and had all of the information it needed in it, and then ... would send it back to the insurance company." Bowen testified that she would "inspect [the report] from a clinical perspective for accuracy medically, as well as grammar, etc., and then send the report back to the insurance company." In her review, she would ensure that the reviewing physician "answered the question, that he answered the right question, that he answered all the questions, that he took advantage of the medicals he was given"; that he called the right provider and asked the right questions; that his rationale was supported by the guidelines; and "that his answer ... actually supports an approval" or "that he has a clear determination of denial." If Bowen did not think the report was medically sound, she "would contact the doctor, ask him questions, if necessary send it back to him to review again, [and] make sure that he answered the question correctly." Troiano, a CQAC supervisor, and Michelle Bolstad, Troiano's supervisor, provided similar descriptions of the quality assurance work, adding that the CQACs would make phone calls if necessary to confirm the accuracy of a report and that the review "is clinical in that these are medical records so you need somebody that can recognize when something doesn't make sense."

*First Duty Requirement: Directly Related to Management or General Business Operations*

**[11]**  The defendants concede that the assignment duties of the CQACs are clerical and mechanical in nature, and therefore cannot be considered exempt. *See, e.g.*, 29 C.F.R. § 541.202(e). I agree with the parties that these duties could not satisfy the exemption. The defendants argue instead that quality assurance was the CQACs' primary duty, and this is the duty on which the exemption inquiry should focus.

The amount of time spent performing exempt work is "a useful guide in determining whether exempt work is the primary duty of an employee. ... [E]mployees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement," but even those who do not spend half their time on exempt activities can still satisfy the duty test under the right circumstances. 29 C.F.R. § 541.700(b); *see Withrow*, 841 F.Supp.2d at 985. Consistent with this general —albeit not determinative—threshold, Bowen testified that she spent fifty percent of her time on some days and one hundred percent of her time on other days doing quality assurance work. The other factors articulated in the regulations also suggest that quality assurance work was primary for the CQACs. 29 C.F.R. § 541.700(a). For example, the quality assurance duties are of greater "relative importance" than the assignment duties, and the job title itself contains the term "quality assurance." *See id.* (factors to consider include "the relative importance of the exempt duties as compared with other types of duties," and "the character of the employee's job as a whole"). Accordingly, I conclude that if the quality assurance work the CQACs perform may properly be considered exempt, the CQAC position overall satisfies the administrative exemption.

**\*16**  Under the regulations, "[d]irectly related to management or general business operations" means that the type of work the employee performs is "directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. §

541.201(a). The plaintiffs argue that the quality assurance work the CQACs perform constitutes non-exempt production activity related to product generation—as opposed to administrative work—because they produce reports that are transmitted between insurers and reviewing physicians. Although this position finds some support in the case law, it is ultimately unpersuasive on the record before me.

The plaintiffs rely on the First Circuit's decision in *Reich* v. *John Alden Life Ins. Co.*, 126 F.3d 1, 9 (1st Cir.1997). In *Reich*, the First Circuit observed that "non-manufacturing employees can be considered 'production' employees in those instances where their job is to generate (i.e., 'produce') the very product or service that the employer's business offers to the public." *Id.* For example, police investigators produce criminal investigations, and the producers and editors of television stations produce newscasts, and therefore are non-exempt because they are production employees. *Id.* In contrast, marketing representatives at a company that sells insurance policies are not production employees, because they are not "involved in the design or generation of insurance policies, the very product 'that the enterprise exists to produce and market.' " *Id.* (citation omitted). In subsequent cases, the First Circuit has applied *John Alden* to conclude that customer relations representatives and salespeople who manage client relationships are not production employees. *See Hines* v. *State Room, Inc.*, 665 F.3d 235, 242–43 (1st Cir.2011); *Cash* v. *Cycle Craft Co.*, 508 F.3d 680, 681, 685–86 (1st Cir.2007). Other circuits have similarly recognized that production jobs are not limited to those producing tangible goods and have focused on the distinction between "production [and] administrative functions" regardless of the nature of the ultimate product in assessing whether a job is exempt. *See, e.g.*, *Davis* v. *J.P. Morgan Chase & Co.*, 587 F.3d 529, 532–33 (2d Cir.2009).

The plaintiffs here argue that the products the defendants offer are peer review and utilization review—precisely the type of reports the CQACs are tasked with reviewing and distributing. At least one court has reached a similar conclusion on similar facts. In *Clark*, 44 F.Supp.3d at 682, Judge Sparks concluded that case managers who were all nurses performing utilization review had jobs that were "more 'production' than 'administration.' " The plaintiffs' employer was in the business of "administering government sponsored health insurance plans," and the plaintiffs were "uniquely positioned to 'produce' [the defendant's] 'product'—in this case, the service of administering Medicaid claims." *Id.* at 682–83. Judge Sparks reasoned that if the plaintiffs were administrative employees, everyone employed by the defendant would also be. *Id.* Because the plaintiffs performed "a core functionality of [the defendant's] business model" that was "essentially unique to [the defendant's] niche industry," they must be considered production employees and therefore not exempt under the administrative exemption. *Id.* at 682. If the plaintiffs had performed "general administrative work applicable to the running of any business," by contrast, they would be exempt. *Id.* at 682, 684. In reaching this conclusion, Judge Sparks rejected the plaintiffs' analogy to cases involving insurance claims adjusters, in part because claims adjusters "have a special place in FLSA jurisprudence." [17] *Id.* at 683–84.

**\*17** There are two important distinctions between this case and *Clark* that render this case more like such First Circuit cases as *Hines* and *Cash*, and the CQACs more like the claims adjusters in other cases.

First, unlike the nurses in *Clark*, the CQACs do not actually produce, manufacture, or author the utilization review reports that are provided to the defendants' clients. Instead, they perform quality control, reviewing the reports for accuracy, legal compliance, and "the highest quality and integrity." This work is not akin to "general administrative work applicable to the running of any business" but rather is unique to this particular industry and is "related to the business's overall efficiency or mode of operation." *Davis*, 587 F.3d at 535.

Second, as with the claims adjusters, the quality assurance work performed by the CQACs is explicitly contemplated as "[w]ork directly related to management or general business operations" by the regulations. *See* 29 C.F.R. § 541.201(b) (duty requirement can be satisfied by work in areas such as "auditing; insurance; quality control ... and similar activities"). This categorization makes sense because quality assurance employees like the CQACs perform an ancillary and important service by ensuring the quality of the product produced by the defendants, which in turn assists the running of the defendants' business. *See* 29 C.F.R. § 541.201(a); *cf. Hines*, 665 F.3d at 242–43 (plaintiff sales managers performed service that was "clearly ancillary to the principal function of actually providing the banquet services themselves").

There is, of course, line drawing necessary to define the scope of this exemption. For example, "quality control" work is generally exempt, whereas "[o]rdinary inspection work" and work involving examination or grading of products is generally not exempt. *See* 29 C.F.R. § 541.203(g), (h). The distinction appears to lie in whether the employees' duties go beyond the routine performance of an ancillary function and require a greater, more direct level of engagement with the work of the company. *Compare* 29 C.F.R. § 541.203(a) (insurance claims adjusters are presumptively exempt because "their duties include ... interviewing insured, witnesses and physicians; inspecting property damage; reviewing factual information to prepare damage estimates; evaluating and making recommendations regarding coverage of claims; determining liability ... ; and making recommendations regarding litigation"), *with* 29 C.F.R. § 541.203(g) ("ordinary inspection work" is presumptively nonexempt because inspectors "normally perform specialized work along standardized lines involving well-established techniques and procedures .... [and] within closely prescribed limits"). Here, the CQACs interface directly with the reviewing physicians and the clients to ensure that the defendants' product meets the expectations of their clients and is something the clients can understand and trust. Their duties in reviewing the reports are not quite at the level of an insurance claims adjuster but certainly exceed that of "ordinary inspection work." Accordingly, I conclude that this prong is satisfied.

*Second Duty Requirement: Exercise of Discretion and Independent Judgment*

**\*18**  **[12]**  To qualify for the administrative exemption, the primary duty must also "include the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.202(a). This generally "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." *Id.* Whether an employee exercises discretion and independent judgment is a fact-specific inquiry, guided by a non-exhaustive list of regulatory factors including "whether the employee carries out major assignments in conducting the operations of the business" and "whether the employee investigates and resolves matters of significance on behalf of management." *Id.* § 541.202(b).

Based on the job description and the accounts provided by the CQAC plaintiffs and supervisors, I conclude that the quality assurance work requires the exercise of discretion and independent judgment, specifically in determining whether the reviewing physician's rationale is supportable. As with the URNAs, determining whether the information in the case file "was sufficient to demonstrate that a request was related to the injury" involves discretion and independent judgment. *See Withrow*, 841 F.Supp.2d at 981. Although the result when a CQAC concludes that the reviewing physician has erred or that his or her rationale is not clear is not necessarily a denial of the request, but rather a conversation with the reviewing physician and a recommendation of an alternative determination, the CQAC makes an independent choice in reaching this conclusion. *See id.*; *see also Hines*, 665 F.3d at 246. The resulting "recommendation for action" can adequately satisfy the discretion requirement. 29 C.F.R. § 541.202(c).

The plaintiffs' assertions that they "had no decision-making authority and functioned merely as a liaison" are not only conclusory but also directly rebutted by Bowen's own testimony that she conducted a clinical review of the reviewing physician's report and could request clarification and further review by the physician, and by Troiano and Bolstad's testimony, which also indicated that the CQACs' review was more than merely mechanical. *See O'Neill–Marino* v. *Omni Hotels Mgmt. Corp.*, No. 99 Civ. 3793, 2001 WL 210360, at \*9 (S.D.N.Y. Mar. 2, 2001). That the CQACs also performed more ministerial tasks in conducting quality assurance—such as checking for grammar, spelling, and formatting—does not serve to lessen the judgment entrusted to them regarding the substance of the report. Similarly, that the CQACs are guided in their review by the applicable medical guidelines does not eliminate their discretion, particularly where the guidelines themselves, as discussed above, emphasize the need for independent judgment and application of medical knowledge. *See* 29 C.F.R. § 541.202(e); *id.* § 541.704; *see also McAllister* v. *Transamerica Occidental Life Ins. Co.*, 325 F.3d 997, 1001 (8th Cir.2003).

The CQACs' exercise of discretion and independent judgment in communicating with reviewing physicians to ensure adequate information, reviewing the physician's reports, ensuring their accuracy, and transmitting them back to the insurer involve matters of significance. Providing physician review and approval of a request for treatment subject to worker's compensation is at the core of the defendants' business as a utilization review company. The role that CQACs play in this clearly occupies a "level of importance or consequence" for both the defendants and their clients. *See* 29 C.F.R. § 541.202(a). By facilitating physician review of a request, ensuring its clinical appropriateness and technical accuracy, and providing that review to the client, CQACs

engaged in "work that affects business operations to a substantial degree, even if the ... assignments are related to operation of a particular segment of the business." *Id.* § 541.202(b). Accordingly, I conclude that this prong is satisfied as well.

**\*19** In sum, the defendants have carried their burden of demonstrating that the CQACs are exempt under the administrative exemption, and the plaintiffs have not demonstrated any genuine issue of material fact that precludes this determination. For this reason, I will deny the CQAC plaintiffs' motion for summary judgment on Count I as to the time period prior to reclassification, and grant the defendants' motion for summary judgment on this Count as to the CQAC plaintiffs, but only as to the time period prior to reclassification.

2. Count II: Failure to Pay Overtime Under FLSA

 **[13]** I turn next to Count II, which alleges that the defendants failed to pay overtime as required by the FLSA. The plaintiffs claim that they worked off the clock without pay with their supervisors' knowledge, and that the supervisors modified timecards to prevent employees from receiving pay for overtime hours worked, including when they worked through lunch.

Under 29 U.S.C. §§ 206 and 207, an employee is entitled to minimum wage and to "compensation for his employment in excess of [forty hours per workweek] at a rate not less than one and one-half times the regular rate at which he is employed," unless the employee is deemed exempt from these provisions under 29 U.S.C. § 213 and the accompanying regulations. Although I have concluded that the CQAC plaintiffs were exempt from the FLSA requirements prior to their reclassification, they cannot be said to be exempt after their reclassification in April 2012. Accordingly, I must assess whether the defendants are subject to liability for non-compliance with the FLSA in relation to the URNA plaintiffs as to all relevant time periods and in relation to the CQAC plaintiffs as to the time period following reclassification.

To succeed on a claim for overtime wages under the FLSA, at least two requirements must be met: first, the non-exempt plaintiffs must establish that they actually worked beyond forty hours in a work week for which they were not compensated and which constitute compensable overtime, and second, they must establish that their employer knew or should have known that they were working overtime. *See Manning* v. *Bos. Med. Ctr. Corp.*, 725 F.3d 34, 43 (1st Cir.2013); *Harvill* v. *Westward Commc'ns*, 433 F.3d 428, 441 (5th Cir.2005); *see also* 29 U.S.C. § 203(g). "[W]here an employer has no knowledge that an employee is engaging in overtime work and that employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is *not* a violation of § 207(a)." *Harvill* v. *Westward Commc'ns, LLC*, 311 F.Supp.2d 573, 583–84 (E.D.Tex.2004), *aff'd*, 433 F.3d 428 (5th Cir.2005). Accordingly, actual or constructive knowledge on the part of the employer is required for an overtime claim. *See Manning*, 725 F.3d at 44. A rule or policy against unauthorized overtime or requiring prior approval for any work that would result in overtime can prevent an employer's liability for overtime if it is enforced. *See* 29 C.F.R. § 785.13; *see also Chao* v. *Gotham Registry, Inc.*, 514 F.3d 280, 288–89 (2d Cir.2008).

There are a number of factual disputes regarding the overtime the plaintiffs worked, the defendants' awareness of this overtime, and the existence and enforcement of an overtime policy that preclude summary judgment on this Count.

These factual disputes are readily apparent in the testimony of the plaintiffs and their supervisors. Chansky, an URNA plaintiff, testified that she ate lunch at her desk, and most other URNAs did too. She testified that although Geraldine Dolan, the URNAs' supervisor, never told the URNAs to work through lunch, "it was the expectation to keep working," and that Dolan herself ate lunch in her office.

**\*20** Dolan testified that she did not observe whether the employees took thirty-minute meal breaks until after this lawsuit was filed, and no one ever complained to her about being inaccurately clocked in or out for a lunch break or having an inaccurate timesheet.

Consistent with Dolan's testimony, Crowe testified that she never spoke to anyone about working outside of the times she was clocked in and out, but nonetheless stated in her affidavit that her supervisors were aware of her overtime work. Crowe further

stated that she regularly worked 7-10 hours over 40 in a week before and after reclassification, during lunch breaks and at the end of the day, and that her supervisors knew she was working these additional hours but ignored it. She also stated that she occasionally started working before she punched in "because of the work load," even though no one told her to do so. Clarke, another URNA, stated that she regularly worked 5-7 extra hours per week without pay both before and after reclassification.

O'Day, a CQAC plaintiff, stated that after reclassification, she was assigned to work 32 hours per week, but would sometimes work 2-5 additional hours per week without pay. O'Day further testified that she was permitted to take a morning break and a lunch break if she wanted to, but she often did not. In contrast, Julianne DiCastro-Nascenz, another URNA who is not a plaintiff in this case, testified that she was always paid for any overtime she worked.

Sky Lucier, a CQAC supervisor, testified that she could not remember any of the employees she supervised reporting that they had worked more than forty hours in a workweek after reclassification, but also that she had authorized some CQACs to work overtime when there was additional work to be done.

This testimony leaves several core factual determinations unresolvable. First, the precise number of excess hours the plaintiffs worked, and whether these hours qualify as overtime, are unclear. Second, it is disputed whether Dolan or another supervisor or manager had knowledge that the plaintiffs worked overtime. Third, the employee handbooks for MES and ExamWorks set forth explicit overtime policies that, if enforced, could relieve the defendants of liability. [18] *See* 29 C.F.R. § 785.13. Although Dolan testified that she could not recall whether there was an overtime policy in the employee handbook, she also testified to engaging in a practice that is consistent with the policy from October 2012 until the filing of this lawsuit. During that time period, Dolan altered employees' timecards to reflect a forty-hour workweek because it was her understanding that they needed to work exactly eight hours a day unless they had obtained approval to work overtime. Lucier testified that this was her understanding as well.

 **\*21**  In short, the present factual record leaves too many open questions that cannot be resolved at this stage. Accordingly, I will deny summary judgment on Count II.

To the extent the CQAC plaintiffs pursue claims under Count II as to pre-reclassification overtime, there is no basis as a matter of law for that claim. Although the defendants did not separately move for summary judgment on Count II, I may enter summary judgment *sua sponte* when "there has been a reasonable opportunity to glean material facts through the discovery process" and "the targeted party received appropriate notice of opportunity to present evidence on the essential elements of the claim or defense." *Tucard, LLC* v. *Fidelity Nat'l Prop. & Cas. Ins. Co.*, 567 F.Supp.2d 215, 222 (D.Mass.2008) (citation omitted); *see Bank* v. *Int'l Bus. Machs. Corp.*, 145 F.3d 420, 431 (1st Cir.1998); *see also* Fed. R. Civ. P. 56(f)(1) (court may grant summary judgment for nonmovant). I find that both of these criteria are satisfied here, particularly where the defendants defended against the plaintiffs' own motion for summary judgment on this Count. For this reason, I will grant summary judgment for the defendants on Count II only as to the CQAC plaintiffs and as to them only as to the pre-reclassification period.

3. Count IV: Failure to Pay Overtime Under Massachusetts Overtime Law

Count IV alleges willful deprivation of overtime pay under Mass. Gen. Laws ch. 151, § 1A, both before and after reclassification, as to all the named plaintiffs and the putative class, under substantially the same theories as discussed for Count II. Although the plaintiffs move for summary judgment on this Count, their briefing does not offer any more than passing references to it. Regardless, my resolution of Count II is equally applicable here. *See Valerio* v. *Putnam Assocs. Inc.*, 173 F.3d 35, 40 (1st Cir.1999) (Massachusetts overtime provisions are identical to FLSA); *Goodrow* v. *Lane Bryant, Inc.*, 432 Mass. 165, 732 N.E.2d 289, 294 (2000) (same). The same factual disputes precluding summary judgment on Count II preclude summary judgment on Count IV as well. *See Valerio*, 173 F.3d at 40. As with Count II, however, I will grant summary judgment for the defendants on Count IV as to the CQAC plaintiffs pre-reclassification only, because they were exempt and therefore ineligible for overtime pay as a matter of law. [19] *See Bank*, 145 F.3d at 431; *Tucard*, 567 F.Supp.2d at 222.

## C. Defendants' Motion for Summary Judgment

### 1. Count I: Misclassification Under FLSA

For the reasons set forth above, I conclude that the defendants have met their burden of demonstrating that the administrative exemption applies to the CQACs post-reclassification, but have not met their burden of demonstrating that the learned professional exemption applies to either the CQACs or the URNAs. Accordingly, I will grant summary judgment for the defendants on Count I as to the CQAC plaintiffs only, limited as previously mentioned, to the pre-reclassification period.

### 2. Count III: Misclassification Under Massachusetts Law

**\*22** **[14]** Count III alleges misclassification of the plaintiffs and other similarly situated class members as exempt employees in violation of Mass. Gen. Laws ch. 149, § 148.[20] The definition of exempt employees under Massachusetts law, like the overtime pay provisions, mirrors that of the FLSA. *See Valerio,* 173 F.3d at 40; *O'Donnell* v. *Robert Half Int'l, Inc.,* 534 F.Supp.2d 173, 183 n. 3 (D.Mass.2008); *Swift* v. *AutoZone,* 441 Mass. 443, 806 N.E.2d 95, 100 (2004); *see also* Mass. Gen. Laws ch. 151, § 1A; 455 Mass. Code Regs. 2.02(3). Because "both the FLSA and Massachusetts law compel the same outcomes," *Valerio,* 173 F.3d at 40, I will grant summary judgment for the defendants on Count III as to the CQAC plaintiffs pre-reclassification only. Similarly, I will grant summary judgment for the plaintiffs on Count III as to the CQAC and URNA plaintiffs post-reclassification, during which time the plaintiffs were non-exempt employees. *See Bank,* 145 F.3d at 431; *Tucard,* 567 F.Supp.2d at 222.

## III. PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

The plaintiffs move for certification of the following class as to their state law claims under Counts III, IV, and V:[21] "All individuals Defendant Examworks, Inc. and Defendant MES Group, Inc. employed as Clinical Quality Assurance Coordinators and Utilization Review Nurse Auditors in Norwood, Massachusetts, from January 13, 2007 to the present."

### A. Rule 23 Requirements

To obtain class certification, the plaintiffs must initially establish each of the four elements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a); *see Smilow* v. *Sw. Bell Mobile Sys., Inc.,* 323 F.3d 32, 38 (1st Cir.2003) (citing *Amchem Prods., Inc.* v. *Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *see also Garcia* v. *E.J. Amusements of N.H., Inc.,* Civ. Action No. 13–12536–PBS 2015 WL 1623837, at \*1–2 (D.Mass. Apr. 13, 2015) (Rule 23 governs class certification of Massachusetts wage and overtime claims), *appeal filed* (No. 15-8011) (1st Cir. Apr. 28, 2015). I find that the plaintiffs have demonstrated each of these requirements by a preponderance of the evidence for Counts III and IV. *See Gen. Tel. Co. of Sw.* v. *Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

**[15]** The class as revealed through discovery is sufficiently numerous. The plaintiffs have identified 47 employees who would potentially qualify for the class: 42 CQACs and 5 URNAs.[22] *See Reid* v. *Donelan,* 297 F.R.D. 185, 188–89 (D.Mass.2014); *DeRosa* v. *Mass. Bay Commuter Rail Co.,* 694 F.Supp.2d 87, 97–98 (D.Mass.2010).

**\*23** **[16]** **[17]** The commonality requirement is clearly met for Count III, is barely met for Count IV, and is not met for Count V. Although commonality has been described as a "low hurdle," requiring "a single common legal or factual basis," *O'Donnell,* 534 F.Supp.2d at 183, the Supreme Court has emphasized that commonality requires some "demonstrat[ion] that class members 'have suffered the same injury' " based on "a common contention ... capable of classwide resolution." *Wal–Mart Stores, Inc.* v. *Dukes,* ––– U.S. ––––, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011) (quoting *Falcon,* 457 U.S. at 157, 102 S.Ct. 2364). "[I]ndividualized issues regarding the amounts of damages and who is entitled to recover," however, are inquiries

better suited for the typicality and predominance requirements. *See Martins* v. *3PD, Inc.*, Civ. Action No. 11–1131–DPW, 2013 WL 1320454, at *6 (D.Mass. Mar. 28, 2013).

There is at least one common question of law or fact here: the CQAC and URNA positions' qualification for exemption under Massachusetts overtime law.[23] A classwide proceeding could "generate [a] common *answer*" to this question of classification "in one stroke" that would be "apt to drive the resolution of the litigation," because a threshold determination whether the employees are exempt or non-exempt is necessary for the resolution of the statutory overtime pay claims. *See Dukes*, 131 S.Ct. at 2551 (citation omitted). Although this single common question is effectively resolved by Count III, it is arguably a necessary predicate for a claim under Count IV.[24] These common questions do not, however, hold true for Count V, where an assessment of liability requires wholly individualized determinations regarding hours worked and the provision of meal breaks.[25]

**\*24** **[18]** The typicality requirement is similarly satisfied. On Count III, although there are factual distinctions between the CQACs and the URNAs overall, there are no such differences between individual employees within the groups. As to Count IV (and Count V, although it is inapposite), the relief the named plaintiffs seek is the same as that sought by the class overall: compensation for overtime hours worked as a non-exempt employee, in varying degrees of amount. *See Espinoza* v. *Assocs. LLC*, 280 F.R.D. 113, 128 (S.D.N.Y.2011). The defendants have not identified any particular defenses that would apply to only the named plaintiffs, or only to others in the class. *In re Credit Suisse–AOL Sec. Litig.*, 253 F.R.D. 17, 23 (D.Mass.2008). The named plaintiffs therefore show substantial identity and "share essential characteristics" with the class overall. *See Swack* v. *Credit Suisse First Bos.*, 230 F.R.D. 250, 260 (D.Mass.2005); *cf. George* v. *Nat'l Water Main Cleaning Co.*, 286 F.R.D. 168, 176 (D.Mass.2012); *Piper* v. *Portnoff Law Assocs.*, 216 F.R.D. 325, 329 (E.D.Pa.2003).

**[19]** Finally, the adequate representation requirement is satisfied. The named plaintiffs' active involvement in the case and shared common interests with the class demonstrate that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Similarly, plaintiffs' counsel appears "qualified, experienced and able to vigorously conduct the proposed litigation." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir.1985). Accordingly, the Rule 23(a) requirements are satisfied for Counts III and IV.

### *B. Rule 23(b)(3) Predominance Requirement*

**[20]** The plaintiffs must also satisfy one of the elements of Rule 23(b) to obtain class certification. *See Comcast Corp.* v. *Behrend*, ––– U.S. ––––, 133 S.Ct. 1426, 1432, 185 L.Ed.2d 515 (2013). Under Rule 23(b)(3), class certification is appropriate if I find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."

**[21]** **[22]** To satisfy the predominance requirement, the proposed class must be "sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623, 117 S.Ct. 2231; *see Comcast*, 133 S.Ct. at 1432. This requirement is "similar to but more demanding than the commonality requirement." *Bezdek* v. *Vibram USA Inc.*, 79 F.Supp.3d 324, 340 (D.Mass.2015). The focus is on "the relative importance and prevalence of the different issues within the lawsuit," *George*, 286 F.R.D. at 179, in relation to what must be proved for the underlying cause of action. *See Erica P. John Fund, Inc.* v. *Halliburton Co.*, 563 U.S. 804, 131 S.Ct. 2179, 2184, 180 L.Ed.2d 24 (2011). Considerations of efficiency and judicial economy drive the assessment of superiority of a class action. *See Otte ex. rel. Estate of Reynolds* v. *Life Ins. Co. of N. Am.*, 275 F.R.D. 50, 58 (D.Mass.2011).

Common questions predominate with respect to Count III.[26] Neither party has presented evidence suggesting that the responsibilities of the individual CQACs or URNAs were so different as to prevent resolution of the positions' exemption on a classwide basis. If there is an injury to be found in misclassification, liability is capable of proof common to the class, parsing only as to CQACs and URNAs generally. *See Comcast*, 133 S.Ct. at 1436–37. This is sufficient to satisfy the predominance standard "even if damages are not provable in the aggregate." *Id.* at 1437. In addition, resolution of such employment classification claims by class action is superior to individual adjudication. *See Martins*, 2013 WL 1320454, at *8–9.

**\*25**  **[23]**  The same cannot be said of Count IV, whose only common question is resolved by Count III, and which otherwise requires individualized assessments to determine both liability and damages. [27]  This Count alleges that the CQACs and URNAs were deprived overtime pay under the Massachusetts Wage Act. The employee handbooks for MES and ExamWorks set forth policies that on their face comply with the meal break and overtime requirements imposed by Massachusetts law. *See* Mass. Gen. Laws ch. 149, § 100 (employee must be provided a 30-minute lunch break when working for a period of 6 hours or more, and must be relieved of all duties during this time period, but need not be paid for the time; rest breaks are not required); Mass. Gen. Laws ch. 151, § 1A (non-exempt employees must be paid one and one half times the regular rate for hours worked over forty hours in a work week); *see supra*, Section II.B.2 (discussion of policies). The plaintiffs have not alleged or identified a consistent practice or unofficial policy across supervisors or employees departing from those set forth in the handbook—such as not paying for overtime that is owed, directing employees to work through lunch (and not properly compensating them), or modifying timecards—that would permit classwide resolution of the claims raised in Count IV, other than identifying a general "pressure" within the company to complete the caseload in a timely fashion. Instead, the plaintiffs have offered ad hoc indications that some supervisors engaged in such practices as to individual employees, and accordingly that some supervisors may have implemented the official policies improperly. [28]

Although Count IV requires resolution of a common threshold issue—whether the CQACs and URNAs are properly considered nonexempt and therefore entitled to overtime wages—individual issues regarding overtime hours actually worked and whether those hours were worked with a supervisor's knowledge or at a supervisor's direction predominate over this question and "go directly to questions of liability." *Martins*, 2013 WL 1320454, at \*8; *see Manning*, 725 F.3d at 44 (actual or constructive knowledge by employer of excess hours worked is required for FLSA overtime claim); *Valerio*, 173 F.3d at 40 (Massachusetts overtime provision "is essentially identical to the FLSA"); *see also Prime Comm'cns, Inc.* v. *Sylvester*, 34 Mass.App.Ct. 708, 615 N.E.2d 600, 602 (1993) (if "employer has no knowledge that an employee is engaging in overtime work and that employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay the overtime hours is not a violation of [FLSA]" (citations and internal quotation marks omitted)). Additional individualized issues arise with regard to timecard modification, including when and why any given employee's timecard was changed, and whether an individual employee has already received pay for the overtime hours worked. As I have observed previously, there is "a strong [judicial] preference for rendering decisions on the classification of employees on [a] class wide basis," because "a company's employee-classification scheme applies to all individuals classified under it," but "the company's treatment of those employees [once classified] may differ widely." *Martins*, 2013 WL 1320454, at \*9. As a result, individual questions often predominate over the claims that derive from classification. *Id.* That is the case here.

**\*26**  Highly individualized questions based on the employee, the supervisor, and the specific circumstances of that relationship are core to the liability determinations necessary for Count IV and preclude class certification on this Count. [29]  *See Babineau* v. *Fed. Exp. Corp.*, 576 F.3d 1183, 1191–92 (11th Cir.2009) (denying class certification on employees' claim that individual employees worked during break times despite policy directing them not to, because liability could not be determined absent inquiry into each employee's work arrangements); *Raposo* v. *Garelick Farms, LLC*, 293 F.R.D. 52, 56–57 (D.Mass.2013) (assessment of whether "all drivers in the class work through meal breaks and, if so, why" and whether "any driver [who] worked through meal breaks ... was compensated for that time," were incapable of classwide resolution because "reasons for doing so vary from driver to driver and from day to day"; in addition, assessment of whether "Drivers were compensated for working breaks" was also incapable of classwide resolution because entrustment of employment patterns to discretion of supervisors resulted in non-uniform employment practice incapable of broad evaluation); *Cornn* v. *United Parcel Serv., Inc.*, No. C03–2001, 2005 WL 2072091, at \*2–6 (N.D.Cal. Aug. 26, 2005) (denying class certification on employees' claim that they performed various procedures before beginning work that warranted compensation, because company had policy instructing employees not to work prior to scheduled start times, and plaintiffs produced insufficient evidence of classwide practice to the contrary giving rise to liability); *Basco* v. *Wal–Mart Stores, Inc.*, 216 F.Supp.2d 592, 602–04 (E.D.La.2002) (denying class certification due to "plethora of individual issues" determinative of liability and damages on plaintiffs' claim of breach of contractual agreement to provide rest and meal breaks, and "myriad of possibilities ... to explain why any one of the plaintiffs worked off-the-clock" on deprivation of pay claims); *see also Garcia*, 2015 WL 1623837, at \*5 (distinguishing between cases in which "courts have rejected class certification where a determination of liability would require a burdensome inquiry into

2015 WL 5749441, 2015 Wage & Hour Cas.2d (BNA) 320,303

each employee's individual circumstances," and those in which "employees alleged per se illegal wage policies that violated the rights of all class members"); *George*, 286 F.R.D. at 182 (distinguishing between cases involving common policy or practice and the *Babineau–Cornn–Basco* line of cases).

In sum, although common questions of law and fact predominate regarding the misclassification claim in Count III, individual issues predominate regarding Count IV and destroy the efficiencies that would be obtained from trying the deprivation of overtime pay claim as a class. *See O'Donnell*, 534 F.Supp.2d at 184. Count V similarly requires individualized liability determinations and possesses no common question that would permit classwide resolution. Accordingly, I will grant the plaintiffs' motion for class certification as to Count III, but deny it as to Counts IV and V.


# IV. CONCLUSION

I end with a brief summary of the disposition of the motions. When the defendants reclassified the URNAs and CQACs, they changed their pay arrangements such that those positions no longer satisfied the salary basis test required for exemption from the FLSA. Accordingly, the plaintiffs are entitled to summary judgment on Counts I and III as to the URNA and CQAC plaintiffs for the post-reclassification period only, because as a matter of law neither position can satisfy the salary basis test for exemption from that point forward.

The defendants have demonstrated as a matter of law that the CQAC position qualifies for the administrative exemption to the FLSA, and are accordingly entitled to summary judgment on Counts I and III for the pre-reclassification period for the CQAC plaintiffs.

Genuine disputes of material fact remain regarding the exempt status of the URNA plaintiffs under the learned profession exemption during the pre-reclassification period. Accordingly, summary judgment is denied to both parties on Count I, and to the defendants on Count III, [30] as to those plaintiffs for the pre-reclassification period.

**\*27** Because genuine issues also remain regarding whether and how much overtime the plaintiffs worked during the time periods in which they were non-exempt, the plaintiffs' motion for summary judgment on Counts II and IV is denied. However, the defendants are entitled to summary judgment on Counts II and IV as to the CQAC plaintiffs for the pre-reclassification period, during which the CQACs were exempt from the FLSA and therefore were not eligible for overtime pay under the federal or state statutes. [31]

The merits of their claims aside, the plaintiffs have satisfied the prerequisites for class certification on Count III, but have not done so for Counts IV and V.

Accordingly, for the reasons and on the terms set forth above, I:

–GRANT in part and DENY in part the Plaintiffs' Cross-Motion for Partial Summary Judgment, Dkt. No. 163;

–GRANT in part and DENY in part the Defendants' Renewed Motion for Summary Judgment, Dkt. No. 166; and

–GRANT in part and DENY in part the Plaintiffs' Motion for Class Certification of Their State Law Claims, Dkt. No. 180.

The parties are directed to submit a status report on or before October 16, 2015 proposing the means for reducing this case to a final judgment.

2015 WL 5749441, 2015 Wage & Hour Cas.2d (BNA) 320,303

**All Citations**

--- F.Supp.3d ----, 2015 WL 5749441, 2015 Wage & Hour Cas.2d (BNA) 320,303

Footnotes

1    Numerous other named plaintiffs who had previously joined in this lawsuit have been dismissed.

2    The parties dispute whether the 10% Rule requires URNAs to approve requests not covered by a specific guideline if the requesting medical provider states that the treatment is medically necessary, or whether the 10% Rule enables URNAs to exercise their discretion on a case-by-case basis.

3    The defendants contend that the Massachusetts Department of Industrial Accidents ("DIA"), which promulgates regulations governing utilization review by insurers, requires that registered nurses ("RNs") perform URNA work, and that any nurse who is not an RN but performs such work must be supervised by one. However, as discussed *infra*, the source cited by the defendants does not support this contention. The plaintiffs observe that the applicable regulations require only that "a practitioner of the same school as the ordering provider" issue "[a]ny adverse determination of a health care service issued by a utilization review agent." 452 Mass. Code Regs. 6.04(5)(c). This is consistent with the internal process of requiring an URNA to refer a case for physician review rather than denying a request for treatment.

4    Although the defendants assert that the plaintiffs "have failed to establish that any of their time sheets were revised by [Patricia] Troiano," one of the supervisors, and "when those time sheets were allegedly changed," the plaintiffs have submitted with their motion for class certification an audit report of the timecard system demonstrating that the usernames "mbolstad," "ptroiano," "gdolan," and "smahoney" modified timecards of employees, including Plaintiffs Joanne Clarke and Anna Maria Crowe.

5    After Crowe filed her first amended complaint, the defendants moved to dismiss for failure to state a claim. Crowe obtained leave to file a second amended complaint that added four named plaintiffs—Rebecca Lawrie, Kathleen O'Day, Joanne Clarke, and Nathan Fern—and continued to make allegations on behalf of a putative class. Thereafter, the defendants filed a partial motion to dismiss, and the plaintiffs filed a motion for conditional certification of a class as to certain counts of the complaint. Following a hearing, I directed the filing of a third amended complaint in order to frame the issues properly, and denied the pending motion to dismiss and the motion to certify the class, both without prejudice.

6    It is unclear why the plaintiffs have not moved for summary judgment on Count III, which presents factual and legal issues regarding misclassification essentially identical to those presented by Count I.

7    As an initial argument, the plaintiffs contend that the reclassification decisions issued by the defendants constitute admissions of liability for misclassification, and that summary judgment should be allowed on this Count for this reason alone. I agree with the defendants that these reclassification decisions are not dispositive. It is well-settled that the nature and duties of the job, rather than the employer's classification of the position, determine whether an exemption applies. *See* 29 C.F.R. § 541.2; *see also Clarke* v. *JPMorgan Chase Bank, N.A.*, No. 08 Civ. 2400(CM)(DCF), 2010 WL 1379778, at *22 (S.D.N.Y. Mar. 26, 2010) ("reclassification is not materially relevant to the determination of whether [plaintiff] falls within the computer employee exemption"); *Reeves* v. *Int'l Tel. & Tel. Corp.*, 357 F.Supp. 295, 302–03 (W.D.La.1973) ("the exemption of any individual depends upon his duties and other qualifications and not upon how the employer classifies the employee"); *Goldberg* v. *Strickland Transp. Co.*, 203 F.Supp. 417, 419 (E.D.Ark.1962); *Walling* v. *Moore Milling Co.*, 62 F.Supp. 378, 382 (W.D.Va.1945).

8    Under a pre-2004 version of the regulations, an employer could lose the exemption if it had "an employment policy that creates a 'significant likelihood' of such deductions." *Auer* v. *Robbins*, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997); *see O'Brien* v. *Town of Agawam*, 350 F.3d 279, 292 (1st Cir.2003). However, following the 2004 revisions, numerous courts have concluded that this "significant likelihood" test is no longer in use. *See Baden–Winterwood* v. *Life Time Fitness, Inc.*, 566 F.3d 618, 627–28 (6th Cir.2009); *Kaiser* v. *At The Beach, Inc.*, No. 08–CV–586–TCK–FHM, 2011 WL 6826577, at *14 (N.D.Okla. Dec. 28, 2011). *But see Martinez* v. *Hilton Hotels Corp.*, 930 F.Supp.2d 508, 521–22 (S.D.N.Y.2013) (reciting significant likelihood test and citing cases recognizing it). An actual practice of improper salary deductions is generally required for an employer to lose the exemption under the salary requirement. *See Kaiser*, 2011 WL 6826577, at *14–15. Nevertheless, "[i]f an employer has a clearly communicated policy that prohibits the improper pay deductions" and provides mechanisms for correction of such deductions, the exemption may still be available. 29 C.F.R. § 541.603(d).

9    The plaintiffs also contend that they must be considered nonexempt after reclassification because they were not paid on a salary basis at that time. It goes without saying that the defendants cannot satisfy the salary basis requirement post-reclassification. The reclassification letter sent to the URNAs explicitly states that the employees were reclassified as "hourly," meaning that they would "be paid based on ... actual hours worked and not a set bi-weekly amount." Regardless of whether the defendants' reclassification decisions were proper, these letters reflect a clear intention on the part of the defendants *not* to pay the plaintiffs on a salary basis,

but rather on an hourly basis. *See* 29 C.F.R. §§ 541.602(a), 541.603(a); *see also Kennedy* v. *Commonwealth Edison Co.*, 410 F.3d 365, 372 (7th Cir.2005); *Martinez* v. *Hilton Hotels Corp.*, 930 F.Supp.2d 508, 521 (S.D.N.Y.2013).

The plaintiffs' other arguments on deprivation of overtime pay and improper deductions during this period are not relevant to Count I. They are, of course, central to the claims of Count II.

10    In making this observation, the Secretary of Labor cited for support the lower court's decision in *De Jesus–Rentas* v. *Baxter Pharmacy Services Corp. See Defining Exemptions*, 69 Fed. Reg. at 22151 (citing *De Jesus–Rentas* v. *Baxter Pharm. Servs. Corp.*, 286 F.Supp.2d 235, 241 (D.Puerto Rico 2003)).

11    Although the plaintiff in *Powell* brought her claim under the D.C. Wage and Hour Law, the exemptions under that law and the FLSA are the same. *Powell* v. *Am. Red Cross*, 518 F.Supp.2d 24, 37 & n. 13 (D.D.C.2007).

12    Several of the Guidelines indicate that they are "not intended to be a substitute for appropriate medical judgment."

13    The Guidelines explicitly recognize that approximately ten percent of cases will fall outside of the Guidelines and require review on a case-by-case basis. Under this 10% Rule, "[i]f the treatment/procedure requested is not allowed under the [Massachusetts Treatment Guidelines], but the treatment/procedure is appropriate and medically necessary based on objective clinical findings, the [URNA] may approve the request." The plaintiffs contend, however, that this determination of medical necessity is made by the referring physician and indicated in the case file the URNA receives, signaling to the URNA that he or she must approve the request without any exercise of discretion. Although the guidance offered by the Massachusetts Office of Health Policy suggests that these discretionary determinations are entrusted to URNAs, the regulations themselves do speak in terms of the referring physicians. *See* 452 Mass. Code Regs. 6.06(2) ( "The ultimate judgment regarding any specific procedure or treatment must be made by the provider in light of all circumstances presented by the injured employee and the needs and resources particular to the locality or facility."). Even if the discretion is with the provider, however, the URNA still plays a role in evaluating his or her clinical findings. In any event, I need not fully explore the question of discretion and independent judgment under the 10% Rule here, because I find discretion and independent judgment demonstrated as a matter of law on the basis of the entire record.

14    The term "customarily" is meant to capture "employees in such professions who have substantially the same knowledge level and perform substantially the same work as the degreed employees, but who attained the advanced knowledge through a combination of work experience and intellectual instruction." 29 C.F.R. § 541.301(d). This includes, for example, "the occasional lawyer who has not gone to law school, or the occasional chemist who is not the possessor of a degree in chemistry." *Id.* Where, however, most employees in the occupation "have acquired their skill by experience rather than by advanced specialized intellectual instruction," the exemption does not apply. *Id.*

15    To the extent the defendants argue that Massachusetts regulations require URNAs to be RNs or supervised by RNs, the defendants have not directed me to any specific provision that states as much. I find no such requirement in 452 Mass. Code Regs. 6.01 *et seq.*, which are the primary regulations governing utilization review. To the contrary, the regulations suggest that both RNs and LPNs may make utilization review determinations. *See* 452 Mass. Code Regs. 6.04(3)(c) (utilization review programs must submit "copies of all current professional licenses issued by the appropriate state licensing agency for all practitioners rendering utilization review determinations"); 452 Mass. Code Regs. 6.02 (defining "practitioner" as "any person who is licensed to practice under the laws of the jurisdiction within which such health care services are rendered including physicians ... and other licensed medical personnel"); *see also* Mass. Gen. Laws ch. 112, §§ 74, 74A (setting forth requirements for license to practice nursing as RN or LPN in Massachusetts).

16    The mere fact that the defendants required the CQACs to clock in and out after reclassification would not, standing alone, be enough to establish a lack of salary basis for the position if there were other indicators that the defendants intended to pay the CQACs on a salary basis. *Cf. Kennedy*, 410 F.3d at 370–71. However, the record suggests that the purpose of the timesheets here was to track how many hours the CQACs were working in order to determine their compensation.

17    For example, in *Roe–Midgett* v. *CC Services, Inc.*, 512 F.3d 865, 867 (7th Cir.2008), the plaintiffs were material damage appraisers who provided claims adjustment services for the insurance companies that contracted with their employer to provide claims processing services for auto, home, and other policies. The Seventh Circuit rejected the plaintiffs' argument that the appraisers produced the defendants' "product" of claims processing services because the plaintiffs provided a service to the defendant's customer that was administrative in nature *in relation to the customer's business. Id.* at 872. In other words, because the customers were in the business of selling insurance policies, and employees of the customer who process claims under the policies would be performing an administrative function for their own employer, employees of the defendant who were providing this service to the defendant's customer should be considered in the same manner. Treating employees with identical duties differently based on who their employer is, the Seventh Circuit reasoned, would be illogical. *Id.* at 872–73.

18    The MES Handbook explains when employees will be asked to work overtime and indicates that overtime must be approved in advance by a manager. It indicates that "non-exempt" employees will be paid time and a half for any time over forty hours per week or eight hours per day. In addition, it states that employees are entitled to two fifteen minute breaks for eight hours each day, that

"[e]mployees may have an unpaid lunch up to one hour," and that employees will not be compensated for the lunch period "[u]nless your job requires that you must remain at your work station."

The ExamWorks Handbook articulates even more specific policies regarding work hours, overtime, and meal and rest breaks. It indicates that non-exempt employees will be paid overtime for hours worked in excess of forty in a workweek, and that such employees "must receive approval from their supervisor prior to performing overtime work." It states that employees "should not perform any work before their normal schedule begins" and should "not clock in more than 10 minutes before your normally scheduled shift" or "clock out ... more than 10 minutes after the end of your scheduled shift." It further indicates that employees should not perform work unless they are "on the clock." In addition, employees "should leave [their] workstations or work area for a period of at least 30 minutes" during the meal break or otherwise should not perform work during this time. Rest periods or breaks are not specifically provided for but may be available to employees.

19   One of the named CQAC plaintiffs, Diane Bowen, left the company before the reclassification, and accordingly has no viable claims under Counts II or IV. For this reason, I will grant summary judgment for the defendants as to all of Bowen's claims under these Counts as well.

20   The plaintiffs identify Mass. Gen. Laws ch. 149, § 148, as the statutory basis for their misclassification claim because it pertains to the timely payment of wages, including overtime wages. *See O'Brien* v. *Lifestyle Transp., Inc.*, 956 F.Supp.2d 300, 309 (D.Mass.2013). Massachusetts General Laws ch. 151, §§ 1, 1A, sets forth the standards for classification of employees and exemptions.

21   Count III alleges misclassification as exempt employees under Mass. Gen. Laws ch. 149, § 148; Count IV alleges willful deprivation of overtime pay under Mass. Gen. Laws ch. 151, § 1A, both before and after reclassification; and Count V alleges breach of contract in failing to pay the plaintiffs for all hours worked and to provide a thirty-minute meal break. *See Salvas* v. *Wal–Mart Stores, Inc.*, 452 Mass. 337, 893 N.E.2d 1187, 1216–17 (2008); Mass. Gen. Laws ch. 149, § 100.

22   The defendants contend that only 17 of these individuals qualify for the class, because 29 of the listed class members had supervisors who never engaged in the improper practices the plaintiffs allege, and one of the listed class members has testified that she was not subject to the allegedly improper policies. It has not been established at this stage, however, whether or not any of the putative class members or named plaintiffs were deprived overtime wages. The defendants narrow the list to 17 by offering the testimony of two of the CQAC supervisors that they did not alter time cards, and arguing that the plaintiffs have not offered any evidence that four of the CQAC supervisors (the two who testified included) engaged in any inappropriate behavior. But the plaintiffs are not required to prove their case as to every putative class member at this stage. It is sufficient that there is a genuine dispute regarding the named CQAC plaintiffs and the conduct of those plaintiffs' supervisors to create a plausible inference that other employees in the same position may have similar claims. As a result, I do not find the plaintiffs' estimate to be "purely speculative." *Cf. Makuc* v. *Am. Honda Motor Co.*, 835 F.2d 389, 394 (1st Cir.1987).

23   I am not persuaded by the defendants' suggestion that because the CQAC and URNA positions require different exemption analyses, they necessarily preclude common resolution, or their suggestion that the misclassification analysis requires individualized inquiries. The defendants engage in a game of semantics by latching on to the phrase "common answer" in the *Dukes* case and contending that "there is no common *answer* for why any particular reclassification occurred." The question requiring an answer is not *why* the CQACs and URNAs were classified as exempt and then reclassified as non-exempt, but whether the CQACs and URNAs can properly be considered exempt or not. This question can be answered collectively.

24   It is somewhat strained to say that this common question, already resolved by Count III, can serve to satisfy the commonality requirement for Count IV. Nonetheless, I will consider it sufficient here where I find that Count IV ultimately fails on predominance grounds under Rule 23(b).

25   Count V presents a common law claim for breach of contract distinct from the statutory requirements. *See Lipsitt* v. *Plaud*, 466 Mass. 240, 994 N.E.2d 777, 785–87 (2013). This Count hinges on whether any individual employee worked through lunch, how often, and whether that work was done at the direction of the supervisor or known to the supervisor. Such individualized inquiries are necessary to determining not just damages but, more fundamentally, liability. *See, e.g.*, *Babineau* v. *Fed. Exp. Corp.*, 576 F.3d 1183, 1191–92 (11th Cir.2009) (individual inquiries necessary to determine liability for deprivation of breaks); *Raposo* v. *Garelick Farms, LLC*, 293 F.R.D. 52, 56–57 (D.Mass.2013) (liability contingent on individualized reasons for working through meal breaks and whether plaintiffs had already been compensated for such work); *Gonzalez* v. *Officemax North Am.*, Nos. SACV 07–00452 JVS (MLGx), CV 07–04839 JVS (MLGx), 2012 WL 5473764, at *5 (C.D.Cal. No. 5, 2012) ("Since [the employer] is liable only for missed meal periods that it forced the Employees to forgo, the reason that any particular employee missed any particular break requires, ineluctably, individualized fact finding."); *see also Basco* v. *Wal–Mart Stores, Inc.*, 216 F.Supp.2d 592, 602–04 (E.D.La.2002).

26   The First Circuit has observed that it is appropriate to "tak [e] into account the common nucleus of operative facts and issues, even though certain of these already ha[ve] been resolved, when ... deciding whether to certify the class." *Waste Mgmt. Holdings, Inc.* v. *Mowbray*, 208 F.3d 288, 299 (1st Cir.2000) ("[T]he fact that an issue has been resolved on summary judgment does not remove it from the predominance calculus. A certification decision is still necessary to determine whether the prior resolution carries res

judicata effect with respect to purported class members."). Although my earlier analysis makes clear that the CQACs are properly classified as exempt, and therefore a misclassification claim as to those individuals cannot lie, there is some possibility that the URNAs could succeed in their misclassification claim.

27   Count V would not survive the predominance inquiry for similar reasons, but I have found this Count inadequate on commonality grounds under Rule 23(a).

28   This lack of a common practice of denying overtime pay or meal breaks across the company makes this case distinguishable from *George* v. *National Water Main Cleaning Co.*, *George* v. *Nat'l Water Main Cleaning Co.*, 286 F.R.D. 168, 179–181 (D.Mass.2012), a case on which the plaintiffs rely. In *George*, the plaintiffs alleged that the defendants "had a uniform policy to use a wage system that either was itself, or that caused, wage violations." *Id.* at 181. The claim that the wage policies at issue "facially violated state law" meant that "little individual inquiry" would be required. *Id.* at 182. The remedy for the unlawful conduct would "involve[ ] reconstructing the correct wage algorithm"—a remedy that would be applicable to all class members. *Id.* at 181–82. Accordingly, Judge Casper rejected the defendants' arguments that "class certification is improper because to calculate any damages owed to a putative class member, one must confront, as a predominating issue, the variability, specificity and accuracy of the time cards" of the employee class members, because "the initial determination of liability" depended on the employer's wage practices. *Id.* at 179. Individualized timecard recording issues were distinct and subsidiary to this classwide question regarding the defendants' common policies and wage payment practices, and could be addressed in individual proceedings after resolution of the classwide issues. *Id.* at 179, 181. Other courts have reached a similar conclusion where a common policy or practice is the basis for the liability. *See, e.g.*, *Ramos* v. *SimplexGrinnell LP*, 796 F.Supp.2d 346, 359 (E.D.N.Y. 2011) ("whether defendant systematically failed to pay its employees the prevailing wages due them" predominates over individualized differences in employee time cards and employee activities), *vacated in part on other grounds*, 773 F.3d 394 (2d Cir.2014) (per curiam).

29   The plaintiffs' attempts to manufacture a common, predominant issue by arguing that the damages calculation—once liability is established—will be uniform across class members are unavailing, where individualized questions are so central to a determination of liability and to the resulting damages that each employee may have suffered. More importantly, the plaintiffs have not yet established that all of the employees included in the class have been deprived of overtime pay or meal breaks. Whether a class that includes individuals who have suffered no injury—and accordingly who have no legal right to damages—may be certified is an issue before the Supreme Court this term. *See Bouaphakeo* v. *Tyson Foods, Inc.*, 765 F.3d 791 (8th Cir.2014), *cert. granted*, ––– U.S. ––––, 135 S.Ct. 2806, ––– L.Ed.2d –––– (Mem.) (June 8, 2015) (No. 14–1146).

30   The plaintiffs have not moved for summary judgment on Count III.

31   Otherwise, the defendants do not move for summary judgment on Counts II and IV.

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

**Distinguished by** Arango v. Landry's, Inc., N.D.Ill., July 12, 2013

2011 WL 4036129
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois,
Eastern Division.

Christine CURRY, Todd Schiltz, Anthony Thompson, David Lenoci, Thomas
Sheridan, Terry T. Gibson, Margaret Key, Felix Kaskie, Estela Diehl and Robert
Kmiecik, on behalf of themselves and others similarly situated, Plaintiffs,

v.

KRAFT FOODS GLOBAL, INC., Defendant.

No. 10 C 1288.
|
Sept. 12, 2011.

**Attorneys and Law Firms**

Joseph W. Phebus, Ryan R. Bradley, William R. Graham, Jr., Phebus & Koester, Urbana, IL, Douglas J. Phebus, Arellano &
Phebus, S.C., Middleton, WI, for Plaintiffs.

Daniel A. Kaplan, Foley & Lardner LLP, Madison, WI, Jonathan William Garlough, Foley & Lardner LLP, Chicago, IL, for
Defendant.

## *MEMORANDUM OPINION AND ORDER*

VIRGINIA M. KENDALL, District Judge.

**\*1** Plaintiffs Christine Curry, Todd Schiltz, Anthony Thompson, David Lenoci, Thomas Sheridan, Terry T. Gibson, Margaret
Key, Felix Kaskie, Estela Diehl, and Robert Kmiecik (collectively "Plaintiffs"), on behalf of themselves and others similarly
situated, sued Defendant Kraft Foods Global, Inc. ("Kraft") for failure to pay them for time spent donning and doffing protective
equipment before and after their work shifts. Plaintiffs claim in Count I that Kraft violated the Illinois Minimum Wage Law,
820 ILCS 105/1 *et seq. ("IMWL"* ), and in Count II the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1
*et seq.,* for non-payment of full wages for hours worked during the three years immediately preceding filing of the Complaint.
Plaintiffs now move under Federal Rule of Civil Procedure 23 for certification as a class action. For the following reasons, the
Court grants Plaintiffs' Motion to Certify the Class.

## *BACKGROUND*

Plaintiffs are hourly employees at Kraft's Naperville, Illinois facility. (Compl.¶¶ 4, 5.) In performing their daily duties, Plaintiffs
were required to wear certain personal protective equipment, including but not limited to safety footwear, earplugs, and hard
hats. (*Id.* ¶ 5.) It takes some time to put on ("don") and take off ("doff") the protective equipment at the beginning and end
of each shift. (*Id.* ¶¶ 5–7.) Plaintiffs claim that Kraft has not counted the donning and doffing as part of their "Work Time,"
so as a result they never received compensation for this time. (*Id.* ¶ 11.) Because Plaintiffs were not compensated, they and

other similarly-situated hourly employees at the Naperville, Illinois facility worked for more than forty hours in a workweek but were not compensated at the increased overtime rate of one-and-a-half times the regular hourly rate as the IMWL requires. (*Id.* ¶¶ 14–16.) Moreover, to the extent that any uncompensated "Work Time" was straight-time hours, rather than overtime, Plaintiffs also claim that Kraft violated the IWPCA. (*Id.* ¶ 14.)

Plaintiffs seek to certify two classes, one for each of the counts in the Complaint. For the IMWL claim in Count I, Plaintiffs' propose the following class definition:

> All hourly and former hourly employees employed at Kraft Foods Global, Inc.'s Plant located in Naperville, Illinois, who in violation of 820 ILCS 105/1, *et seq.* were not paid at their full **Wages** for **Hours Worked** during the **Class Period.**
>
> The **Class Period** is from three years immediately preceding the filing of the complaint to the time of payment of judgment.
>
> Excluded from the class are claims for personal injuries. Also excluded from the class are individuals who opt out of the class.

(R. 46, Mot. for Class Cert. at 1) (emphasis in original). For the IWPCA claim in Count II, Plaintiffs' proposed class definition is the same except for the class period:

> All hourly and former hourly employees employed at Kraft Foods Global, Inc.'s Plant located in Naperville, Illinois, who in violation of 820 ILCS 115/1, *et seq.* were not paid at their full **Wages** for **Hours Worked** during the **Class Period.**
>
> **\*2** The **Class Period** is from five years immediately preceding the filing of the complaint to the time of payment of judgment.
>
> Excluded from the class are claims for personal injuries. Also excluded from the class are individuals who opt out of the class.

(*Id.* at 2.) (emphasis in original).

## STANDARD OF REVIEW

The Court has "broad discretion" to determine whether certifying a class is proper under Rule 23. *Keele v. Wexler,* 149 F.3d 589, 592 (7th Cir.1998). In making this analysis, the Court takes the substantive allegations in the Complaint as true and usually does not examine the ultimate merits of the case. *Eggleston v. Chicago Journeymen Plumbers' Local Union No. 130,* 657 F.2d 890, 895 (7th Cir.1981). Plaintiffs bear the burden of demonstrating that their case meets all of the requirements of Rule 23. *Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, ——, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011) (Plaintiffs must "affirmatively demonstrate" compliance with Rule 23); *Williams v. Chartwell Fin. Servs., Ltd.,* 204 F.3d 748, 760 (7th Cir.2000).

Plaintiffs must first show that the putative class satisfies the four threshold requirements of Rule 23(a): (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. *See* Fed.R.Civ.P. 23(a). If Plaintiffs meet this initial burden, they must then show that the requirements for one of the subsections of Rule 23(b) are met. *See Oshana v. Coca–Cola Co.,* 472 F.3d 506, 513 (7th Cir.2006). Here, the Plaintiffs seek certification under either Rule 23(b)(2) or Rule 23(b)(3). Under Rule 23(b)(2), Plaintiffs must request injunctive or declaratory relief based on Kraft's actions that apply to the whole class. Rule 23(b)(3), though, mandates that Plaintiffs establish that "questions of law or fact common to the members of the class predominate over any questions affecting only individual members [predominance] and that a class action is superior to other available methods for fair and efficient adjudication of the controversy [superiority]." Fed.R.Civ.P. 23(b)(3). In addition to the Rule 23 requirements, the party seeking class certification must also provide a workable class definition by showing that the members of the class are identifiable. *See Oshana,* 472 F.3d at 513.

## DISCUSSION

Case: 3:15-cv-00081-bbc   Document #: 58-49   Filed: 05/13/16   Page 35 of 112

## I. Rule 23(a)

The Plaintiffs contend that class certification is appropriate because they can satisfy the four threshold requirements of Rule 23(a). Here, Kraft does not dispute the numerosity requirement, nor the commonality one. (R. 56, Resp. to Memo. for Class Cert. at 19–25.) The Court must therefore address the typicality and adequacy of representation requirements.

### A. 23(a)(3) Typicality Requirement

Rule 23(a)(3) requires that the claims of the Plaintiffs and the claims of the class as a whole must be "typical." Fed.R.Civ.P. 23(a)(3). Plaintiffs need not establish that all claims are identical, but rather the inquiry turns on whether "the named representatives' claims have the same *essential characteristics* as the claims of the class at large." *De La Fuente v. Stokely–Van Camp, Inc.,* 713 F.2d 225, 232 (7th Cir.1983) (emphasis added). This boils down to two considerations: whether the same event, practice, or course of conduct gives rise to the claims of the class and whether the claims are grounded in the same legal theory. *Id.; Arreola v. Godinez,* 546 F.3d 788, 798 (7th Cir.2008); *see also Oshana,* 472 F.3d at 514. Factual distinctions among the different class members does not prevent Plaintiffs from meeting the typicality requirement so long as a similar legal theory binds the named Plaintiffs and the other class members. *De La Fuente,* 713 F.2d at 232 ("[S]imilarity of legal theory may control even in the face of differences of fact."); *Arreola,* 546 F.3 d at 798.

**\*3** Here, Kraft's time card policy required all employees of the Naperville facility to punch in and out when they were fully dressed in their work clothes; employees are not entitled to compensation for time spent donning and doffing protective gear before and after the shifts. (R. 49, Memo. Class Cert., Ex. D.) Plaintiffs claim that this policy violates the IMWL and IWPCA. Specifically, the nature of Plaintiffs' claims, and the basis for moving for class certification, rests upon application of this policy to all Kraft employees at the Naperville facility. The relief sought for the entire class stems from a same practice or conduct— denying compensation for donning and doffing—and a consistent legal theory—violation of the IMWL and IWPCA. *See, e.g., Spoerle v. Kraft Foods Global, Inc.,* 253 F.R.D. 434, 440–41 (W.D.Wisc.2008) (in nearly identical case resulting from Kraft's Madison facility failing to compensate for donning and doffing, there was typicality because plaintiffs were challenging the "uniform policy" of refusing to pay for time spent donning and doffing). Because the named Plaintiffs challenge the legality of Kraft's prohibition on compensation for donning and doffing, and this would be the exact same claim of any potential class members, the typicality requirement is met. *See, e.g., Arreola,* 546 F.3d at 798–99 (typicality where plaintiff challenged jail's general policy of not providing crutches to inmates in certain areas); *Keele v. Wexler,* 149 F.3d 589, 595 (7th Cir.1998) (typicality where plaintiff and others in the class all received debt collection letters that allegedly violated the Fair Debt Collection Practices Act). Further, numerous other courts have found class certification appropriate for employees seeking unpaid compensation for donning and doffing equipment before and after a work shift. *See Spoerle,* 253 F.R.D. at 440–41 (collecting cases).

Kraft's arguments against typicality essentially attempt to factually distinguish the characteristics of the individual class members. Specifically, Kraft maintains differences in each employee's hours and pay, as well as other variables such as Kraft's changes in the kind of protective gear each employee must wear, are sufficient enough to warrant an "individualized analysis" of each employee. But if the named Plaintiffs and the potential class members are united by a common legal theory, which they are, factual differences among them do not disrupt a finding of typicality. *De La Fuente,* 713 F.2d at 232; *Arreola,* 546 F.3d at 798. While each of the class members would have a unique claim for damages, this does not affect the typicality analysis. *See, e.g., Hernandez v. United Fire Ins. Co.,* 79 F.R.D. 419, 425 (N.D.Ill.1978) ( "Clearly, differences in the amount of damages sought do not destroy typicality."). As such, Plaintiffs have met the typicality requirement.

### B. 23(a)(4) Adequacy of Representation Requirement

The remaining requirement under Rule 23(a) requires that the interests of the class be fairly and adequately protected by the class representative. Fed.R.Civ.P. 23(a)(4). Rule 23(a)(4) is "not [a] difficult" standard to meet. *Wahl v. Midland Credit Mgmt., Inc.,* 243 F.R.D. 291, 298 (N.D.Ill.2007). The adequacy analysis has two dimensions: (1) adequacy of Plaintiffs' counsel; and (2) adequacy of the named Plaintiffs to protect the interests of the entire class. *See Retired Chi. Police Ass'n v. City of Chi.* 7 F.3d 584, 598 (7th Cir.1993); *see also Sec 'y of Labor v. Fitzsimmons,* 805 F.2d 682, 697 (7th Cir.1986). "A class is not fairly

and adequately represented if class members have antagonistic or conflicting claims." *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir.1992).

**\*4** First, Kraft does little to question the experience and qualifications of Plaintiffs' counsel to vigorously and competently litigate the case. The firm resume and the individual resumes of Plaintiffs' counsel establishes their experience, competence, and qualifications. They have acted as counsel in several class action lawsuits, including class action lawsuits in this state. (R. 49, Memo. Class Cert., Ex. I–J.) They were also involved in a nearly identical class action lawsuit against Kraft for its donning and doffing policy at its Madison, Wisconsin facility, which the parties litigated up to the Seventh Circuit. Plaintiffs' counsel can therefore sufficiently represent the interests of all of the class members.

This leaves the issue of whether the named Plaintiffs adequately represent the class. This depends on whether the named Plaintiffs: (1) have any conflicts with the claims of the potential class members; and (2) have a sufficient stake in the outcome of the litigation so that the Court is confident that they will zealously advocate on behalf of the class. *Retired Chi. Police Ass'n.,* 7 F.3d at 598; *Fitzsimmons,* 805 F.2d at 697; *see also Schmidt v. Smith & Wollensky, LLC,* 268 F.R.D. 323, 328 (N.D.Ill.2010).

Kraft challenges the adequacy of the named Plaintiffs to represent the class on several fronts. First, it argues that Plaintiffs lack the credibility to lead the class, given that some of them purchased drugs on Kraft's property, lied on job applications, or were disciplined for using violence at work. (R. 56, Resp. to Memo. for Class Cert. at 19–25.) "For an assault on the class representative's credibility to succeed, the party mounting the assault must demonstrate that there exist admissible evidence so severely undermining plaintiff's credibility that a fact finder might reasonably focus on plaintiff's credibility, to the detriment of the absent class members' claims." *CE Design Ltd. v. King Architectural Metals, Inc.,* 637 F.3d 721, 728 (7th Cir.2011) (quoting *Dubin v. Miller,* 132 F.R.D. 269, 272 (D.Colo.1990)). While legitimate concerns about the credibility of a class representative can undermine class certification, petty credibility challenges do not. *CE Design Ltd.,* 637 F.3d at 728. Typically where courts have denied class certification they have done so because the class representative generally lacked credibility (i.e., criminal conviction for a crime of dishonesty) or the class representative's credibility was severely strained with respect to the claims in the lawsuit. *See, e.g., Schleicher v. Wendt,* No. 02–cv–1332, 2009 WL 761157, at *3 (S.D.Ind. March 20, 2009) (class representative who was convicted of criminal fraud was unfit to serve as fiduciary for class that was asserting that they were victims of a fraudulent scheme); *Kaplan v. Pomerantz,* 132 F.R.D. 504, 510 (N.D.Ill.1990) (Rovner, J.) (false testimony during deposition warranted decertification of the class). Here, Kraft only challenges the credibility of three of the class representatives. All of the allegations, however, relate to personal shortcomings not directly indicative of honesty, and they do not indicate dishonest conduct in this litigation. *See, e.g., Gooch v. Life Investors Ins. Co. of Am.,* 264 F.R.D. 340, 349 (M.D.Tenn.2009) (credibility analysis is not an "examination into [the representatives'] moral righteousness" but instead relates to any "improper or questionable conduct arising out of or touching up on the very prosecution of the lawsuit"); *Phipps v. Sheriff of Cook County,* 249 F.R.D. 298, 301 (N.D.Ill.2008) (Bucklo, J.) (prior drug conviction did not make plaintiff inadequate class representative). These kind of allegations do not put Plaintiffs in conflict with any of the potential class members.[1]

**\*5** Kraft also argues that the Plaintiffs do not adequately represent the class because they are not sufficiently involved in the litigation process. (R. 56, Resp. to Memo. for Class Cert. at 23–25.) Specifically, Kraft alleges that the named Plaintiffs were not involved in the preparation of the Complaint, are unaware of their duties as class representatives, and have spent little time preparing for litigation. (*Id.*) The Plaintiffs need only possess a simple understanding of the nature of the proceedings and the basis of the claims. *See Culver v. City of Milwaukee,* 277 F.3d 908, 913 (7th Cir.2002) ( "Experience teaches that it is counsel for the class representative and not the named parties, who direct and manage these actions."); *Randle v. GC Serv., L.P.,* 181 F.R.D. 602, 604 (N.D.Ill.1998) ("[A]s long as a class representative's interests do not conflict with those of the proposed class, she need only have a marginal familiarity with the facts of her case and need not understand the larger legal theories upon which her case is based."). The Plaintiffs satisfy this low bar, especially given their participation in depositions and submission of declarations. Plus, there is no evidence that the interests of the named Plaintiffs are in conflict with the interests of any potential class member. In sum, the Court sees no reason to question the named Plaintiffs' dedication to zealous advocacy on behalf of the class of the class as a whole, nor is there any basis to question the competence of class counsel.

Curry v. Kraft Foods Global, Inc., Not Reported in F.Supp.2d (2011)
Case: 3:15-cv-00081-bbc   Document #: 58-49   Filed: 05/13/16   Page 37 of 112
2011 WL 4036129

Plaintiffs have therefore satisfied all four of the requirements of Rule 23(a).

## II. Rule 23(b)(3)

Turning to the second step in the analysis, Plaintiffs claim that they meet Rule 23(b)(3)'s requirement "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to the other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b) (3); *see also Payton v. County of Kane,* 308 F.3d 673, 680 (7th Cir.2002) (plaintiff must satisfy at least one of the Rule 23(b) subsections). Class actions brought under Rule 23(b)(3) are those that would "achieve economies of time, effort, and expense, and promote ... uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Amchem Prod., Inc., v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

## A. Predominance

While this Court found the commonality requirement was met because of the common legal theory linking the class, Rule 23(b) (3)'s "predominance criterion is far more demanding." *See Amchem Prod., Inc.,* 521 U.S. at 623–24. It tests whether a proposed class is "sufficiently cohesive" to warrant class adjudication. *See id.* at 623. To satisfy this inquiry, Plaintiffs must show not only that common issues exist, but also that they outweigh any questions affecting only individual members. *See* Fed.R.Civ.P. 23(b)(3); *Ross v. RBS Citizens, N.A.,* 09 C 5695, 2010 WL 3980113, at \*6 (N.D.Ill. Oct.8, 2010) (Lefkow, J.).

**\*6** The predominance inquiry begins with an examination of the substantive elements of the class claims and defenses. *See Simer v. Rios,* 661 F.2d 655, 672 (7th Cir.1981); *Driver v. AppleIllinois, LLC,* 265 F.R.D. 293, 303 (N.D.Ill.2010) (Plaintiffs must show "that the elements of liability are capable of proof at trial through evidence that is common to the class rather than individual to the members"). There is no bright line test for predominance: on the one side, the existence of individual issues will not automatically defeat certification; but on the other, a class action will not serve its intended purpose if it degenerates into separate trials on almost all elements of all the class claims. *Simer,* 661 F.2d at 672. In between these guideposts, the Court must exercise sound discretion to determine whether issues common to the class predominate over issues individual to each class member. *See Retired Chi. Police Ass'n,* 7 F.3d at 596.

Plaintiffs seek damages for each class member based on Kraft's violation of the IMWL and IWPCA. An IMWL claim exists if Plaintiffs can show that: (1) members of the proposed class performed work before and after their shift; (2) Kraft required or permitted that work to be performed; (3) the class members worked for more than forty hours during the week that they performed the alleged work before and after their shift; and (4) they were not paid at one-and-a-half times their regular hourly rate for that overtime work. *See* 820 ILCS 105/4a(1). A claim under the IWPCA requires that Plaintiffs prove: (1) members of the proposed class performed work before and after their shifts; (2) Kraft required or permitted that work to be performed; (3) the class members were not paid for that work. *See* 820 ILCS 115/3.

Here, the common evidence required to prove liability on both counts exceeds the details unique to each individual class member. The uniting thread for the IMWL and IWPCA claims is the validity of Kraft's policy that bars employees from receiving compensation for time spent donning and doffing. A legal determination as to whether Plaintiffs are entitled to unpaid compensation for this time will be a driving force in the outcome of the lawsuit. If the donning and doffing time is compensable, then a fact determination equally affecting all the class members will be whether Kraft has paid the employees the amount they are owed. *See, e.g., Musch v. Domtar Indus., Inc.,* 252 F.R.D. 456, 461–62 (W.D.Wis.2008) (finding predominance where defendant owed plaintiffs compensation as a result of its policy of not compensating for time spent donning and doffing because legal and factual issues applied to the entire class). Kraft, though, asserts that individual analysis is needed because the Plaintiffs had different habits when clocking in and out, and some changed into or out of the protective gear while on the clock. (R. 56, Resp. to Memo. Cert. Class at 10–12.) While these kind of discrepancies may exist among the class members, they do not outweigh the similarities: that Plaintiffs all were hourly employees of Kraft, they were required to wear protective gear to perform their jobs, and Kraft had an overarching policy that prohibited compensation for time that the class members were at work but were donning and doffing the protective clothes. *See, e.g., Kasten v. Saint–Gobain Performance Plastics Corp.,* 556

F.Supp.2d 941, 956–57 (W.D.Wis.2008) ("Regardless whether plaintiffs work in different areas, on different shifts and don and doff different amounts of required protective gear, they are subject to defendant's general practice of not compensating employees for donning and doffing certain protective gear and walking to work areas."); *Spoerle,* 253 F.R.D. at 441 (in nearly identical case, finding 23(b)(3) was met and class certification appropriate); *Ross,* 2010 WL 3980113, at *6 (predominance where there was evidence suggesting existence of a company-wide policy to deny overtime pay, even though there were "variations in methods" that the company used to deny overtime).

**\*7** The thrust of Kraft's argument against predominance, in essence, relates to divergent damages that each of the class members could receive. Differences resulting from some class members periodically doffing their protective gear before clocking out, and variances in the amount of hours worked per week and the specific items that employees had to wear are inquiries relevant to calculating damages; as such, they do not bar class certification under Rule 23(b)(3). *See Arreola,* 546 F.3d at 801; *Kohen v. Pac. Inv. Mgmt. Co.,* 244 F.R.D. 469, 477 (N.D.Ill.2007); *Ross,* 2010 WL 3980113, at *7.

## B. Superiority

In addition to predominance, a class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). Here, there are a large number of potential class members (200), each with the same claim and each potentially entitled to a relatively small recovery—at least relative to the costs of individually litigating the case. Deciding each claim separately would be an extremely inefficient use of both judicial and party resources, and many individual class members would otherwise be unlikely to bring their claims. *Hinman v. M and M Rental Ctr., Inc.,* 545 F.Supp.2d 802, 807 (N.D.Ill.2008). This makes Plaintiffs' claims ideal for resolution as a class action. *See Murray v. GMAC Mortgage Corp.,* 434 F.3d 948, 953 (7th Cir.2006) ("Rule 23(b)(3) was designed for situations ... in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate"). Kraft contends that while Plaintiffs seek compensation for "reasonable time" spent donning and doffing, they cannot reach a consensus on exactly what this means. As such, Kraft argues, individualized treatment is appropriate. As discussed, the amount of compensation is a damages issue, and does not stand in the way of class certification. In any event, this is exactly the kind of case that should proceed as a class action. *See, e.g., G.M. Sign, Inc. v. Franklin Bank, S.S.B.,* No. 06 C 949, 2008 WL 3889950, at *6 (N.D.Ill. Aug.20, 2008) (Kocoras, J.) (class action superior in part due to consistency of decision and efficiency).

As such, the Plaintiffs satisfy the requirements of Rule 23(b) (3), and the Court need not analyze (b)(2).

## III. Class Period

In their Complaint, in Count II for the IWPCA claim, Plaintiffs assert that the relevant time period for this claim is three years immediately before the filing of the Complaint. (R. 1, Compl. Count II, ¶ 15.) Now, in the Motion to Certify the Class, Plaintiffs seek a class period of "five years immediately preceding the filing of the complaint." (R. 48, Mot. Class Cert. at 2.) The Court finds that the appropriate class period for the IWPCA claim is three years, as Plaintiffs originally asserted in their Complaint. First, the parties engaged in discovery on the issue of class certification with the three year limitations period in mind. Second, Plaintiffs offer no explanation as to why they never amended the Complaint to reflect this expanded period, nor do they offer argument as to why augmenting the limitations period by two years is necessary. Without any explanation as to why the five year period is now appropriate, the Court rejects Plaintiffs' attempt to enlarge the class period. *See, e.g., In re Wal–Mart Wage and Hour Employment Practices Litigation,* No. 06–CV–225, 2008 WL 3179315, at *6 (D. Nev. June 20, 2008) (denying expansion of class period between complaint and motion for certification because plaintiffs offered no reason why expansion was necessary and never explained why they never amended the complaint to reflect the new class period); *cf. Camilotes v. Resurrection Healthcare,* No. 10 C 366, 2011 WL 1539670, at *3–4 (N.D. Ill. April 21, 2011) (St.Eve, J.) (allowing plaintiffs to amend complaint to expand class period because there was still sufficient class certification discovery time left for defendants to explore the issue). Third, the class period for the IMWL claim is three years, and for the sake of consistency it makes sense to have the period for the IWPCA claim the same because they are closely related claims. Legal argument and additional discovery involve overlap between Counts I and II, so efficiency is gained by confining the class period to three years for both claims.

*CONCLUSION AND ORDER*

 **\*8**  The Plaintiffs have satisfied all four elements of Federal Rules of Civil Procedure 23(a) and 23(b)(3), as required to achieve class certification. The IMWL class is defined as: All hourly and former hourly employees employed at Kraft's Naperville, Illinois facility who, starting three years before the filing of the Complaint, were not paid their full wages for hours worked (or work time) because they worked in excess of forty (40) hours in an individual workweek but were not compensated for that overtime work at a rate of one-and-a-half times their regular rate of pay. The IWPCA class is defined as: All hourly and former hourly employees employed at Kraft's Naperville, Illinois facility who, starting three years before the filing of the Complaint, were not paid in full for the hours worked (or work time). The Court appoints Plaintiffs' counsel as class counsel under Rule 23(g).

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 4036129

Footnotes

1     Kraft also asserts that Plaintiffs lack credibility because they lied in their depositions. On a declaration each Plaintiff stated that "I was not paid for time spent putting on and the time removing the personal protective equipment, and other articles as required under Kraft's Good Manufacturing Processes Policies that were required for work at Kraft"; but some of the Plaintiffs then stated in their depositions that, on a few occasions, they had changed before clocking out (and therefore were paid for the time it took them to change). (R. 56, Resp. to Memo. Cert. Class at 22.) This argument, however, does not subvert the Plaintiffs' credibility, especially in light of the fact that this lawsuit stems from Kraft's blanket refusal to pay employees for any time spend donning and doffing.

---

**End of Document**                                   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Case: 3:15-cv-00081-bbc    Document #: 58-49    Filed: 05/13/16    Page 40 of 112

2016 WL 1273241
Only the Westlaw citation is currently available.
United States District Court,
E.D. Wisconsin.

Ryan Dekeyser, Thomas Cooper, Harley Granius, and Carlos Lopez,
on behalf of themselves and others similarly situated, Plaintiffs,
v.
Thyssenkrupp Waupaca, Inc., d/b/a Waupaca Foundry, Inc., Defendant.

Case No. 08-C-0488
|
Signed March 31, 2016

**Synopsis**
**Background:** Current and former nonexempt, hourly paid, production employees, in Wisconsin, Indiana, and Tennessee, brought putative class action against employer under Fair Labor Standards Act (FLSA), Wisconsin wage and hour laws, and common law seeking to be paid for time spent donning and doffing work clothes and protective gear, and for time spent showering after their shifts in iron foundry facilities. The District Court, William C. Griesbach, J., 589 F.Supp.2d 1026, partially granted employer's motion to dismiss, 2008 WL 5263750, granted conditional certification of FLSA class, and 747 F . Supp.2d 1043, denied both employees' and employer's motions for summary judgment. Following discovery, the District Court, William C. Griesbach, J., 2012 WL 2952360, granted employer's motion for summary judgment on FLSA claim, and, 2012 WL 3880886, dismissed employees' Wisconsin law claims, and employees appealed. The Court of Appeals, Lee, District Judge, 735 F.3d 568, reversed and remanded. Employees moved for certification of class action for Wisconsin law claims, and employer moved to de-certify previously conditionally certified FLSA collective action.

**Holdings:** The District Court, William C. Griesbach, Chief Judge, held that:

[1] employees satisfied numerosity requirement for class certification;

[2] employees satisfied commonality requirement for class certification;

[3] employees satisfied typicality requirement for class certification;

[4] employees satisfied adequacy of representation requirement for class certification;

[5] common questions of law and fact predominated over individual issues, as required for class certification;

[6] class action was superior method for litigating action, as required for class certification; and

[7] conditionally certified FLSA class would be partially de-certified into three classes based on federal judicial district in which employees worked.

Ordered accordingly.

**Attorneys and Law Firms**

Anne T. Regan, John Gordon Rudd, Jr., Zimmerman Reed PLLP, Minneapolis, MN, Kelly A. Lelo, T. Joseph Snodgrass, Shawn M. Raiter, Larson King LLP, St Paul, MN, Patricia Agnes Bloodgood, Zwerling Schachter & Zwerling LLP, New York, NY, for Plaintiffs.

Joseph Louis Olson, Paul E. Benson, Mitchell W. Quick, Michael Best & Friedrich LLP, Milwaukee, WI, for Defendant.

## DECISION AND ORDER GRANTING MOTION TO CERTIFY CLASS AND DENYING MOTION TO DE-CERTIFY CLASS

William C. Griesbach, Chief Judge, United States District Court

**\*1** Plaintiffs are past and current workers in Defendant Waupaca Foundry Inc.'s iron foundries who seek to be paid for time spent "donning and doffing" (changing into and out of) work clothes and protective gear, and for time spent showering after their shifts in facilities provided by Waupaca. In 2012, I granted summary judgment in favor of Waupaca on Plaintiffs' claims for unpaid wages and overtime under the Fair Labor Standard Act and its Wisconsin-law counterpart. ECF Nos. 427 & 437. The Seventh Circuit reversed, concluding summary judgment was not proper based on a factual dispute as to whether such changing and showering were "required by the nature of the work" in the foundries, and thus compensable under these laws. *DeKeyser v. Thyssenkrupp Waupaca, Inc.*, 735 F.3d 568, 571 (7th Cir.2013).

The case is back before me on Plaintiffs' motion to certify the Wisconsin law claims as a class action under Federal Rule of Civil Procedure 23, and on Waupaca's motion to de-certify the previously "conditionally" certified FLSA collective action, under 29 U.S.C. § 216(b). For the reasons below, Plaintiffs' motion will be granted and Waupaca's motion granted-in-part and denied-in-part.

## BACKGROUND

This case involves six iron foundries, three located in two plants in Waupaca, Wisconsin ("Plant 1" and "Plant 2/3"), and one located in each of the cities of Marinette, Wisconsin ("Plant 4"), Tell City, Indiana ("Plant 5"), and Etowah, Tennessee ("Plant 6"). Plaintiffs asserted the FLSA claims on behalf of all "similarly situated" workers in these foundries, and they asserted the Wisconsin law claims on behalf of similarly situated workers in the Wisconsin foundries. This Court previously conditionally certified a collective action under the FLSA, 29 U.S.C. § 216(b), based on a preliminary showing that the Plaintiffs were indeed similarly situated to the proposed FLSA class members. ECF No. 91 at 4 (describing two-step approach to certification of FLSA collective action). The proposed class (hereinafter "the FLSA class") was defined as all non-exempt, hourly paid, production workers employed by Waupaca at the six foundries at any time since December 18, 2005. ECF Nos. 91 at 9; 94 at 1. Notices were disbursed, 486 individuals opted into the FLSA class, and 4 subsequently withdrew, leaving the FLSA class comprised of 482 current or former workers. Def.'s Br. in Supp. of Mot. to De-Certify at 3 & n.2, ECF No. 554. These workers perform many different jobs in different departments of the foundries. Waupaca seeks de-certification of the FLSA class.

Plaintiffs oppose Waupaca's motion to decertify the FLSA class and have filed their own motion to certify a Rule 23 class including production workers in the four Wisconsin foundries. Plaintiffs define the proposed class (hereinafter "the Wisconsin class") as follows: "All persons who are or were employed by Waupaca Foundry at any time after June 4, 2006, as nonexempt, hourly paid, production employees (defined as employees in the Millroom, Coreroom, Disa, Shakeout, Melt, Maintenance, and Melt Maintenance departments) at plants located in Waupaca, Wisconsin, or Marinette, Wisconsin, and who are not or have not been paid for their on-site donning, doffing, or showering." ECF No. 547 at 1. Plaintiffs submit that this class includes 4,104 workers. Pls.' Br. in Supp. Mot. for Class Cert. at 15, ECF No. 438.

# ANALYSIS

## I. Wisconsin Class/Rule 23

**\*2** **[1]** "A district court may certify a class of plaintiffs if the putative class satisfies all four requirements of Federal Rule of Civil Procedure 23(a)—numerosity, commonality, typicality, and adequacy of representation—and any one of the conditions of Rule 23(b)." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 935 (7th Cir.2010). The party seeking certification bears the burden of demonstrating compliance with Rule 23. *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011). Here, Plaintiffs seek certification under both Rule 23(b)(2) and Rule 23(b)(3), discussed below.

## A. Rule 23(a)

**[2]** As Plaintiffs estimate the Wisconsin class includes more than 4,000 workers, the numerosity requirement ("the class is so numerous that joinder of all members is impracticable") is not in dispute.

**[3]** The commonality requirement is that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Even a single such common question is enough to satisfy Rule 23(a)(2), and the existence of a mixture of common and individual questions presents an issue of whether common questions "predominate" over individual questions under Rule 23(b)(3), not an issue of commonality under Rule 23(a)(2). *See Wal–Mart Stores*, 131 S.Ct. at 2556. At the same time, the Supreme Court has warned that because any competently crafted class complaint literally raises common questions, what matters for commonality purposes is whether the classwide proceeding will generate common answers to those questions. *Id.* at 1551.

**[4]** Here, the obvious common question is whether the donning, doffing and changing activities are compensable under the FLSA and Wisconsin laws. [1] More specifically, the question is whether such activities are "required by the nature of the work" in Waupaca's foundries, and more specifically yet, to the extent Waupaca does not require its employees to don and doff their clothes at work, the question at trial will be whether Plaintiff can establish that "changing clothes and showering at work will significantly reduce the risk to the health of the employee." ECF No. 504 at 9. Plaintiffs maintain that this basic question concerning Waupaca's liability can be resolved with common evidence, namely written materials Waupaca provided to workers advising of the hazards of some of the chemicals workers in the foundries might be exposed to, and, more importantly, the expert opinion of an industrial hygienist hired by Plaintiffs which holds that such changing and showering will indeed "substantially decrease" health risks to foundry workers and their families. ECF No. 552-14, ¶ 7A & B.

**\*3** Waupaca argues Plaintiffs are trying to bring "toxic tort" claims on a classwide basis. In other words, Waupaca's position is that Plaintiffs' and the class members' claims are inherently individualized by nature, requiring each claimant to show that his or her changing and showering before leaving work was required given such factors as his or her individual health history, his or her "exposure profile" (e.g. the intensity, frequency, and duration of exposures to hazardous materials), and even the length of his or her commute home from work. *See* ECF No. 554 at 9. Waupaca maintains that such an individualized showing is called for in order for a claimant to sustain the burden to show that on-site changing and showering would indeed significantly reduce the health-related risks of working in a foundry.

But Plaintiffs' are not seeking damages for "toxic tort." Indeed, Plaintiff's position is that the preventative measures of changing clothes and showering at work are reasonably necessary to avoid injury from "toxic tort." The question for trial is not whether the class members are currently suffering from illnesses and diseases caused by exposure to hazardous materials, but whether changing clothes and showering at work are reasonably necessary to protect human beings from such illnesses and diseases. Thus, the inquiry is not the individualized one that Waupaca claims; it is the more general question of whether the conditions that production workers are exposed to in the plants warrant the safety precautions for which Plaintiffs seek compensation.

If Waupaca were correct about the individualized nature of the liability standard, class certification would seem to never be appropriate for this type of case, i.e., where the precautions at issue are not required by law or by the employer. In fact, the exacting burden of proof demanded by Waupaca would seem to doom even such claims brought individually, because workers have no way of knowing exactly what or how much hazardous material they are actually exposed to. It is for that reason that Plaintiffs' expert opines that an "individualized risk assessment" would not be proper with respect to workers in Waupaca's foundries, and that the only reasonable thing to do in the workers' position, given the potential of exposure to materials known to be dangerous, is to shower and change clothes at work. ECF No. 552-14, ¶¶ 7E, 39. Of course, the jury or other factfinder will not be required to accept Plaintiffs' expert's opinion with respect to the dangerousness of working in Waupaca's foundries and the necessity of the changing and showering at work. It may instead disregard Plaintiff's expert's opinion based on opinions provided by experts hired by the defense or based other evidence in the case. In any event, the issue with respect to commonality is simply whether Plaintiffs have produced common evidence tending to prove their common assertion, and the opinion of their expert is just that.

[5]  [6]  The typicality requirement is that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Plaintiffs' claims need not be identical to the Wisconsin class members' claims, but Plaintiffs' claims must have the same essential characteristics as the Wisconsin class members' claims. "This boils down to two considerations: whether the same event, practice, or course of conduct gives rise to the claims of the class and whether the claims are grounded in the same legal theory." *Curry v. Kraft Foods Global, Inc.*, No. 10–1288, 2011 WL 4036129, at *7 (N.D.Ill. Sept. 12, 2011) (citing *Arreola v. Godinez*, 546 F.3d 788, 798 (7th Cir.2008); *Oshana v. Coca–Cola Co.*, 472 F.3d 506, 514 (7th Cir.2006); and *De La Fuente v. Stokely–Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir.1983)). The answer to both questions is clearly "yes" here, where all claims arise out of the same Waupaca practice or course of conduct not to pay employees for time spent changing or showering, and where all claims are based on the same legal theory that such activities were "required by the nature of the work" and thus compensable under the FLSA and Wisconsin law.

 *4  [7]  Waupaca vigorously disputes that the typicality requirement is met, noting differences in the workers' employment histories, health histories and habits, exposure profiles, the manner in which they were paid, etc., ECF No. 563 at 17–20; ECF No. 554 at 5–14, 10–21, but these variations are more germane to Waupaca's commonality argument addressed above and its Rule 23(b)(3) argument addressed below. Simply put, "[f]actual distinctions among the different class members do[ ] not prevent Plaintiffs from meeting the typicality requirement so long as a similar legal theory binds the named Plaintiffs and the other class members." *Curry*, 2011 WL 4036129, at *7; *see also De La Fuente*, 713 F.2d at 232 ("[S]imilarity of legal theory may control even in the face of differences of fact.").

[8]  [9]  The adequacy of representation requirement is that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Again there are two considerations: "the adequacy of the named plaintiff's counsel, and the adequacy of representation provided in protecting the different, separate, and distinct interest of the class members." *Retired Chicago Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir.1993) (quotation omitted). There is no dispute that Plaintiffs have retained qualified counsel. Waupaca disputes the adequacy of representation of class members' interests, however, on two grounds. ECF No. 563 at 22–23; *see also* ECF No. 554 at 23–24. First, Waupaca notes none of the proposed class representatives currently works at "Plaint 1," one of the foundries located in Waupaca, Wisconsin, and that former employees will not adequately represent the interests of current employees. However, the proposed class representatives do include current employees Thomas Cooper and John Cummings and former employee Debra Wilde, who previously worked at Plant 1, ECF No. 548 at 17, so these individuals will adequately represent the interests of the proposed class both with respect to current workers and with respect to Plant 1 workers.

Second, Waupaca argues Plaintiffs "conceded" they were only seeking "modest" wages estimated at 10 minutes per day, thereby violating their fiduciary duty to the Wisconsin class by "throwing away," according to Waupaca, compensation for any workers who took longer than 10 minutes. ECF No. 563 at 22–23. But Plaintiffs have not conceded any particular amount of time or disclaimed any entitlement to wages; the 10 minute figure was merely used to provide an estimated damage amount for reference

in relation to, among other things, Plaintiffs' Rule 23(b)(2) argument that their claims for injunctive relief are as important as their claims for damages.

Accordingly, all four conditions of Rule 23(a) are satisfied, and the question becomes whether either or both of the requirements in Rule 23(b)(2) and (3) are also satisfied.

**B. Rule 23(b)**

Plaintiffs seek and Waupaca opposes certification under both Rule 23(b)(2) and (b)(3). The former provision authorizes certification if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Waupaca cites *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894, 898 (7th Cir.1999), for the proposition that where compensatory damages are also sought, certification under Rule 23(b)(2) is likely to be improper. This is because claims for compensatory damages " 'introduce new and substantial legal and factual issues' requiring the Court to find an actual injury based on individualized proof for each class member." ECF No. 563 at 24 (citing *Jefferson*, 195 F.3d at 898).

**\*5** It is not clear that *Jefferson* would bar certifying the class under Rule 23(b)(2) here, however, since the damages Plaintiffs seek are essentially back pay awards. As the *Jefferson* court noted, "back pay is a form of equitable relief, but this relief was treated as incidental to the injunction—and, because it was deemed equitable, neither side had a right to a jury trial, so that handling the suit as a consolidated proceeding in equity did not threaten anyone's rights." *Id.* at 896. In *Jefferson*, the damages sought by the plaintiffs included both compensatory damages and punitive damages. Because that is not the case here, I conclude that certification under Rule 23(b)(2) is permissible.

**[10]** Certification is also proper under Rule 23(b)(3). That subsection applies where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Given my conclusion above that the central liability question in this case can be answered with common evidence, the first question is whether that question "predominates" over, or can be considered more important than, individualized questions. *See Tyson Foods, Inc. v. Bouaphakeo*, ––– U.S. ––––, ––––, 136 S.Ct. 1036, ––– L.Ed.2d ––––, 2016 WL 1092414, at \*7 (March 22, 2016). Frankly, the importance of the common question is hard to overstate in this case. *Cf. id.* at ––––, 136 S.Ct. 1036, 2016 WL 1092414, at \*7 ("[T]he parties do not dispute that there are important questions common to all class members, the most significant of which is whether time spent donning and doffing the required protective gear is compensable work under the FLSA."). It is the central issue the parties have spent years litigating. In its response regarding Rule 23(b)(3), Waupaca reiterates its view that the liability issue requires considering each individual claimant's varied work and health histories in conjunction with their unique exposure/ dose scenarios and commute times, the same argument I rejected above. Beyond that, Waupaca argues calculating individual class members' damages will take an extraordinary amount of time, considering that individuals will have engaged in varying amounts of compensable time and were and/or are paid differently. But these are mere mathematical computations, and "[i]t has long been recognized that the need for individual damages determinations at [a] later stage of the litigation does not itself justify the denial of certification." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 671 (7th Cir.2015).

**[11]** Finally, the superiority requirement is that the class action is superior to other methods of adjudication. Rule 23 directs courts to consider such factors as class members' interests in individually controlling the prosecution of the actions, the extent and nature of any litigation concerning the controversy already begun by class members, the desirability or undesirability of concentrating the litigation of the claims in the particular forum, and the likely difficulties in managing a class action. Rule 23(b)(3)(A)–(D). Although Waupaca correctly points out that there will be difficulties in managing the Wisconsin class given its size and the fact that each claimant will conceivably (if Plaintiffs are successful as to liability) be entitled to a unique amount of unpaid wages and/or overtime, the rest of the factors favor the class action. Moreover, contrary to Waupaca's arguments, Waupaca's rights under the Wisconsin Constitution do not prohibit bifurcating the liability and damages issues for separate proceedings. *Int'l Fin. Servs. Corp. v. Chromas Tech. Canada, Inc.*, 356 F.3d 731, 735 (7th Cir.2004) ("Even where, as here, a district court is applying the substantive law of a state, federal procedural law controls the question of whether there is a

right to a jury trial."). For all of these reasons, I conclude that Rule 23 is satisfied, and I therefore will certify the Wisconsin class as defined below.

## II. FLSA Class

**\*6** **[12]** **[13]**   Naturally, Waupaca's arguments for de-certification of the FLSA class mirror its arguments against certification of the Wisconsin class. The FLSA authorizes employees to bring suit against an employer individually and on behalf of "similarly situated" employees. 29 U.S.C. § 216(b). Factors relevant to the FLSA certification question include any disparate factual and employment settings of the individual plaintiffs, the various individualized defenses available to the defendant, and fairness and procedural considerations. *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1102–03 (10th Cir.2001) (cited approvingly in *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 771–72 (7th Cir.2013)). The Seventh Circuit has indicated in dicta that the standards for certification under § 216 and Rule 23 should be treated as the same, *Espenscheid*, 705 F.3d at 771–772 ("[T]here isn't a good reason to have different standards for the certification of the two different types of action .... Simplification is desirable in law, especially in the present context, because joining a collective action and a class action or actions in one suit, as in this case, is both common and, we have held, permissible."), and at a minimum logic would seem to dictate that a class satisfying Rule 23(a) and Rule 23(b)(3), including the requirements of commonality, typicality, adequacy of representation, predominance, manageability, etc., also satisfies the FLSA's less onerous "similarly situated" requirement (even if it is conceivable that the converse may not always be true).

Of course, there is the fact that the FLSA class conditionally certified in this case is of a different scope than the Wisconsin class. The FLSA class includes all production workers in the six foundries since December 2005; the Wisconsin class includes all production workers in the four Wisconsin foundries since June 2006. There is no reason to believe that the different starting dates will affect the class certification analysis, however. Notwithstanding the foregoing, Plaintiffs do not oppose decertifying the workers from the non-Wisconsin foundries included in the FLSA class. Pls.' Br. in Opp. to Mot. to De-certify at 29, ECF No. 559 ("The parties agree that [the] Indiana and Tennessee opt-ins do not belong in this lawsuit.").

This presents an unusual situation. Plaintiffs previously moved to sever the non-Wisconsin opt-in workers and transfer those portions of the case to district courts in their home states. Waupaca opposed Plaintiffs' motion and convinced the Court that it would suffer prejudice if it was required to defend essentially the same case in three different venues. Waupaca made clear that it expected to defeat Plaintiffs' motion to certify any class under Rule 23 and to successfully move to de-certify the FLSA collective class the Court had conditionally certified at the inception of the action. Based on the circumstances of the case at that time, the Court denied Plaintiff's motion to sever and transfer. Waupaca's expectations have not been realized, however, and thus the circumstances have changed. The effect of decertifying the non-Wisconsin opt-ins would be dismissal of their claims which would require that they start over from scratch in the district courts in the states where they reside. This would require counsel to file new lawsuits on behalf of some of the non-Wisconsin opt-ins, provide notice of the proposed class and gather hundreds of new opt-in forms from workers who have already opted in to this lawsuit. It would also introduce questions of whether applicable statutes of limitations have been tolled by virtue of the worker's prior decisions to opt in to this lawsuit.

Taking these matters into consideration, the Court concludes that Plaintiffs' request to sever and transfer the non-Wisconsin portions of the case to the appropriate district courts in Indiana and Tennessee is the more prudent course. The residence of those workers and location of the plants where they work make those districts more convenient forums now that the non-Wisconsin opt-ins have been decertified from initial collective action class and Plaintiffs have not sought to include them in the class they have requested the Court to certify under Rule 23. The Court will therefore follow the procedure utilized by the court in *Medina v. Happy's Pizza Franchise, Inc.*, Case No. 10–3148, 2012 WL 1094353 (N.D.Ill. Feb. 3, 2012), and partially decertify the FLSA collective action into three classes based on the federal judicial district in which they worked. Upon Plaintiffs filing amended complaints for each sub-class, the Court will transfer the non-Wisconsin cases to the appropriate district.

## CONCLUSION

**\*7** For the reasons above, Plaintiffs' motion to certify the Wisconsin class under Rule 23 is **GRANTED** and Waupaca's motion to de-certify the FLSA class is **GRANTED-IN-PART** and **DENIED-IN-PART**.

The Wisconsin class is defined as follows: All persons who are or were employed by Waupaca Foundry at any time after June 4, 2006, as nonexempt, hourly paid, production employees (defined as employees in the Millroom, Coreroom, Disa, Shakeout, Melt, Maintenance, and Melt Maintenance departments) at plants located in Waupaca, Wisconsin, or Marinette, Wisconsin, and who are not or have not been paid for their on-site donning, doffing, or showering.

The FLSA class is divided into three sub-classes with the opt-in workers in Indiana and Tennessee each comprising a separate class from the Wisconsin class. The Wisconsin FLSA class is now defined as follows: All persons who are or were employed by Waupaca Foundry at any time after December 18, 2005, as nonexempt, hourly paid, production employees (defined above) at plants located in Waupaca, Wisconsin, or Marinette, Wisconsin, and who are not or have not been paid for their on-site donning, doffing or showering. As to the Indiana and Tennessee sub-classes, the courts to which they are transferred will address further certification questions as they arise. Proposed amended complaints for each subclass shall be filed no later than May 6, 2016. The case is set for a telephone status conference on May 16, 2016, at 9:30 a.m.

**SO ORDERED** this 31st day of March, 2016.

## All Citations

--- F.R.D. ----, 2016 WL 1273241

## Footnotes

1      Plaintiffs argue the Wisconsin liability standard under Wis. Admin. Code § DWD 272.12(2)(e)1. is more employee-friendly than that under the FLSA. I have previously concluded otherwise, ECF No. 437, but Plaintiffs argue my decision was called into question by subsequently-decided Wisconsin lower court decisions. ECF No. 548 at 22. However, Plaintiffs' briefs were submitted before the Wisconsin Supreme Court decided *United Food & Commercial Workers Union, Local 1473 et al. v. Hormel Foods Corporation*, in which the Court suggests the Wisconsin standard is substantially similar to the FLSA standard, 2016 WI 13, ¶ 43 n. 13 & ¶ 69, 367 Wis.2d 131, 876 N.W.2d 99 (lead opinion), and because I conclude class certification is appropriate even in light of the supposedly more demanding FLSA standard, there is no need at the moment to address Plaintiffs' position (if it is still their position) regarding the Wisconsin liability standard.

**End of Document**                                              © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 10945630
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Brett JOHNSON, obo himself, and others similarly situated, Plaintiff,

v.

WAVE COMM GR LLC, et al., Defendants.

No. 6:10−CV−346 (DNH/ATB).
|
Oct. 4, 2011.

Attorneys and Law Firms

Timothy C. Selander, Esq., et al., for Plaintiff.

Scott P. Quesnel, Esq., et al., for Defendants.

## REPORT RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter has been referred to me for Report and Recommendation, pursuant to 28 U.S.C. § 636(b), by the Honorable David N. Hurd, United States District Judge.

Presently before the court is plaintiff's Motion for Class Certification under Fed.R.Civ.P. 23. (Dkt. No. 45).[1] The defendants filed an opposition to the motion for class certification. (Dkt. No. 52). Plaintiff, in turn, filed a reply. (Dkt. No. 57). The court conducted a recorded conference on September 28, 2011, during which attorneys for both side addressed the court's questions and were allowed to present additional argument. For the reasons set forth below, this court recommends granting plaintiff's motion to certify a class, as redefined herein, under Fed.R.Civ.P. 23(b) (3), without prejudice to the defendants later seeking to modify or vacate a certification order under Rule 23(c)(1)(C).

## I. Procedural History

On March 24, 2010, plaintiff Brett Johnson filed this action against defendants Wave Comm GR LLC ("Wave Comm"), and its two owners, Robert Guillerault ("Guillerault") and Richard Ruzzo ("Ruzzo"). (Compl., Dkt. No. 1). Wave Comm provides cable television ("CATV") installation, maintenance, and construction services for residential, commercial, and governmental customers of, *inter alia,* Time Warner Cable, Inc. (hereinafter "Time Warner"). (6/24/2011 Guillerault Aff. ¶¶ 3, 5, Dkt. No. 52–7). Plaintiff Johnson, an installation technician ("installer") for Wave Comm, alleges that defendants failed to pay him, and all other installers, overtime wages, in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et. seq.,* and Article 19 of the New York Labor Law ("NYLL"). Plaintiff brings these claims on behalf of himself and others similarly situated under the FLSA,[2] and a proposed class of Wave Comm installers, under Fed.R.Civ.P. 23, with respect to the New York state law claims. On April 13, 2010, defendants filed an answer in which they denied plaintiff's allegations that he was not paid proper wages for work he performed for Wave Comm. (Dkt. No. 9).

Pursuant to a stipulation between the parties (Dkt. No. 27), this court, on July 26, 2010, entered an order (Dkt. No. 28), staying all proceedings as a result of an ongoing investigation by the New York State Department of Labor ("NYDOL") concerning *inter*

*alia,* whether Wave Comm installers were entitled to overtime pay. After the parties advised the court that NYDOL decided to defer to this action for a resolution of any overtime issues, the court lifted the stay and entered a scheduling order, on January 27, 2011 (Dkt. No. 32). (Selander Aff. ¶¶ 3–8). Thereafter, the parties conducted extensive discovery. (Pl.'s Mem. of Law at 3, Dkt. No. 45–2).

On May 13, 2011, defendants filed a motion to amend their complaint, by adding the two affirmative defenses, under 29 U.S.C. § 207(i) and 12 N.Y.C.R.R. § 142–2.14(5), and a counterclaim for unjust enrichment. (Dkt. No. 44). By order dated September 23, 2011 (Dkt. No. 71), this court granted defendants' motion to amend.[3] Following the telephonic conference with counsel on September 28, 2011, the court extended the deadline for completing discovery to December 2, 2011.

## II. Factual Background

**\*2**  Wave Comm, a New York corporation with an office in Utica, entered into contracts with cable television providers to perform installation and maintenance services; its primary client was Time Warner. (Guillerault Aff. ¶¶ 3–5). Wave Comm used a cadre of installers, whose primary function was to perform installation, maintenance, and construction services on cable television, internet, and telephone equipment for Wave Comm customers. (*Id.* ¶ 4). The parties do not appear to disagree that the Wave Comm installers had the same basic duties and followed a similar work routine, although the common work practices changed somewhat over time. (Pl.'s Mem. of Law at 5–7; Def.s' Mem. of Law at 3–4, Dkt. No. 52).

Until it entered into a new contract in April 2011, Wave Comm negotiated, with Time Warner, a fixed price or "rate" for each specific item of installation or repair work its installers would perform for Time Warner customers. (Guillerault Aff. ¶ 5). From approximately April 2006 through March 2010, Wave Comm compensated its installers, under what defense counsel refers to as "Plan A": the installers were paid for each discrete item of work they performed, based on the rates Wave Comm negotiated with Time Warner, without regard for the amount of time spent doing the work. The amount of compensation an installer received for each item of work was based on that installer's "Tech Rate," a particular percentage of the price paid by Time Warner to Wave Comm for that item of work. The number and range of Tech Rates varied over time; a particular installer's Tech Rate at a given time was determined by Wave Comm, based on factors such as seniority and job performance. (*Id.* ¶¶ 9–11, 13). Plaintiff argues that this compensation scheme was a "piece rate" plan, and points to instances in which Wave Comm and the individual defendants characterized that plan as such. (*See* 9/27/2011 Amended Decision and Order at 14, Dkt. No. 72). However, as noted in this court's Decision and Order granting defendants' motion to amend their answer, the mechanics of the compensation plan provide considerable support for the defendants' current position that they paid Wave Comm installers primarily "commissions," at least under Plan A. (*Id.* at 14–18).

After the NYDOL informed the defendants, in September 2009, that they were under investigation, *inter alia,* for not recording the installers' work hours and failing to pay them overtime, Wave Comm directed installers to start accurately and completely recording their work hours. (Guillerault Aff. ¶ 12). In approximately March 2010, Wave Comm changed its compensation plan to a "weighted half-time" compensation plan with performance incentives, which defense counsel refers to as "Plan B." Under Plan B, Wave Comm calculated installers' pay based on (1) a set hourly rate for each hour of work, with time-and-a-half pay for any hours in a given week over 40, and, (2) the prior compensation system (Plan A) based on Tech Rates. If an installer's pay based on the hourly rate (with any overtime) was less than what he would have earned under the prior Tech Rate system, Wave Comm paid the installer a bonus to increase his total pay to the higher amount he wold have earned based on his Tech Rate. (*Id.*¶¶ 14–16).

**\*3**  Plaintiff disputes that installers were properly compensated for overtime hours under the weighted half-time system or Plan B. (Compl .¶ 18). Plaintiff Johnson testified at his deposition, that Wave Comm instructed installers to record that they took daily, one-half-hour lunch breaks, even if they did not. (Pl.'s Dep. at 161:20–165:24, Dkt. No. 45–8). During the telephonic conference on September 28, 2011, plaintiff's counsel also represented that some Wave Comm installers contend that they prepared work-related paperwork at home in the evenings, the time for which was not counted or compensated by Wave Comm.

In April 2011, after plaintiff Johnson stopped working for Wave Comm,[4] the company changed its compensation system for installers again, based a change in its contract with Time Warner to a "points-based" system. The defendants contend that the new system, dubbed "Plan C" by defense counsel, includes appropriate overtime pay. (Guillerault Aff. ¶¶ 17–19). During the conference on September 28, 2011, plaintiff's counsel agreed that the overtime claims asserted in the pending action were effectively limited to the period before April 2011, *i.e.,* to Wave Comm's compensation Plans A and B.

### III. Class Certification under Fed.R.Civ.P. 23

In response to defendants' objections, plaintiff has proposed the following revised definition for a class to be certified under Fed.R.Civ.P. 23(b)(3) with respect to the overtime claims under the New York Labor Law:

> All persons who worked for Wave Comm GR LLC as installation technicians ("installers") in the State of New York at any time between April 2006 and the present who did not receive proper overtime pay when they worked more than forty (40) hours in any given workweek.

(Pl.'s Reply Brief at 8, Dkt. No. 57). Based on the conference on September 28, 2011, the parties agreed that the time period for a class action, if one were to be certified, should be limited to the period between April 2006 and April 2011, and that two separate subclasses should be designated for Wave Comm installers compensated under Plan A and Plan B.

### A. Applicable Law

Rule 23 requires that a proposed class action (1) involve a class that is so numerous that joinder of all members is impracticable, (2) involve questions of law or fact common to the class, (3) involve class plaintiffs whose claims are typical of those of the class, and (4) involve a class representative or representatives who adequately represent the interests of the class. *See* Fed.R.Civ.P. 23(a). "Additionally, while it is not explicitly spelled out in Rule 23, courts have added an 'implied requirement of ascertainability' with respect to the class definition." *Meyers v. Crouse Health System, Inc.,* 274 F.R.D. 404, 413 (N.D.N.Y.2011) (citing *In re Initial Pub. Offerings Sec. Litig.,* 471 F.3d 24, 30 (2d Cir.2006)).[5]

Moreover, Rule 23(b)(3), which would govern the proposed class action here, requires the party seeking certification to show that "questions of law or fact common to class members predominate over any questions affecting only individual members," and that class treatment would be superior to individual litigation. Fed.R.Civ.P. 23(b)(3). As the Second Circuit has stated:

**\*4** The "predominance" requirement of Rule 23(b)(3) "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." ... The requirement's purpose is to "ensure[ ] that the class will be certified only when it would 'achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.' " ... Therefore the requirement is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."

*Myers v. Hertz Corp.,* 624 F.3d 537, 547 (2d Cir.2010) (citations omitted).

Plaintiffs must establish that they have met all Rule 23 requirements, and the court must perform a "rigorous analysis" before certifying the class. *Gen. Tel. Co. of the Southwest v. Falcon,* 457 U.S. 147, 161 (1982). In doing so, the court must resolve relevant factual disputes, even if they overlap with issues that go to the merits of the claims. *In re Initial Pub. Offerings Sec. Litig.,* 471 F.3d at 41, 42.

The Second Circuit has also emphasized that Rule 23 should be " 'given liberal rather than restrictive construction,' " and has shown a preference for granting rather than denying class certification. *Gortat v. Capala Bros.,* 257 F.R.D. 353, 361 (E.D .N.Y.2009) (quoting *Marisol A. v. Giuliani,* 126 F.3d 372, 377 (2d Cir.1997)); *Meyers v. Crouse Health System, Inc.,* 274

F.R.D. at 412 ("Doubts about whether Rule 23 has been satisfied should be resolved in favor of certification."). Moreover, class certification is " 'inherently tentative' "-"[e]ven after a certification order is entered, the judge remains free to modify it in light of subsequent developments in the litigation." *Gen. Tel. Co. of the Southwest v. Falcon,* 457 U.S. at 160; Fed.R.Civ.P. 23(c)(1) (C). [6] *See also Morangelli v. Chemed Corp.,* 275 F.R.D. 99, 121 (E.D.N.Y.2011) (court may consider de-certification of class depending on pretrial reassessment as to whether common issues of law and fact predominate).

**B. Analysis**

The defendants essentially concede that the plaintiff has established the various elements of Fed.R.Civ.P. 23(a), at least with respect to Wave Comm installers paid under Plan A, between April 2006 and March 2010. (Def.s' Mem. of Law at 11–12). [7] The court agrees that plaintiff has sustained its burden of meeting the Rule 23(a) requirements for class certification with respect to installers compensated under Wave Comm's Plans A and B. [8] However, the parties emphatically disagree as to whether plaintiff has satisfied the elements of Rule 23(b)(3) that issues of law or fact common to class members predominate, and that a class action is the superior method for fairly and efficiently adjudicating the controversy. For convenience of analysis, the court will examine the second Rule 23(b)(3) element first.

**1. Superiority of Rule 23 Class Action in a FLSA Case**

**\*5** Rule 23 sets forth a non-exclusive list of factors pertinent to the judicial inquiry into the superiority of a class action, including: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. *See* Fed.R.Civ.P. 23(b)(3)(A)-(D). Defendants make only one argument with respect to the "superiority" element, based on the fact that most Wave Comm installers have been provided an opportunity to join the FLSA claims in this action under the "opt-in" conditional certification procedures of the FLSA. Defendants contend that certifying an "opt-out" Rule 23(b) (3) class action on similar state law overtime claims [9] would not be in the best interests of the Wave Comm installers who, by this stage of the litigation, have not opted-in to the FLSA claims. (Def.s' Mem. of Law at 24–26). The Second Circuit has very recently rejected this line of argument, as have a number of prior district court cases in this Circuit. *Shahriar v. Smith & Wollensky Restaurant Group,* 2011 WL 4436284, at \*6, 9–11 (**disagreeing with** the arguments that there is an "inherent conflict" between an opt-in collective FLSA claims and an opt-out Rule 23 class action on state overtime claims, and that a dual action including both would be "impractical, unfair, and 'offensive to the structure of the FLSA' "). The defendants ignore the very real possibility that current or former Wave Comm installers "fearful of retaliation or of being 'blackballed' in his or her industry may choose not to assert his or her FLSA rights." *Id.* at 6 (*citing, inter alia, Damassia v. Duane Reade, Inc.,* 250 F.R.D. 152, 163 (S.D.N.Y.2008) ("Indeed, it may be that in the wage claim context, the opt-out nature of a class action is a valuable feature lacking in an FLSA collective action, insofar as many employees will be reluctant to participate in the action due to fears of retaliation." (internal citations omitted)); *Krichman v. J.P. Morgan Chase & Co.,* 06 CV 15305, 2008 WL 5148769, at \*3 (S.D.N.Y. Dec. 8, 2008) (collecting cases).

Based on the current record, the court agrees with the observations of District Judge Batts of the Southern District of New York in another case that combined collective FLSA overtime claims and similar claims under the New York Labor Law:

> ... [A] class action is superior to other available methods, given that the NYLL claims are nearly identical to the FLSA claims, which will be tried collectively in this Court. Given that the issues are so closely related, resolving the NYLL claims in this forum has significant advantages to the alternative, which would be to allow hundreds of individual claims to go forward in state court.

**\*6** *Alonso v. Uncle Jack's Steakhouse, Inc.,* 08 Civ. 7813, 2011 WL 4389636, at \*5 (S.D.N.Y. Sept. 21, 2011).

**2. Predominance Requirement**

In arguing that he has satisfied the predominance element of Rule 23(b)(3), plaintiff notes that the class members all worked as installers for Wave Comm and performed the same basic job duties in one geographical area. Under compensation "Plan A," all class members were classified as "exempt" workers, and were compensated fixed amounts for each work task performed; they were not paid overtime wages when they worked over forty hours in a workweek. Plaintiff contends the Wave Comm workers were later reclassified and paid under a different compensation plan (Plan B), but were still not paid for all of the hours they worked. Plaintiff argues that a single adjudication can readily resolve common issues of law and fact to determine whether the entire class was entitled to overtime compensation under the New York Labor Law. (Pl.'s Mem. of Law at 19).

Defendants intend to defend plaintiff's state law overtime claims based on the retail or services establishment exemption under the FLSA, 29 U.S.C. § 207(i) (the "section 207(i) exemption"). They argue that this defense will require a series of highly individualized inquiries concerning each class member that will predominate over any issues that are subject to generalized proof. It is clear in this Circuit, that a Rule 23 class action may be denied if individualized issues relating to an exemption defense under the FLSA predominates over issues of law and fact common to the proposed class. *Myers v. Hertz Corp.,* 624 F.3d 537, 551 (2d Cir.2010) (upholding denial of Rule 23(b)(3) class certification of NYLL wage claims of "station managers" for car rental company; the plaintiff did not sustain her burden of establishing that a determination regarding the FLSA exemption for "executive" employees could be based on common or generalized proof, given the apparent variations in the duties of station managers in different locations). However, the Second Circuit in *Myers* acknowledged lower court cases in which class actions involving FLSA exemption defenses were certified, and did **not** appear to endorse the concept that an FLSA "exemption is an *inherently* individualized inquiry, such that class treatment will never be appropriate in exemption cases ..." *Id.* at 549 (citing *Damassia v. Duane Reade, Inc.,* 250 F.R.D. at 156–61 (certifying Rule 23 class action of overtime claims under New York Labor Law and concluding that plaintiffs satisfied the predominance requirement by, *inter alia,* demonstrating that the job duties of putative class members were "largely consistent" across the class and that individual differences in job tasks would not be of the "magnitude" to "cause individual issues to predominate")).

Plaintiff's counsel correctly contends that the section 207(i) overtime exemption defense would not apply to Wave Comm compensation Plan B, which purported to pay overtime.[10] Plaintiff further argues that this affirmative defense could be eliminated from the case, even with respect to Plan A, based on elements that involve common proof. Alternatively, plaintiff argues that, if the defense survives substantive motions, it may be addressed at trial based on representative testimony. In any event, plaintiff argues that, on the current record, issues of law and fact common to the proposed class predominate, and, if that changes prior to trial, the court can explore decertification of the class. For the reasons set forth below, the court recommends that a class action be certified under Rule 23(b)(3) at this time, but recognizes that, as discovery is completed, substantive motions are made and resolved, and/or the parties solidify their plans for proof at trial, the district court may need to reconsider Rule 23 certification.

### a. Section 207(i) Exemption

 **\*7**  The FLSA entitles a non-exempt employee to an overtime wage of one and one-half times the employee's hourly wage for all hours worked over 40 in any given work week. 29 U.S.C. § 207(a). If an employer fails to compensate its employees for overtime hours worked, it bears the burden of demonstrating that the employee falls under one of the FLSA overtime exemptions. *Mitchell v. Kentucky Fin. Co.,* 359 U.S. 290, 291 (1959).

The "retail or service establishment" commission overtime exemption codified in 29 U.S.C. § 207(i), specifically states that:

> No employer shall be deemed to have violated [29 U.S.C. § 207(a) ] by employing any employee of a retail or service establishment for a workweek in excess of the applicable workweek specified therein, if (1) the regular rate of pay of such employee is in excess of one and one-half times the minimum hourly rate applicable to him under section 206 of this title, and (2) more than half his compensation for a representative period (not less than one month) represents commissions on goods or services....

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Johnson v. Wave Comm GR LLC, Slip Copy (2011)

2011 WL 10945630

The New York State Labor Law does not, itself, require the payment of "overtime." *See Ballard v. Community Home Care Referral Service, Inc.,* 264 A.D.2d 747, 695 N.Y.S.2d 130 (2d Dept.1999). Nevertheless, NYLL § 655(5)(b), empowers the Commissioner of Labor to appoint a wage board, with the authority to, *inter alia,* recommend "regulations governing ... overtime or part-time rates." *Id.* Pursuant to that delegated authority, the New York State Department of Labor has promulgated 12 N.Y.C.R.R. § 142–2.2, which states that:

> An employer shall pay an employee for overtime at a wage rate of 1 V2 times the employee's regular rate in the manner and methods provided in and subject to the exemptions of sections 7 and 13 of 29 U.S.C. 201 et seq., the Fair Labor Standards Act of 1938, as amended, provided, however, that the exemptions set forth in section 13(a)(2) and (a)(4) shall not apply. In addition, an employer shall pay employees subject to the exemptions of section 13 of the Fair Labor Standards Act, as amended, except employees subject to section 13(a)(2) and (a)(4) of such act, overtime at a wage rate of 1 V2 times the basic minimum hourly rate.

Pursuant to this provision, if Wave Comm's Plan A qualified under the section 207(i) exemption to the FLSA, the defendants would not have been obligated to pay overtime wages under the New York State Labor Law, pursuant to the express language of 12 N.Y.C.R.R. § 142–2 .2. The defendants moved to amend their answer, and this court recently granted that motion to allow, *inter alia,* the following affirmative defense:

> Plaintiff Johnson, and all other similarly situated installation technicians, are not entitled to overtime under the New York State Labor Law pursuant to 12 N.Y.C.R.R. § 142–2.2 because Wave Comm satisfies the requirements of the "retail or service establishment" exception to the Fair Labor Standards Act, codified in 29 U.S.C. § 207(i).

**\*8**  (9/27/2011 Amended Decision and Order at 9–18). [11]

Exemptions under the FLSA are to be "narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *See Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392 (1960). In order to qualify under the section 207(i) exemption, Wave Comm must show that: (1) it is a "retail or service establishment"; (2) plaintiff received at least 50% of his income in the form of "bona fide commissions"; and (3) plaintiff was paid at least one and one-half times the minimum wage (*e.g.* $10.88 per hour) for all hours of work he performed for Wave Comm. *See* 29 U.S.C. § 207(i); *Horn v. Digital Cable & Communications, Inc.,* 1:06 CV 325, 2009 WL 4042407, at \*3 (N.D.Ohio Feb. 11, 2009); *Owopetu v. Nationwide CA TV Auditing Services, Inc.,* 5:10–CV–18, 2011 WL 883703, at \*3 (D.Vt. Mar. 11, 2011).

**b. Common or Individual Issues of Law/Fact?**

Plaintiff argues that the first two elements of the section 207(i) involve issues of law and fact common to the proposed class. (Pl.'s Reply Brief at 5). [12]  The court agrees that whether Wave Comm is a "retail or service establishment" and whether it paid its installers by "commissions," rather than on a piece rate basis, are issues that would be common to all class members, with respect to compensation Plan A. The defendant focuses on the third element of this exemption in arguing that resolving the section 207(i) affirmative defense at trial would require extensive individualized proof that would predominate over common issues of law and fact.

There would be no apparent legal obstacle to class certification in this action if the section 207(i) exemption defense could not be asserted, given the other issues of law and fact common to the proposed class. While "individualized inquiries into damages ... might eventually be necessary if liability is proven[,]" they would not predominate over common issues relating to liability, and would not prevent Rule 23(b)(3) class certification. *Alonso v. Uncle Jack's Steakhouse, Inc.,* 2011 WL 4389636, at \*5. *See also Torres v. Gristede's Operating Corp.,* 04 Civ. 3316, 2006 WL 2819730, at \*16 (S.D.N.Y. Sept. 29, 2006) (plaintiffs introduced sufficient proof that defendants engaged in a common practice to deny employees overtime pay; this issue predominates over

any individual calculations of overtime wages defendants may owe, if liability is found); *Meyers v. Crouse Health System, Inc.,* 274 F .R.D. at 418 (existence of individualized claims for damages, alone, is not a barrier to class certification) (citing *Shabazz v. Morgan Funding Corp.,* 269 F.R.D. 245, 250–51 (S.D.N.Y.2010)).

At a status conference conducted on September 28, 2011, plaintiff's counsel advised that plaintiff may appeal my ruling granting defendants' motion to amend to District Judge Hurd; if Judge Hurd were to preclude defendants from asserting the section 207(i) exemption defense, that would clearly affect whether class certification should be granted. As noted above, the section 207(i) overtime exemption would not logically apply to Wave Comm's compensation Plan B, which was designed and intended to pay time-and-a-half for any hours worked by an installer exceeding 40 per week. Plaintiff could eliminate the section 207(i) exemption defense, even with respect to compensation Plan A, if he were to prevail, on summary judgment, with respect to the issues, common to the class, that Wave Comm was not a "retail or service establishment" or that it paid its installers on a piece rate basis, rather than by "commissions." [13] Based on the current record and status of this case, this court is satisfied that issues of law and fact common to the class predominate over individual issues. However, further developments in this litigation, including substantive motion practice, may substantially impact whether the proposed class should remain certified under Rule 23(b)(3).

**\*9** Assuming the section 207(i) exemption defense is not eliminated before trial, defendants argue that the proof they will need to offer to demonstrate that each putative class member received at least one and one-half times the applicable minimum wage for each hour of work presents "the type of 'fact-intensive inquiry into each potential plaintiff's employment status' that numerous courts have found to be inappropriate for class certification." (Def.s' Mem. of Law at 15). As noted above, between April 2006 and October 2009, Wave Comm did not require installers to track or record their work hours in a comprehensive fashion. The opt-in plaintiffs have estimated their "average" workweeks for this time period in affidavits. However, the defendants argue that they would contest those estimates for each installer based on the records that are available, including more comprehensive time records for installers who worked after September 2009, necessitating a mini-trial for each installer to determine liability issues.

Plaintiff counters that, like damage issues common in overtime class actions, the issue of whether Wave Comm installers were paid one and one-half times the applicable minimum wage for all hours worked, could be determined based on the testimony of representative members of the class. Judge Hurd has suggested that similar factual issues could **possibly** be resolved based on representative testimony. *Meyers v. Crouse Health System, Inc.,* 274 F.R.D. at 418 ("Factual questions regarding whether hourly employees worked through meal breaks without compensation may possibly be answered with the testimony of a representative sample of employees."). Judge Hurd also suggests that, whether such issues will need to be resolved based on individualized proof or representative testimony need not be decided at the stage where class certification is first considered. *Id.* [14] *See also Noble v. 93 University Place Corp.,* 224 F.R.D. 330, 345 (S.D.N.Y.2004) ("[t]he gravamen of the claim is that defendants engaged in a course of conduct that deprived employees of their right to overtime pay. Although determinations as to damages, exempt status, and alleged labor agreements will require individualized findings, common liability issues otherwise predominate.)

This court is concerned that, to the extent the defendants are able to pursue the section 207(i) exemption defense at trial, representative testimony may ultimately prove to be inappropriate to establish whether Wave Comm installers received at least one and one-half times the applicable minimum wage for each hour of work. *See, e.g., Johnson v. TGF Precision Haircutters, Inc.,* Civ.A. H–03–3641, 2005 WL 1994286, at \*6 (S.D.Tex. Aug. 17, 2005); [15] *Beauperthuy v. 24 Hour Fitness USA, Inc.,* 772 F.Supp.2d 1111, 1126–27 (N.D.Cal. Feb. 24, 2011). *Cf. Espenscheid v. DirectSat USA, LLC,* 09–CV–625, 2011 WL 2009967, at \*6–7 (W.D.Wis. May 23, 2011). [16] However, the courts in these three cases just cited, and others who have faced similar concerns, have concluded that such issues were best addressed at the latter stages of the case, usually in the context of a motion to decertify an FLSA action and/or a Rule 23 class action. *See also Jason v. Falcon Data Com, Inc.,* 09–CV–03990, 2011 WL 2837488, at \*5–6 (E.D.N.Y. July 18, 2011) (Cablevision argues that the evidence regarding the [section 20]7(i) exemption, involving the hours worked by each installation technician, will be highly individualized and cannot be collectively adjudicated; this argument is premature and is more appropriately addressed at the decertification stage). [17]

**\*10** Accordingly, the court concludes that, based on the current record, Rule 23(b)(3) certification of a class of Wave Comm installers is appropriate with respect to the New York Labor Law overtime claims. The court recognizes however, that, even if the District Judge certifies a class action now, as recommended, he may need to reconsider the certification order as the case moves through the completion of discovery, the litigation of substantive motions, and possible trial.

## IV. The Recommended Class

As indicated, the parties discussed possible modifications of the proposed class during the conference on September 28, 2011. The court sets forth two proposed subclasses, which should address any issues the defendant had regarding the ascertainability of the class, as originally proposed. (Def.s' Mem. of Law at 27–28). The court recognizes that, based on possible objections to this ReportRecommendation or other input from the parties, the District Court may wish to consider further refinement of the subclasses.

Subclass I: All persons who worked for Wave Comm GR LLC ("Wave Comm") as installation technicians ("installers") in the State of New York at any time between April 2006 and March 2010, with compensation determined based on "Tech Rates" assigned by Wave Comm, who did not receive proper overtime pay when they worked more than forty (40) hours in any given workweek.

**Subclass II:** All persons who worked for Wave Comm as installers in the State of New York at any time between March 2010 and April 2011, with compensation determined based on Wave Comm's weighted halftime compensation system, with performance incentives based on "Tech Rates," who did not receive proper overtime pay when they worked more than forty (40) hours in any given workweek.

## V. Class Notification

The proposed class notification originally submitted by the plaintiff has been mooted by subsequent events. Accordingly, if the District Court decides to certify a class action in this case, this court recommends that the parties be directed to submit, within 30 days of any certification order, either a form notice acceptable to both parties, or, alternatively, counter-proposals for the language of such a notice.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that, plaintiff's motion to certify a class action under Fed.R.Civ.P. 23(b)(3) (Dkt. No. 45) be **GRANTED,** with respect to the subclasses described above, and it is further

**RECOMMENDED,** that Nichols Kaster, PLLP, be appointed class counsel pursuant to Fed.R.Civ.P. 23(g), and it is further

**RECOMMENDED,** that, within 30 days of any order certifying a class action in this case, the parties submit either a form notice acceptable to both parties, or, alternatively, counter-proposals for the language of such a notice

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72.

## All Citations

Slip Copy, 2011 WL 10945630

Footnotes

1    Plaintiff also moved for conditional certification under the Fair Labor Standards Act ("FLSA"). However, with defendants' consent, conditional certification under the FLSA was previously granted by this court. (Dkt.Nos.58, 59).

2    Approximately sixty (60) other installers joined this case by filing their written consent to pursue an action for unpaid overtime wages against defendants. (Selander Aff. ¶ 12, Dkt. No. 45–3). This court granted conditional certification of the action under the FLSA, on July 27, 2011, and approved a judicial notice to present and past Wave Comm installers. (Dkt.Nos.58–1, 59). Since that time, several additional plaintiffs have consented to join the action.

3    The court's order was slightly modified on September 27, 2011. (Dkt. No. 72).

4    Plaintiff Johnson worked for Wave Comm between approximately June 2008 and July 2010. (Guillerault Aff. ¶ 4).

5    "Class members do not actually need to be ascertained before certification, but a court must determine that the class will be ascertainable at some stage of the proceedings. .... Ascertainability is usually found where membership in the class can be identified by 'reference to objective criteria.' " *Meyers*, 274 F.R.D. at 416 (citations omitted).

6    Rule 23(c)(1)(C) provides in relevant part: "An order that grants or denies class certification may be altered or amended before final judgment."

7    Defendants concede that "Plaintiff's class would appear to satisfy the numerosity requirement of Rule 23[ (a)(1) ]." (Def.s' Mem. of Law at 11). They acknowledge that "Plaintiff and the putative class members performed similar job duties and were classified by Wave Comm as 'exempt' from the overtime requirements of the New York Labor Law under Plan A[,]" which raises "common questions of law and fact, which may be typical of the class, [and which] satisfy the [commonality and typicality] requirements of Rule 23(a) [ (2) & (3) ]." (*Id.* at 11–12). The defendants "do not dispute" that Nichols Kaster, PLLP, the firm representing plaintiff, is qualified, experienced and able to conduct this litigation. (*Id.* at 12). Finally, the "assume *arguendo*" that plaintiff Johnson's interests "are not antagonistic to the interest[s] of the other members of the class." (*Id.* at 12). *See* Fed.R.Civ.P. 23(a)(4) (requirement that "representative parties will fairly and adequately protect the interests of the class").

8    With respect to compensation Plan B, the issue of whether subclass members were properly compensated when they worked through their lunch break or were otherwise working "off the clock" would raise common questions of law and fact that would satisfy the commonality and typicality requirements. *See Meyers v. Crouse Health System, Inc.,* 274 F.R.D. at 414–15 (finding these Rule 23(a) elements satisfied for subclasses, members of which were not compensated for missed meal breaks. The concessions in defendant's brief with respect to the other Rule 23(a) elements were not limited to compensation Plan A.

9    The New York Labor Law, unlike the FLSA, does not have a provision for collective actions. Instead, plaintiffs may pursue a traditional "opt-out" class action through Rule 23 class certification for their state law claims. *Shahriar v. Smith & Wollensky Restaurant Group,* F.3d, 2011 WL 4436284, at *6, 9–11 (2d Cir. Sept. 26, 2011).

10    At the conference on September 28, 2011, the parties discussed whether the defendants would rely on the section 207(i) overtime exemption defense with respect to Wave Comm's compensation Plan B, which, as defendants acknowledge, included the payment of overtime at one and one-half times the applicable hourly wage. While defense counsel did not concede the point, this court concludes that a defense based on an exemption to the overtime requirement would not logically be applicable to a compensation scheme that implicitly acknowledged the obligation to pay overtime and purported to do so.

11    My prior Decision and Order (Dkt. No. 72) granting defendants' motion to amend includes further discussion of the nuances of the section 207(i) exemption which, while not directly relevant to this Report Recommendation, may provide useful background.

12    Defense counsel did not challenge this contention during the conference on September 28, 2011.

13    As noted in my Decision and Order granting defendants' motion to amend, plaintiff did not raise any arguments regarding "retail or service establishment" element, although he reserved his right to contest this, and all other aspects of the section 207(i) exemption, if the motion was granted. The court noted that further discovery on this issue may be warranted. (Dkt. No. 72 at 11 n. 9, 13–14 & n. 10). In connection with the motion to amend, plaintiff argued that Wave Comm did not pay its installers by "commission," but did not convince the court that the defendants' proposed section 207(i) exemption defense would be "futile" on that basis. (Dkt. No. 72 at 14–18).

14    As Judge Hurd reasoned: "Admittedly, whether a particular class member worked through a meal period without compensation may be subject to individualized proof. Plaintiff argues resolution of whether a class member worked through a meal break without compensation may be achieved by representative testimony. Whether that is permissible need not be decided at this point." *Id.*

15    As stated in *Johnson:* " § [20]7(i) is in fact a highly individualized defense because its application requires week-by-week and other periodic calculations ... specific to each individual Plaintiff and his or her particular circumstances. The "regular rate" of pay, for example, "is a rate per hour, computed for the particular workweek by a mathematical computation in which hours worked are divided into straight time earnings for such hours to obtain the statutory regular rate." 29 C.F.R. § 779.419.... With respect to commissions,

Case: 3:15-cv-00081-bbc   Document #: 58-49   Filed: 05/13/16   Page 56 of 112

§ [20]7(i) also requires the totaling of each particular Plaintiff's commissions over a "representative period" of not less than one month. See 29 U.S.C. § 207(i).... The proof required to establish these individualized § [20]7(i) exemption defenses would become the overwhelming focus of a trial which, to a jury or factfinder, would amount to trials of perhaps as many as 200 individual cases." *Id.*

16    The court in *Espenscheid* initially granted conditional certification on FLSA claims and a Rule 23 class action on state law overtime claims. *Id.* at * 1. The action included claims that installation technicians were denied proper overtime, *inter alia,* because they were required to record a lunch break even when they did not take one, and they worked hours, before and after their recorded work day, for which they were not paid. *Id. at *2.* The case did not involve the section 207(i) exemption defense. On the eve of trial, the court decided to decertify the case as a class and collective action, based on the proposed trial plans offered by each side. *Id.* at *3, 8. District Judge Crabb concluded, based on developments in the case following certification, that the overtime claims could not be fairly presented by representative testimony. In reaching this conclusion, Judge Crabb stated, *inter alia:* "The wide variability in weekly hours worked implies strongly that one technician's experiences may not be a proxy for others.... Another complicating factor is that the technicians used a variety of methods to record the time.... Defendants contend that their [evidence] reveals that many technicians were overreporting the time they worked, ... [which] goes to the credibility of certain plaintiffs' testimony and claims, and would be difficult to assert without the ability to cross-examine individual technicians." *Id .* at 6, 7. The claims in *Espenscheid* are similar to the claims in this case relating to Wave Comm's compensation Plan B, which suggests that the District Court in this case may ultimately need to reconsider certification even of the subclass of installers paid under Plan B, notwithstanding the fact that the section 207(i) exemption would not seem to apply to this subclass.

17    The parties have not sought to supplement their arguments based on the Supreme Court's recent class action decision in *Wal–Mart Stores, Inc. v. Dukes,* U.S., 131 S.Ct. 2541 (June 20, 2011). The Court in *Dukes* reversed the lower courts' certification of a Rule 23(b)(2) class consisting of a 1.5 million current and former female employees of Wal–Mart who alleged that the discretion exercised by their local supervisors over pay and promotion matters resulted in Title VII gender discrimination. The Court held that the Rule 23(a) requirement that a common question of law or fact unite the class was not satisfied because there was no proof that Wal–Mart operated under a general policy of discrimination that provided direction to individual managers who made pay and promotion decisions. *Id.* at 2550–57. The Court concluded that, based on the "multitude of different jobs" held by the Wal–Mart workers in the proposed class, the "kaleidoscope of supervisors (male and female)" across the country, and the "variety of regional [pay and promotion] policies that all differed," the class had "little in common but their sex and this lawsuit." *Id.* at 2557 (internal quotation omitted). By contrast, there are substantial common issues of law and fact in this case because Wave Comm had compensation plans that were uniformly applied to a relatively small group of installers in one state who all performed the same type of work.

The *Dukes* Court also held that an injunction class under Rule 23(b)(2) was not appropriate when accompanied by class claims for individualized money damages (back pay) that are more than merely "incidental" to the injunctive relief. *Id.* at 2557–61. In so ruling, the court noted that Wal–Mart was entitled to assert individualized defenses to each employee's claim for backpay-e.g., by establishing a non-discriminatory reason for a particular adverse employment action and disapproved the lower courts' plan to address those defenses based on the representative testimony of a sample set of class members. *Id.* at 2560–61. This last aspect of the *Dukes* opinion may provide further support for the defendants' position that the "one and one-half times the minimum wage" element of the section 207(i) exemption defense may not be determined based on representative testimony. However, there are significant differences between the section 207(i) exemption defense and the backpay defenses in *Dukes* that could make representative testimony more appropriate for the former than the latter. Moreover, the section 207(i) exemption defense could be eliminated in this case, on summary judgment, depending on how the District Court's rules with respect to the other elements of the 207(i) exemption defense which do not require individualized proof. Accordingly, this court does not believe any aspect of the *Dukes* case is inconsistent with my recommendation that class certification be granted at this stage of the case, subject to later reconsideration.

---

**End of Document**                                   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 642092
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.

Monica Kurgan and Madeline Diaz, on behalf of themselves and others similarly situated, Plaintiffs,

v.

Chiro One Wellness Centers LLC, Defendants.

Case No. 10–cv–1899
|
Filed February 19, 2014

**Attorneys and Law Firms**

Douglas M. Werman, David Erik Stevens, Maureen Ann Salas, Werman Salas P.C., James A. Jones, Richard J. Burch, Bruckner Burch PLLC, Houston, TX, for Plaintiff.

Eugene Edward Murphy, Jr., John N. Hourihane, Jr., John H. Scheid, Murphy & Hourihane L.L.C., Chicago, IL, for Defendant.

## MEMORANDUM OPINION AND ORDER

Robert M. Dow, Jr., United States District Judge

**\*1** Before the Court is Plaintiffs' amended motion for collective and class certification [144]. Plaintiffs ask the Court to (1) authorize notice under 29 U.S.C. § 216(b) to similarly situated current and former employees of this collective action; (2) certify Plaintiffs' IMWL overtime wage claim under Federal Rule of Civil Procedure 23(b)(3) and/or Rule 23(c)(4); (3) appoint Plaintiffs' counsel as class counsel; and (4) approve the proposed notice forms. For the reasons stated below, the Court grants Plaintiffs' amended motion for collective and class certification [144]. This case is set for further status on 3/11/2014 at 2:00 p.m.

## I. Background

Plaintiffs Monica Kurgan and Madeline Diaz allege that Defendant Chiro One Wellness Centers, LLC ("Chiro One") willfully failed to pay them and other hourly workers the overtime wages to which they were entitled under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. and the Illinois Minimum Wage Law, 820 ILCS § 105/1 et seq. They seek to proceed on their own behalf and on behalf of all others similarly situated, both as class representatives and lead plaintiffs in a collective action. See *Ervin v. OS Restaurant Servs., Inc.,* 632 F.3d 971, 981 (7th Cir.2011).

Chiro One is a limited liability corporation headquartered in Oak Brook, Illinois, that operates 75 "wellness centers" providing chiropractic services in Illinois, Kentucky, and Texas. Chiro One has 57 locations in Illinois, 12 locations in Kentucky, and 6 locations in Texas. Chiro One owns each location; they are not franchises. Each location is staffed with at least one Chiropractor and, typically, three or more Chiropractic Technicians ("CTs"). In the past, staffing also included Chiropractic Assistants ("CAs"). The CA job duties were completely subsumed within those of the CT. Eventually, Chiro One simply "incorporated" the CA position and job duties into the CT "role." Plaintiffs have come forward with evidence that Chiro One employs standardized corporate policies and procedures governing CTs and that the job duties of CTs are uniform throughout Chiro One. For instance, Chiro One uses "checklists," which detail all of the duties CTs are expected to perform each day, and CTs are provided with comprehensive "scripts" for dealing with customers.

Before being assigned to a Chiro One location, CTs receive four to eight weeks of centralized, uniform training at Chiro One's corporate headquarters in Oak Brook, Illinois. During training, CTs were paid on an hourly basis. At the end of training, CTs

were assigned to a Chiro One location and changed from non-exempt, hourly employees to salaried, exempt employees. Thus, after training, CTs were not paid overtime for any hours worked in excess of 40 in any work week. For most of the relevant period, Chiro One did not keep records of the hours worked by CTs. This lawsuit was filed in March 2010, and approximately a year and a half later, Chiro One began tracking the hours worked by CTs. However, Chiro One did not pay CTs for overtime worked until December 2012, when Chiro One finally reclassified all of its CTs from exempt to non-exempt.

**\*2** On March 25, 2010, Plaintiffs filed their Original Complaint against Chiro One, bringing claims under the IMWL. Prior to Chiro One filing an answer, Plaintiffs amended their complaint to add claims under the FLSA. On October 7, 2010, Chiro One filed its Answer and did not plead any affirmative defenses. On September 15, 2011, Plaintiffs filed a second amended complaint. Chiro One again answered and did not plead any affirmative defenses. On May 23, 2012, Chiro One stated on the record it would not raise any affirmative defense not already raised, and this Court entered an Order barring Chiro One from doing so.

Plaintiffs seek conditional certification of their FLSA claim and request that notice be sent to "All Chiropractic Assistants and Chiropractic Technicians employed by Chiro One during the period April 21, 2007 to December 17, 2012." Plaintiffs also seek to certify their IMWL overtime claims as a class action pursuant to Rule 23(b)(3) or, in the alternative, Rule 23(c)(4). Plaintiffs' proposed class is "All Chiropractic Assistants and Chiropractic Technicians employed by Chiro One in the State of Illinois during the period March 25, 2007 to December 17, 2012."

## II. Conditional Certification of a Collective Action under the FLSA

Plaintiffs have moved for conditional approval or certification of a federal collective action under the FLSA, 29 U.S.C. § 216(b), which "authorizes employees to act together to seek redress for violations of the statute's minimum wage and maximum hour provisions." *Ervin v. OS Restaurant Servs., Inc.,* 632 F.3d 971, 974 (7th Cir.2011). In the proposed notice, Plaintiffs identify the "class" as "[a]ll Chiropractic Assistants and Chiropractic Technicians employed by Chiro One during the period April 21, 2007 to December 17, 2012."

" '[C]ertification' is neither necessary nor sufficient for the existence of a representative action under FLSA, but may be a useful 'case management' tool for district courts to employ in 'appropriate cases.' " *Myers v. Hertz Corp.,* 624 F.3d 537, 555 n.10 (2d Cir.2010) (quoting *Hoffmann–La Roche,* 493 U.S. 165, 169, 174 (1989)); see also *Zavala v. Wal Mart Stores, Inc.,* 691 F.3d 527, 536 (3d Cir.2012) (same). "Section 216(b) does not by its terms require any such device, and nothing in the text of the statute prevents plaintiffs from opting in to the action by filing consents with the district court, even when the notice described in *Hoffmann–La Roche* has not been sent, so long as such plaintiffs are 'similarly situated' to the named individual plaintiff who brought the action." *Myers,* 624 F.3d at 555 n.10. Nonetheless, "[t]he conditional approval process is a mechanism used by district courts to establish whether potential plaintiffs in the FLSA collective action should be sent a notice of their eligibility to participate in the collective action and given the opportunity to participate in the collective action." *Ervin,* 632 F.3d at 974.

Courts generally take a two-step approach to conditional approval or certification of a federal collective action. See, *e.g.,Myers,* 624 F.3d at 554–55; *Hipp v. Nat'l Life Ins. Co.,* 252 F.2d 1208, 1218 (11th Cir.2001). At the first step, the court makes an initial determination to send notice to potential opt-in plaintiffs who may be "similarly situated" to the named plaintiff with respect to whether a FLSA violation has occurred. *Myers,* 624 F.3d at 555. Plaintiff bears the burden of making a "modest factual showing sufficient to demonstrate that [he] and potential plaintiffs together were victims of a common policy or plan that violated the law." *Russell v. Ill. Bell Tel. Co.,* 575 F.Supp.2d 930, 933 (N.D.Ill.2008) (quoting *Flores v. Lifeway Foods, Inc.,* 289 F.Supp.2d 1042, 1045 (N.D.Ill.2003)); see also *Bergman v. Kindred Healthcare, Inc.,* 949 F.Supp.2d 852, 855 (N.D.Ill.2013). [1] "The 'modest factual showing' cannot be satisfied simply by 'unsupported assertions,' but it should remain a low standard of proof because the purpose of this first stage is merely to determine *whether* 'similarly situated' plaintiffs do in fact exist." *Myers,* 624 F.3d at 555 (citations omitted). It requires "some evidence, beyond pure speculation, of a factual nexus between the manner in which the employer's alleged policy affected her and the manner in which it affected other employees." *Zavala,* 691 F.3d at n.4 (quotation omitted); see also *Molina v. First Line Sol'ns LLC,* 566 F.Supp.2d 770, 786 (N.D.Ill.2007) ("Unless defendant

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.

admits in its answer or briefs that other similarly situated employees exist, plaintiffs cannot rely on their allegations alone to make the required modest factual showing.").

**\*3** If Plaintiffs are able to satisfy their initial burden, notice may be issued to prospective plaintiffs who may opt in to the action. Then, when discovery is closed, the case moves to the second step. On the more robust record, the Court determines whether the so-called "collective action" may go forward by assessing "whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs. The action may be 'de-certified' if the record reveals that they are not, and the opt-in plaintiffs' claims may be dismissed without prejudice." *Myers,* 624 F.3d at 555; see also *Bergman,* 949 F.Supp.2d at 855 (explaining that at the second step, "the defendant is given an opportunity to move for decertification"). "At the second stage, the court considers (1) whether the plaintiffs share similar or disparate factual and employment settings; (2) whether the various affirmative defenses available to the defendant would have to individually applied to each plaintiff; and (3) fairness and procedural concerns." *Strait v. Belcan Eng'g Grp., Inc.,* 911 F.Supp.2d 709, 718 (N.D.Ill.2012) (quotation omitted). This stage is where the certification becomes more akin to the familiar Rule 23 class certification standard, (see *Espenscheid v. DirectSat USA, LLC,* 705 F.3d 770, 772 (7th Cir.2013)); "it is not until the conclusion of the opt-in process and class discovery 'that the court more rigorously reviews whether the representative plaintiff and the putative claimants are in fact similarly situated so that the lawsuit may proceed as a collective action.' " *Tamas v. Family Video Movie Club, Inc.,* 2013 WL 4080649, at \*3 (N.D.Ill. Aug. 13, 2013) (quoting *Smallwood v. Ill. Bell Tel. Co.,* 710 F.Supp.2d 746, 750 (N.D.Ill.2010)).

Defendant Chiro one does not contend that Plaintiffs have failed to meet the lenient standard ordinarily applied to conditional certification of an FLSA collective action. Instead, it asks the Court to deny notice under the "decertification" standard because "discovery \* \* \* is already closed." However, the scheduling order in this case contemplated an initial period for "class discovery," after which a class certification motion would be filed, and a subsequent period of discovery following the court's ruling on certification. Thus, while class discovery is complete, additional discovery remains. See *Babych v. Psychiatric Solutions, Inc.,* 2011 WL 5507374, at \*3 (N.D.Ill. Nov. 9, 2011) ("Courts refuse to skip the first step of the conditional certification inquiry where the parties' agreed schedule indicates that there will be two stages of discovery."). Further, "it is not until the conclusion of the opt-in process and class discovery 'that the court more rigorously reviews whether the representative plaintiff and the putative claimants are in fact similarly situated so that the lawsuit may proceed as a collective action.' " *Brown v. Club Assist Rd. Serv. U.S., Inc.,* 2013 WL 5304100, at \*12 (N.D.Ill. Sept. 19, 2013). After all, the Court is "assessing whether the plaintiffs who have opted in are in fact 'similarly situated' to the named plaintiffs." *Id.* Until the opt-in process is complete, the Court cannot compare the named plaintiffs with those "who have opted in." *Id.*; *Sylvester v. Wintrust Fin. Corp.,* 2013 WL 5433593, at \*3 (N.D.Ill. Sept. 30, 2013); *Babych,* 2011 WL 5507374 at \*3 ("unless the court is able to assess the individual claims of the employees who choose to opt-in to this FLSA collective action, it cannot make a final determination of whether the class members are 'similarly situated.' "); see also *Bergman v. Kindred Healthcare, Inc.,* 949 F.Supp.2d at 855.

While the "lenient standard occasionally is heightened if plaintiffs have been allowed extensive discovery," an intermediate standard—not the decertification standard requested by Chiro One–applies. *Bergman v. Kindred Healthcare, Inc.,* 949 F.Supp.2d at 855 (citing *Creely v. HCR ManorCare, Inc.,* 789 F.Supp.2d 819, 823–26 (N.D.Ohio 2011)). The intermediate standard, while more stringent than the lenient first-step standard, is less rigorous than the second-step decertification standard. "Both sides' evidentiary submissions [are] considered in determining whether there is a group of similarly situated employees who may be discovered by sending out an opt-in notice." *Bergman,* 949 F.Supp.2d at 856. But in "evaluating each side's submissions, it must be kept in mind that, despite the discovery that has been allowed, defendants still have greater access to evidence than plaintiffs and plaintiffs' modest showing need not be conclusive." *Id.* So even if a stricter standard is applied, Plaintiffs need only "make a modest 'plus' factual showing that there is a group of potentially similarly situated plaintiffs that may be discovered by sending opt-in notices." *Id.* at \*3.

**\*4** Here, Plaintiffs have made the minimal "modest factual showing"—indeed, have made a "modest plus" showing— sufficient to carry them past the first stage of the conditional certification process, identifying for the Court and Defendant a group of potentially similarly-situated plaintiffs who may be discovered by sending opt-in notices. At this stage, Plaintiffs have demonstrated that Chiro One has always treated CTs as a cohesive group for the purposes of applying the FLSA. It

uniformly classified them as exempt from the FLSA, which, Plaintiffs allege, resulted in a systemic failure to maintain accurate records of the hours that CTs worked. And Chiro One later reclassified CTs to non-exempt employees and began paying them overtime. Plaintiffs also have showed that Chiro One employed CTs under a uniform job description, gave CTs uniform training, and structured (or "scripted") CTs' job duties to "standardize" the delivery of its services. See, *e.g.,Betancourt v. Maxim Healthcare Servs., Inc.,* 2011 WL 1548964, *6 (N.D.Ill. Apr. 21, 2011) (uniform classification as exempt supported conditional certification); *Jirak v. Abbott Labs., Inc.,* 566 F.Supp.2d 845, 849 (N.D.Ill.2008) (same); *Vaughan v. Mortgage Source LLC,* 2010 WL 1528521, *4–5 (E.D.N.Y. Apr. 14, 2010) (uniform failure to record plaintiffs' time worked supported certification); *Pefanis v. Westway Diner, Inc.,* 2008 WL 4546526, *1 (S.D.N.Y. Oct. 8, 2008) (same); *Smallwood v. Illinois Bell Tel. Co.,* 710 F.Supp.2d 746, 752 (N.D.Ill.2010) ("A common policy or plan appears to exist because [all employees in the challenged position] were uniformly reclassified as non-exempt employees, making them eligible for overtime").

Chiro One argues that notice should be denied because the potential class members "did not have a common supervisor" and may have worked differing amounts of overtime. However, geographic commonality is not necessary to satisfy the FLSA collective action's "similarly situated" requirement. See *Falcon v. Starbucks Corp.,* 580 F.Supp.2d 528, 53–40 (S.D.Tex.2008) (finding plaintiffs "similarly situated"—at the decertification stage—because they were subject to the same FLSA violation, even though they worked in different locations, under supervision of different individuals, for differing amounts of time); *Kuperman v. ICF Int'l,* 2008 WL 4809167 (E.D.La. Nov. 3, 2008) (geographic disparity among potential opt-ins does not preclude conditional certification: "the law is plain that that fact does not undermine the 'similarly situated' requirement"). Rather, the focus is on whether the employees were affected by a common policy. See *Sperling v. Hoffmann–La Roche, Inc.,* 118 F.R.D. 392, 405 (D.N.J.1988) (affirmed by 493 U.S. 165 (1989)); see also *Kelly v. Bluegreen Corp.,* 256 F.R.D. 626, 631 (W.D.Wisc.2009) ("Where an apparent company-wide policy is behind the alleged FLSA violations, the plaintiff seeking certification for a company-wide class action should not be required to collect specific violations from each location or from each state before seeking authorization to provide notice to employees from all locations.").

To date, Plaintiffs have come forward with evidence that Chiro One classified all of its CTs as exempt; violated the record keeping requirements with respect to all CTs until December 2011; and, even after it began tracking hours worked, failed to pay overtime to CTs for hours worked in excess of 40 in a workweek. Under either the "modest" or "modest plus" standard, Plaintiffs have met the standard for FLSA certification and the issuance of notice. Accordingly, the Court concludes that Plaintiffs have met their burden of demonstrating that they and others were subject to a common policy or course of conduct by Defendant, and that issuance of a notice advising prospective opt-in plaintiffs of their rights is appropriate in this case.

### III. Rule 23 Certification of IMWL Claims

To be certified as a class action, a proposed class must satisfy the requirements of Federal Rule of Civil Procedure 23(a), as well as one of the three alternative requirements in Rule 23(b). *Messner v. Northshore University HealthSystem,* 669 F.3d 802, 811 (7th Cir.2012). "As a threshold matter, a proposed class must always meet the Rule 23(a) requirements of numerosity, typicality, commonality, and adequacy of representation." *Id.* Then, when certification is sought under Rule 23(b)(3), as it is here, proponents of the class must show: (1) questions of law or fact common to the members of the proposed class predominate over questions affecting only individual class members; and (2) a class action is superior to other available methods of resolving the controversy. *Messner,* 669 F.3d at 811.

 **\*5**  Plaintiffs bear the burden of proving that they are entitled to class certification. *Oshana v. Coca–Cola Co.,* 472 F.3d 506, 513 (7th Cir.2006). Although class certification proceedings are not "a dress rehearsal for the trial on the merits," *Messner,* 669 F.3d at 811, for purposes of deciding the certification question, the Court does not presume that all well-pleaded allegations are true. See *Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672, 676–77 (7th Cir.2001). Rather, before it allows a case to proceed as a class action, the Court "should make whatever factual and legal inquiries are necessary under Rule 23." *Id.* at 676. "A party seeking class certification must affirmatively demonstrate his compliance with th[e] Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal–Mart Stores v. Dukes,* 131 S.Ct. 2541, 2551 (2011). But the showing need not be "to a degree of absolute certainty. It is sufficient if each disputed requirement has been proven by a preponderance of evidence." *Messner,* 669 F.3d at 811. The Court exercises broad discretion

Case: 3:15-cv-00081-bbc Document #: 58-49 Filed: 05/13/16 Page 61 of 112

in determining whether class certification is appropriate given the particular facts of the case. *Keele v. Wexler,* 149 F.3d 589, 592 (7th Cir.1998).

## A. Rule 23(a)

### 1. Numerosity

The first requirement under Rule 23(a) is that the purported class be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). "While there is no threshold or magic number at which joinder is impracticable, a class of more than 40 members is generally believed to be sufficiently numerous for Rule 23 purposes." *Ringswald v. County of DuPage,* 196 F.R.D. 509, 512 (N.D.Ill.2000) (citations omitted). Further, "a plaintiff does not need to demonstrate the exact number of class members as long as a conclusion is apparent from good-faith estimates." *Barragan v. Evanger's Dog & Cat Food Co., Inc.,* 259 F.R.D. 330, 333 (N.D.Ill.2009). Courts rely on "common sense" to determine whether an estimate of class size is reasonable and estimates "may not be based on pure speculation." *Murray v. E\*Trade Fin. Corp.,* 240 F.R.D. 392, 396 (N.D.Ill.2006).

During discovery, Defendant produced a list of class members with their dates of employment. The list shows that the Illinois class consists of at least 374 members. In addition, Defendant's Chief Operations Officer testified that each of the 55 Illinois locations employs at least one CT, and most locations have 3 or more CTs on staff. Defendant argues that numerosity is not met because Plaintiffs (1) "cannot establish one class member of chiropractic assistants," (2) cannot "provide an estimate for the number of chiropractic assistants damaged by [Chiro One's] conduct," and (3) cannot establish the number of Chiropractic Technicians who worked overtime.

With respect to Defendant's first argument, the list of class members produced by Defendant shows that the class of misclassified CTs *and CAs* consists of at least 374 members. Plaintiffs have asserted that, given the near complete overlap of job duties, CTs and CAs are properly included in a single class. At this stage, Defendant has failed to show any relevant distinctions between CTs and CAs, and thus Plaintiff's classification passes muster. Defendant's second and third arguments challenge the merits of Plaintiffs' claims. At this stage, the suggestion that Plaintiffs cannot show numerosity because some potential class members may not have worked overtime does not stand in the way of certification. Not every class member needs to have been damaged by the Defendant's policy in order to support a class. *Kohen v. Pac. Inv. Mgmt. Co. LLC,* 571 F.3d 672, 677 (7th Cir.2009) ("a class will often include persons who have not been injured by the defendant's conduct; indeed this is almost inevitable because at the outset of the case many of the members of the class may be unknown, or if they are known still the facts bearing on their claims may be unknown. Such a possibility or indeed inevitability does not preclude class certification"); *Messner v. Northshore Univ. HealthSystem,* 669 F.3d 802, 823 (7th Cir.2012) ("All of this is at best an argument that some class members' claims will fail on the merits if and when damages are decided, a fact generally irrelevant to the district court's decision on class certification."); *Wiedenbeck v. Cinergy Health, Inc.,* 2013 WL 5308206, at \*8 (W.D.Wis. Sept. 20, 2013) (the possibility that some members of the class were not harmed by defendant's conduct is not a basis for rejecting class certification). Even if certain class members were not harmed by Defendant's policies, this is "an argument not for refusing to certify the class but for certifying it and then entering a judgment that would largely exonerate [Chiro One]." See *Butler v. Sears, Roebuck & Co.,* 727 F.3d 796, 799 (7th Cir.2013). The Court finds that Plaintiffs have met the numerosity requirement.

### 2. Commonality

**\*6** For a class to be certified, questions of law or fact must exist common to the class. Fed.R.Civ.P. 23(a)(2). The commonality requirement may be satisfied by showing one issue common to all class members. See *Dukes,* 131 S.Ct. at 2556 ("We quite agree that for purposes of Rule 23(a)(2) even a single common question will do") (internal punctuation omitted); see also *Walker v. Bankers Life & Cas. Co.,* 2007 WL 2903180, \*4 (N.D.Ill. Oct. 1, 2007) ("Not all factual or legal questions raised in a lawsuit need be common so long as a single issue is common to all class members."). Commonality thus requires a common issue

capable of classwide resolution, "which means a determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes,* 131 S.Ct. at 2551. A common question may be shown where claims of individual members are based on the common application of a statute, or where class members are aggrieved by the same or similar conduct. *Keele,* 149 F.3d at 592.

Plaintiffs contend that there are at least two common issues in this case: (1) treating CTs as exempt from the overtime requirements of the IMWL, and (2) failing to maintain records of the hours worked by CTs (until late 2011). Plaintiffs contend that Defendant treated all CTs—the entire IMWL proposed class—in the same manner resulting in an identical violation of the maximum hour provisions of the IMWL. According to Plaintiffs, these common employment practices create common issues of law and fact. *Barragan,* 259 F.R.D. at 334; *Keele,* 149 F.3d at 594 ("A common nucleus of operative facts" arising from a defendant's "standardized conduct towards members of the proposed class" is sufficient to show commonality). Plaintiffs further contend that the legality of Defendant's decision to treat all CTs as exempt is particularly amenable to class resolution because Chiro One, by failing to assert the affirmative defense of exemption, waived its right to contest that any CTs were exempt from the overtime pay provisions of the IMWL.

In arguing against a finding of commonality, Defendant relies on *Wal–Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541 (2011). However, the lack of commonality found in *Dukes* sprang from the fact that the plaintiffs' Title VII claims turned on reasons that motivated particular employment decisions. This would require analyzing millions of subjective employment decisions and would not result in a common answer as to why each employee was a victim of alleged discrimination. "Unlike a Title VII claim, * * * plaintiffs' IMWL claim requires no proof of individual discriminatory intent." *Driver v. AppleIllinois, LLC,* 2012 WL 689169, at *2 (N.D. Ill. Mar. 2, 2012). "The answer to 'why,' which is critical to a Title VII case, is irrelevant here." *Id.*

Additionally, as recognized by Defendant, commonality is established if "the claims of the class members depend on a 'common contention' that is 'of such a nature that is capable of classwide resolution—which means that the termination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.' " Def.'s Resp. at p. 9 (quoting *Dukes,* 131 S.Ct. at 2551) ]. Here, Defendant's alleged failure to pay overtime and track hours of work resulted from a uniform, official, corporate policy of treating CTs as exempt. This decision was made at the corporate level, not by individual supervisors at each location. The legality of this uniform policy is the focus of this litigation. *Dukes,* 131 S.Ct. at 2551. Indeed, post-*Dukes,* the Seventh Circuit noted that "a single, firm-wide policy * * * could satisfy 23(a)(2)." See *Yang v. Kohler Co.,* 488 Fed.Appx. 146, 147 (7th Cir.2012); see also *Bolden v. Walsh Const. Co.,* 688 F.3d 893, 897 (7th Cir.2012) ("Relying on *Falcon,* the Court in *Wal–Mart* explained that a multi-store (or multi-site) class could satisfy Rule 23(a)(2) if the employer used a procedure or policy that spanned all sites."); *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 672 F.3d 482, 490 (7th Cir.2012) (challenging company-wide policies in a class action is not forbidden by the *Dukes* decision).

 *7 Although Plaintiffs' claims may raise individualized questions regarding the number of hours worked and how much each employee was entitled to be paid, those differences go to the damages each employee is owed, not to the common question of Chiro One's liability. "Recognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal." *Comcast Corp. v. Behrend,* 133 S.Ct. 1426, 1437 (2013) (Ginsberg and Breyer, JJ., dissenting); see also *Butler,* 727 F.3d at 801 (confirming, post-*Comcast,* that individual damages do not preclude class certification); *Messner,* 669 F.3d at 815 ("It is well established that the presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)."); *Arreola v. Godinez,* 546 F.3d 788, 801 (7th Cir.2008)("need for individual damages determinations does not, in and of itself, require denial of his motion for certification."). Plaintiffs have alleged a common injury based on particular employment policies that are capable of classwide resolution without inquiry into multiple employment decisions.

In sum, the Court finds that the allegations of standardized conduct put forth by Plaintiffs arise from a "common nucleus of operative fact." See *Butler,* 727 F.3d at 801 (commonality shown where an "issue 'central to the validity of each one of the claims' in a class action * * * can be resolved 'in one stroke' ") (quoting *Dukes,* 131 S.Ct. at 2551). Defendants' classification of CTs as exempt was made at the corporate level (as was the decision to reclassify the position as non-exempt). Additionally, Plaintiffs have come forward with evidence that Chiro One's locations have a standardized hierarchy and that Chiro One had

Case: 3:15-cv-00081-bbc  Document #: 58-49  Filed: 05/13/16  Page 63 of 112

standardized corporate policies and procedures governing these employees and uniform training programs for these employees. See, *e.g.*, *Damassia v. Duane Reade, Inc.,* 250 F.R.D. 152 (S.D.N.Y.2008). Where there is evidence that the duties of the job are largely defined by comprehensive corporate procedures and policies, district courts have routinely certified classes of employees challenging their classification as exempt. Here, commonality is established.

### *3. Typicality*

Claims of the class representatives and class members are typical if they arise from the same practice or course of conduct and are based on the same legal theory. *Keele,* 149 F.3d at 595; *Cicilline,* 542 F.Supp.2d at 836. Typicality and commonality are closely related. *Rosario v. Livaditis,* 963 F.2d 1013, 1018 (7th Cir.1992). "Typical does not mean identical, and the typicality requirement is liberally construed." *Gaspar v. Linvatec Corp.,* 167 F.R.D. 51, 57 (N.D.Ill.1996).

Typicality is meant to insure that the claims of the class representatives have the "same essential characteristics as the claims of the class at large." *Retired Chicago Police Ass'n,* 7 F.3d at 596. In cases involving violations of wage and hour laws, typicality is generally satisfied because the named plaintiffs and class members have been injured by the same course of unlawful conduct. See *Barragan,* 259 F.R.D. at 334. Not surprisingly, Chiro One has not challenged Plaintiffs' contention that the claims of the class representatives are typical of those of the class. Indeed, Plaintiffs' claims and the claims of all potential class members arise from the same course of action by Defendant: the misclassification and the alleged failure to pay overtime. Further, the claims of Plaintiffs and the potential class also arise from the same legal theory: an alleged violation of the IMWL. The typicality requirement has been satisfied.

### *4. Adequacy of Representation*

Before a class will be certified, Rule 23(a)(4) requires a plaintiff to show that "the representative parties will fairly and adequately protect the interests of the class." The adequacy requirement requires that the claims and interests of the named Plaintiffs not conflict with those of the class, that the class representatives have sufficient interest in the outcome of the case, and that class counsel are experienced and competent. *Retired Chicago Police Ass'n,* 7 F.3d at 598.

**\*8** Defendant contends that Plaintiffs cannot adequately represent a class of CAs because neither worked as a CA. Putting aside the issue of whether a CT could represent a class including CAs—given the similarity of their job duties—there is evidence in the record that both Kurgan and Diaz worked as CAs. Diaz testified in a declaration that she worked for a time as a CA. Although Defendant suggests that her declaration "contradicts" her deposition, Diaz was not asked whether she worked as a CA at her deposition. And Chiro One's own personnel documents demonstrate Diaz worked as a CA. Additionally, Chiro One ignores Kurgan's deposition to argue that she was never a CA (citing only to Kurgan's declaration, which does not discuss her work as a CA). During her deposition, which defense counsel presumably attended, Kurgan testified to working as a CA, and Chiro One's own personnel records demonstrate that Kurgan worked as a CA. Thus, Defendant's argument lacks a factual basis.

Chiro One's remaining arguments reflect both a factual and legal misunderstanding of Plaintiffs' IMWL class claim. For example, Chiro One suggests Plaintiffs are inadequate class representatives because they never "worked outside of Illinois, and they have provided no evidence that [CTs] in Texas or Kentucky share similar experiences." Since Plaintiffs' proposed IMWL class is limited to Illinois employees, Defendant's argument makes little sense. Chiro One also suggests that Plaintiffs are inadequate because, under the FLSA, the three-year statute of limitations is reserved for "willful" violations. [ECF No. 157, p. 11]. This argument fails because the IMWL—the claim that Plaintiffs seek to certify under Rule 23—has a three-year statute of limitation irrespective of whether the violation is "willful." See 820 ILCS 105/12(a). In short, each of the arguments advanced by Defendant in contesting the adequacy of the named Plaintiffs lacks either a factual or legal basis.

Plaintiffs have participated actively in the case, class counsel has experience bringing class-action claims under the IMWL, and there is no indication that the interests of the named Plaintiffs are antagonistic to those of the other class members. The adequacy requirement is met.

## B. Rule 23(b)(3)

Next, Plaintiffs argue that the proposed class satisfies the requirements set forth in Rule 23(b)(3). As set forth above, Rule 23(b)(3) permits class certification where common questions of law and fact predominate over individualized questions, and where a class action is superior to other available methods of resolving the controversy.

### 1. Predominance

The predominance inquiry tests whether the proposed class is "sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 623 (1997)). Although related to the commonality requirement found in Rule 23(a), "the predominance criterion is far more demanding." *Id.* at 624. A party meets the predominance requirement if she can show that " 'common questions represent a significant aspect of [a] case and * * * can be resolved for all members of [a] class in a single adjudication.' " *Messner,* 669 F.3d at 815 (quoting 7AA Wright & Miller, FEDERAL PRACTICE & PROCEDURE § 1778 (3d ed.2011)). " 'If, to make a prima facie showing on a given question, the members of a proposed class will need to present evidence that varies from member to member, then it is an individual question. If the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question.' " *Messner,* 669 F.3d at 815 (quoting *Blades v. Monsanto Co.,* 400 F.3d 562, 566 (8th Cir.2005)).

Defendants contend that the predominance requirement of Rule 23(b)(3) is not satisfied "because damages among the proposed class can only be resolved on an individual basis." However, where liability can be established as a common issue, individualized damage issues do not necessarily preclude certification. See *Butler,* 727 F.3d at 801; *Messner,* 669 F.3d at 815 ("[T]he presence of individualized questions regarding damages does not prevent certification under Rule 23(b)(3)."). In fact, the Ninth Circuit recently reversed a district court with instructions to grant class certification in a wage and hour case, holding that the court abused its discretion and "used the wrong standard" when it denied certification on the basis that damages calculation would be individual. *Leyva v. Medline Indus. Inc.,* 716 F.3d 510, 513–14 (9th Cir.2013). The court confirmed that "damage calculations alone cannot defeat certification." *Id.* Thus, a class can satisfy predominance based on common questions regarding liability notwithstanding the need for individualized damage calculations. See *Arreola,* 546 F.3d at 801 ("need for individual damages determinations does not, in and of itself, require denial of his motion for certification."). Indeed, "[i]f the issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification." *Butler,* 727 F.3d at 801; *Healy v. Int'l Bhd. of Elec. Workers, Local Union No. 134,* ——F.Supp.2d. ——, 2013 WL 4494685, * 10 (N.D.Ill. Aug. 22, 2013) ("*Comcast* does not come close to saying, as defendants suggest, that a class cannot be certified whenever there are variations among class members' damages.").

**\*9** Certainly a plaintiff's theory of damages must flow from the theory of liability—*i.e.,* the plaintiff must seek damages that are "the result of the wrong" (*Comcast,* 133 S.Ct. at 1434)—but that requirement is satisfied here. Plaintiffs' theory of liability is that Defendant unlawfully refused to pay CTs overtime pay as required under the IMWL. "[T]here is no possibility in this case that damages could be attributed to acts of defendants that are not challenged on a classwide basis;" all members of the class attribute their damages to Chiro One's decision to classify them as exempt. See *Butler,* 727 F.3d at 800. Further, if this finding is made, then Defendant also likely violated the record keeping requirements of the IMWL. 29 U.S.C.A. § 211(c) (employers must keep accurate records of non-exempt employees' work hours); 820 ILCS 105/8 (same). If this is the case, then class members may be entitled to a relaxed standard of proof in establishing their damages. See *Driver,* 2012 WL 689169, *3 (a relaxed standard of proof applies when an employer fails to keep the records required by the IMWL). In other words, the classwide determination of the exemption issue will not only determine whether Defendant is liable, it also may aid in resolving damages.

The IMWL claim alleged here arises from a uniform type of alleged violation by Defendant, namely, a common practice of exempting CTs from overtime. At this stage, the damages issues—if they are reached—appear manageable. Juxtaposed against common liability questions such as those in this case, the mere fact of individualized damage issues does not defeat predominance. *Rosario v. Valentine Avenue Discount Store Co., Inc.,* 2013 WL 2395288, *8–9 (E.D.N.Y. May 31, 2013). (While each class member will have different damages depending on the length of time they were employed, the wages they received, and the hours they worked, such questions do not defeat predominance.). Where, as here, the focus is on liability-imposing conduct of the defendant that is identical as to all putative plaintiffs, the predominance element is satisfied. *Butler,* 727 F.3d at 801 (confirming, post-*Comcast,* individual damages do not preclude class certification); *Sullivan v. DB Investments, Inc.,* 667 F.3d 273, 298–301 (3rd Cir.2011).

### 2. Superiority

The second prong of Rule 23(b)(3) is satisfied when it is shown that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Plaintiffs allege that a class action would allow for consistency of judgments, and that judicial economy and efficiency would dictate a certification of this class. The Court agrees that in this instance, a class action is the superior method. Although the damages questions for members of the class may vary, the liability determination is best adjudicated once, in the class form. And, as already set forth in detail, individualized damage claims do not render class actions inappropriate. See *Butler,* 727 F.3d at 801 ("If issues of liability are genuinely common issues, and the damages of individual class members can be readily determined in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification."). Plaintiffs' proposed class satisfies the superiority requirement.

In sum, Rule 23(b)(3) is satisfied. Common questions of law or fact predominate over questions affecting only individual members, and a class action is superior to the available methods for the fair and efficient adjudication of the controversy.

### C. Mootness

Defendant admits that its settlement offers could not moot Plaintiffs' case if a motion for class certification was pending when their July 16, 2013 offers were made. To get around that fact, Defendant twists the record to argue that no certification motion was pending at that time. Defendant's argument is disingenuous and ignores direct communication from the Court regarding its practice when the parties do not brief class certification motions in a timely manner.[2]

**\*10**  Plaintiffs originally filed their certification motion on June 22, 2012. At the Court's request (because neither side had briefed the motion), Plaintiffs re-filed their certification motion on February 15, 2013. On February 19, 2013, the Court withdrew the original certification motion, and granted Plaintiffs leave to re-file. The Court specifically noted that Plaintiffs' motion had been re-filed, referencing "Doc. [121]" and stating "[a]ll previously filed briefs on motion to certify class will remain in place." Plaintiffs filed their current amended motion for collective and class certification on August 26, 2013, and on August 29, 2013, the Court struck Plaintiffs' February 15, 2013 motion. Defendant's claim that there was no certification motion pending on July 16, 2013 is further contradicted by Judge Keys' March 1, 2013 minute entry that states: "There is a pending motion to certify class [121] before the District Court Judge." The February 15 motion remained pending until it was stricken *after* Plaintiffs filed their amended motion. Because a certification motion was pending at all relevant times, the class allegations in this case could not be mooted by Defendant's offers. See *Greisz v. Household Bank (Illinois), N.A.,* 176 F.3d 1012, 1015 (7th Cir.1999).

### IV. Conclusion

For these reasons, the Court grants Plaintiffs' amended motion for collective and class certification [144]. The Court grants conditional certification of the FLSA's claims and certifies Plaintiffs' IMWL claims for class treatment under Rule 23. This

matter remains set for status at 2:00 p.m. on March 11, 2014. At that time the Court will address any questions or concerns with respect to the form of the notice. The parties are directed to submit a joint status report no later than March 7, 2014.

**All Citations**

Not Reported in F.Supp.2d, 2014 WL 642092

Footnotes

1    Some courts characterize the plaintiffs' burden as one of showing "a reasonable basis for his claim that there are other similarly situated employees." *Morgan v. Family Dollar Stores, Inc.,* 551 F.3d 1233, 1260 (1 1th Cir.2008).

2    In almost every case of this nature in the Seventh Circuit, counsel for Plaintiffs file a motion for class certification in the early stages of the case—often with the complaint itself—to comply with the Seventh Circuit's decision in *Damasco v. Clearwire Corp.,* 662 F.3d 891, 896 (7th Cir.2011). In many instances, the motions are withdrawn shortly after the initial status hearing because defendants are willing to enter into a stipulation that they will not attempt to "pick off" the named plaintiff in an early settlement. No such stipulation was entered into in this case. When stipulations are not reached, parties generally are willing to periodically refile the motion until they are ready to set a briefing schedule. That is the procedure that was followed in this case. At all times between June 22, 2012 and today, a motion for class certification has been pending in this case.

---

End of Document

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 1778326
Only the Westlaw citation is currently available.
United States District Court,
N.D. California,
**San Jose Division**.

Jacqueline Cavalier Nelson, et al., Plaintiff,

v.

Avon Products, Inc., et al., Defendants.

Case No. 13–cv–02276–BLF
|
Signed April 17, 2015

**Attorneys and Law Firms**

Norman B. Blumenthal, Aparajit Bhowmik, Kyle Roald Nordrehaug, Ruchira Piya Mukherjee, Blumenthal Nordrehaug & Bhowmik, La Jolla, CA, for Plaintiff.

Rhonda Renee Trotter, Kaye Scholer LLP, Los Angeles, CA, Jeremy White, Jeremy M. White, Kerry Alan Scanlon, Kaye Scholer LLP, Washington, DC, for Defendants.

## ORDER GRANTING PLAINTFFS' MOTION FOR CLASS CERTIFICATION

[Re: ECF 56]

BETH LABSON FREEMAN, District Judge

**\*1** This purported class action involves a dispute over alleged employment misclassification. The named Plaintiffs are former District Sales Managers of Defendant Avon Products, Inc. The Plaintiffs allege that Avon improperly misclassified DSMs as exempt from overtime wages. Plaintiffs move the Court to certify a class of "all persons employed by Defendant in California as District Sales Managers from April 8, 2009 to the present," as well as to appoint Plaintiffs' counsel, Blumenthal, Nordrehaug & Bhowmik, as class counsel, and to designate the named Plaintiffs as class representatives. For the reasons below, the Court GRANTS Plaintiffs' motion.

## I. BACKGROUND

### A. The Job Duties and Major Responsibilities of Avon DSMs

The nineteen named Plaintiffs were employed as District Sales Managers ("DSMs") by Avon in California between April 8, 2009 and the present. DSMs were classified by Avon as exempt from overtime wages during this time period. Martin Depo., Bhowmik Decl., ECF 56–2 at 103:18–23. DSMs are responsible for recruiting Representatives to sell Avon products. *See, e.g., id.* at 134:11–137:19. [1] Several named Plaintiffs in this case testify that this recruiting, called "prospecting" in Avon corporate parlance, was a DSM's primary job responsibility. *See* Bandini Depo., Bhowmik Decl., ECF 56–2 Exh. 10 at 107:20–110:12 (describing meeting with and recruiting prospective Representatives to be her "primary task" as a DSM); Colon Decl., Bhowmik Decl., ECF 56–9 at ¶ 4 ("My main responsibility as a District Sales Manager for Avon was to recruit independent contractor Sales Representatives in and around my assigned district."); Bilitch Depo., Bhowmik Decl. ECF 56–2 Exh. 6 at 116:4–14 (testifying that she was instructed to "go out and prospect with my reps, get my reps involved, teach them how to prospect and

spend my time prospecting"); Flores Decl., ECF 56–10 at ¶ 4 ("Defendant's company policy required me and other District Sales Managers to spend at least eight (8) hours each day in the 'field' recruiting independent contractor Sales Representatives."). DSMs would also train their Representatives to do their own prospecting, in addition to providing some training in general sales skills. *See, e.g.,* Campbell. Depo., Bhowmik Decl., ECF 56–2 Exh. 13 at 93:23–94:24 ("What I did for training was I would teach [the Representatives] how to sell, but that was very, very minimal because most of what Avon wanted us to do was to recruit them and teach them how to recruit."). DSMs do not themselves sell Avon products. *See, e.g.,* Martin Depo. at 38:21–23.

Avon provides its DSMs with materials to assist in prospecting and training Representatives, including promotional materials, product samples, recruiting tents, and other props. *See* Martin Depo. at 121:1–122:3. DSMs testify that they would set up these tents, which could be quite heavy, around their assigned districts when attempting to recruit new Representatives. *See, e.g.,* Branson Decl. ¶ 9 ("I had to set up the recruiting tent multiple times during my employment in the parking lots of local businesses ... in order to recruit Sales Representatives. The tent was so big I had to ask random strangers to help me set it up.").

 **\*2** DSMs also testify that they are subject to substantial supervision. Division Managers, to whom DSMs report, can access a DSM's work calendar and schedules. *See* Cabrera Depo. at 32:133:24 (testifying that she was able to review her DSM's work schedules and calendars); Gaskell Depo., Bhowmik Decl., ECF 56–2 Exh. 8 at 13:20–14:1 (testifying that she could review DSM work calendars). An Avon employee further testified in the company's 30(b)(6) deposition that Division Managers supervised DSMs in a manner such that they were able to know "where, geographically, [a DSM] might be in the district." Martin Depo. at 62:2–12. District managers also ride along with their DSMs while the DSMs are prospecting in order to directly supervise their work. *See* Gordon Depo., Bhowmik Decl., ECF 56–2 Exh. 9 at 54:24–55:2. DSMs are also monitored by their Division Managers with regard to Avon's Key Performance Indicators ("KPIs"), which includes, among other data, the number of Representatives a DSM recruits and the sales those Representatives makes. *See* Martin Depo. at 30:9–23, 37:15–24; *see also* Gaskell Depo. at 21:8–22:5. At least one Division Manager testified that she reviewed her DSMs' KPI reports on a daily basis. *See* Cabrera Depo. at 35:20–37:22, 40:15–23.

Finally, the named Plaintiffs contend that DSMs are far removed from the general business operations of Avon's business, because they exercise no control over Avon's operating or managerial policies since their main job was to recruit "anyone with a pulse" as a Representative. *See, e.g.,* Bishop Decl., ECF 56–7 at ¶¶ 3–4 ("I could not hire, fire, discipline, or promote any Avon employees ... Avon would allow me to accept anyone with a pulse."); Branson Decl. ¶ 3 ("I possessed zero authority to make any employment-related, personnel decisions.").

Avon's own documents support the named Plaintiffs' testimony that the main role of DSMs is to recruit new Representatives. Avon's "DSM Roles & Responsibilities" document outlines that DSMs have six primary areas of responsibility, the first two being "training and developing 1st generation representatives/top sellers (through coaching and mentoring)" and "appointing, training, and developing new sales leaders." *See* "Direct Sales Manager Role & Responsibilities," Bhowmik Decl., ECF 56–2 Exh. 4 at 1, 3. Avon again describes the importance of prospecting new Representatives in a training presentation entitled "US Sales Training & Development," ECF 56–2 Exh. 3 at 8, which says that "Direct Sales Managers are the key to achieving direct selling excellence through outstanding recruiting, motivating, and training of Avon Representatives." This document further states that "Direct Sales Manager and Representative's (sic) roles are clearly defined," *id.* at 9, and identifies four tasks in which DSMs are expected to engage: (1) planning, (2) recruiting Representatives, (3) training and developing Representatives, and (4) measuring performance and reporting results. *See id.* at 12. Avon identifies the "fundamental expectations" of DSMs with regard to these four tasks to include "prospect[ing], recruit[ing], and appoint[ing] Representatives," "maintain[ing] high levels of Representative coverage," "enthusiastically promot[ing] and manag[ing] the New Representative Development Process," and "improv[ing] Representative retention." *Id.* at 14–18.

After this lawsuit was filed, Avon commissioned a study by Dr. Christina Banks which was designed to "determine what tasks and activities DSMs actually perform on the job." *See* Banks Decl., ECF 61 at ¶ 3.[2] The study observed thirty DSMs over the course of a day, and Dr. Banks identified 153 discreet tasks that DSMs perform, grouped into nineteen "Task Areas":

1. Planning Recruiting Activities

2. Promoting Avon and Recruiting Representatives

3. Growing the Representative Base Through Others

4. Educating Representatives on Building their Sales and Recruiting Skills

5. Demonstrating Sales and Recruiting Activities to Representatives

6. Coaching and Mentoring Representatives in Marketing and Sales

7. Coaching and Mentoring Representatives in Recruiting

8. Facilitating Representatives' Orders and Customer Service

9. Developing and Implementing Strategies for Growing Revenue

**\*3** 10. Reviewing and Analyzing District Performance

11. Business Planning and Scheduling

12. Updating Product Knowledge and Sales Skills

13. Managing District Budget

14. On-boarding New Representatives

15. Selling Products and Performing Sales Support Activities

16. Maintaining and Securing Facilities and Equipment

17. Performing Clerical Activities

18. Managerial Drive Time

19. Non–Managerial Drive Time

Banks Decl. at p. 17, Table 4.

Dr. Banks noted in short that "DSMs serve as the interface between the company and the independent sales representatives, the people who sell Avon's products directly to consumers." *Id.* at ¶ 5. Though the study found that all DSMs engaged in these nineteen Task Areas, it found variations among the DSMs regarding the amount of time each spent undertaking certain tasks. For example, the least amount of time spent by an observed DSM engaging in "updating product knowledge and sales skills," Task Area 11, was no time at all, while the most time spent by an observed DSM undertaking tasks in this Task Area was 5 hours and 37 minutes. *See id.* at ¶ 34.

At oral argument on the motion, Plaintiffs' counsel did not disagree with the Task Areas identified by the Banks Study's Task Areas as comprising the activities in which DSMs engaged:

The Court: In your reply brief you seemed to be willing, at least for purposes of this motion, to accept the 19 tasks identified by Ms. Banks. Did I read that correctly?

Mr. Bhowmik: Absolutely.

The Court: Okay. But I presume at trial you would have your own list of tasks and you are not adopting those for all purposes.

Mr. Bhowmik: I would have to look at them a little more closely. I think the point is *I agree that's what the people do*.

February 19 Hearing Transcript at 28:21–29:5 (emphasis added).


## B. The Legal Claims

Plaintiffs contend that they have been denied overtime pay in violation of California Labor Code §§ 510, 1194, and 1198. California law provides that the Industrial Welfare Commission ("IWC") may establish exemptions from the requirement that employees be paid overtime compensation. *See* Cal. Labor Code § 515. The IWC has promulgated, through California Wage Order 4–2001 (hereinafter "Wage Order 4"), three exceptions to the general rule that employees must be compensated for overtime, for "executive," "administrative," and "professional" employees. See Wage Order 4 §§ 1(A)(1)–(3). In this case, Avon contends that DSMs fall within the administrative exemption of Wage Order 4, and are thus not entitled to overtime.

Wage Order 4 outlines a five-part test to determine whether an employee falls within the administrative exemption:

**\*4** The employee must (1) perform "office or non-manual work directly related to management policies or general business operations" of the employer or its customers, (2) "customarily and regularly exercise[ ] discretion and independent judgment," (3) "perform[ ] under only general supervision work along specialized or technical lines requiring special training" or "execute [ ] under only general supervision special assignments and tasks," (4) be engaged in the activities meeting the test for the exemption at least 50 percent of the time, and (5) earn twice the state's minimum wage.

See, e.g., Eicher v. Adv. Bus. Integrators, Inc., 151 Cal.App. 4th 1363, 1371 (2007) (citing Wage Order 4 § 1(A)(2)).

Critically, Avon bears the burden of proof with regard to whether the DSMs are properly classified as exempt from the provisions of Wage Order 4. *See, e.g., Ramirez v. Yosemite Water Co., Inc.,* 20 Cal.4th 785, 794–95 (1999) ("[T]he assertion of an exemption from the overtime laws is considered to be an affirmative defense, and therefore the employer bears the burden of proving the employee's exemption.") (citing *Nordquist v. McGraw–Hill Broad. Co.,* 32 Cal.App. 4th 555, 562 (1995)). Further, Wage Order 4's requirements are stated in the conjunctive: if only one of the requirements for the administrative exemption is lacking, the administrative exemption is inapplicable to the employee. *See Eicher* at 1372 (2007) ("Stated in the conjunctive, each of the five elements must be satisfied to find the employee exempt as an administrative employee.").

The parties dispute whether the Court can determine if DSMs were properly classified as exempt on a class-wide basis. Because Defendant bears the burden of proof with regard to the administrative exemption, Plaintiffs proffer four questions of law or fact that they contend can be adjudicated on a classwide basis, each of which they contend would render all DSMs misclassified under the law: (1) whether DSMs' duties and responsibilities involve the performance of non-manual work; (2) whether DSMs' duties and responsibilities involve work directly related to management policies or general business operations; (3) whether DSMs customarily and regularly exercise discretion and independent judgement; and (4) whether DSMs work under only general supervision.

Plaintiffs contend that these four questions predominate over any individual inquiries, because if they prevail as to any of these four questions they would show that the administrative exemption is inapplicable to Avon's California DSMs. Defendant argues in response that while DSMs might have the same job description, the manner in which they actually perform their jobs varies too widely for the Court to be able to determine whether DSMs as a class were exempt, and that such questions must instead be adjudicated individually.


## II. LEGAL STANDARD

Recognizing that "[t]he class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only," Federal Rule of Civil Procedure 23 demands that two requirements be met before a court certifies a class. *Comcast Corp. v. Behrend,* 133 S.Ct. 1426, 1432 (2013).

A party must first meet the requirements of Rule 23(a), which demands that the party "prove that there are in fact sufficiently numerous parties, common questions of law or fact, typicality of claims or defenses, and adequacy of representation." *Behrend* at 1432. If a party meets Rule 23(a)'s requirements, the proposed class must also satisfy at least one of the requirements of Rule 23(b). Here, Plaintiffs invoke Rule 23(b)(3), which demands that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). The predominance inquiry inherent in a Rule 23(b)(3) analysis asks "whether proposed classes are sufficiently cohesive to warrant adjudication by representation," focusing on "the relationship between common and individual issues." *In re Wells Fargo Home Mortg. Overtime Pay Litig.,* 571 F.3d 953, 957 (9th Cir.2009) (further noting that the express purpose of Rule 23(b)(3) was to "achieve economies of time, effort, and expense and promote [ ] uniformity of decision as to persons similarly situated"). Rule 23 outlines four pertinent factors to the Court's analysis in determining the appropriateness of a(b)(3) class: the class members' interest in individually controlling the action; the extent and nature of already-existing litigation regarding the action; the desirability (or lack thereof) of concentrating the litigation of the claims in a single forum; and manageability of the action. *See* Fed.R.Civ.P. 23(b)(3); *see also Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1022 (9th Cir.1998).

**\*5** The party seeking class certification bears the burden of showing affirmative compliance with Rule 23. *See, e.g., Wal–Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2551 (2011). A court's analysis of class certification "may entail some overlap with the merits of the plaintiff's underlying claim [s]," *Amgen Inc. v. Conn. Ret. Plans & Trust Funds,* 133 S.Ct. 1184, 1194 (2013), though the merits can be considered only to the extent they are "relevant to determining whether the Rule 23 prerequisites to class certification are satisfied." *Id.* at 1195. Within Rule 23's framework, the district court maintains broad discretion over whether to certify a class or subclass. *See, e.g., Zinser v. Accufix Research Institute, Inc.,* 253 F.3d 1180, 1186 (9th Cir.2001).

## III. DISCUSSION

Plaintiffs seek to certify a class of "all persons employed by Defendant in California as District Sales Managers from April 8, 2009 to the present." *See* Mot. at 1. Class certification requires the Court to engage in a two-step analysis. First, it must determine whether the four requirements of Rule 23(a) have been established: (1) numerosity, (2) common questions of law or fact, (3) typicality, and (4) adequate representation." *See, e.g., Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 974 (9th Cir.2011). Second, Plaintiffs must satisfy at least one of Rule 23(b)'s provisions. *See Stearns v. Ticketmaster Corp.,* 655 F.3d 1013, 1019 (9th Cir.2011). When a party invokes Rule 23(b)(3), as Plaintiffs do here, the Court is tasked with deciding whether "the actual interests of the parties can be served best by settling their differences in a single action." *Hanlon* at 1022. "In contrast to Rule 23(a)(2), Rule 23(b)(3) focuses on the relationship between common and individual issues. When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication," a court may certify a class pursuant to Rule 23(b)(3). *See id.*

The Court turns first to the four requirements of Rule 23(a). Defendant argues that Plaintiffs cannot meet the Rule's commonality or typicality requirements. For the reasons discussed below, the Court disagrees.

### A. Rule 23(a)

#### 1. Numerosity

Under Rule 23(a)(1), a class must be "so numerous that joinder of all members is impracticable." Courts have repeatedly held that classes comprised of "more than forty" members presumptively satisfy the numerosity requirement. *See, e.g., DuFour v. BE LLC,* 291 F.R.D. 413, 417 (N.D.Cal.2013).

Defendant does not dispute that the class is sufficiently numerous, and stated in its Notice of Removal that it employed 187 employees as DSMs in California between April 8, 2009 and May 17, 2013. *See* Notice of Removal, ECF 1 at ¶ 31. The Court finds that the proposed class satisfies Rule 23(a)(1).

### 2. Commonality

Rule 23(a)(2) demands that "there are questions of law or fact common to the class." The Supreme Court has stated that the mere raising of common questions by plaintiffs is insufficient for purposes of class certification, and instead that the "common contention [ ] must be of such a nature that it is capable of classwide resolution." *Wal–Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2551 (2011) (citing Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof,* 84 N.Y.U. L.Rev. 97, 131–32 (2009) ("What matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather, the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation.") (emphasis in original)).

 **\*6** Plaintiffs proffer four possible common questions that they contend are capable of classwide resolution: (1) whether DSMs' duties and responsibilities involve the performance of non-manual work; (2) whether DSMs' duties and responsibilities involve work directly related to management policies or general business operations; (3) whether DSMs customarily and regularly exercise discretion and independent judgement; and (4) whether DSMs work under only general supervision. In response, Defendant conflates these common inquiries into a single common question—"that Defendant's polic[ies] improperly treat[ ] all employees alike for exemption purposes"—and argues that this is the type of "literal common question[ ] that the Supreme Court [has] rejected as being insufficient" to show commonality under Rule 23(b)(2). *See* Opp. at 15 (citing *Dukes,* 131 S.Ct. at 2550–51). Defendant argues that Plaintiffs cannot simply rely on a uniform classification policy in order to show commonality. *See id.* Instead, Defendant contends, individualized inquiries are necessary for the Court to determine how each DSM spends his or her time. The Court considers each of Plaintiffs' proposed common questions in order to determine whether they are capable of generating the "common answers" necessary to find commonality.

The first common question identified by Plaintiffs, whether DSMs' duties and responsibilities involve the performance of non-manual work, is by far the least susceptible to generating a classwide resolution. Defendant points to wide discrepancies in the testimony of named class member DSMs in terms of how much manual labor they perform. *See, e.g.,* Nielson Depo., ECF 60–5 at 105:5–107:4 (describing spending twenty hours per week on manual labor tasks, including loading and unloading boxes from her car); Espinoza Depo. ECF 60–6 at 105:3108:19 (describing an office-based work environment in which he spent most of the day contacting his independent Representatives, with no discussion of manual labor tasks). Defendant further points to declarations from non-plaintiff DSMs in which they describe performing varying degrees of manual labor. *See* Guerrios Decl., ECF 60–13 at ¶ 9 ("The physical tasks associated with [recruiting] activities are not a major production and are a minimal, insignificant part of my job."); *see also* Montalvo Decl. ¶ 10 ("[W]hen I was a DSM, I spent only about 20 to 30 minutes in a day performing physical tasks.").

Plaintiffs argue that Avon's corporate policy demanding DSMs be able to lift 35 pounds, as well as the fact that Avon provides DSMs with an eighty pound tent for campaign events, is evidence that the class as a whole engages in manual labor. This argument is unpersuasive, however, because the evidence presented to the Court by both parties shows that individualized inquiries are necessary to determine whether the "primary duty" of each individual DSM was the performance of office or non-manual work. *See Rincon v. AFSCME,* 2013 WL 4389460, at \*17 (N.D.Cal. Aug. 13, 2013) (finding that "fieldwork is not necessarily manual work" for purposes of a union organizer who engaged in substantial out-of-office organizing activities). As the Court in *Rincon* noted, "an exempt employee can perform some manual work without losing exempt status." *Id.* (citing *Schaefer v. Ind. Mich. Power Co.,* 358 F.3d 394, 401 (6th Cir.2004)). Plaintiffs' proposed common question is not susceptible to classwide resolution due to the wide disparity in testimony from named Plaintiffs and other DSMs with regard to how much

of their work is manual labor, and the need for the Court to individually determine whether each DSM was primarily involved in manual labor rather than office work.

Plaintiffs' second through fourth questions, however, fare better in the commonality inquiry. Plaintiffs' second question, whether the DSMs' duties and responsibilities involve work "directly related to management policies or general business operations," can be determined by examining the tasks in which DSMs engage, and does not rise or fall depending on how much time each DSM spends engaged in those activities. Defendant's own argument supports a finding of commonality with regard to this question: Defendant does not argue that some DSMs engage in work directly related to management policies while others do not, but rather that "DSMs satisfy this requirement because they independently manage their own mini-Avon business and perform promotional work through recruiting, training and motivating reps." *See* Opp. at 20. Both parties thus offer a single class-wide argument on the merits of the "directly related" prong. The argument between the parties boils down to whether the types of tasks in which DSMs engage are directly related to management policies, in contrast to the "non-manual work" element, which would force individualized inquiries as to the amount of time spent on those tasks. Plaintiffs are correct that "[t]he trier of fact can determine if the nineteen (19) finite tasks identified by Defendant are exempt or non-exempt tasks" for purposes of the "directly related" element of the administrative exemption, and therefore this question is sufficient to meet Rule 23(a)(2)'s commonality prong. *See* Reply, ECF 67 at 2.

 **\*7** Though "even a single common question will do" for purposes of Rule 23(a)(2), *see Dukes* at 2556, the Court notes that the remaining two questions identified by Plaintiffs are also sufficiently common to justify class certification. The third question, whether DSMs customarily and regularly exercise discretion and independent judgment, is susceptible to common proof because of the theory on which Plaintiffs rely. Plaintiffs contend that because Avon Representatives are independent contractors, DSMs are precluded by California law from exercising direct control over them. Defendant responds by arguing that "DSMs use their judgment in a variety of ways including, but not limited to, calendar planning and management, training and coaching [Representatives], resolving issues they encounter in the field, and developing strategies to improve sales." Opp. at 22. Defendant's argument is similar to the one it offered with regard to the "directly related" prong: that DSMs necessarily exercise discretion based on their job responsibilities. This question is therefore also susceptible to class-wide resolution.

Similarly, Plaintiffs' fourth proposed common question, whether DSMs work under general supervision, relies on proof common to the class. Plaintiffs point to two policies put in place by Avon with regard to all DSMs: both a minimum, baseline supervision policy, and that Avon permits its Division Managers—who supervise DSMs—to impose more supervision over DSMs as desired. *See* Reply at 7–8. This supervision includes a uniform attendance policy, access to each DSM's daily calendar, and the monitoring of a DSM's performance goals. *See id.* at 4–5. Defendant argues in contrast that DSMs are subject to "infrequent direct supervision and are not required to have their calendars approved by their supervisor," and contends that the Court will need to make individual inquiries as to whether each DSM was subject to general supervision. *See* Opp. at 21.

Though this is a closer call than the "directly related" and "discretion and independent judgment" questions, the Court finds that this fourth proposed question is also subject to common proof. Plaintiffs argue that there is sufficient evidence to show that class members were subject to far more than just "general supervision," including a uniform attendance policy, *see* Bhowmik Decl., ECF 56–2 Exh. 7 (stating that DSMs are to "adhere to their work calendar and to advise their Division Manager of any deviation from that schedule."), Division Managers having the ability to access DSMs' daily calendars, and the capacity of Division Managers to impose additional supervision when key performance indicators ("KPIs") were not being met. Defendant argues that Plaintiffs' declarations show that they were subject to varying degrees of supervision, and thus the Court would need to engage in individualized inquiries, but this argument is unpersuasive: Plaintiffs point to evidence that shows various *additional* forms of supervision which were imposed upon DSMs which, if true, would allow the factfinder to determine that DSMs are subjected to more than just general supervision despite the slight variations in the forms of supervision imposed. *See, e.g.,* Gaskell Depo. at 13:20–14:13 (noting that she, as a Division Manager, has access to her DSMs' calendars and is "able to review their calendars"); Cabrera Depo. at 32:1–33:23; *see also* Martin Depo. at 90:15–18 (stating that Division Managers "hold [DSMs] accountable to [ ]the various, you know, job responsibilities and duties"); Gordon Depo. at 54:24–55:19 (describing riding along with DSMs in order to supervise them in the field).

Though some DSMs may be subject to greater supervision than others, the common question here is whether DSMs were subject to more than just general supervision. Defendant points to no persuasive reason why individualized inquiries are required to answer this question, and the Court therefore finds Plaintiffs' fourth question also sufficiently common to the class.

### 3. Typicality

Class representatives must have claims that are "typical of the claims" of the other members of the class, in order to ensure that "the named plaintiffs' claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. Sw. v. Falcon,* 457 U.S. 147, 158 n.13 (1982) (citing Rule 23(a)(3)). Typicality is "directed to ensuring that plaintiffs are proper parties to proceed with the suit." *Reis v. Arizona Beverages USA,* 287 F.R.D. 523, 539 (N.D.Cal.2012). The standard for determining typicality, however, is a permissive one, *see id.,* and asks only whether the claims of the class representatives are "reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1020 (9th Cir.1998).

 **\*8** Defendant argues that Plaintiffs' claims are not typical "[b]ecause the evidence demonstrates that the manner in which plaintiffs performed their job duties is dissimilar to the way other DSMs performed them." Opp. at 23. Defendant's argument is unpersuasive, and relies on a conflation of the commonality and typicality inquiries. The named Plaintiffs and absent class members have claims that are "reasonably co-extensive" with one another—slight variations in the manner in which Plaintiffs performed their jobs as DSMs does not render a single named Plaintiffs' claim atypical from the rest of the class. All named Plaintiffs challenge the classification of DSMs as exempt—none seek to advance claims that are divergent from the claims of absent class members. *See Hanlon* at 1020. As such, the named Plaintiffs set forth claims that are typical of the other members of the class.

### 4. Adequacy

The final requirement of Rule 23(a) is that the named Plaintiffs "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). The adequacy inquiry requires the Court to make two determinations: (1) whether the named plaintiffs and class counsel have any conflicts of interest with other class members; and (2) whether counsel and the class representatives will "vigorously prosecute the action on behalf of the class." *Reis,* 287 F.R.D. 523, 540 (citing *Ellis v. Costco Wholesale Corp.,* 657 F.3d 970, 985 (9th Cir.2011)). The Court has an obligation to "ensure that the litigation is brought by a named Plaintiff who understands and controls the major decisions of the case." *Sanchez v. Wal–Mart Stores, Inc.,* 2009 WL 1514435, at \*3 (E.D.Cal. May 28, 2009).

Defendant does not challenge the adequacy of the named Plaintiffs or of Plaintiffs' counsel, Blumenthal, Nordrehaug & Bhowmik. Plaintiffs offer declarations in which they recognize that their duty as named Plaintiffs is to the interests of the class as a whole, and that they will not put their own individual interests before those of the class. *See, e.g.,* Becerra Decl. ¶¶ 1011; Bilitch Decl. ¶¶ 10–11. Neither party identifies any possible conflict between the class representatives and any absent class members. Further, Plaintiffs' counsel has outlined the firm's experience in class litigation of this type, and points to several other district courts that have found the firm to be adequate counsel. *See* Mot. at 18; *see also* Blumenthal Decl. Exh. A.

The Court finds that Plaintiffs are adequate class representatives and that Plaintiffs' counsel will vigorously prosecute this action on the class' behalf. Plaintiffs have therefore met Rule 23(a)(4)'s adequacy requirement.

Plaintiffs have made a sufficient showing under all four prongs of Rule 23(a). The Court therefore turns to the requirements of Rule 23(b)(3) to determine if "a class action would achieve economies of time, effort and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."

**Nelson v. Avon Products, Inc., Not Reported in F.Supp.3d (2015)**
Case: 3:15-cv-00081-bbc   Document #: 58-49   Filed: 05/13/16   Page 75 of 112
2015 WL 1778326

*Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 615 (1997) (citing the Advisory Committee Notes on Rule 23, 28 U.S.C.App. at 697).

**B. Rule 23(b)(3)**

Rule 23(b)(3) permits a court to certify a class only when two criteria are met: (1) the questions of law or fact common to members of the class predominate over any questions affecting only individual members, and (2) that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. *See Zinser* at 1189. The party seeking class certification bears the burden of showing that common questions of law or fact predominate. *See id.* Though these criteria are interrelated, the court must address each independently. *See, e.g., Valentino v. Carter–Wallace, Inc.,* 97 F.3d 1227, 1234–35 (9th Cir.1996). Defendant's argument against Rule 23(b)(3) certification focuses on predominance, and the Court begins its inquiry there.

### 1. Predominance

**\*9** The Ninth Circuit has stated that the "focus of [the predominance factor] is on the relationship between the common and individual issues." *In re Wells Fargo,* 571 F.3d 953, 957. "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification" for certifying a class action. *Hanlon* at 1022. The Court must determine whether a "common nucleus of facts and potential legal remedies dominates" the litigation. *Id.*

Defendant's primary argument against predominance is that a determination of liability by the Court requires "individualized inquiries regarding how DSMs actually perform their job duties," an argument similar to the one it made regarding commonality. *See* Opp. at 23–24. Avon argues that Plaintiffs rely too heavily on its uniform exemption policy in support of class certification, while ignoring the individualized inquiries the Court will need to make. *See id.* at 24 ("[T]he evidence overwhelmingly demonstrates that how DSMs perform their job duties, and the time spent on those duties, varies based on numerous factors.... On this basis alone, the Court should find that individual issues predominate."). Defendant is correct that the Court cannot rely on Avon's uniform exemption policy "to the near exclusion of other factors relevant to the predominance inquiry." *In re Wells Fargo* at 960. That being said, "[a]n internal exemption policy that treats all employees alike for exemption purposes suggests that the employer believes some degree of homogeneity exists among the employees." *Id.* at 957, 958–59 ("[U]niform corporate policies will often bear heavily on questions of predominance and superiority."). Thus, the Court looks both the uniform policies identified by Plaintiffs as well as the specific differences between Plaintiffs outlined by Defendant. A review of the evidence proffered by both sides shows that though individual differences exist among the named Plaintiffs and absent class members – as they would in any case in which hundreds of employees engage in the same job – the issues common to the class members predominate over those differences. *See, e.g.,* Banks Study, at ¶¶ 6– 7. [3]

First, the three common questions that the Court found appropriate for class treatment—whether DSMs' duties are directly related to management or business operations, whether DSMs regularly exercise independent judgment, and whether DSMs work only under general supervision—are subject to common proof that relies in no small part on the nature of their duties, not the amount of time in which individual DSMs spend on each task. The Court needs to look no further than Defendant's own arguments and the Banks Study to ascertain that common issues will predominate over individual issues with regard to these three questions. Defendant argues that DSMs' responsibilities are directly related to management policies because "they independently manage their own min-Avon business." Opp. at 21. Avon does not suggest that some DSMs meet this criterion while others do not—Defendant's argument rests on the idea that *all* DSMs engage in duties related to management policies. This broad characterization severely undercuts Defendant's argument that the Court will need to engage in individual inquiries, let alone that those individual inquiries will predominate over questions common to the class.

**\*10** Defendant's arguments regarding Plaintiffs' "exercise discretion" and "general supervision" questions are similarly unpersuasive. Defendant argues that DSMs exercise discretion "in a variety of ways including, but not limited to, calendar planning and management, training and coaching [Representatives], resolving issues they encounter in the field, and developing strategies to improve sales." Opp. at 22. These, again, are tasks in which Avon claims all DSMs engage. *See, e.g.,* Banks Study. Defendant's reliance on *Friend v. Hertz Corp.,* a 2011 case from this district, actually undermines Avon's argument here. In *Friend,* the district court noted that the applicability of an exemption to overcome compensation generally requires a fact-specific inquiry as to the way each employee actually spends his or her time, but that plaintiffs can still certify a class when they show "uniformity in work duties and experiences that would diminish the need for individualized inquiry." *See Friend,* 2011 WL 750741, at \*5 (N.D.Cal. Feb. 24, 2011). Defendant has indicated that it intends to rely on the uniformity of DSMs' work duties—the *nature* of the tasks they are expected to perform—in support of its classification of those employees as exempt. *See, e.g.,* Opp. at 20–23. Further, Plaintiffs' legal argument on this question relies on its contention that California law prevents DSMs from exercising control over Representatives because Representatives are independent contractors. This is a legal question that is common to the class as it goes to the general relationship between DSMs and Representatives.

Though the Court has already noted above that there are individual differences among DSMs with regard to whether they work under only general supervision, these differences do not render class treatment inferior to individual actions. This is because Plaintiffs' theory is not dependent on the specific type of supervision one Division Manager imposes on one DSM, but rather on Avon's corporate policies that give Division Managers wide latitude to exercise supervisory control over DSMs, and to impose *additional* supervision as needed. The evidence proffered by Plaintiffs is consistent with this argument, as they point to various ways in which Division Managers control DSMs' calendars or scheduling, engage in ride alongs with their DSMs, or discipline them when they fail to meet their KPIs. Plaintiffs' theory of this prong of the administrative exemption is based on both the minimum and maximum amount of supervision allowed by Avon's company policies.

Though Avon contends that a determination of liability requires individualized inquiries as to the work DSMs perform, a review of the evidence and theories to be offered by both sides to the factfinder shows that the questions common to the class predominate over any of these individual questions. A comparison of Defendant's arguments regarding Plaintiffs' manual labor question, which the Court found inappropriate for class treatment, and the exercise of discretion question, which the Court found appropriate for class treatment, is instructive. Individual issues would predominate the manual labor question because its answer turns on how much manual labor an individual DSM actually performs. In contrast, common issues predominate with regard to the exercise of discretion question because it turns on whether the nature of the tasks in which DSMs engage require independent judgment or discretion. Because the parties *do not dispute* what tasks DSMs engage in, a factfinder could determine whether, for example, each task outlined in the Banks Study requires a DSM to use his or her discretion. Thus, common questions sit at the heart of this case, and predominate over any individual differences between the Plaintiffs.

### 2. Superiority

In order to certify Plaintiffs' class under 23(b)(3), the court must also find "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). "The superiority inquiry under Rule 23(b)(3) requires a determination of whether the objectives of the particular class action procedure will be achieved in the particular case," *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1023 (9th Cir.1998). The court finds that two facts weigh heavily in favor of class certification.

First, the proposed class includes employees that still work for Avon. These employees may be afraid to bring actions on their own behalf, for fear of retaliation by their employer. Allowing Plaintiffs to proceed in a representative capacity ensures that all class members will receive their day in court without requiring current employees of Avon to risk their employment to receive that right.

Nelson v. Avon Products, Inc., Not Reported in F.Supp.3d (2015)
Case: 3:15-cv-00081-bbc   Document #: 58-49   Filed: 05/13/16   Page 77 of 112
2015 WL 1778326

**\*11**  Second, if this action were to proceed on an individual basis, it is possible that a judgment in favor of Plaintiffs would bind Avon with respect to other class members by virtue of collateral estoppel, while a judgment in favor of Avon would not bind class members who are not party to the present litigation. For instance, if Plaintiffs were to proceed individually and prove that even the most minimal supervision of DSMs provided for in Avon's company policies constitutes more than "only general supervision," Avon would be bound by this finding in future actions by other class members. This would render Avon vulnerable to suit by every other class member without the benefit of the defense it asserts in the current action. On the other hand, if Avon were to succeed on this point, each class member not party to the present action would still retain the ability to bring suit and re-litigate this issue, since collateral estoppel would not apply with respect to non-parties to this litigation. In other words, allowing a class action in this case will ensure that the finality of judgment in this action is a two-way street, not one that adheres only to the benefit of the Plaintiffs and non-party members of an uncertified class.

These two facts go directly to two of the four factors outlined in Rule 23(b)(3) and *Hanlon* which a court must consider in the superiority inquiry: the interests of class members in individually controlling the action and the desirability of concentrating the litigation in a single forum. The other two factors—the extent of already-existing litigation and manageability of the action—also support certification. First, neither party identifies in their briefing any existing actions regarding DSMs and overtime misclassification in California. Second, the Court is not persuaded by Defendant's argument that this case will devolve into "200 mini-trials," *see* Opp. at 25, because the questions common to the class will serve to streamline the litigation.

## IV. ORDER
For the foregoing reasons, the Court certifies the following class: "[A]ll persons employed by Defendant in California as District Sales Managers from April 8, 2009 to the present." The Court further appoints Blumenthal, Nordrehaug & Bhowmik as class counsel, and approves the designation of named Plaintiffs as representatives of the class.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 1778326

Footnotes

1    Avon sells consumer goods, including skin care products and household items. Its business model relies on nearly six million "Avon Representatives" who are responsible for selling these and other Avon products directly to consumers. These Representatives are independent contractors. *See* Martin Depo. at 10:11–25, 38:24–39:2.

2    Plaintiffs object to, and move to strike, the Banks Declaration on two grounds: (1) that Dr. Banks was not disclosed to Plaintiffs and (2) that her Declaration contains improper legal conclusions. *See* Reply, ECF 67 at 15. For the reasons stated on the record at the February 19, 2015 hearing, the objection is **overruled** and the motion to strike is **denied**. The Court will disregard any improper legal conclusions contained within the Banks Declaration.

3    The Banks Study characterized certain Task Areas as "exempt" and others as "non-exempt." *See, e.g.,* ECF 61 at ¶¶ 17–18. The Court disregards these legal conclusions, but notes that the Banks Study contends all 30 DSMs observed spent the majority of their time engaged in the same set of Task Areas. *See id.* at ¶ 7.

End of Document                                            © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 2711085
Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

Howard David PROVINE, individually and on behalf of other persons similarly situated, Plaintiffs,

v.

OFFICE DEPOT, INC., Defendant.

No. C 11–00903 SI.
|
July 6, 2012.

**Attorneys and Law Firms**

Gregory N. Karasik, Karasik Law Firm, Robert Ira Spiro, Los Angeles, CA, Alexander Isaac Dychter, Dychter Law Offices, APC, San Diego, CA, Dennis Frank Moss, Dennis F. Moss, Attorney at Law, Sherman Oaks, CA, for Plaintiffs.

Jennifer Lea Bradford, Barbara Jean Miller, Irvine, CA, for Defendant.

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

SUSAN ILLSTON, District Judge.

**\*1** Presently pending before the Court are defendant's motion for summary judgment and plaintiff's motion for class certification. For the reasons set forth below, the Court DENIES defendant's motion and GRANTS plaintiff's motion.

## BACKGROUND

Defendant Office Depot has offered a program for its employees known as the Bravo Award Program since at least January 2007. Declaration of Jennifer L. Bradford ("Bradford Decl."), Ex. 1 at 22. The Bravo Program awards employees for superior work performance. *Id.* at 30. It is administered in all of defendant's facilities under the same general procedures described in Office Depot's "People Manual." *Id.* at 31. All non-management associates are eligible to participate in the Bravo Program. Bradford Decl., Ex. 9 at 4. Managers can award Bravo Cards for performance above and beyond expectations. *Id.* Managers in each store have leeway over when to award Bravo Cards to employees. *Id.* Bravo Program procedures outline a non-exhaustive list of areas in which employee conduct may warrant the award of a Bravo Card. *Id.* at 4–5. Awarded Bravo Cards are placed in a container. *Id.* at 5. At the end of the month, there is a drawing for a cash prize of $50, which is a "Bravo Award" paid in the winning employee's next paycheck. *Id.* at 5.

Plaintiff Howard David Provine worked at an Office Depot retail store in Antioch, California from June 2010 to December 2010. Bradford Decl., Ex. 2 at 12. During his entire employment, plaintiff was paid on an hourly basis and eligible to receive Bravo Awards. *Id.* at 13. Plaintiff had no expectation that he would receive any Bravo Cards, and no expectation that he would win a Bravo Award if he did receive any cards. *Id.* at 18, 27. Nevertheless, plaintiff won two Bravo Awards, one in July 2010, and one in November 2010. *Id.* at 23–25. Plaintiff was paid the $50 Bravo Award in his paychecks in August 2010 and December 2010. *Id* .

During the month of July, plaintiff worked 101.28 total hours including 0.25 hours of overtime. Bradford Decl., Ex. 6; Ex. 7 at 1. During the month of November, plaintiff worked 114.02 hours including 0.0667 hours (4 minutes) of overtime. Bradford Decl., Ex. 6; Ex. 8 at 1. Defendant does not factor Bravo Awards into the calculation of an employee's regular rate of pay for the purposes of computing overtime. If defendant had included Bravo Awards in that calculation, plaintiff would be entitled to nineteen cents of additional overtime pay for the month of June and four cents for the month of November. Bradford Decl., ¶¶ 10–11. Defendant does not pay an overtime premium on Bravo Awards themselves.

On January 19, 2011, plaintiff filed his original complaint against defendant. On July 18, 2011, plaintiff amended the complaint, and on December 14, 2011, plaintiff filed the second amended complaint ("SAC"). The SAC alleges five causes of action against defendant: (1) failure to pay overtime wages, (2) failure to provide accurate wage statements, (3) unfair competition under the California Unfair Competition Law ("UCL"), (4) failure to pay all wages owed upon termination, and (5) civil penalties under the California Private Attorney General Act ("PAGA"). Defendant seeks summary judgment against plaintiff on all of his individual claims, and plaintiff seeks class certification of the first four claims.

## LEGAL STANDARDS

### I. Summary judgment

**\*2** Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party, however, has no burden to negate or disprove matters on which the non-moving party will have the burden of proof at trial. The moving party need only demonstrate to the Court that there is an absence of evidence to support the non-moving party's case. *See id.* at 325.

The burden then shifts to the non-moving party to "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. To carry this burden, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence ... will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In deciding a summary judgment motion, the evidence is viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn in its favor. *Id.* at 255. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when she] is ruling on a motion for summary judgment." *Id.* Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir.1979); *see also Villiarimo v. Aloha Island Air, Inc.,* 281 F.3d 1054, 1061 (9th Cir.2002) (observing that there is no genuine issue of fact "where the only evidence presented is 'uncorroborated and self-serving' testimony" (quoting *Kennedy v. Applause, Inc.,* 90 F.3d 1477, 1481 (9th Cir.1996))). The evidence presented by the parties must be admissible. Fed.R.Civ.P. 56(c). Hearsay statements found in affidavits are inadmissible. *Fong v. Am. Airlines, Inc.,* 626 F.2d 759, 762–63 (9th Cir.1980).

### II. Class certification

Class certification is warranted where a plaintiff demonstrates that all of the requirements of Federal Rule of Civil Procedure 23(a) are satisfied and at least one of the requirements of Rule 23(b) is satisfied. *See* Fed.R.Civ.P. 23; *Wal–Mart Stores, Inc. v. Dukes,* —— U.S. ——, ——, 131 S.Ct. 2541, 2548, 180 L.Ed.2d 374 (2011). Rule 23(a) provides that a court may certify a class only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact

common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a).

**\*3** In addition to demonstrating that the Rule 23(a) requirements are met, plaintiff must establish one or more of the following grounds for maintaining the suit as a class action pursuant to Rule 23(b): (1) that there is a risk of substantial prejudice from separate actions; (2) that declaratory or injunctive relief benefitting the class as a whole would be appropriate; or (3) that common questions of law or fact predominate and the class action is superior to other available methods of adjudication. Fed.R.Civ.P. 23(b).

## DISCUSSION

## I. Defendant's motion for summary judgment

### A. The Bravo Awards are not discretionary

Defendant contends that it was not required to include Bravo Awards in plaintiff's regular rate of pay because Bravo Awards are discretionary. California law requires employers to pay non-exempt employees for any hours worked in excess of eight hours in one workday and forty hours in one workweek "at the rate of no less than one and one-half times the regular rate of pay." Cal. Labor Code § 510. The parties agree that under the FLSA and California law, discretionary bonuses are excluded from the regular rate of pay. *See* 29 U.S.C. § 207(e)(3); DLSE Enforcement Policies & Interpretations Manual § 49.12 (2002) § 49.1.2.4(3) (DLSE Manual). [1] Bonuses are discretionary if "both the fact that payment is to be made and the amount of the payment are determined at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly." 29 U.S.C. § 207(e)(3)(a); *see also* 29 C.F.R. § 778.211 ("In order for a bonus to qualify for exclusion as a discretionary bonus under section [20]7(e)(3)(a) the employer must retain discretion both as to the fact of payment and as to the amount until a time quite close to the end of the period for which the bonus is paid."); *see also* DLSE Manual § 49.1.2.4(3) ("Sums paid in recognition of services performed during a given period" are discretionary if "both the fact that payment is to be made and the amount of payment are determined at the sole discretion of the employer" and "not pursuant to any prior contract, agreement or promise.").

Based on the text of the FLSA and accompanying interpretive regulation, and the DLSE Manual, the Court finds that because it is undisputed that Bravo Awards are always $50 dollars, they are not discretionary. Defendant argues that because Bravo Cards are awarded at the discretion of its store managers, and because winning a Bravo Award is contingent on winning a random drawing from the Bravo Cards, Bravo Awards are by definition discretionary. The Court agrees that "the fact that payment [of the Bravo Award] is to be made ... [is] determined at the sole discretion of the employer at or near the end of the period and not pursuant to any prior contract, agreement, or promise causing the employee to expect such payments regularly." 29 U.S.C. § 207(e)(3). However, the authority cited by defendant also requires that the *amount* of payment be discretionary in order for the bonus to be excluded from the regular rate of pay. In each of the cases on which defendant relies, both the fact and the amount of payment were under the discretion of the store manager. *See Alonzo v. Maximus, Inc.,* No. 08–6755, 2011 WL 6396444, \*9 (C.D.Cal. Dec.5, 2011) ("MaxDollar bonuses were 'spot bonuses to employees who ... made unique or extraordinary efforts' and were not awarded according to preestablished criteria or pre-established rates."); *see also Zator v. Spring/United Management Co.,* No. 09–935, 2011 WL 1157527, \*3–5 (S.D.Cal.2011) (holding that various benefits were not part of compensation under the FLSA and that there was no evidence of their worth or non-discretionary fact of payment); *Brown v. Nipper Auto Parts and Supplies, Inc.,* No. 08–521, 2009 WL 1437836, \*7 (W.D.Va. May 21, 2009) (manager had "sole discretion as to whether and in what amount these bonuses were paid" and therefore bonuses were discretionary). Defendant has not identified, and the Court has not located, any cases in which the amount of payment was known in advance and the bonus in question was held to be discretionary under the FLSA or California law.

**\*4** Defendant also cites an Opinion Letter from the Department of Labor, evaluating a proposed gift program where all employees who have had perfect attendance for a quarter are entered into a semi-annual drawing in which the winner receives

a new car. Department of Labor Wage & Hour Division, Opinion Letter Fair Labor Standards Act (FLSA), 1996 WL 1031796 (Aug. 6, 1996). In the letter, the employer asked whether the value of the car would have to be included in winning employee's regular rate used in computing overtime. *Id.* The letter explained:

> As indicated in Section 778.331 of 29 C.F.R. Part 778 (copy enclosed) gifts or prizes awarded to employees for their efforts in improving quality, quantity, efficiency or attendance are paid as additional remuneration for employment. Thus, the value of gifts or prizes paid to employees for "perfect attendance" would normally be included in the employees' regular rate of pay.

> In your situation, however, the employee simply becomes eligible to participate in a drawing or lottery for the prize, and we presume from the large value of the prize that an employee's likelihood of winning the prize is very small. Given these circumstances, we would not assert that any prize awarded under the lottery drawing conditions described in your letter would have to be included in calculating the regular rate for the employee selected for the award.

> *Id.*

The Court accords this opinion letter due deference as it is the Secretary of Labor's interpretation of its own regulation. *See Auer v. Robbins,* 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997); *In re Farmers Ins. Exch. Claims Representatives' Overtime Pay Litig.,* 481 F.2d 1119, 1129 (9th Cir.2007). However, the opinion letter does not address whether a set, known value for a bonus renders it non-discretionary under the FLSA. While it is true, as defendant asserts, that the Bravo Program is "even more discretionary" as to the fact of payment than the program in the letter because it involves two separate layers of discretion or chance, the opinion letter does not state whether the value of the car is known in advance of the drawing. Instead, the letter focused on the dichotomy between the two parts of the bonus award procedure. The letter finds that in a situation where the method for granting a bonus is part known and part random, the bonus is discretionary where the randomization procedure makes the fact of payment unlikely, and therefore uncertain, that an employee will receive the bonus. To emphasize this point, the letter notes that the presumed likelihood of winning the drawing is low, and hence overwhelms the non-discretionary entry of the contestants into the lottery by a known procedure.

Accordingly, the Court concludes that even though the fact of receiving a Bravo Award is discretionary, such awards are not "discretionary" under the California Labor Code because the amount of payment was known to all employees in advance.

## B. *De minimis* defense

**\*5** Defendant asserts that even if Bravo Awards are non-discretionary, the awards were nevertheless properly excluded from plaintiff's regular rate of pay because the total amount at issue is less than fifty cents. Defendant relies on 29 C.F.R. § 548 .3(e), which provides that employers can exclude from an employee's regular rate of pay "additional payments in cash or in kind which, if included in the computation of overtime under the Act, would not increase the total compensation of the employee by more than 50 cents a week on the average for all overtime weeks (in excess of the number of hours applicable under section 7(a) of the Act) in the period for which such additional payments are made." 29 C.F.R. § 548.3(e).

Plaintiff contends that 29 C.F.R. § 548.3(e) does not apply because that section only applies to calculation of overtime pay in accordance with Section 7(g)(3) of the FLSA. Plaintiff contends that Section 7(g)(3) of the FLSA does not apply to employees like plaintiff with a single hourly rate of pay. Section 7(g)(3) applies to employees paid at a "basic rate" that is "substantially equivalent to the average hourly earnings of the employee." 29 U.S .C. § 207(g)(3); 29 C.F.R. § 548.2. Plaintiff argues that a "basic rate" under this section must necessarily be something other than a singular hourly rate of pay, otherwise the "basic rate" would always be exactly equal to the employee's "average hourly earnings" and Section 7(g)(3) would have no meaning.

The Court agrees with plaintiff. As explained in 29 C.F.R. § 548 .100(a),

> The purpose of Section 7(g)(3) of the act, and subpart A of this part, is to provide an exception from the requirements of computing overtime at the regular rate, and to allow, under specific conditions, the use of an established "basic" rate instead. Basic rates are alternatives to the regular rate of pay under section

7(a), and their use is optional. The use of basic rates is principally intended to simplify bookkeeping and computation of overtime pay.

29 C.F.R. § 548.100(a). The regulations provide numerous requirements that an employer must satisfy in order to use a basic rate. For example Section 548.3, titled "Authorized basic rates," sets forth numerous conditions that "will be regarded as being substantially equivalent to the average hourly earnings of the employee ... and may be used in computing overtime compensation for purposes of section 7(g)(3) and section 548.2." For example, one authorized basic rate is "a rate per hour which is obtained by dividing a monthly or semi-monthly salary by the number of regular working days in each monthly or semi-monthly period or hours in the normal or regular workday." 29 C.F.R. § 548.3(a).

Defendant has not cited any authority for the proposition that an employee earning a single hourly rate is an employee paid at a "basic rate" under Section 7(g)(3). The cases cited by defendant do not involve application of Section 7(g)(3) to an employee with a single hourly rate of pay. Further, the Court notes that even if Section 7(g)(3) and 29 C.F.R. § 548.3(e) applied to employees earning a single hourly rate, the regulations state that *de minimis* amounts can be excluded from the computation of overtime "upon agreement or understanding with the employee." Section 548.305, titled "Excluding certain additions to wages," states:

> **\*6** Section 548.3(e) permits the employer, upon agreement or understanding with the employee, to omit from the computation of overtime certain incidental payments which have a trivial effect on the overtime compensation due. Examples of payments which may be excluded are: modest housing, bonuses or prizes of various sorts, tuition paid by the employer for the employee's attendance at the school, and cash payments or merchandise awards for soliciting or obtaining new business.

29 C.F.R. § 548.305(b); *see also id.* § 548.305(e) ("There are many situations in which the employer and employee cannot predict with any degree of certainty the amount of bonus to be paid at the end of the bonus period.... In such situations the employer and employee may agree prior to the performance of the work that a bonus will be disregarded in the computation of overtime pay if the employee's total earnings are not affected by more than $.50 a week on the average for all overtime weeks during the bonus period."). Here, defendant has not submitted any evidence showing that plaintiff and defendant agreed or understood that Bravo Awards would be excluded from the computation of overtime pay.

Accordingly, the Court denies defendant's motion for summary judgment on plaintiff's first claim for relief.

### C. UCL and civil penalties under PAGA

Defendant moves for summary judgment on plaintiff's UCL claim and claim for civil penalties under PAGA on the ground that those claims depend entirely on a finding that defendant violated the Labor Code by failing to include the Bravo payment into the regular rate calculation. Accordingly, for the reasons stated above, the Court denies defendant's motion for summary judgment as to those claims.

### D. Failure to pay all wages owed upon termination

In the fourth claim for relief, plaintiff seeks waiting time penalties under California Labor Code § 203 as a result of the purported failure to pay all of the overtime to him upon employment termination. Defendant moves for summary judgment on this claim, contending that a good faith dispute exists over whether the Bravo Award must be included in the regular rate calculation.

In order to recover waiting time penalties, the Court must find that the defendant "willfully" withheld wages. Cal. Labor Code § 203. "A willful failure to pay wages within the meaning of [that section] occurs when an employer intentionally fails to pay wages to an employee when those wages are due. However, a good faith dispute that any wages are due will preclude imposition of waiting time penalties under Section 203." Cal.Code Regs. Tit. 8, § 13520 (2012). A "good faith dispute ... occurs when an employer presents a defense, based in law or fact which, if successful, would preclude any recovery on the part of the employee." *Id.* "The fact that a defense is ultimately unsuccessful will not preclude a finding that a good faith dispute did exist."

*Id.* However, "[d]efenses presented which, under all the circumstances, are unsupported by any evidence, are unreasonable, or are presented in bad faith, will preclude a finding of a 'good faith dispute.' " *Id.*

**\*7** Defendant contends that a good faith dispute exists because "the statutes, regulations, and cases that govern the calculation of an employee's regular rate of pay suggest that payments like the Bravo prizes are properly excluded from the regular rate, as both the fact that the payments were made in the amount of the payments were matters of Office Depot's sole discretion." Motion at 15:10–14. Defendant asserts that Office Depot's decision not to factor the value of the Bravo Awards into plaintiff's regular rates was based on a reasonable, good-faith interpretation of the applicable law.

The Court finds that defendant has not demonstrated that it is entitled to summary judgment on this ground. Neither party has submitted any evidence regarding the reasonableness of Office Depot's decision not to factor Bravo awards into the regular rate of pay, and thus the Court cannot conclude on this record that a good faith dispute exists.

Defendant also moves for summary judgment on the ground that the amount of waiting time penalties purportedly owed to plaintiff is unconstitutional. Section 203 provides for a penalty of up to thirty days continued wages for any willful failure to pay wages owed at the time of termination. Cal. Labor Code § 203(a). Defendant asserts that the amount of unpaid overtime at issue is $.23, and that the purportedly owed waiting time penalties is unconstitutionally excessive ($2,016, assuming an eight hour workday or $1,008, assuming a four-hour workday). Defendant cites cases for the proposition that a statutory penalty violates due process where " 'the penalty prescribed is so severe and oppressive as to be wholly disproportioned to the offense and obviously unreasonable.' " *United States v. Citrin,* 972 F.2d 1044, 1051 (9th Cir.1992) (quoting *St. Louis, Iron Mt. & S. Ry. Co. v. Williams,* 251 U.S. 63, 66–67, 40 S.Ct. 71, 64 L.Ed. 139 (1919)).

Plaintiff argues that the possibility of excessive damage award does not provide defendant with a defense to liability and that the Court need not resolve this question at this time. The Court agrees. Prior to a determination of defendant's liability, it is premature to analyze whether the potential penalty owed is unconstitutional. The Court has not held that defendant "willfully" withheld wages, nor has the Court precluded the possibility of a finding of a good faith dispute. Accordingly, the Court denies defendant's motion on this ground without prejudice to renewal in the event defendant is found liable.

### E. Failure to provide accurate wage statements

Plaintiff alleges Office Depot violated California Labor Code Section 226 because the wage statements he received during his employment did not reflect the additional overtime due to him as a result of winning Bravo Awards. Defendant moves for summary judgment on this claim, contending that Section 226 does not create a penalty for nonpayment or late payment of wages, but rather simply requires that employers accurately describe the monies that are being paid "at the time of each payment of wages." Cal. Labor Code § 226(a). As support, defendant cites a DLSE opinion letter, which states that the purpose of Section 226 "is to provide transparency as to the calculation of wages" and "to allow employees to maintain their own records of wages earned, deductions, and pay received"). *See* 2006.07.06 DLSE Opinion Letter at 2. Plaintiff responds that wage statements violate Labor Code Section 226 when they do not state the correct amount of wages "earned," and that this section does not simply impose the requirement to accurately state the correct amount of wages actually paid.

**\*8** The plain language of Section 226 requires that wage statements set forth the correct amount of wages "earned" by employees. Contrary to defendant's assertions, it is not obvious from either the language of Section 226 or the DLSE Opinion Letter that Section 226 simply requires a statement of the wages actually paid to an employee where there is a dispute regarding whether overtime pay was earned. In the absence of on point authority supporting defendant's interpretation of Section 226, the Court declines to adopt defendant's construction.

Defendant also contends that it is entitled to summary judgment on this claim because plaintiff testified at his deposition that he was not harmed as a result of receiving inaccurate wage statements. Plaintiff asserts that a review of his deposition testimony shows that he made no such concession, and that plaintiff's deposition testimony is not inconsistent with the statement in plaintiff's declaration in which he stated that as a result of the inaccurate wage statements he could not determine the correct

amount of overtime wages owed. The Court finds that whether or not plaintiff suffered an injury as a result of receiving allegedly inaccurate wage statements is a disputed question of fact, and therefore that summary judgment on this ground is not appropriate.

Finally, defendant contends that there is no evidence of a knowing and intentional violation of Section 226 because there is a good faith dispute as to whether the Bravo Award should be included in the regular rate calculation. For the reasons set forth above, the Court finds that the record is insufficient to grant summary judgment on this ground.

## II. Plaintiff's motion for class certification

Plaintiff seeks classification of the first through fourth claims for relief. For the failure to pay overtime wages, failure to provide accurate wage statements, and UCL claims, plaintiff seeks to certify the following class:

> All persons who, at any time since [January 19, 2008 for the overtime wage claim; January 19, 2010 for the failure to provide accurate wage statements claim; and January 19, 2007 for the UCL claims] worked in California as a non-exempt employee of Defendant and earned a Bravo Award bonus for a month in which the employee worked more than eight hours in a workday or more than forty hours in a workweek.

For the failure to pay wages upon termination claim, plaintiff seeks to certify the following class:

> All persons whose employment with Defendant ended at any time since January 19, 2008 who worked in California as a non-exempt employee of Defendant and earned a Bravo Award bonus for a month in which the employee worked more than eight hours in a workday or more than forty hours in a workweek.

Plaintiff seeks appointment as the representative for all the classes, and plaintiff's counsel Gregory N. Karasik seeks appointment as class counsel.

### A. Rule 23(a)

#### 1. Numerosity

According to defendant, as of July 30, 2011 there were 5,940 Bravo Awards since January 2007, 4,958 awards since January 2008, and 2,672 awards since January 2010. Karasik Decl. ¶ 3, Ex. B. Defendant has stipulated to numerosity for purposes of class certification, *id.* at ¶ 4, and the Court finds that plaintiff has established this element.

**\*9** The proposed classes are also readily ascertainable from both defendant's records and by potential class members themselves. Because defendant has the ability to identify which employees won Bravo Awards, a notice can be sent out to all winners, asking them to identify whether they are in the class. *Id.* Ex. B at 54. Defendant also has the ability to determine whether or not an employee worked overtime hours during any month. *Id.* The list of employees who have won Bravo Awards and the list of employees who worked overtime can be cross-referenced to find all class members. Accordingly, the Court finds that the proposed classes are readily ascertainable.

#### 2. Commonality

Defendant contends that plaintiff cannot establish Rule 23(a) commonality. "Commonality requires the plaintiff to demonstrate that class members 'have suffered the same injury[.]' [internal citations omitted]. This does not mean merely that they have all suffered a violation of the same provision of law." *Dukes,* 131 S.Ct. at 2551. "Their claims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

Here, all of class members' claims revolve around the central contention that defendant was required to factor Bravo Awards into the calculation of their regular rate of pay for the purposes of computing overtime. Plaintiff asserts that "[s]ince there is no factual dispute about how the Bravo Award Program operates, whether or not defendant was required to factor Bravo Awards into the calculation of the regular rate of pay presents a purely legal question that is clearly capable of classwide resolution." Plf. Mot. For Class Certification at 5.

Defendant counters that because each store operates differently in terms of how often Bravo Cards are awarded, any determination as to whether Bravo Awards are discretionary must be made on an employee-by-employee basis, making class adjudication unsuitable for this case. Defendant emphasizes the fact that employees had no expectation of receiving Bravo Cards, the contingent nature of winning a Bravo Award, and the fact that the timing and occurrence of the drawings themselves varied by facility. According to defendant, the above factors make each prospective class members' experience in receiving a Bravo Award so disparate from the others that class adjudication is not warranted.

The Court disagrees. Plaintiff defines all four classes in this case to include only those employees who have received a Bravo Award. The slight variance in the procedure for receiving those awards is irrelevant to determining whether defendant should have included the Bravo Awards in calculating the regular rate of pay for purposes of overtime compensation. Similarly, because it is undisputed that Bravo Awards were never included in the calculation of the regular rate of pay, whether defendant willfully withheld wages or whether there is a good faith dispute can also be determined on a classwide basis. The fact that Bravo Awards may have been more difficult to win at certain facilities than others does not affect the class claims alleged here. The Court finds that the prospective class members raise claims based on a "common contention ... such that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes,* 131 S.Ct. at 2551. Accordingly, the Court finds that plaintiff has satisfied the commonality element of Rule 23(a).

### C. Typicality
 **\*10**  Rule 23(a)(3) requires that the representative plaintiff have claims "typical of the claims ... of the class." FRCP 23(a) (3). Defendant does not dispute that plaintiff's claims are typical, and the Court finds that plaintiff has established this element.

### D. Adequate Representation
Rule 23(a)(4) permits class certification only if "the representative parties will fairly and adequately protect the interests of the class." Adequate representation requires the class representatives to "prosecute the action vigorously on behalf of the class," and to avoid conflicts of interest with other class members. *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1020 (9th Cir.1998). Defendant argues that plaintiff is not an adequate representative of the class for three reasons. First, defendant argues that plaintiff cannot represent the class because he is not familiar with Office Depot policies at other facilities, does not know of any other Office Depot employee who supports him bringing this lawsuit, and does not know if any other employee was injured by Office Depot's policy. Second, defendant argues that the fact that plaintiff is subject to unique defenses (specifically a *de minimis* defense) renders him incapable of adequately representing the class. Finally, defendant argues that plaintiff's credibility is severely compromised because he arrived at his deposition unable to provide testimony due to medication he had taken that morning.

The Court is not persuaded by these arguments. The fact that plaintiff is not aware of Office Depot policies at other facilities or of others employees who may have been injured does not suggest that plaintiff has a conflict of interest with other class members, nor does it prevent plaintiff from vigorously prosecuting the class. Second, as discussed *supra,* the Court finds that plaintiff is not subject to the *de minimis* defense. Finally, the fact that plaintiff could not answer questions at his first deposition date due to medical issues does not diminish his credibility as a class representative. The Court finds plaintiff an adequate class representative.

### II. Rule 23(b)

Having satisfied the Rule 23(a) requirements, plaintiff must satisfy one of the three prongs of Rule 23(b). Plaintiff seeks certification under Rule 23(b)(3) which requires showing that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. Proc. 23(b)(3).

## A. Predominance

Plaintiff must establish that common questions of law or fact predominate for each claim in which he seeks to certify a class. The Court finds that this requirement is met because the claims for which plaintiff seeks certification hinge on whether defendant was required to include Bravo Awards in employees' regular rate of pay to calculate overtime.

 **\*11**  Defendant contends that determination of the overtime rate would be individualized to each employee for each Bravo Award. However, "[t]he amount of damages is invariably an individual question and does not defeat class action treatment." *Blackie v. Barrack,* 524 F.2d 891, 905 (9th Cir.1975). Defendant also argues that the Court should not certify plaintiff's waiting time penalties claim under Cal. Labor Code § 203 because each individual penalty "is unconstitutionally confiscatory." Def's. Opp'n. at 22. As discussed supra, the Court finds that it is premature to decide whether potential penalties in this case would be unconstitutional, and in any event this issue does not defeat predominance.

Finally, defendant argues that individual issues predominate with regard to plaintiff's claim regarding inaccurate wage statements because Labor Code Section 226(e) requires a showing of injury. For certification plaintiff must show that class members suffered the same injury as a result of receiving non-complaint wage statements. "The injury requirement in section 226, subdivision (e), cannot be satisfied simply if one of the nine itemized requirements in section 226, subdivision (a) is missing from a wage statement." *Price v. Starbucks Corp.,* 192 Cal.App.4th 1136, 1142, 122 Cal.Rptr.3d 174 (2011). "By employing the term 'suffering injury,' the statute requires that an employee may not recover for violations of section 226, subdivision (a) unless he or she demonstrates an injury arising from the missing information. [internal citations omitted] Thus, the deprivation of that information, standing alone is not a cognizable injury." *Id .* at 1142–43, 122 Cal.Rptr.3d 174. However, a "mathematical injury that requires computations to analyze whether the wages paid in fact compensated [the employee] for all hours worked" is sufficient to establish injury. *Id.* (citing *Jaimez v. DAIOHS USA, Inc.,* 181 Cal.App.4th 1286, 1306, 105 Cal.Rptr.3d 443 (2010)). "While there must be some injury in order to recover damages [under § 226(e) ], a very modest showing will suffice." *Jaimez,* 181 Cal.App.4th at 1306, 105 Cal.Rptr.3d 443; *see also Elliot v. Spherion Pac. Work, LLC,* 572 F.Supp.2d 1169, 1181 (C.D.Cal.2008) (injuries under § 226(e) include "possibility of not being paid overtime, employee confusion over whether they received all wages owed them, difficulty and expense involved in reconstructing pay records, and forcing employees to make mathematical computations to analyze whether the wages paid in fact compensated them for all hours worked.").

Plaintiff contends that all class members suffered from the "same inability to determine, from the wage statements owed to them by defendant when they won Bravo Awards, the correct amount of overtime wages owed to them, and they thus had a resulting need to engage in discovery and mathematical calculation to determine exactly how much in overtime wages they were owed." Plf's. Mot. at 10. By alleging a "mathematical injury" and the possibility that prospective class members have not received all wages owed to them, plaintiff has made the "modest showing" required under § 226(e).

## B. Superiority

 **\*12**  Under Rule 23(b)(3) plaintiff must also show "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. Proc. 23(b)(3). "Typically, a class action is superior if the case presents a large volume of individual claims that could strain judicial resources if tried separately and if each potential plaintiff's recovery may not justify the cost of individual litigation." *McKenzie v. Fed. Exp. Corp.,* 275 F.R.D. 290, 301 (C.D.Cal.2011). Courts will look to the following factors listed in Rule 23(b)(3) when determining superiority: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. Proc. 23(b)(3).

Here, all of these factors lead the Court to conclude that a class action is superior to any other method of adjudication in this case. All of the prospective class claims revolve around a question of law common to all prospective class members—whether defendant should have included Bravo Awards in class member's regular rate of pay when computing overtime pay. The Court is not aware of any prospective class member's individual interest in controlling prosecution of separate actions, or of any litigation concerning the issues at hand other than this case. Finally, managing this case as a class action will be far easier than addressing all of the prospective class member's claims individually. Each prospective class member would allege the same set of common facts to answer the same question of law. Class adjudication of this question of law is markedly more efficient than addressing it individually for each class member. *See Lerwill v. Inflight Motion Pictures, Inc.,* 582 F.2d 507, 512 (9th Cir.1978).

## CONCLUSION

For the reasons set forth above, the Court DENIES defendant's motion for summary judgment and GRANTS plaintiff's motion for class certification. Docket Nos. 31 and 42. The Court GRANTS plaintiff's motion to strike defendant's unauthorized separate statement of facts. *See* Civ. Local Rule 56–2. Docket No. 49–1.

Plaintiff's motion for class certification did not include a proposed notice to be sent to the class. The parties are directed to meet and confer regarding the form of notice, and to submit the proposed notice to the Court within 14 days of the filing date of this order.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 2711085

Footnotes

1    The California Labor Code does not define the term "regular rate of pay." The California Division of Labor Standards Enforcement ("DLSE") recommends that courts look to the Fair Labor Standards Act ("FLSA") and adopt its definition of "regular rate of pay." DLSE Manual § 49.12; *see also Advanced–Tech Security Serv., Inc. v. Superior Ct.,* 163 Cal.App.4th 700, 707, 77 Cal.Rptr.3d 757 (2008) (explaining that California law looks to FLSA to determine what is excludable from compensation when calculating the "regular rate").

End of Document    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 5681323
United States District Court,
N.D. California.

Matthew Ross, et al., Plaintiffs,

v.

Ecolab Inc., Defendant.

Case No. 13-cv-5097-PJH
|
Signed 09/28/2015

**Attorneys and Law Firms**

Daniel Jay Palay, Jenna Holston Strauss, Brian Daniel Hefelfinger, Palay Law Firm, Alejandro Pedro Gutierrez, Ventura, CA, for Plaintiffs.

Arch Stokes, Diana Lerma, Shirley Anne Banner, Peter B. Maretz, Stokes Wagner Hunt Maretz & Terrell, San Diego, CA, John R. Hunt, Stokes Wagner Hunt Maretz Terrell, Atlanta, GA, for Defendant.

PHYLLIS J. HAMILTON, United States District Judge

**ORDER RE MOTIONS FOR SUMMARY JUDGMENT AND MOTION FOR DECERTIFICATION**

 **\*1** Plaintiffs' motion for partial summary judgment, defendant's motion for summary judgment, and defendant's motion for decertification came on for hearing before this court on May 20, 2015. Plaintiffs Matthew Ross and Robert Magee ("plaintiffs") appeared through their counsel, Alejandro Gutierrez and Brian Hefelfinger. Defendant Ecolab, Inc. ("defendant" or "Ecolab") appeared through its counsel, Arch Stokes, Shirley Gauvin, Peter Maretz, and John Hunt. Having read the papers filed in conjunction with the motions and carefully considered the arguments and relevant legal authority, and good cause appearing, the court hereby rules as follows.

**BACKGROUND**

This is a wage and hour class action centering around the alleged misclassification of employees as exempt. Plaintiffs work as "Route Sales Managers" (or "RSMs") for Ecolab, which describes itself as "the global leader in water, hygiene, and energy technologies and services." The exact job duties of the RSMs is a matter of some dispute, but the parties agree that the RSMs travel to the sites of Ecolab's customers (including restaurants and other businesses in the hospitality industry) in order to provide service to their commercial dishwashers, which are leased from Ecolab. Specifically, the RSMs install, repair, and otherwise maintain the dishwashers, and also sell products (such as detergents, sanitizers, etc.) to the customers. Plaintiffs claim that they have been misclassified as "exempt," and thus have not received the overtime pay and meal breaks to which they were entitled.

The suit was originally filed by plaintiff James Icard in state court in December 2009, then removed in January 2010, only to be remanded in June 2010 based on Ecolab's failure to establish the required amount in controversy. Ecolab then removed the case for a second time in June 2011, but the case was again remanded in September 2011, because Ecolab had still not established that the amount in controversy requirement was met.

The case was removed for a third time in October 2013, and has been pending in this court since then. During the case's stint in state court between September 2011 and October 2013, the state court granted class certification, but subsequently found that

2015 WL 5681323, 166 Lab.Cas. P 36,384

plaintiff Icard was not a suitable class representative. In response, plaintiffs' counsel filed a motion to substitute Matthew Ross and Robert Magee as class representatives, which was granted.

The class certified by the state court consists of "all employees of Ecolab, who are/were Route Managers or Route Sales Managers (hereafter referred to collectively as 'RSMs'), who have worked in California between December 21, 2005 and the present, who did/did not cross state lines in performance of their duties, and have not received full and correct pay for all hours worked and have not received accurate itemized wage statements required pursuant to Labor Code section 226, and who have not fully and completely released all of the claims made in this lawsuit." See Third Amended Complaint ("TAC"), ¶ 13.

**\*2** The TAC asserts four causes of action on behalf of the class: (1) violation of California Labor Code § 510, for failure to pay overtime and failure to provide meal breaks, (2) violation of California Business and Professions Code § 17200, for failure to pay all wages, (3) violation of California Labor Code § 226 for failure to timely provide accurate wage statements, and (4) violation of California's Private Attorneys General Act. Plaintiffs now move for partial summary judgment on three issues: (1) that the "outside salesperson" exemption does not apply to the RSMs, (2) that the "commissioned salesperson" exemption does not apply to the RSMs, and (3) that the "hazardous materials" exemption does not apply to the RSMs.

Defendant moves for summary judgment on all asserted claims. Defendant also moves for decertification of the class.


**DISCUSSION**

A. Motions for Summary Judgment

1. Legal Standard
A party may move for summary judgment on a "claim or defense" or "part of ... a claim or defense." Fed. R. Civ. P. 56(a). Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Id.

A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Material facts are those that might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id.

Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. Soremekun v.Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). On an issue where the nonmoving party will bear the burden of proof at trial, the moving party may carry its initial burden of production by submitting admissible "evidence negating an essential element of the nonmoving party's case," or by showing, "after suitable discovery," that the "nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc., 210 F.3d 1099, 1105-06 (9th Cir. 2000); see also Celotex, 477 U.S. at 324-25 (moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case).

When the moving party has carried its burden, the nonmoving party must respond with specific facts, supported by admissible evidence, showing a genuine issue for trial. Fed. R. Civ. P. 56(c), (e). But allegedly disputed facts must be material—the existence of only "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Anderson, 477 U.S. at 247-48.

2015 WL 5681323, 166 Lab.Cas. P 36,384

When deciding a summary judgment motion, a court must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. Id. at 255; Hunt v. City of Los Angeles, 638 F.3d 703, 709 (9th Cir. 2011). In adjudicating cross-motions for summary judgment, the Ninth Circuit "evaluate[s] each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences." ACLU of Nevada v. City of Las Vegas, 466 F.3d 784, 790-91 (9th Cir. 2006) (citations omitted).

**\*3** If a party makes a showing "that there is no genuine issue of material fact as to particular claim(s) or defense(s), the court may grant summary judgment in the party's favor 'upon all or part thereof.' " Schwarzer, Tashima & Wagstaffe, Federal Civil Procedure Before Trial (2008) § 14:33 (emphasis added). "This procedure is commonly referred to as a 'partial summary judgment.' " Id. § 14:34

2. Legal Analysis

As mentioned above, plaintiffs move for partial summary judgment on three issues, all of which are related to Ecolab's classification of RSMs as exempt from overtime regulations. Plaintiff seek an order finding that (1) the RSMs are not subject to the "outside salesperson" exemption, (2) the RSMs are not subject to the "commission sales" exemption, and (3) the RSMs are not subject to the "hazardous materials" (or "haz-mat") exemption. Defendant seeks an order granting summary judgment in its favor on the overtime claim (based on the three exemptions), and further seeks summary judgment on the remainder of the asserted claims. The court will first examine the three overtime exemptions.

a. Outside salesperson exemption

The outside salesperson overtime exemption applies to employees who "customarily and regularly work more than half the working time away from the employer's place of business selling tangible or intangible items or obtaining orders or contracts for products, services, or use of facilities." Cal. Labor Code § 1171; Wage Order 5, ¶ 2(M); Wage Order 4, ¶ 2(M); Wage Order 7, ¶ 2(J).

There is an important difference between how federal law and state law interpret the "more than half the working time" requirement of the outside salesperson exemption. The federal exemption focuses on defining the employee's "primary function," asking whether the employee's "chief duty or primary function is making sales." Ramirez v. Yosemite Water Co., Inc., 20 Cal.4th 785, 797 (1999). If so, then the exemption applies, so long as no more than 20 percent of the employee's time is spent on non-sales activity. Id. The federal exemption also allows activities "incidental to sales" to be counted as sales-related activity. Id.

In contrast, California takes a "purely quantitative approach," and focuses "exclusively on whether the individual 'works more than half the working time ... selling ... or obtaining orders or contracts.' " Ramirez, 20 Cal.4th at 797. Also, state law "does not contain any provision that reclassifies intrinsically nonexempt nonsales work as exempt based on the fact that it is incidental to sales." Id. (emphasis in original). Instead, the "language of the state exemption only encompasses work directly involved in 'selling ... items or obtaining orders or contracts.' " Id. In other words, under the California exemption, the only question is whether the employee spends over 50% of his or her time involved in activities directly related to sales, not including activities incidentally related to sales.

With that standard in mind, the next step is to determine whether the outside salesperson exemption applies to the RSMs. The court also notes that "the assertion of an exemption from the overtime laws is considered to be an affirmative defense, and therefore the employer bears the burden of proving the employee's exemption." Ramirez, 20 Cal.4th at 794-95.

In their motion, plaintiffs claim that RSMs spend the majority of their work time performing "hands-on duties," such as:

> **\*4** Installing and repairing commercial dishwashers, dispensers, and related equipment; performing preventative maintenance on dishwashers, dispensers, and related equipment; testing the pH of the client's water, detergent levels, rinse-aid levels, and more; testing the functionality of the client's equipment; checking inventory on the client's supply of detergent, sanitizers, degreasers, and rinse-aid; talking to customers in an effort to diagnose problems with their equipment; responding to emergency calls from Ecolab clients when their dishwashers, dispensers, or related equipment are malfunctioning; planning their day, including figuring out which clients to visit each day; ordering repair parts; ordering materials to perform tests on dishwashers, dispensers, and related equipment; and preparing Service Detail Reports ("SDRs").

Dkt. 74 at 3.

Plaintiffs also cite to 16 employee declarations containing the same list of activities and claiming that more than 80% of an RSM's non-driving work day is spent on those tasks. Dkt. 74-1, Ex. 4.

Plaintiffs do acknowledge that RSMs spend some of their day performing "some minimal sales tasks," including upselling detergents, sanitizers, degreasers, and commercial kitchen accessories; demonstrating new products and services; and taking orders for goods. Dkt. 74 at 3. However, the employee declarations state that only five to twenty percent of their workday is spent performing these sales-related tasks. Dkt. 74-1, Ex. 4.

Ecolab responds by arguing that "even though the customer calls involve service, sales are the key." Ecolab provides its own competing employee declarations, with one RSM stating that "my primary duty is sales," another claiming that 100% of his job duties are related to sales, and others making similar statements about the importance of sales to the RSMs' job duties. See, e.g., Dkt. 87-1, Ex. K, ¶ 3; Ex. M, ¶ 11. One of Ecolab's declarants states that "there was nothing I did that did not relate to sales," and that even "[b]rushing my teeth or having a cup of coffee in the morning are all related to sales." Dkt. 87-1, Ex. E, ¶ 15.

Ecolab also emphasizes the importance that the company itself places on sales, arguing that RSMs are "expected to build relationships with the customers, earn their trust by familiarizing themselves with the customers' needs, and look for opportunities to sell products to the customers," and pointing out that it holds monthly sales meetings with RSMs and distributes sales brochures and videos to RSMs. Ecolab also notes that it does not charge customers for the service visits that the RSMs provide, and instead derives the majority of its income from the sales of products.

Ecolab provides testimony from its expert, Donald Winter, who is offered as a sales expert based on his 40 years of experience as an "advisor and consultant to the hospitality industries." Dkt. 87-1, Ex. NN. Mr. Winter opines that "[u]sing both qualitative and quantitative methods," he has "determined that both approaches yield the ineluctable conclusion that Ecolab's Route Sales Managers are primarily sales persons—and further, dishwasher repair comprises but a small portion of the Route Sales Managers' ongoing functions," and that the "majority of the Route Sales Managers' actual time and focus is directed towards the selling function." Id., ¶ 17.

The divide between plaintiffs' and defendant's arguments highlights an area of ambiguity in the application of the outside salesperson exemption. Plaintiffs focus on the time actually spent on sales-related duties, while Ecolab also introduces arguments related to how much time should be spent selling. The Ramirez court noted this ambiguity, asking: "Is the number of hours worked in sales-related activities to be determined by the number of hours that the employer, according to its job description or its estimate, claims that the employee should be working in sales, or should it be determined by the actual average hours the employee spent on sales activity?" 20 Cal.4th at 802 (emphasis in original).

**\*5** The Ramirez court noted a problem with either approach—if the exemption was defined solely by employer expectations, the employer could "make an employee exempt from overtime laws simply by fashioning an idealized job description that had little basis in reality." 20 Cal.4th at 802. On the other hand, an employee "who is supposed to be engaged in sales activities

during most of his working hours and falls below the 50 percent mark due to his own substandard performance should not thereby be able to evade a valid exemption." Id.

According to the Ramirez court, the way to "steer clear of these two pitfalls" was by "inquiring into the realistic requirements of the job." 20 Cal.4th at 802 (emphasis in original). To do so, the court must "first and foremost" ask "how the employee actually spends his or her time," but should also "consider whether the employee's practice diverges from the employer's realistic expectations, whether there was any concrete expression of employer displeasure over an employee's substandard performance, and whether these expressions were themselves realistic given the actual overall requirements of the job." Id.

The facts of Ramirez are actually strikingly similar to those in this case. The plaintiffs were bottled water delivery persons, but their job title was "route sales representatives." 20 Cal.4th at 790. While plaintiffs performed such duties as delivering bottled water, picking up empty bottles, refilling other supplies (cups, etc.), checking bottles for leaks, and occasionally performing minor service on water coolers, the defendant also expected the plaintiffs to "engage the solicitation of new customers," and said that selling "is the main job of our route salespeople." Id. at 790-92. The defendant also claimed that it expected the route sales representatives to spend 90 percent of their workday selling, though later clarified to the court that the 90 percent figure included "the time spent delivering bottles of water to the customer as part of the selling activity." Id. at 792.

The Ramirez court ultimately found that the plaintiffs engaged in both sales and delivery functions, and that delivery/restocking of bottles was not a "sales" function, because "one who only performed these delivery tasks could not be considered a salesperson." Id. The court acknowledged that "failure to properly deliver the product would lead to loss of the customer, but that does not make such delivery a sales activity, any more than an attorney's preparation of a legal brief in order to satisfy and thereby retain a client is a sales activity." [1] Id.

    The court finds that the rationale of Ramirez applies with equal force to this case. Under Ecolab's view, everything a RSM does is related to sales, essentially arguing that "failure to properly [service] the product would lead to loss of the customer." However, as in Ramirez, "that does not make such [service] a sales activity."

**\*6**  Ecolab argues that a broader interpretation of the term "sales" is justified by the Ninth Circuit's decision in Christopher v. SmithKline Beecham Corp., 635 F.3d 383 (9th Cir. 2011). In Christopher, the court held that "pharmaceutical sales representatives" did qualify as outside salespeople even though they did not directly sell products to doctors, and instead engaged only in promotion-type activities. However, in reaching that conclusion, the court emphasized the unique nature of the pharmaceutical sales industry, noting that "[i]n most industries, there are no firm legal barriers that prohibit the actual physical exchange of the goods offered for sale." Id. at 396 (emphasis in original). "Because such barriers do exist in this industry, the fact that [sales] commitments are non-binding is irrelevant." Id. Ecolab offers no justification for expanding Christopher's holding, which appears to apply only to sales in the context of the pharmaceutical industry (or, at most, to industries in which direct sales are prohibited) to this case, in which sales representatives are free to effect the "actual physical exchange of the goods offered for sale."

Ecolab's overly expansive view of "sales-related activities" is reflected in its expert's report. In the report, Mr. Winter includes a chart listing the various activities performed by RSMs and categorizes them as "selling," "maintenance," or "repairing." Dkt. 87-46, Ex. A. Interestingly, every single activity is characterized, at least in part, as selling. "Synching up for the day" is categorized as "selling," "inspect, test, and calibrate machines" is categorized as "maintenance" and "selling," and "installation of dishwasher" is categorized as both "repairing" and "selling," though Mr. Winter acknowledges that a "relatively minor proportion is considered to be selling." Id. Most starkly, even "repairs" are categorized as both "repairing" and "selling." Id.

It seems clear that, under Ecolab's view, literally every RSM function can be considered "sales." However, as mentioned above, the Ramirez court specifically rejected this expansive view of "sales-related activities."

2015 WL 5681323, 166 Lab.Cas. P 36,384

By sticking to its "everything is sales" view, Ecolab fails to present the court with any basis for finding that over 50 percent of the RSMs' time is spent on sales-related tasks. In fact, Ecolab has not presented evidence that even one RSM spends over 50 percent of his or her time performing duties directly related to sales, and admitted at the hearing that "no one has quantified" how the RSMs spend their time to distinguish "this is sales, this is not sales." Dkt. 103 at 10. This lack of evidence is especially surprising given the fact that RSMs carry tablets to complete their Service Detail Reports ("SDRs"), which record the specific duties performed at each service call. Dkt. 87 at 5. However, rather than citing to those records and distinguishing between activities directly related to sales and those merely incidental to sales, Ecolab has opted for an all-or-nothing approach, maintaining that every single RSM activity is related to sales.

In a similar case in this district, the court noted that the defendant required its employees to "carry personal digital assistants" to "record the time they spend at each store." Campanelli v. Hershey, 765 F.Supp.2d 1185, 1193 (N.D. Cal. 2011). However, like the defendant in this case, the Hershey defendant failed to provide evidence of how employees spent their time, on a quantitative basis, and the court granted partial summary judgment in favor of plaintiff. Id. Plaintiffs emphasize the lack of any Service Detail Reports, which the RSMs use to track their daily work activities, that are cited in defendant's papers.

Overall, Ecolab has chosen not to present evidence of how much of the RSMs' time was spent on strictly sales-related activities, and has instead opted to argue that all of the RSMs' tasks were directed towards the ultimate goal of sales. In essence, Ecolab is arguing that all of the RSMs' duties—from "synching up" and "planning for the day," to "upload[ing] info at the end of the day"—are all incidental to sales. And, indeed, if the federal overtime exemption were at issue in this case, Ecolab's evidence could be sufficient to create a triable issue of material fact as to whether the RSMs' "primary function" was sales. However, under California's exemption, Ecolab must create a triable issue of material fact that the RSMs spent more than half of their day, on a purely quantitative basis, directly involved in selling. As mentioned above, Ecolab has not met this standard with respect to even one RSM. Instead, Ecolab appears to reject the distinction between "direct sales" tasks and tasks "incidental to sales"—relying on generalities such as "even though the customer calls involve service, sales are the key," or that sales are the "raison d'etre of the RSM position."

*7 Because Ecolab bears the burden of establishing the "outside salesperson" exemption, its failure to raise a triable issue of fact as to whether the RSMs spend more than 50 percent of their time on direct sales activities warrants summary judgment in plaintiffs' favor. Accordingly, plaintiffs' motion for partial summary judgment is GRANTED as to the "outside salesperson" exemption, and defendant's motion for summary judgment is DENIED on the issue.

### b. Commissioned salesperson exemption

Separate from the "outside salesperson" exemption, Ecolab also contends that the RSMs are exempt from overtime laws based on the "commissioned salesperson" exemption. The "commissioned salesperson" exemption applies if the employee's "earnings exceed one and one-half times the minimum wage, if more than half of that employee's compensation represents commissions." Wage Order 4, ¶ 3(D); Wage Order 7, ¶ 3(D).

As a threshold matter, the parties disagree over whether the RSMs are even covered by a wage order which contains the "commissioned salesperson" exemption. Plaintiffs contend that Wage Order 5, which does not contain the exemption, applies to the class members. Wage Order 5 covers businesses in the "public housekeeping" industry. Ecolab, on the other hand, argues that the class members are governed by Wage Order 4 or Wage Order 7, both of which contain the "commissioned salesperson" exemption. Wage Order 4 covers those employed in "professional, technical, clerical, mechanical, and similar occupations," while Wage Order 7 covers the "mercantile" industry.

Neither party has presented controlling authority for the applicability of any of the three cited wage orders, so for purposes of plaintiffs' motion for partial summary judgment, the court will view the evidence in the light most favorable to Ecolab and draw

all justifiable inferences in its favor. Accordingly, the court will proceed on the assumption that Ecolab's employees are subject to either Wage Order 4 or Wage Order 7, both of which contain the "commissioned salesperson" exemption.

As mentioned above, the "commissioned salesperson" exemption applies if the employee's "earnings exceed one and one-half times the minimum wage, if more than half of that employee's compensation represents commissions." "Commissions" are further defined as "compensation paid to any person for services rendered in the sale of such employer's property or services and based proportionately upon the amount or value thereof." Cal. Labor Code § 204.1.

In interpreting this language, the California Supreme Court cited (with apparent approval) this language from a California appeals court:

> Labor Code section 204.1 sets up two requirements, both of which must be met before a compensation scheme is deemed to constitute 'commission wages.' First, the employee must be involved principally in selling a product or service, not making the product or rendering the service. Second, the amount of their compensation must be a percent of the price of the product or service.

Ramirez, 20 Cal.4th at 803-04 (citing Keyes Motors, 197 Cal.App.3d at 563).

Plaintiffs argue that that the first prong of this test is identical to the "outside salesperson" exemption test. That is, the relevant inquiry is whether, on a quantitative basis, the employee spends more than half of his or her time directly involved in selling. The California Supreme Court's decision in Ramirez appears to support this view—after discussing the quantitative test applicable to the "outside salesperson" exemption, the court then discusses the "commissioned salesperson" exemption, and then notes that "[a]s discussed above, it remains to be clarified on remand whether Ramirez was 'involved principally in selling the product or service.' " 20 Cal.4th at 804. Nothing in Ramirez, nor in any other case cited by Ecolab, suggests that the federal "primary function" test should be used when applying the first prong of the "commissioned salesperson" exemption. Thus, based on the court's earlier finding that Ecolab has not raised a triable issue of fact as to whether the RSMs spend more than half of their time selling, summary judgment would be warranted in plaintiffs' favor on the "commissioned salesperson" exemption. However, out of an abundance of caution, the court will also analyze the second prong of the "commissioned salesperson" test—whether the RSMs' compensation is "a percent of the price of the product or service."

**\*8** The central dispute between the parties can be traced to an ambiguity in the law, which is unclear about whether the employee's compensation must be a percent of the price of the product/service that he himself sells, or may be merely a percentage of the product price in general. The way the test is structured impliedly suggests that a salesperson's commission must be tied to his own sales—with the first prong requiring that "the employee must be involved principally in selling a product or service," and the second prong requiring that the "amount of their compensation" be "a percent of the price of the product or service"—but there is no controlling authority specifically requiring a nexus between the employee's own sales and the commission paid to that employee.

Plaintiffs seek to impose such a requirement—in their motion for partial summary judgment, they set out the "commissioned salesperson" test as follows:

> (1) Plaintiffs must have spent more than one half of their total work time engaged in selling a product or service, not making the product or rendering the service, and (2) the purported "commissions" must have been computed as a percent of the price of the product or services that were sold by plaintiffs.

Dkt. 74 at 14 (emphasis added).

Plaintiffs further argue that the class members "have no control over the 'commissions' they passively 'earn' from machine rental fees, excess load charges, or minimum product purchase requirements under a lease contract," and thus, "the 'commissions' for those items are not a percent of the price of the products that were sold by the RSMs." Dkt. 74 at 14 (emphasis added). Plaintiffs

then sum up the argument: "The fact that most of the ostensible 'commissions' received by the RSMs were derived from sales made by others, alone, disqualifies plaintiffs from the commission sales exemption." Id.

Ecolab implicitly admits that the RSMs' commissions do not come from sales that they themselves make, through the use of carefully-chosen language. Ecolab claims that, a few weeks after being hired, a RSM "purchases" a territory, and then moves from a salary-based income to a commission-based income, whereby the income "depends almost entirely on the amount purchased by the customers he services." Dkt. 87 at 16 (emphasis added). Ecolab similarly states that the commissions "are earned entirely based on the sale of products" and that "the overwhelming majority of his or her compensation derives from the products purchased." Id. Notably, Ecolab is careful never to say that an RSM's commission is based on the amount of products that he/she sells, it is based on the amount of products purchased by the customers that he/she services. Nor does Ecolab dispute plaintiffs' claim that "the majority of RSMs' commissions come to them whether or not they ever sell a single product themselves."

Neither party cites any authority, one way or the other, on the nexus needed between the employee's own sales and the sales used to calculate the commission. However, the court finds plaintiffs' interpretation to be more consistent with the test set out in Ramirez, and with the common-sense purpose of the exemption. The idea of the commissioned salesperson exemption is that, if an employee wants to work longer hours in order to make more sales and increase his own pay, he should be allowed to do so, without triggering overtime laws. If the employee's income was determined by something other than his own sales—that is, if every employee simply received a percentage of the company's overall sales—then the employee is not really receiving the fruit of his own labor, so the exemption would not be justified. Moreover, defendant's view of the exemption would allow employers to classify all of their employees as "commissioned salespersons" simply by tying their income to the company's sales. In other words, rather than paying its janitors a set salary, a company could calculate their salaries as a percentage of the company's total sales, and then argue that they are commissioned salespersons. Such an interpretation is at odds with the purpose of the exemption.

 *9  Thus, the court does find that, in order to qualify for the exemption, the employee's compensation must be calculated as a percentage of the price of the products/services that he himself sells. Because Ecolab has presented no evidence that RSMs' commissions are based on their own sales, plaintiffs' motion for summary judgment is GRANTED as to the "commissioned salesperson" exemption, and defendant's motion for summary judgment is DENIED on the same issue.


c. Hazardous materials exemption

The third overtime exemption raised in plaintiffs' motion for partial summary judgment is the "hazardous materials" (or "haz-mat") exemption. The haz-mat exemption is found in Wage Order 4, Wage Order 5, and Wage Order 7, and provides as follows:

The provisions of this section are not applicable to employees whose hours of service are regulated by:

(1) the United States Department of Transportation Code of Federal Regulations, title 49, sections 395.1 to 395.13, regulating Hours of Service of Drivers, or

(2) Title 13 of the California Code of Regulations, subchapter 6.5, section 1200 and following sections, regulating hours of drivers.

Wage Order 4, ¶ 3(K); Wage Order 5, ¶ 3(I); Wage Order 7, ¶ 3(K).

The parties focus on the second portion of that passage, and note that California Code of Regulations section 1200 covers "[t]wo-axle motor trucks with a gross vehicle weight rating of 26,000 pounds or less transporting hazardous materials in quantities for which placards are not required." According to Ecolab, this ends the analysis. The RSMs drive trucks weighing less than

26,000 pounds, and they transport hazardous materials in quantities that do not require placards—thus, they are covered by section 1200, and in turn, they are exempt from the overtime requirements of the applicable wage order.

Plaintiffs argue that there are more requirements that must be met before the RSMs can be found exempt under the haz-mat exemption. The first one, and the one most heavily discussed in the briefs, is based on the idea that California's regulations apply only to people who are "drivers" by profession, not those for whom driving is incidental to their profession. Plaintiffs' main source of support for this argument is a Central District of California case also involving Ecolab. See Ladore v. Ecolab, Case No. 11-cv-9386, Dkt. 65 (C.D. Cal. Jan. 22, 2013). The key passage of that opinion states that "the federal and state regulations...address issues pertaining to those whose occupation is driving rather than those who must drive to a site as an incidental function to the principal duties of their occupation." Ladore at 9. The Ladore court, in turn, cited to the Division of Labor Standards Enforcement ("DLSE") manual, which stated that the exemption "only applies to employees whose regular duty is that of a driver, not any other category of worker." Id. (citing DLSE manual § 50.9.2.1).

In response, Ecolab argues that this portion of the DLSE manual has been amended. Ecolab cites to a case from this court, holding that "the DLSE manual changed section 50.9.2.1 to omit the statement that a driver must drive more than 50% of the time." Wamboldt v. Safety-Kleen Systems, 2007 WL 2409200, at *9 (Aug. 21, 2007). Based on this, Ecolab repeatedly argues that Ladore is "simply wrong" and "egregiously wrong," that it "reflects the misunderstanding of Judge Feess regarding the application of the exemption," and that the changes in the DLSE manual were "ignored by the Judge in Ladore." Dkt. 87 at 21.

*10  However, the portion of section 50.9.2.1 that was quoted in Ladore was not affected by the amendment. In fact, even Ecolab's declarant admits that, while portions of the DLSE manual were amended in 2006, "[t]he language of section 50.9.2.1 that limits the IWC exemption to only those employees whose regular duty is that of a driver, relief driver, or assistant driver was left unchanged." Dkt. 87, Ex. AAA, ¶ 22. For context, section 50.9.2.1 reads as follows:

> The IWC exemption only applies to employees whose regular duty is that of a driver, not any other category of worker. The policy would cover employees regularly employed as relief drivers or as assistant drivers. However, any driver who does not drive or operate a truck for any period of time during an entire workday is entitled to overtime premium compensation for all overtime hours worked performing duties other than driving during that day.

DLSE Policies and Interpretation Manual, section 50.9.2.1.

Ecolab argues that the "new" version of the DLSE manual states "that the overtime exemption fails to apply only when a driver 'does not drive or operate a truck for any period of time during an entire workday.' " Dkt. 87 at 22 (emphasis added). But that argument is belied by the text of the manual itself, which makes clear that an employee can avoid the exemption (and thus receive overtime pay) in two ways, not just one. Either (1) he can have a regular duty that is something other than driving, or (2) he can not drive a truck at all in a given day, and can receive overtime pay for that day. Ecolab ignores (1) and focuses only on (2). In other words, Ecolab argues that the RSMs drive a truck for some period of time every day, and thus, they are not entitled to overtime pay. However, the DLSE manual states that, even if an employee drives a truck every day, they can still be entitled to overtime pay if their regular duty is not that of a driver (phrased a different way, the exemption applies only if the employee's regular duty is being a "driver").

Ecolab glosses over the first part of the DLSE definition, making no attempt to argue that RSMs' regular duty is that of a driver. Instead, Ecolab limits its arguments to the issue of whether the RSMs have any non-driving days. One possible reason for this line of argument is that, with respect to the "outside salesperson" exemption, Ecolab has argued that the primary duty of the RSMs is sales, so it would be inconsistent to now argue that their primary duty is driving. Regardless of the reason, Ecolab does not even attempt to raise a triable issue of fact as to whether the RSMs' regular duty is that of a driver. Accordingly, because there is no triable issue of fact as to whether the RSMs' regular duty is that of "drivers," the court finds that the haz-mat exemption does not apply. Plaintiffs' motion for partial summary judgment on the haz-mat exemption is GRANTED, and defendant's motion on the issue is DENIED.

The court also finds an additional basis for granting plaintiffs' motion for partial summary judgment as to the haz-mat exemption. As set forth above, the exemption applies to "employees whose hours of service <u>are regulated by</u>" the applicable California regulations (section 1200 and following sections). <u>See</u> Wage Order 4, ¶ 3(K); Wage Order 5, ¶ 3(I); Wage Order 7, ¶ 3(K) (emphasis added). Thus, in order to qualify for the exemption, Ecolab must show that the RSMs' hours of service were actually regulated by section 1200 and the following sections. However, Ecolab has made no attempt to do so, and instead, plaintiffs point to the <u>Ladore</u> court's finding that Ecolab actually did not comply with many of these supposedly-required regulations. For instance, (1) section 1212.5 imposed limits on driving time, which were not followed by Ecolab, (2) section 1214 required records of drivers' driving time, fatigue levels, and illness status to be kept, which Ecolab did not keep, (3) section 1215 required daily reports to be kept, which Ecolab did not keep, and (4) sections 1230 and 1232 required regular inspections and maintenance of trucks, which Ecolab did not perform. <u>See</u> <u>Ladore</u> at 8. On the basis of those findings, the court found that "Ecolab plainly wants to have its cake and eat it too." <u>Id</u>. "To the extent that Ecolab believes the haz-mat exemption applies, it clearly feels no compulsion to abide by the regulations that would be applicable." <u>Id</u>. at 8-9. In other words, while Ecolab argues that the RSMs are not exempt because they are subject to the haz-mat regulations, the <u>Ladore</u> court emphasized that Ecolab makes no effort to actually comply with those haz-mat regulations.

**\*11**  Similarly, in the present case, Ecolab makes no effort to show that the RSMs' "<u>hours of service</u>" are actually regulated by "section 1200 <u>and following sections</u>," and instead attempts to read that language out of the wage order exemption by arguing that, because the RSMs are covered by section 1200 (which governs only vehicle weight and the amount of hazardous materials carried, not the drivers' hours of service), they are exempt. In other words, Ecolab would have the court read the following language—"The provisions of this section are not applicable to employees whose hours of service are regulated by... Title 13 of the California Code of Regulations, subchapter 6.5, section 1200 and following sections, regulating hours of drivers"—as this: "The provisions of this section are not applicable to employees who are regulated by... Title 13 of the California Code of Regulations, subchapter 6.5, section 1200." Because it is Ecolab's burden to show that the haz-mat exemption applies, its failure to address the requirement that the employees' hours of service are regulated by section 1200 and the following sections provides an additional basis for granting plaintiffs' motion and denying Ecolab's motion on the haz-mat issue.

As a result of the court granting partial summary judgment in plaintiffs' favor on all three asserted overtime exemptions, defendant's motion for summary judgment on the overtime claim, as a whole, is denied.

### d. Evidentiary objections

In both their opposition to Ecolab's motion for summary judgment and their reply brief in support of their own motion for partial summary judgment, plaintiffs raised a number of evidentiary objections. In particular, plaintiffs claim that certain witnesses were not properly disclosed under Rule 26 and that certain lay witnesses are being offered as experts. Because the court finds that plaintiffs' motion must be granted, and defendant's denied as to the overtime exemptions, even without excluding the challenged evidence, the court finds that plaintiffs' objections are moot.

### e. Meal breaks and other claims

In their complaint, plaintiffs allege that Ecolab failed to provide meal breaks to the RSMs, and in its motion for summary judgment, Ecolab provides evidence of a policy that required its employees to take meal breaks in accordance with California law. <u>See</u> Dkt. 78, Ex. III. Under the policy, employees are sent a "meal break reminder message" that says "please ensure you take your required meal and rest breaks," and also must certify that they have been provided all meal and rest breaks when they sign their timesheets. <u>Id</u>.

2015 WL 5681323, 166 Lab.Cas. P 36,384

Plaintiffs respond by arguing that the policy "did not go into effect until 2008," and thus, because the class period runs from December 21, 2005 to the present, denial of summary judgment is warranted.

At the hearing, the court sought to clarify the timing of Ecolab's meal break policy, and asked defense counsel to identify which part of the evidentiary record showed that Ecolab's policy was in effect during the entire class period. Counsel was given one week to submit a reference to the evidentiary record.

In its supplemental filing, Ecolab pointed out that the first portion of the cited policy (which set forth the meal break requirement, but did not have the "reminder" or the certification) reflected that it was last revised in June 2007. Ecolab further cited to portions of deposition testimony from its employees, many of whom testified that Ecolab had a meal break policy in effect in 2005 and earlier. Finally, Ecolab pointed to the deposition testimony of its "person most knowledgeable," who testified that the meal break policy has existed at least since December 2005. However, Ecolab did not submit the "person most knowledgeable" testimony as part of its motion for summary judgment, and requests leave of court to do so now.

While Ecolab's decision not to include this evidence along with its motion is puzzling, the court will nonetheless allow the parties an opportunity to fully address the proper temporal scope of the meal break claim. Based on the current evidence, the court finds that there is no evidence of any meal break violation from October 12, 2008 (the earliest date for which defendant has submitted records) to the present, and thus GRANTS defendant's motion for summary judgment as to the meal break claim for that time period. Because there remains a triable issue of fact regarding the existence of meal break violations from December 21, 2005 to October 11, 2008, the court will defer its ruling until after Ecolab submits its new evidence and plaintiffs have an opportunity to respond. Ecolab shall have until **October 9, 2015** to file a supplemental brief, along with evidence, regarding the viability of plaintiffs' meal break claim from 2005 to 2008. Plaintiffs shall then have until **October 23, 2015** to file a responsive brief. The briefs shall not exceed five pages each.

> **\*12**  Ecolab then argues that plaintiffs' remaining claims (specifically, the claims under Cal. Bus. & Prof. Code § 17200, Cal. Labor Code § 226, and PAGA) must fail because they are dependent on an unpaid wage claim. Because the court has found that plaintiffs' overtime claim remains viable, so too are these claims, and thus, Ecolab's motion for summary judgment is DENIED on that basis.

With respect to the section 226 claim, Ecolab further argues that the presence of a good-faith dispute precludes a finding that any violation was "knowing and intentional," and further argues that plaintiffs suffered no harm from any alleged violation. First, Ecolab's argument regarding the "good-faith dispute" is completely conclusory, as it consists of only a one-line argument without any support for such a finding. Ecolab's motion is DENIED on that basis.

Second, as to harm, plaintiffs allege that they suffered harm "in not receiving their overtime wages based on actual hours worked," creating a "substantial risk that without accurate wage stubs the plaintiffs will continue not to be paid their overtime wages in accordance with the law." That alone distinguishes this case from the non-precedential case cited by Ecolab, in which the Ninth Circuit noted that the plaintiff "conceded in his deposition that he experienced no harm as a result of his employer's alleged violations of section 226(a), and that the alleged violations had no consequences." Villacres v. ABM Industries Inc., 384 Fed. Appx. 626, 627 (9th Cir. 2010). Accordingly, Ecolab's motion is also DENIED on that basis.

## B. Motion for Decertification

### 1. Legal Standard

The court may, at its discretion, decertify a class if the requirements of Federal Rule of Civil Procedure 23 are not satisfied. See, e.g., O'Connor v. Boeing North American, Inc., 197 F.R.D. 404, 409–10 (C.D.Cal. 2000). The standards used for determination of class certification, contained in Rule 23 of the Federal Rules of Civil Procedure, are applied in determining whether to decertify a class. O'Connor, 197 F.R.D. at 410.

Rule 23(a) requires that plaintiffs demonstrate numerosity, commonality, typicality and adequacy of representation in order to maintain a class. Mazza v. American Honda Motor Co., 666 F.3d 581, 588 (9th Cir. 2012). That is, the class must be so numerous that joinder of all members individually is "impracticable;" there must be questions of law or fact common to the class; the claims or defenses of the class representative must be typical of the claims or defenses of the class; and the class representative must be able to protect fairly and adequately the interests of all members of the class. See Fed. R. Civ. P. 23(a)(1)-(4).

If the class is ascertainable and all four prerequisites of Rule 23(a) are satisfied, the court must also find that the plaintiff has "satisf[ied] through evidentiary proof" at least one of the three subsections of Rule 23(b). Comcast Corp. v. Behrend, 133 S.Ct. 1426, 1432 (2013). A class may be certified under Rule 23(b)(1) upon a showing that there is a risk of substantial prejudice or inconsistent adjudications from separate actions. Fed. R. Civ. P. 23(b)(1). A class may be certified under Rule 23(b)(2) if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Finally, a class may be certified under Rule 23(b)(3) if a court finds that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### 2. Legal Analysis

**\*13** Ecolab's primary challenge to certification is on the "predominance" prong of Rule 23(b)(3), although its motion also purports to challenge the commonality, typicality, adequacy, and superiority prongs.

In its motion, Ecolab first addresses predominance and commonality together, noting that the commonality analysis is "subsumed" by the predominance analysis. With regard to the overtime claim, Ecolab argues that individual issues predominate as to each of the three asserted overtime exemptions. First, as to the sales exemptions, Ecolab argues that different RSMs may spend more or less than 50% of their time performing sales activities, and that "many RSMs think their business is all sales, all the time, and describe the 'service' part of the job as minimal," while others may minimize the sales aspect of the job.

As an initial matter, having granted plaintiffs' motion for partial summary judgment on both sales-related exemptions, the presence or absence of individual issues is now moot. Regardless, even if the court had not granted plaintiffs' motion, the court finds that Ecolab's argument depends on the same re-casting of all duties as sales-related that has been rejected by the California Supreme Court. Ecolab relies on evidence regarding the subjective belief of its employees, showing that they have adopted the "all sales, all the time" viewpoint that was rejected in Ramirez. Ecolab appears to suggest that, if enough employees simply believe that they are salespeople, that is sufficient for individual issues to predominate over common ones. The court rejects that argument. Employees' subjective beliefs are irrelevant to the application of the sales-related overtime exemptions. If Ecolab had instead presented evidence that at least some of the RSMs actually spent more than 50% of their time performing tasks directly related to sales, that would affect the predominance analysis. However, as noted above in the context of the summary judgment motions, Ecolab has failed to present evidence that even one RSM spent more than 50% of his or her time, on a purely quantitative basis, involved in sales. In other words, while Ecolab is correct that "variations among employees are material to deciding" whether the employees are exempt, those variations must go to the time spent on sales tasks. Simply showing variations in employees' subjective beliefs about the importance of sales is not sufficient.

Ecolab then makes a separate argument applicable to only the commissioned salesperson exemption, arguing that some RSMs may not earn more than 1.5 times the minimum wage for every hour during weeks in which they worked over 40 hours, as required to trigger the exemption. Again, having found that the commissioned salesperson exemption does not apply, the presence or absence of individual issues is now irrelevant. In addition, on the merits, Ecolab has presented no evidence showing that certain RSMs earn above the required income threshold while some do not. Instead, Ecolab relies on speculation that some of the RSMs may fall below the threshold, making it possible that individual issues would predominate. Such speculation is not sufficient to warrant decertification. Moreover, Ecolab has not presented evidence that any single RSM receives commissions based on his or her own sales, further demonstrating that any individual issues regarding the "1.5 times the minimum wage" prong are speculative.

**\*14** With regard to the haz-mat exemption, Ecolab argues that different RSMs may carry different amounts of the hazardous materials on different days. Even if true, the court has previously found that the haz-mat exemption does not apply to any of the RSMs, because their regular duty is not that of drivers and because the drivers' hours of service are not actually regulated. Thus, the amount of materials carried by the RSMs is irrelevant.

Apart from the overtime claims, Ecolab argues that individual inquiries predominate regarding the meal break claim and derivative claims. Taking the derivative claims first, to the extent that they are derivative of the overtime claim, the court finds that common issues do predominate over individual ones, for the same reasons described above.

With regard to the meal break claim, the court will re-assess the predominance analysis after the parties have submitted their supplemental evidence and briefing.

Next, Ecolab argues that the proposed class representatives are not typical of the class, because other RSMs have submitted declarations stating that they spend the majority of their time selling. Again, Ecolab is placing far too much emphasis on the subjective beliefs of its employees, which is irrelevant to the "purely quantitative" analysis required under California law. Given that Ecolab has not presented any evidence showing that the proposed class representatives are atypical in terms of how they actually spend their time while working, the court finds no basis on which to decertify the class based on lack of typicality.

Ecolab then argues that the proposed class representatives are not adequate. Specifically, Ecolab argues that Ross is not adequate because he is a former employee and thus lacks standing to seek injunctive relief, and argues that Magee is not adequate because he works as a SSRM (a Sales Service Route Manager), not a RSM (Route Sales Manager), and thus falls outside of the class definition.

With respect to Ross, the court finds no reason why he, even as a former employee, would not have standing to pursue claims for damages; and moreover, courts in this district have found that "not only are former employees adequate representatives of current employees in class actions seeking at least in part declaratory and/or injunctive relief, but ... former employees provide superior representation in bringing claims against the employer." See, e.g., Mendez v. R+L Carriers, Inc., 2012 WL 5868973 (Nov. 19, 2012); Krzesniak v. Cendant Corp., 2007 WL 1795703 (June 20, 2007).

As to Magee, it appears undisputed that he works as a SSRM rather than as a RSM. Plaintiffs contend that this is a distinction without a difference, as SSRMs perform the same functions as RSMs, the only difference being that they are assigned to work in a different division of Ecolab, referred to as the "PureForce" division. Plaintiffs also emphasize that, after the class was certified in state court, Magee (and the other SSRMs) were included on the notice list provided by Ecolab to the notice administrator.

If the latter is true, plaintiffs may have an argument that Ecolab is estopped from arguing that the SSRMs should not be in the class. However, as it stands now, the SSRMs are not within the definition of the class that was actually certified, which includes only employees "who are/were Route Managers or Route Sales Managers." If plaintiffs wish to amend the class definition to include Sales Service Route Managers, they may move to do so, but the court will not expand the class definition on its own. Thus, based on the current class definition, the court finds that Magee is not an adequate class representative. However, because the court finds that Ross is an adequate class representative, Magee's lack of adequacy does not provide a basis for granting Ecolab's motion for decertification.

**\*15** Ecolab makes one other argument as to adequacy, but it is simply a rehash of their sales-related argument that has been repeatedly rejected throughout this order. In short, Ecolab argues that Ross and Magee are not adequate class representatives because they are "antagonistic to the RSM group, many of whom love selling full-time and do not want their classification to change." Whether some class members do indeed "love selling" is entirely irrelevant to the claims at issue, and does not affect the Rule 23 analysis whatsoever.

2015 WL 5681323, 166 Lab.Cas. P 36,384

Ecolab then challenges the superiority of a class action as a means of litigating this case, although its arguments appear to be reiterations of its predominance and adequacy arguments. Specifically, Ecolab argues that "the lack of common evidence" would make trial unmanageable, and that "RSMs have their own collection of experiences, most of which are markedly different from those alleged by Ross/Magee." Having already ruled on Ecolab's arguments regarding predominance and adequacy, the court finds no new issues to be raised by these arguments, and finds that the superiority requirement is met.

Finally, after Ecolab's reply was filed, plaintiffs filed evidentiary objections, and in response to the objections, Ecolab filed a motion to strike, arguing that the so-called objections actually constituted an impermissible sur-reply, because the filing contained substantive arguments on the motion. While the court agrees that the objections straddle the line between objections and argument, they do not constitute an improper sur-reply, and the court denies the motion to strike.

## CONCLUSION

Based on the foregoing reasons, plaintiffs' motion for partial summary judgment is GRANTED; Ecolab's motion for summary judgment is DENIED with the exception of the meal break claim, for which summary judgment is GRANTED for the time period from October 12, 2008 to the present and DEFERRED for the time period from December 21, 2005 to October 11, 2008; and Ecolab's motion for decertification is DENIED, with the exception of the meal break claim, for which a decision on decertification is DEFERRED.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2015 WL 5681323, 166 Lab.Cas. P 36,384

Footnotes

1        The Ramirez court also cited a previous California Court of Appeal decision, in which the court found that car mechanics were not engaged in sales. Keyes Motors, Inc. v. Division of Labor Standards Enforcement, 197 Cal.App.4th 557 (1987). The Keyes court acknowledged that "[i]t may be true that parts and labor are ultimately sold because mechanics diagnose the need for additional repairs," but held that "this diagnosis and recommendation is no more 'salesmanship' than a plumber's diagnosis and recommendation that an additional pipe is needed to make a repair." Id. at 564. "Put simply, a mechanic performs labor, not sales." Id.

**End of Document**                                                   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
**Leave to File for Reconsideration Granted by**   Wamboldt v. Safety-Kleen Systems, Inc.,   N.D.Cal.,   September 10, 2007

2007 WL 2409200
Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

Steven WAMBOLDT, Plaintiff,

v.

SAFETY-KLEEN SYSTEMS, INC., Defendant.

No. C 07-0884 PJH.
|
Aug. 21, 2007.

**Attorneys and Law Firms**

Barron Edward Ramos, Del Mar, CA, Donald S. Edgar, Jeremy R. Fietz, The Edgar Law Firm, Santa Rosa, CA, Kristen Elizabeth Caverly, Henderson & Caverly, Rancho Santa Fe, CA, for Plaintiff.

Cassandra H. Carroll, Janine Syll Simerly, Robert William Tollen, Seyfarth Shaw LLP, San Francisco, CA, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT; GRANTING CLASS CERTIFICATION

PHYLLIS J. HAMILTON, United States District Judge.

**\*1**  Now before this court are the motion of defendant Safety-Kleen Systems, Inc. ("Safety-Kleen") for summary judgment or partial summary judgment and the motion of plaintiff Steven Wamboldt ("Wamboldt") for class certification. Jeremy R. Fietz and Barron E. Ramos appeared for plaintiff; Robert William Tollen appeared for defendant. Having read the papers and carefully considered the relevant legal authority, defendant's motion for summary judgment is hereby GRANTED IN PART AND DENIED IN PART for the following reasons and for the reasons stated at the hearing. Plaintiff's motion for class certification is hereby GRANTED.

## BACKGROUND

This action arises from defendant's failure to pay overtime to certain employees, and was originally filed by Wamboldt on behalf of himself and others on November 17, 2006 in Los Angeles Superior Court. Safety-Kleen removed the case to the Central District of California alleging that this action meets the requisites of the Class Action Fairness Act of 2005. The case was then transferred here, where *Perez v. Safety Kleen Systems, Inc.* is pending, upon plaintiff's motion.

Plaintiff alleges that Safety-Kleen failed to pay overtime due to their customer service representative employees as required by California Labor Code § 510. In addition to failing to pay overtime to non-exempt employees, plaintiff alleges Safety-Kleen also improperly reduced commissions payable to those employees. *See* Am. Compl. ¶¶ 10, 12, 27-28. The complaint also contains derivative claims that defendant violated: (1) California Labor Code § 202 which requires an employer to pay all wages due within 72 hours of an employee's separation; (2) California Unfair Competition law, Cal. Bus. & Prof.Code §§

17200 et seq., which prohibits unlawful withholding of wages; and (3) California Labor Code Private Attorneys General Act of 2004 ("PAGA"), Labor Code §§ 2698 et seq., which authorizes civil penalties. *Id.* ¶¶ 13, 26, 30, 33-41.

Safety-Kleen now moves for summary judgment, or in the alternative, partial summary judgment. In support of its motion, Safety-Kleen contends that California's overtime requirements are not applicable to Safety Kleen's customer service representatives ("CSRs"), including Wamboldt. It also contends that it used branch revenue, not profitability, in calculating CSR commission compensation and that California law does not prohibit that practice. Wamboldt now moves for class certification.

## DISCUSSION

### A. Legal Standards

#### 1. Summary Judgment

Summary judgment shall be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FRCP 56(c). Material facts are those which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* The court must view the facts in the light most favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *United States v. City of Tacoma,* 332 F.3d 574, 578 (9th Cir.2003). "To show the existence of a 'genuine' issue, ... [a plaintiff] must produce at least some significant probative evidence tending to support the complaint." *Smolen v. Deloitte, Haskins & Sells,* 921 F.2d 959, 963 (9th Cir.1990) (quotations omitted). The court must not weigh the evidence or determine the truth of the matter, but only determine whether there is a genuine issue for trial. *Balint v. Carson City,* 180 F.3d 1047, 1054 (9th Cir.1999).

**\*2** A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion, and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party will have the burden of proof at trial, it must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue where the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by pointing out to the district court that there is an absence of evidence to support the nonmoving party's case. *Id.* If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is some genuine issue for trial in order to defeat the motion. *See* Fed.R.Civ.P. 56(e); *Anderson,* 477 U.S. at 250.

#### 2. Class Certification

In order for a class action to be certified, plaintiffs must prove that they meet the requirements of Federal Rule of Civil Procedure 23(a) and (b). As a threshold to class certification, plaintiffs must satisfy four prerequisites under Rule 23(a). First, the class must be so numerous that joinder of all members individually is "impracticable." *See* Fed.R.Civ.P. 23(a)(1). Second, there must be questions of law or fact common to the class. Fed.R.Civ.P. 23(a)(2). Third, the claims or defenses of the class representative must be typical of the claims or defenses of the class. Fed.R.Civ.P. 23(a)(3). And fourth, the person representing the class must be able to protect fairly and adequately the interests of all members of the class. Fed.R.Civ.P. 23(a)(4). The parties moving for class certification bear the burden of establishing that the Rule 23(a) requirements are satisfied. *Gen'l Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 156, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

If all four prerequisites of Rule 23(a) are satisfied, the court then determines whether to certify the class under one of the three subsections of Rule 23(b), pursuant to which named plaintiffs must establish that 1) there is a risk of substantial prejudice from separate actions; or 2) declaratory or injunctive relief benefitting the class as a whole would be appropriate; or 3) common

questions of law or fact common to the class predominate and that a class action is superior to other methods available for adjudicating the controversy at issue. *See* Fed.R.Civ.P. 23(b)(3).

The court does not make a preliminary inquiry into the merits of plaintiffs' claims in determining whether to certify a class. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). It will, however, scrutinize plaintiffs' legal causes of action to determine whether they are suitable for resolution on a class wide basis. *See, e.g., Moore v. Hughes Helicopters, Inc.* 708 F.2d 475, 480 (9th Cir.1983). In doing so, the court must accept the substantive allegations contained in plaintiffs' complaints as true, but will consider matters beyond the pleadings in order to ascertain whether the asserted claims or defenses are susceptible of resolution on a class wide basis. *See McCarthy v. Kleindienst,* 741 F.2d 1406, 1419 n. 8 (D.C.Cir.1984).

B. Defendant's Motion for Summary Judgment

1. Statutory Background

a) Motor Carrier Overtime Exemption

**\*3** The Industrial Welfare Commission ("IWC") was established by the California Legislature in 1913. It is a quasi-legislative body authorized by statute to issue regulations or orders governing wages, hours, and working conditions. The IWC has promulgated 15 wage orders, following a similar format, which each apply to separate industries or occupations. *See Collins v. Overnite Transportation Co.,* 105 Cal.App.4th 171, 174, 129 Cal.Rptr.2d 254 (2003).

The Eight-Hour-Day Restoration and Workplace Flexibility Act of 1999, 1999 Stats. Ch. 124 (AB 60) was a response to the IWC's amendment of five wage orders on April 11, 1997, which eliminated the state's daily overtime rule in favor of the less restrictive weekly overtime rule of the federal Fair Labor Standards Act ("FLSA"). *Id.* at 175, 129 Cal.Rptr.2d 254. California's Act "established a new statutory scheme governing hours of labor and overtime compensation for all industries and occupations, which codified certain provisions of IWC wage orders, amended other provisions, and added a series of new options for alternative workweeks." *Id.* at 176, 129 Cal.Rptr.2d 254.

California Labor Code § 510, which requires daily and weekly overtime, was enacted as part of that Act. It states, in part, that:

> Eight hours of labor constitutes a day's work. Any work in excess of eight hours in one workday and any work in excess of 40 hours in any one workweek and the first eight hours worked on the seventh day of work in any one workweek shall be compensated at the rate of no less than one and one-half times the regular rate of pay for an employee.

Cal. Lab.Code § 510(a). The requirements of the section do not apply to certain exempt categories of employees. *Id.* The employer bears the burden of proving an employee is exempt from overtime. "Exemptions are narrowly construed against the employer and their application is limited to those employees plainly and unmistakably within their terms." *Nordquist v. McGraw-Hill Broad. Co.,* 32 Cal.App.4th 555, 562, 38 Cal.Rptr.2d 221 (1995). *See also Reich v. American Driver Serv.,* 33 F.3d 1153, 1157 (9th Cir.1994) (noting that defendant was not "plainly and unmistakably" within the terms of motor carrier exemption).

Labor Code § 515(b)(2) authorizes the IWC to retain exemptions contained in its wage orders. It states: "Except as otherwise provided in this section and in subdivision (g) of Section 511, nothing in this section requires the commission to alter any exemption from provisions regulating hours of work that was contained in any valid wage order in effect in 1997." Labor Code § 515, therefore, does not affect the validity of the "motor carrier exemption" contained in IWC wage orders, because that exemption is contained in a valid wage order in effect in 1997. *See Collins,* 105 Cal.App.4th at 178, 129 Cal.Rptr.2d 254.

This "motor carrier exemption" is contained in multiple IWC wage orders. Specifically, the wage order governing the mercantile industry, IWC Order No. 7-1001 ("Wage Order 7"), § 3(K) states that provisions of the overtime section are not applicable

to *employees whose hours of service are regulated* by (1) the United States Department of Transportation ("DOT") Code of Federal Regulations, title 49, sections 395.1 to 395.13, Hours of Service of Drivers; or (2) Title 13 of the California Code of Regulations, section 1200, subchapter 6.5, section 1200 and following sections, regulating hours of drivers. This same motor carrier exemption is also contained in section 3(K) of wage order No. 4-2001 ("Wage Order 4"), Professional, Technical, Clerical, Mechanical, & Similar Occupations, as well as in certain other wage orders not at issue here. It is not contained in Wage Orders 16 and 17. [1]

**\*4** Safety-Kleen maintains that the hours of its CSRs are regulated by Title 13 California Code of Regulations ("CCR") §§ 1200 et. seq ., because its CSRs, including Wamboldt, drive vehicles that transport hazardous materials. Safety-Kleen does not maintain that the federal DOT regulations apply to plaintiff.

Section 1200 is the first section of chapter 6.5 of CCR Title 13, and provides that the motor carrier safety provisions of that chapter apply to all vehicles listed in Vehicle Code § 34500 and their operations. *See* 13 CCR § 1200. California Vehicle Code § 34500 provides that the department of the California Highway Patrol "shall regulate the safe operations of" various vehicles including "any truck ... transporting hazardous materials." Hazardous material is any material "posing an unreasonable risk to health, safety, or property during transportation" as set forth under 49 CFR § 172.101. *See* Vehicle Code §§ 353, 2402.7; 13 CCR § 1160.3(d). That section includes the hazardous materials table which lists a number of materials as hazardous.

Drivers of vehicles covered by 13 CCR § 1200 are governed by certain regulations limiting driving time. For example, "no motor carrier shall permit or require any driver used by it to drive nor shall any such driver drive" more than "twelve hours following eight consecutive hours off duty" or drive after having been on duty 15 hours following 8 consecutive hours off duty. *See* 13 CCR § 1212.5(a)(2). In addition, 13 CCR § 1212.5(b) sets forth maximum on-duty time for drivers. A driver is defined as "[a]ny person, including the owner-driver, who drives any motor vehicle subject to this chapter, and any person, whether driving for compensation or not, who is under the direct control of and drives for a motor carrier." 13 CCR § 1201(h). A driver-salesperson is defined as "[a]ny employee who is employed solely as such by a private carrier of property by motor vehicle, who is engaged both in selling goods, services, or the use of goods, and in delivering by commercial motor vehicle the goods sold or provided or upon which the services are performed, who does so entirely within a radius of 100 miles of the point at which he/she reports for duty, who devotes not more than 50 percent of his/her hours on duty to driving time." 13 CCR § 1201(i). [2] Safety-Kleen's motion for summary judgment is based on its claim that Wamboldt is a driver, not a driver-salesperson.

California retained a motor carrier exemption based on the similar exemption of the Fair Labor Standards Act. *See Collins,* 105 Cal.App.4th at 175, 129 Cal.Rptr.2d 254 (noting that the IWC orders "retained this exemption based on Federal Motor Vehicle Safety Standards and added a reference to a parallel set of California regulations").

Under federal law, any motor carrier that engages in interstate commerce is subject to the Secretary of Transportation's jurisdiction, *see* 49 U.S.C. § 10521, and is exempt from the maximum hours provisions of the FLSA. "Upon engaging in such interstate commerce, the Secretary of Transportation may prescribe the requirements for the 'qualifications and maximum hours of service of employees of, and safety of operation and equipment of, [the] motor carrier....' 49 U.S.C. § 3102(b)(1)." *Reich v. American Driver Serv.,* 33 F.3d 1153, 1155-1156 (9th Cir.1994). "Any motor carrier that engages in wholly intrastate commerce, however, is subject to the Secretary of Labor's jurisdiction, and consequently, to the maximum hours provisions of the FLSA." *Id.* "Although many motor carriers engage in both interstate and intrastate commerce, a motor carrier cannot be subject to the jurisdiction of both the Secretary of Labor and the Secretary of Transportation." *Id.*

**\*5** To determine which Secretary's jurisdiction such a motor carrier's employees are subject, courts look to the Supreme Court's decision in *Morris v. McComb,* 332 U.S. 422, 68 S.Ct. 131, 92 L.Ed. 44 (1947), under which even a "minor involvement in interstate commerce as a regular part of an employee's duties can subject that employee to the Secretary of Transportation's jurisdiction." "Nevertheless, an employee's minor involvement in interstate commerce does not necessarily subject that employee to the Secretary of Transportation's jurisdiction for an unlimited period of time, and if the employee's minor involvement can be characterized as de minimis, that employee may not be subject to the Secretary of Transportation's

jurisdiction at all." *Id. See also* 29 CFR § 782.2(b)(3) ("As a general rule, if the bona fide duties of the job performed by the employee are in fact such that he is ... called upon in the ordinary course of his work to perform, either regularly or from time to time, safety-affecting activities .., he comes within the exemption in all workweeks when he is employed at such job.... On the other hand, where the continuing duties of the employee's job have no substantial direct effect on such safety of operation or where such safety-affecting activities are so trivial, casual, and insignificant as to be de minimis, the exemption will not apply to him in any workweek so long as there is no change in his duties....").

A "driver," as defined for the federal Motor Carrier Act jurisdiction ... does not require that the individual be engaged in such work at all times; it is recognized that even full-duty drivers devote some of their working time to activities other than such driving. "Drivers," as thus officially defined, include, for example, such partial-duty drivers as the following, who drive in interstate or foreign commerce as part of a job in which they are required also to engage in other types of driving or nondriving work: ... so-called "driver-salesmen" who devote much of their time to selling goods rather than to activities affecting such safety of operation. 29 CFR § 782.3(a).

b) Commission Reductions
It is "unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." Cal Lab Code § 221.

California Code of Regulations, title 8 § 11070, subdivision 8, applicable to the mercantile industry, provides that employers cannot "make any deduction from the wage or require any reimbursement from an employee for any cash shortage, breakage, or loss of equipment, unless it can be show that the shortage, breakage, or loss is caused by a dishonest or willful act, or by the gross negligence of the employee." This provision is also included in 8 CCR § 11040. In other words, this provision is found in both IWC Orders 4 and 7, but not IWC Orders 16 or 17. See 8 CCR §§ 11160-11170. Wages include bonuses. *See also Ralphs Grocery Co. v. Superior Court,* 112 Cal.App.4th 1090, 1104, 5 Cal.Rptr.3d 687 (2003).

2. Overtime Claim
  **6** Preliminarily, the court must first determine which wage order applies here to determine if the claimed exemption is even applicable. Plaintiff argues that Wage Order 7 does not apply to Safety-Kleen's business. To determine which order is applicable, one must look at the main purpose of the business being examined. Both parties cite to the DLSE's January 2003 publication: *Which Wage Order? Classifications,* available at www.dir.ca.gov/dlse/WhichIWCOrderClassifications.PDF. If the business is not covered by any industrial order, then occupational orders must be turned to. However, distinct operations in any given business can be governed by separate wage orders if management is separately organized and they are operated for different business purposes. *Id.*

Safety-Kleen describes itself as a leading provider of cleaning and environmental services. Its mission statement is "to be the leader in providing responsible oil re-refining, cleaning and environmental solutions." Servicing and cleaning is a main focus of its business. *See* www.safety-kleen.com. Safety-Kleen describes itself as a provider of parts washers, environmental services, and industrial waste management. *See* MSJ at 3:10.

Turning to the potentially applicable wage orders, Wage Order 4 governs "Professional, Technical, Clerical, Mechanical and Similar Occupations" and includes professional, semiprofessional, managerial, supervisory, laboratory, research, technical, clerical, office work, and mechanical occupations, which include, but are not limited to "inspectors; installers; ... machine operators; mechanics; ... sales persons and sales agents; ... and other related occupations listed as professional, semiprofessional, technical, clerical, mechanical, and kindred occupations." This order is an occupational order, which covers mechanics and sales persons only when they are not governed by an industry order. DLSE's guide lists "hazardous material cleanup and handling" as a business/occupation, noting that Wage Order 4 applies if no contractor's license is required, and that Wage Order 16 applies if work is done "on construction site (contractor's license required)."

Wage Order 7 governs the "Mercantile Industry" which means "any industry, business, or establishment operated for the purpose of purchasing, selling or distributing goods or commodities at wholesale or retail; or for the purpose of renting goods or commodities." This wage order may apply to Safety-Kleen, although Safety-Kleen's own website states that its business is cleaning and refining waste and seems more service-oriented than sales oriented.

Wage Order 16 governs occupations in the construction, drilling, logging, and mining industries, where "construction occupations" means "all job classifications associated with construction, including, but not limited to, work involving alteration, demolition, building, excavation, renovation, remodeling, maintenance, improvement, and repair work by the California Business and Professions Code, Division 3, Chapter 9, §§ 7025 et seq., and any other similar, or related occupations or trades." Order 16 includes hazardous material cleanup only when the worker is participating in "on-site construction activities." There are no facts showing that this order is applicable, as Safety-Kleen's CSRs were not in the business of on-site construction activities (and certainly had nothing to do with drilling, logging, or mining).

*7  Finally, while Wage Order 17 covers miscellaneous employees and notes that "any industry or occupation not previously covered by, and all employees not specifically exempted in, the Commission's Wage Orders in effect in 1997, or otherwise exempted by law, are covered by this order," the Division of Labor Standards Enforcement has not identified any occupations that meet the definition of "miscellaneous employees" in Industrial Welfare Commission Order 17-2001.

Therefore, plaintiffs have not provided evidence showing that any Wage Orders other than Wage Order 4 or 7 apply. Wage Order 4 seems applicable (although as defendant notes, it is not necessary for purposes of this motion to decide between Orders 4 and 7). Plaintiff has offered no evidence that Wage Order 16 applies, as there is no evidence of on-site construction activities or the requirement of a contractor's license. Nor has it offered evidence that Wage Order 17 applies, as that Wage Order does not identify any occupations that meet its definition. Wage Order 4 is broad and covers salespersons, mechanics, and hazardous materials cleanup and handling if not done on a construction site. The court therefore finds that either Wage Order 4 or 7 applies here. Both Wage Orders contain the motor carrier exemption at issue here.

As to whether or not the motor carrier exemption applies to Wamboldt, the court finds that there are disputed material facts regarding this issue. Regarding whether Wamboldt was a "driver" under California motor carrier provisions, a driver is defined as "[a]ny person, including the owner-driver, who drives any motor vehicle subject to this chapter, and any person, whether driving for compensation or not, who is under the direct control of and drives for a motor carrier." 13 CCR § 1201(h). Driving includes "all time spent at the driving controls of a motor vehicle in operation." 13 CCR § 1201(g). Given this broad definition of "driver," Wamboldt was a driver if he operated a vehicle covered by the statute.

Here, Safety-Kleen only moves for summary judgment on the basis that Wamboldt was a driver of a truck transporting hazardous materials. The facts in a light most favorable to plaintiff are that Wamboldt typically drove 25% of his workday. Wamboldt Decl. ¶ 3. He typically spent the last two hours of each day at the branch doing paperwork. *Id.* ¶ 13, 5 Cal.Rptr.3d 687. He was not hired as a driver, but was hired as a customer service representative, and his duties included sales, service, compliance inspections, driving to perform service calls, packaging waste, etc. *Id.* ¶ 2, 5 Cal.Rptr.3d 687.

Safety-Kleen's motion, however, depends upon how often and to what extent Wamboldt drove a truck transporting hazardous materials, which include materials designated as hazardous under 49 CFR § 172.101. *See* 13 CCR § 1160.3(d). Wamboldt claims that he did not transport hazardous materials on a regular basis. He claims that he never carried either AquaWorks SPRAY or DIP concentrates. Wamboldt Decl. ¶ 9. He carried the diluted versions on only one occasion, and was told they were not hazardous. *Id.* The diluted solutions are listed as not being regulated by the DOT on Safety Kleen's own website. Wamboldt also claims that he rarely carried hazardous paint thinner and 105 parts washer solvent. *Id.* ¶ 11, 5 Cal.Rptr.3d 687. He frequently carried only the aqueous non-hazardous solution. *Id.* ¶ 12, 5 Cal.Rptr.3d 687. As for waste he picked up from customers, he claims that the return drum of non-hazardous aqueous solvent was not hazardous; nor is the dirt, oil, and grease removed by the parts washing solution. *Id.*

**\*8**  Safety-Kleen itself admits it uses several parts washer cleaning solvents that are not hazardous. Two exceptions are, however, AquaWorks SPRAY concentrate and AquaWorks DIP concentrate. They are both listed as hazardous materials at 49 CFR § 172.101. Defendant claims that every CSR carries at least one drum and two gallons of each of these solutions, respectively. *See* Ross Decl. As for shipments from the customers back to the branch, Safety Kleen maintains that Wamboldt transported hazardous materials from the customers back to the branch approximately 85.7% of his workdays, based upon the company records. *See* Ross Decl., Exs. C-E.

While Safety-Kleen claims that Wamboldt conceded to transporting hazardous materials during his deposition, the court can find no such admission. Counsel asked Wamboldt to assume that the DOT regulations included the solvents he handled on a regular basis, and asked whether he had any reason to dispute that. In response, Wamboldt noted he had not read every line of the DOT regulations, but he "could assume that." *See* Wamboldt Depo Tr. at 168. This is not a clear admission that he transported hazardous materials on a regular basis-rather, Wamboldt stated he was willing to assume such for purposes of the deposition.

Given Wamboldt's declaration, the court finds that there are disputed facts as to whether Wamboldt regularly transported hazardous waste, and summary judgment is inappropriate on this claim.

Furthermore, as plaintiff points out, Safety-Kleen's own records seem to indicate that they treated Wamboldt as a non-exempt employee. Not only did Safety-Kleen put the number of hours and the hourly rate on Wamboldt's paystub, but they paid him a flat overtime lump sum of $100 for working on a Saturday. *See* Williams Depo. at 217-221, 247. It is unclear as to whether these facts are material. Plaintiff has not adequately explained how defendant's treatment of him figures into whether or not he legally falls within an overtime exemption. Do these facts create a defense to defendant's claim of a statutory exemption? Do these facts give rise to a non-statutory claim that defendant and plaintiff had an agreement that he would be paid certain hourly or overtime rates? If so, is amendment of the complaint necessary to raise such claims? Even though the court has found that other disputed facts prevent it from granting summary judgment, the court raises these issues now, as presumably, they will need to be addressed at some point in this litigation.

Similarly, regarding the legal standard the factfinder will ultimately apply to determine whether Wamboldt is covered by the exemption, and if so, whether he is entitled to overtime for hours or days during which he was not driving under the exemption, the parties have not provided the court with sufficient information to determine whether California's motor carrier exemption should be interpreted and construed in the exact same manner as the federal exemption, as Safety-Kleen urges. Are there material differences between California's motor carrier laws and the federal motor carrier laws that influence the breadth or application of the motor carrier exemption? Does the difference in the breadth of the federal and California exemptions make a difference here? [3]  Does California follow federal exemptions when construing its other overtime exemptions?

**\*9**  While there is significant caselaw regarding the federal motor carrier exemption, the application of California's exemption is not entirely clear, as illustrated by the brief yet vague interpretation in California's DLSE manual, which states that "any driver who does not drive or operate a truck for any period of time during an entire workday is entitled to overtime premium compensation for all overtime hours worked performing duties other than driving during that day." The manual quotes *Crooker v. Sexton Motors, Inc.,* 469 F.2d 206 (1st Cir.1972), which in turn states that in work weeks in which the employee performed no interstate driving subject to the federal motor carrier exemption (overtime under federal law is governed week-to-week as opposed to day-to-day under California regulations), he is entitled to overtime and is not exempt for those weeks. *See* 469 F.2d at 210. *Crooker,* however, quotes DOL regulations, which themselves state that if a person is "called upon in the ordinary course of his work to perform, either regularly or from time to time, safety-affecting activities" then "he comes within the exemption in all workweeks when he is employed at such job." This rule applies "regardless of the proportion of the employee's time or of his activities which is actually devoted to such safety-affecting work in the particular workweek" and applies even if he performs no work directly affecting safety of operation. On the other hand, "where the continuing duties of the employee's job have no substantial direct effect on such safety of operation or where such safety-affecting activities are so trivial, casual, and insignificant as to be *de minimis,* the exemption will not apply to him in any workweek so long as there is no change in his duties." If in particular workweeks other duties are assigned which affect "safety of operation of motor vehicles in interstate

commerce on the public highways, the exemption will be applicable to him those workweeks, but not in the workweeks when he continues to perform the duties of the non-safety-affecting job." 29 CFR § 782.2(b)(3).

In light of the caselaw, it does seem that driving 25% of the time a vehicle regulated by the motor carrier regulations would have a substantial effect on motor safety and would trigger the motor carrier exemption. *See, e.g., Morris v. McComb,* 332 U.S. 422, 68 S.Ct. 131, 92 L.Ed. 44 (1947) (where drivers were full-time drivers of motor vehicles, finding that motor carrier exemption applied to drivers who only drove in interstate commerce approximately 4% of the time). Wamboldt's argument that drivers must drive more than 50% of the time does not appear to be supported by the statute.[4] In fact, the DLSE manual changed Section 50.9.2.1 to omit the statement that a driver must drive more than 50% of the time. *See* Ramos Decl., Ex. D (DLSE Manual). However, as discussed above, there are some unanswered questions as to whether California's exemption should follow the DOL regulations regarding the federal exemption. Because there is a dispute of fact as to whether and to what extent Wamboldt drove hazardous materials, however, the court need not resolve these questions now. As the factual disputes are not likely to be resolved by further motion practice, the court expects the parties to assist the court in determining how the legal question of whether the exemption applies will be answered following a jury's determination of the factual issues.

### 3. Commissions Claim

**\*10** There are two provisions upon which plaintiff bases his claim that Safety-Kleen illegally reduced Wamboldt's commissions when it took into account branch performance. First, Labor Code Section 221 provides that "[i]t shall be unlawful for any employer to collect or receive from an employee any part of wages theretofore paid by said employer to said employee." Second, both Wage Orders 4 and 7 provide that "[n]o employer shall make any deduction from the wage or require any reimbursement from an employee for any cash shortage, breakage, or loss of equipment, unless it can be shown that the shortage, breakage, or loss is caused by a dishonest or willful act, or by the gross negligence of the employee." *Ralphs Grocery,* 112 Cal.App.4th at 1098, 5 Cal.Rptr.3d 687.

Labor Code § 221 does not prohibit deductions from wages for cash or merchandise shortages. Incentive bonuses based on profitability do not constitute a recapture of wages prohibited by § 221. Moreover, where exempt employees receive an incentive bonus "based on a previously disclosed profitability formula", this does not threaten "special hardship" because of unanticipated or unpredictable deductions from their wages. *Ralphs Grocery,* 112 Cal.App.4th at 1105, 5 Cal.Rptr.3d 687. The Labor Code prohibits an employer only from collecting or receiving wages that have already been earned by performance of agreed-upon requirements. *See Steinhebel v. Los Angeles Times Communications, LLC,* 126 Cal.App.4th 696, 707, 24 Cal.Rptr.3d 351 (2005).

Here, the undisputed facts show that the CSRs commissions for 2004 were predicated on a number of factors, including revenue received for product sales, placements, and overall branch performance as measured against performance goals. Until these various factors were calculated, there was no commission that was "paid to the employee." Therefore, this method of calculating commissions did not collect back wages already paid to Wamboldt. While plaintiff argues that the deduction for branch budget performance was not made until plaintiff's individual commission was already calculated, the evidence shows that the branch performance factor was just a part of the entire formula used to calculate the commission due. There is no evidence in the record that shows that Safety-Kleen and Wamboldt had some different agreement as to how Wamboldt's commissions would be structured or that they had any other "agreed upon requirements" that Wamboldt would be awarded certain commissions based on his sales alone. Nor did Wamboldt's counsel represent that he needed additional discovery to obtain this type of information.

As for the separate wage order prohibition on deductions for cash shortages, in *Ralphs Grocery,* the employer presented "persuasive arguments, supported by substantial academic literature, that profit-based compensation plans benefit both employers and employees" and demonstrated that "as a matter of economics, calculation of an incentive bonus based on profitability by taking into account not only revenues but also store expenses in accordance with standard accounting principles differs markedly from reducing (or recapturing) wages through prohibited deductions." 112 Cal.App.4th at 1101, 5 Cal.Rptr.3d 687. Nonetheless, that court found that economic reality had to yield to regulations, "to the extent the Legislature or, as

applied to nonexempt employees, the Commission in its authorized wage orders has prohibited the use of certain expenses in determining wages due an employee." Here, Safety-Kleen reduced Wamboldt's commissions when his branch did not meet certain revenue goals in order to encourage cooperation among and between CSRs and sales associates. This also resulted in increased commissions on occasion. However, plaintiff has not presented any evidence that his salary was reduced based on any *expenses* or by cash or inventory shortages, which are prohibited deductions, as the revenue figure did not take expenses into account.

**\*11** The court in *Ralphs Grocery* specifically held that "[t]o the extent the bonus calculation includes expense items the Legislature or the Industrial Welfare Commission has declared may not be charged to an employee (deductions for any part of the cost of workers' compensation claims or cash shortages for nonexempt employees), such a bonus plan is unlawful. However, other expense items, even those beyond the individual manager's direct control, may lawfully be considered in profit-based bonus programs, which can serve as an effective economic incentive to managerial level employees to maximize company profit by increasing revenue and minimizing expenses." *Id.* at 1094, 5 Cal.Rptr.3d 687. There is no evidence that Safety-Kleen deducted for any expenses or inventory or cash shortages when calculating Wamboldt's commission. In light of the above, summary judgment is proper on plaintiff's claim that Safety-Kleen improperly reduced Wamboldt's commissions.

C. Plaintiff's Motion for Class Certification

As for whether class certification is proper under Rule 23(a), Safety-Kleen only contests the adequacy of representation. Briefly, as to the other factors, numerosity is satisfied, as the class is comprised of approximately 200 members, and courts have found that the numerosity factor is satisfied if the class comprises 40 or more members and will find that it has not been satisfied when the class comprises 21 or fewer. *See Consolidated Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995); *Ansari v. New York Univ.,* 179 F.R.D. 112, 114 (S.D.N.Y.1998). The typicality requirement is also satisfied, as all claims arise from the same practice of not paying CSRs overtime. As for commonality, a common nucleus of operative facts is enough to satisfy the commonality requirement of Rule 23(a)(2). *Rosario v. Livaditis,* 963 F.2d 1013, 1017-18 (7th Cir.1992), *cert. denied,* 506 U.S. 1051, 113 S.Ct. 972, 122 L.Ed.2d 127 (1993). This factor can be met by raising a single common issue that is central to the case. *See Staton v. Boeing,* 327 F.3d 938, 954-56 (9th Cir.2003). Here, all CSRs share the same alleged harm of not being paid overtime. Whether they are exempt or non-exempt is a shared legal issue. Even if certain facts differ somewhat for each plaintiff, all plaintiffs are CSRs and generally perform the same duties. In addition, Safety-Kleen's policy is the same with regard to all proposed class plaintiffs. Commonality, therefore, is also established.

Finally, as to adequacy of representation, Safety-Kleen maintains that Wamboldt cannot adequately represent the class with regards to injunctive relief, because he lacks standing to seek such relief, and as a former employee, his only interest is in damages. It may, therefore, not be in the best interest of current employees to trade some monetary relief for prospective relief, even though it may be in Wamboldt's interest to do so.

As a former employee, Wamboldt has standing to pursue injunctive relief on behalf of current and former employees. California UCL provides that "[a]ny person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction.... Any person may pursue representative claims or relief on behalf of others only if the claimant meets the standing requirements of Section 17204 and complies with Section 382 of the Code of Civil Procedure .... Cal Bus & Prof Code § 17203. Actions for relief under Cal. Bus. & Prof.Code § 17200 may be prosecuted "by any person who has suffered injury in fact and has lost money or property as a result of such unfair competition." Cal Bus & Prof Code § 17204.

**\*12** In addition, "if the court has reason to conclude that a plaintiff has neglected or will neglect the claims for injunctive relief in his pursuit of his damage claims, it may find him an inadequate representative." *Stewart v. Winter,* 669 F.2d 328, 335 (5th Cir.1982); *see also Wofford v. Safeway Stores,* 78 F.R.D. 460, 490 (N.D.Cal.1978) (noting that former employees may represent present employees); *Wetzel v. Liberty Mut. Ins. Co.,* 508 F.2d 239, 247 (3d Cir.1975) (noting that the former employees were "free from any possible coercive influence of [the company's] management, [the plaintiffs] are better situated than either job applicants or present employees to present an intelligent and strongly adverse case against [the company's] alleged discriminatory practices."). There is no basis to make such a finding here. Wamboldt has worked for Safety-Kleen

Case: 3:15-cv-00081-bhc   Document #: 58-49   Filed: 05/13/16   Page 111 of 112

2007 WL 2409200

twice, and previously took three years off in between his two periods of employment. *See* Wamboldt Decl. ¶ 7. It is certainly possible, even if unlikely, that he could return to Safety-Kleen. He voluntarily asserted a claim for injunctive relief, and there is no indication that he will not vigorously pursue that claim, as he and his attorneys have done to date. The requirements of Rule 23(a) are therefore satisfied.

Turning to Rule 23(b), plaintiff moves to certify the class under Rules 23(b)(1) and 23(b)(3). Under Rule 23(b)(1), a class action is proper where separate lawsuits by each class member would create a risk of imposing incompatible standards of conduct on the party opposing the class through inconsistent adjudications. FRCP 23(b) (1)(A). The risk must be that defendant would be unable to act in response to both judgments, which may be the case where class members are likely to seek injunctive or declaratory relief. *See Klender v. United States,* 218 F.R.D. 161, 167 (E.D.Mich.2003). The rule includes "cases where the party is obliged by law to treat the members of the class alike (a utility acting toward customers; a government imposing a tax), or where the party must treat all alike as a matter of practical necessity (a riparian owner using water as against downriver owners)." *Amchem Prods. v. Windsor,* 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

While Wamboldt seeks injunctive relief, it is not clear that this creates the risk of inconsistent judgments. Here, it seems that "[i]f each class member were to proceed separately, an injunction might (or might not) issue ordering Defendant to reclassify that particular class member as non-exempt based on an individualized analysis of duties performed" and the injunction may not affect the rights of the other employees. *See Sepulveda v. Wal-Mart Stores, Inc.,* 237 F.R.D. 229, 245 (C.D.Cal.2006) (finding class certification inappropriate under Rule 23(b)(1)). Although Wamboldt seeks an injunction ordering Safety-Kleen to pay overtime to all CSRs, the court has doubts as to whether a global injunction would issue affecting all CSRs. [5] However, because the court finds that the requirements of Rule 23(b)(3) are satisfied, class certification is proper.

**\*13** Under Rule 23(b)(3), common issues must predominate and the class action must be the superior device. In determining whether common issues predominate, the court first identifies the substantive issues raised by the cause of action and the applicable defenses. It then inquires into the proof relevant for each issue. Predominance is determined not by counting the number of common issues but by weighing their significance. *See* Schwarzer, Tashima & Wagstaffe, *Federal Civil Procedure Before Trial* (2006) § 10:412. In determining whether the class action is superior, the court considers class members' individual interests in controlling the prosecution in separate actions.

Safety-Kleen's main argument in opposition to certification under 23(b)(3) relates to superiority and is: (1) that plaintiffs have large claims for damages that economically may be pursued individually; and (2) class members have alternative remedies that are superior to a class action, like alternative administrative forums, in which they can pursue speedy and informal relief.

The court finds, however, that the individual claims for damages are not so large that they may be pursued individually in an economic manner. Here, plaintiff's maximum potential overtime entitlement is approximately $48,000, and class members with shorter periods of employment would have smaller claims that would be expensive to litigate individually. The cases relied upon by Safety-Kleen are inapposite. *See Zinser v. Accufix Research Inst., Inc.,* 253 F.3d 1180, 1191 (9th Cir.2001) (finding certification not appropriate where class action complaint specifically stated that plaintiffs each claimed in excess of $50,000, not including punitive damages); *Benner v. Becton Dickinson & Co.,* 214 F.R.D. 157, 173 (S.D.N.Y.2003) (finding certification not warranted where claimants each had damage claims in excess of $75,000).

Regarding procedural alternatives, "courts have not hesitated to certify class actions for wage and hour claims simply because California law provides for administrative relief. In fact, under the California Labor Code, 'an employee may seek administrative relief by filing a wage claim with the commission or, in the alternative, may seek judicial relief by filing an ordinary civil action for breach of contract and/or the wages prescribed by statute .' " *Wang v. Chinese Daily News, Inc.,* 231 F.R.D. 602, 614 (C.D.Cal.2005). Therefore, the mere availability of a DLSE administrative hearing-especially in light of the fact that Safety-Kleen previously appealed the Labor Commissioner ruling to the Superior Court-does not mandate denial of certification.

Case: 3:15-cv-90081-bbc   Document #: 58-49   Filed: 05/13/16   Page 112 of 112

While the availability of a DLSE administrative hearing might be entitled to more weight if the manageability of the lawsuit were questionable, this class action appears manageable at this juncture. *See Jiminez v. Domino's Pizza, Inc.,* 238 F.R.D. 241, 254 (C.D.Cal.2006). There are many common legal and factual issues here with regards to the applicability of any overtime exemptions, namely the motor carrier exemption. CSRs all share the same job description and drive within a certain range of hours per day. Safety-Kleen contends that the motor carrier exemption applies to all CSRs and has not paid overtime to any of them. Even though there may very well be a factual inquiry with regards to each plaintiff regarding the number of hours spent driving hazardous materials per day, as plaintiff notes, these are relatively straightforward calculations, and defendant has this data readily available. Even if overtime will need to be computed on a daily basis for each plaintiff, performing this calculation has not been shown to be an unmanageable task. Individual issues will not predominate, and class certification is therefore proper.

## CONCLUSION

**\*14**  Accordingly, the motion for summary judgment is GRANTED IN PART AND DENIED IN PART. Summary judgment is GRANTED as to the portions of plaintiff's two causes of action based on defendant's failure to pay full commissions, but all remaining claims in those two causes of action remain. The motion for class certification is GRANTED.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2409200

Footnotes

1   Defendant contends that Wage Order 4 or 7 (codified at California Code of Regulations, title 8, sections 11040 and 11070.) is applicable. Plaintiffs contend that Wage Order 16 or 17 may be applicable.

2   There are certain provisions specific to driver-salespersons. The provisions of Section 1212.5(b) do not apply to any driver-salesperson whose total driving time does not exceed 40 hours in any period of seven consecutive days. 13 CCR § 1212(c). In addition, a driver is exempt from the requirements of Section 1213 in certain situations, including when the "driver, except a driver salesperson, returns to the work reporting location and is released from work within 12 consecutive hours." 13 CCR § 1212(e).

3   For example, under Federal Law, the FLSA's overtime provisions "shall not apply with respect to ... any employee with respect to whom the Secretary of Transportation has *power to establish qualifications and maximum hours of service* pursuant to the provisions of section 204 of the Motor Carrier Act." 29 U.S.C. § 213 (emphasis added). Under California law, however, California's overtime provision is "not applicable to *employees whose hours of service are regulated* by (1) the United States Department of Transportation Code of Federal Regulations, title 49, sections 395.1 to 395.13, Hours of Service of Drivers; or (2) Title 13 of the California Code of Regulations, section 1200, subchapter 6.5, section 1200 and following sections, regulating hours of drivers."

4   Wamboldt's argument that drivers must drive more than 50% of the time because driver-salespersons drive 50% or less of the time does not make sense, as "driver-salespersons" appear to be a subcategory of drivers under the statute-the two are not mutually exclusive.

5   Plaintiff has not met his burden to prove that a class action is proper under Rule 23(b)(1)(B), as there is no evidence that the claims would exceed the amount of funds available.

**End of Document**                                           © 2016 Thomson Reuters. No claim to original U.S. Government Works.