IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

**LONG, D.**
individually and on behalf
of all others similarly situated,

                Plaintiffs,

vs.

**EPIC SYSTEMS CORPORATION**

                Defendant.

Case No. 15-cv-081

---

## DECLARATION OF DALE ERLANDSON

I, Dale Erlandson, certify under penalty of perjury that the following is true and correct to the best of my knowledge and recollection:

1. I am an adult resident of the state of Wisconsin and am competent to testify regarding the matters set forth in this declaration.

2. I have reviewed the contents of this declaration and affirm that its contents are true, accurate, and based on my personal experience and observations.

3. I was employed by Epic Systems Corporation ("Epic") as a Technical Writer ("TW") from approximately February 2011 to July 2015. I worked as a "support writer" on the "ADT" software application. My Team Leads ("TLs") were David Jalensky and Maria Herro.

4. I graduated in 2005 from the University of Wisconsin-Madison with a Bachelor of Arts in English and Journalism; in 2010 I received a Masters in Journalism. Prior to my employment with Epic, I had no experience in the information technology or software industries, and I had no prior exposure or training in technical writing or computer programming. Prior to my employment with Epic, I taught preschool and worked in a clerical capacity for a nonprofit. While I was earning my Masters I was a Teaching Assistant ("TA"); I taught at the Madison Area Technical College for one semester after receiving my Masters.

5. During Epic's hiring process, I took a personality test, a logic/math test, and a writing evaluation. I was not evaluated in any aspect of my ability to work with computers or write computer code.

1

6. I do not recall that any prior experience in technical writing or working with computers was necessary to apply for the TW job. I had no prior experience.

7. During Epic's TW training process, I received no training in computer programming, coding, computer systems analysis, or software engineering. I attended the first week of training, "Epic 360," with all new hires and learned about the company and the healthcare industry generally. Then I completed "TW Boot Camp" with all new TWs. I recall a spreadsheet entitled "Writer Roadmap" that laid out the classes and requirements of Boot Camp. I attended basic grammar classes, and a series of classes that taught me about the tools Epic used to produce its documents ("deliverables"). In addition to TW Boot Camp, I completed the application certification for ADT, the software application to which Epic assigned me. Application training was similar to the training that end-user customers received. The certification did not require that I learn to write code or program software.

8. I was paid a fixed salary during the entirety of my employment with Epic. I received no additional compensation for hours I worked over 40 per workweek. My starting salary of $42,000 was raised to $44,000 after I received my certification in the ADT application. By the time I left Epic, my salary was $50,000. I recall receiving holiday bonuses ranging from approximately $500 to $2,000.

9. During my employment with Epic, I routinely worked in excess of 40 hours per workweek. I logged my work hours into Epic's time log system.

10. My primary duty as an Epic Technical Writer was to produce or revise standardized documents that describe how Epic's software works, based on instructions and information provided by Epic's software developers, implementers, and trainers.

11. I used templates and Epic's Technical Communications Wiki (an intranet) to produce deliverables. Deliverables were assigned to me via EMC2, Epic's project management tool. Examples of common deliverables I produced include Release Notes, Setup and Support Guides, and Plus Guides.

12. Every deliverable I wrote was produced and published in Cumulus, Epic's content management system. Cumulus has a word processing function and assembles pieces of text into different templates ("content models") for each specific deliverable.

13. The Wiki provided instructions to help TWs produce deliverables. I referenced the Wiki often, especially when I was learning how to write a deliverable, and when changes were made to a deliverable.

14. In training, I was instructed to use Epic's templates and the Wiki to produce deliverables. Epic's templates are formulaic and rigid; when they were changed I was unable to provide my input or ideas. I was frequently discouraged from using creativity and judgment in writing deliverables. For example, if I received questions from readers that prompted me to include background information in a deliverable, my TL would tell me to take it out because it was not part of the standardized template.

15. As a TW, my work was reviewed extensively by TWs and other Epic staff. I was not able to publish my work independently without going through the review and editing process. Release notes were reviewed by several technical employees, including Developers and Technical Services staff, in addition to other TWs.

16. As a TW, I did not have the authority or the ability to write code, access code, or fix a coding problem with the software. I was considered a "non-technical" employee and never engaged in computer programming, computer systems analysis, or software engineering.

Dated: 5/4/16

*/s/ Dale Erlandson*

Dale Erlandson