IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

**LONG, D.**,
individually and on behalf
of all others similarly situated,

                                          Case No. 15-cv-081

                Plaintiff,

     vs.

**EPIC SYSTEMS CORPORATION**,

                Defendant.

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION
FOR DECERTIFICATION OF THE CONDITIONALLY CERTIFIED CLASS
UNDER 29 U.S.C. § 216(b)**

## <u>INTRODUCTION</u>

Defendant, Epic Systems Corporation ("Epic"), asks this Court to decertify a conditionally certified class of 15 Technical Writers. These Technical Writers worked in the same department, received the same basic training, were recruited and paid according to standardized criteria, and performed the same primary duty of producing Epic's standardized documents in conformance with Epic's templates and rules. Epic uniformly classified the Named Plaintiff and opt-in plaintiffs ("Plaintiffs") as exempt from overtime without any individualized consideration of their duties. Pursuant to Epic's well-documented expectations and evidenced by Epic's time-record data, Plaintiffs commonly worked over 40 hours per week. Plaintiffs seek to recover overtime wages that Epic denied to them under its

uniform classification scheme.

Despite the small number of Plaintiffs and the significant evidence that they performed the same primary duty and were subject to uniform policies, Epic asks this Court to order these employees to litigate their claims individually. In so doing, Epic distorts the reality of Plaintiffs' homogenous work. Epic gives disproportionate attention to inconsequential differences, ignores the mandatory and standardized deliverable production process, and relies on unfounded inferences from time-record data. Epic's attempt to invent divisions among Plaintiffs belies its own blanket determination that their common duties rendered them all exempt from overtime wages.

The Fair Labor Standards Act ("FLSA") provides for collective actions to enable efficient, meaningful adjudication of claims of different employees arising out of the same character of employment. Discovery has uncovered significant evidence of commonalities in Plaintiffs' primary duties, training, compensation, and exemption classification. As such, Plaintiffs shared a similar factual and employment setting. Given the weight of Plaintiffs' evidence and Epic's across-the-board exemption decision, Epic's defenses are not so individually tailored to each plaintiff as to merit decertification. Further, fairness and procedural considerations demand that Epic's motion be denied. This Court should permit Plaintiffs to proceed to trial collectively.

## FACTUAL BACKGROUND

### I.   EPIC'S CORPORATE POLICY TREATS PLAINTIFFS AS A COLLECTIVE GROUP FOR THE PURPOSE OF CLASSIFYING THEM AS EXEMPT FROM OVERTIME

Epic's centralized corporate management made a single decision to classify all Plaintiffs as exempt from overtime when the Technical Writer ("TW") role was created approximately 20 years ago. (See dkt. # 52, Martin Dep. 16:2-17:15, February 23, 2016.) To date, Epic has never revised TWs' classification as overtime exempt. (Martin Dep. 201:2-7.) Epic's corporate representative, Stirling Martin, testified that Epic made this role-wide decision based on its consideration of duties common to the entire role:

> I asked both [CEO Judy Faulkner and President Carl Dvorak] individually what they recall about the creation of the tech comm role and the classification of the role as salaried… [B]oth described *the role* having a high degree of independence and decision-making and had always thought *it* was appropriately classified.

(Martin Dep. 17:1-8 (emphasis added).) Martin, in consultation with other executive management employees and the Human Resources department, is responsible for Epic's exemption decisions. (Martin Dep. 23:19-24:1.) Indeed, the Human Resources department is responsible for creating the single position description used to describe all members of the collective class. (Martin Dep. 65:5-66:16.) In further testifying that the exemption classification of Plaintiffs is appropriate, Martin grouped together the daily activities of the entire role:

> Always my personal belief has been that it [the tech comm role] has a tremendous amount of

3

> independence and discretion *involved in the day-to-day activities*.

(Martin Dep. 18:1-9 (emphasis added).) In other words, Epic itself treated Plaintiffs as a collective group for the purpose of determining whether their job duties rendered them properly exempt from overtime. Indeed, Epic has not conducted any individualized assessment of TWs to determine whether they are appropriately classified. (Martin Dep. 201:8-15.) Rather, Epic's classification of the entire TW role as exempt is a corporate policy applied uniformly to all Plaintiffs based on the common duties of their role.

## II. PLAINTIFFS PERFORMED THE SAME PRIMARY DUTY ACCORDING TO EPIC'S STANDARDIZED PROCEDURES

### A. Plaintiffs Had the Same Primary Duty of Producing Deliverables

All Plaintiffs worked in the same position of "Technical Writer." The conditionally certified class of Plaintiffs does not include "Team Leads.[1]" In the TW position, Plaintiffs shared the same primary duty of producing or revising standardized documents (known as "deliverables") that describe how Epic's software works, based on instructions and information provided by Epic's software developers, implementers, and trainers and following Epic's clear templates for those documents. (See dkt. # 64, Long Decl. ¶ 11; dkt. # 75, Yenzer Decl. ¶ 12; dkt. #

---

[1] Team Leads are managers of TWs. (See dkt. # 51, Dolan Dep. 20:22-21:7, February 24, 2016.) There is a reporting hierarchy in which a TW reports to a Team Lead, and that TW's Team Lead reports to their own Team Lead. (Dolan Dep. 21:22-22:35.) Team Leads are not included in the conditionally certified class. In fact, they were explicitly *excluded* from the list of putative FLSA collective class members which Epic provided Plaintiff's counsel pursuant to the parties' joint stipulation for conditional certification. (Compare Zoeller Decl. Ex. A, List of Putative FLSA Class Members, with Zoeller Decl. Ex. B, List of FLSA Class Members' Team Leads.) Contrary to the parties' understanding and Epic's initial position, Epic now raises the duties of Team Leads to argue that Plaintiffs are not similarly situated. As discussed in part II.A.3.b, this duplicitous point is irrelevant.

70, Seeker-Conroy Decl. ¶ 11; dkt. # 73, Weber Decl. ¶ 9; dkt. # 66, Pitterle Decl. ¶
12; dkt. # 71, Thayer Decl. ¶ 11; dkt. # 68, Rockhill Decl. ¶ 12; dkt. # 65, Paley Decl.
¶ 11; dkt. # 74, Wood Decl. ¶ 11; dkt. # 67,  Profumo Decl. ¶ 11; dkt. # 62, Kosciolek
Decl. ¶ 11; dkt. # 72, Vanderwist Decl. ¶ 10.)

Discovery to date supports that Plaintiffs shared a common core duty of
producing the standardized documents that accompany Epic's software. First,
Plaintiffs were all subject to a single position description, which applied across all
writing teams and software applications and which commonly described their
primary duty—to "create documentation about the nuts and bolts" of Epic's
software. (See dkt. # 58.02, Technical Writer Position Descriptions,
EPICVLONGD002901-04.) Epic's corporate representative affirmed the accuracy of
this description on a role-wide basis, characterizing "the primary role of technical
communications staff at Epic" as "to understand what the software does and
represent it in one or more documents that would be used by internal staff or
customers." (Martin Dep. 114:2-6.)

Additional internal documents establish that Plaintiffs shared a common core
duty. For example, in training, a presentation explained that "a writer's role" is "to
document how Epic works and what changes we make to Epic." (Dkt. # 58.07,
Writer's Role at Epic, EPICVLONGD009356-57.) Epic also operated under one
definition of technical writing for all Plaintiffs, without respect to their application
or writing team: "technical writing is a process in which information is gathered
from experts and then presented in a clear, easily understandable format that is

5

best suited to the intended audience." (Dkt. # 58.08, Technical Writing Definition, EPICVLONGD012411.)

Beyond documentary evidence, Plaintiffs' time-record data show that they spent the majority of their time on deliverable-related tasks. Epic required all Plaintiffs to log their time worked in Epic's time-logging system ("TLG") and to record *what* they worked on by entering a code (known as a "TLP") which corresponds to what type of work they were doing. (See dkt. # 50, Benz Dep., 36:9-16, 41:18-24, February 25, 2016; Yenzer Decl. ¶ 11; Seeker-Conroy Decl. ¶ 10; Weber Decl. ¶ 8; Pitterle Decl. ¶ 11; Thayer Decl. ¶ 10; Profumo Decl. ¶ 10; Paley Decl. ¶ 10; Rockhill Decl. ¶ 11; Wood Decl. ¶ 10; Long Decl. ¶ 10; Kosciolek Decl. ¶ 10; Vanderwist Decl. ¶ 9.) Epic maintains a list of "Writing Team TLPs" which relate to producing Epic's standardized documentation. (Dkt. # 58.34, Writing Team TLPs, EPICVLONGD008580.) An analysis of Plaintiffs' time spent on the Writing Team TLPs shows that, excluding their training, Plaintiffs all dedicated the majority of their time to these writing tasks. (Dkt. # 61, Kennedy Decl.)

In sum, Plaintiffs uniformly attest to the same primary duty of producing Epic's standardized documents, regardless of the particular application or writing team to which they are assigned. Epic itself grouped all of these Plaintiffs together under a single job description, employed a single definition of technical writing, and portrayed a "typical" writer week without respect to a writer's team or application.

## B. Plaintiffs Perform this Common Primary Duty According to the Same Basic Process

All Plaintiffs produced "deliverables" for Epic according to the same

systematic process and rules, a process which is intended to enforce consistency and uniformity. (See Seeker-Conroy Decl. ¶ 14; Yenzer Decl. ¶ 17; Pitterle Decl. ¶ 16; Profumo Decl. ¶ 14; Wood Decl. ¶ 14; Long Decl. ¶ 14; Vanderwist Decl. ¶ 12; dkt. # 58.18, Excerpt from Cumulus Camp, EPICVLONGD010286-88 ("We follow consistent, predictable patterns in our documentation so readers know what to expect…."); dkt # 58.19, Performance Review of Alison Reuschlein, EPICVLONGD004319-21 ("[I]t's been a challenge for me to revert to writing in 'the Epic way.' I've been mostly able to do this, but am grateful to my many editors. Continuing to work on making my Epic writing unidentifiable from the next writer's seems to be a good goal"); dkt. # 53, Long Dep. 88:11-15 (stating "for most deliverables there was a template, and everybody for every application would use the template for…that type of deliverable. That way they were the same; they were a standard set"), May 6, 2016.) TWs cannot deviate from existing deliverable templates without permission. (Dkt. # 58.20, Style Guide FAQs, EPICVLONGD004008-09.) Across all types of deliverables and all applications, the same basic production process governs.

First, deliverables were assigned to Plaintiffs by Epic's project management software program, EMC2, or by their Team Lead. (See dkt. # 58.10, How Do I know What to Work On?, EPICVLONGD009358;  Yenzer Decl. ¶ 13; Seeker-Conroy Decl. ¶ 12; Weber Decl. ¶ 11; Pitterle Decl. ¶ 13; Thayer Decl. ¶ 12; Profumo Decl. ¶ 12; Paley Decl. ¶ 13; Kosciolek Decl. ¶ 12; Long Decl. ¶ 12; Vanderwist Decl. ¶ 11.)

Second, Plaintiffs gathered the information needed for deliverables from the

"experts," such as Epic's software developers, implementers, or trainers. (See Technical Writing Definition; Writer's Role at Epic; dkt. # 58.11, Big Picture of the Release Cycle, EPICVLONGD009895-96; dkt. # 58.12, Working with Subject Matter Experts, EPICVLONGD002036-38; dkt. # 58.13, Educate Yourself about a DLG, EPICVLONGD009307; dkt. # 58.14, Writers Job Overview, EPICVLONGD005545.)

Third, Plaintiffs produced deliverables in conformance with Epic's templates and language rules. (See Excerpt from Cumulus Camp ("We follow consistent, predictable patterns in our documentation so readers know what to expect…."); Seeker-Conroy Decl. ¶ 14; Yenzer Decl. ¶ 17; Pitterle Decl. ¶ 16; Profumo Decl. ¶ 14; Wood Decl. ¶ 14; Long Decl. ¶ 14; Vanderwist Decl. ¶ 12.) Epic controlled the structure, content, and language of all deliverables to enforce consistency and anonymity across deliverables. (See dkt. # 58.26, Deliverables Wiki, EPICVLONGD00001-02 (collecting "wikis that describe how to write and otherwise produce the deliverables owned by the Technical Communications team"); Style Guide FAQs, EPICVLONGD004008-09; Rockhill Decl. ¶ 13-14; Yenzer Decl. ¶ 15; Seeker-Conroy Decl. ¶ 13; Weber Decl. ¶ 10; Thayer Decl. ¶ 14; Pitterle Decl. ¶ 15; Kosciolek Decl. ¶ 13; Long Decl. ¶ 12; Vanderwist Decl. ¶ 11; Dolan Dep. 46:21-47:7; Long Dep. 88:11-15 (stating "for most deliverables there was a template, and everybody for every application would use the template for…that type of deliverable. That way they were the same; they were a standard set").)

The "Tech Comm Wiki" contains instructions and explanations for all deliverable templates, and Plaintiffs referenced this Wiki to produce deliverables.

8

(See Yenzer Decl. ¶ 15; Seeker-Conroy Decl. ¶ 13; Weber Decl. ¶ 10; Rockhill Decl. ¶ 13; Thayer Decl. ¶ 14; Pitterle Decl. ¶ 15; Kosciolek Decl. ¶ 13; Long Decl. ¶ 12; Vanderwist Decl. ¶ 11; Style Guide FAQs ("Deliverable-specific instructions and conventions" maintained on the Wiki); e.g., dkt. # 58.25, Reporting Highlights Wiki, EPICVLONGD000152-57.)

For the most common types of deliverables, Plaintiffs also typically relied on Epic's content management system, Cumulus. (See Yenzer Decl. ¶ 14; Seeker-Conroy Decl. ¶ 13; Weber Decl. ¶ 12; Pitterle Decl. ¶ 14; Kosciolek Decl. ¶ 12.) Cumulus controls the structure and format of deliverables. (See Yenzer Decl. ¶ 14; Seeker-Conroy Decl. ¶ 13; Weber Decl. ¶ 12; Pitterle Decl. ¶ 14; Kosciolek Decl. ¶ 13; dkt. # 58.22, Advantages of Cumulus, EPICVLONGD009918 (explaining that Cumulus enforces structured writing, which "is the concept of structuring all deliverables of the same type in the same or similar ways"); Excerpt from Cumulus Camp (describing a Cumulus content model as an "enforceable outline that defines the structure for your document and makes you follow the rules").)

Epic also has templates for deliverables that do not have a content model in Cumulus. (See Long Dep. 151:15-23 (stating that Testing Toolkits and Validation Documents are not created in Cumulus); dkt. # 58.24, Templates for Testing Toolkits and Validation Documents, EPICVLONGD000540-41.)

For all types of deliverables, Plaintiffs were required to use language that conforms to Epic's writing conventions. "The Epic Style Guide" provides the "rules and recommendations about style and usage for general and Epic-specific technical

terminology as well as general writing style and formatting guidelines." (See Yenzer Decl. ¶ 17; Seeker-Conroy Decl. ¶ 14; Thayer Decl. ¶ 14; Rockhill Decl. ¶ 15; Pitterle Decl. ¶ 16; Kosciolek Decl. ¶ 7; Long Decl. ¶ 14; Vanderwist Decl. ¶ 12; Style Guide FAQs.) The Style Guide's conventions "apply to all deliverables unless the instructions on the deliverable's Wiki or in the specific Style Guide topic indicate otherwise." (Dkt. 58.27-28, The Epic Style Guide, EPICVLONGD004006-4112.) In other words, the Style Guide controls the language in deliverables produced across all writing teams and relating to all software applications.

Fourth, all deliverables go through a regimented review process prior to being published (See dkt. # 58.29, Sending a Document to Review, EPICVLONGD007482-94; Yenzer Decl. ¶ 18; Seeker-Conroy Decl. ¶ 15; Weber Decl. ¶ 13; Thayer Decl. ¶ 16; Rockhill Decl. ¶ 16; Pitterle Decl. ¶ 17; Profumo Decl. ¶ 15; Wood Decl. ¶ 15; Paley Decl. ¶ 15; Long Decl. ¶ 15; Kosciolek Decl. ¶ 14; Vanderwist Decl. ¶ 13.) TWs first send deliverables to "subject matter experts" (such as software developers, implementers, trainers, and Quality Assurance employees) who review them for accuracy. (Sending a Document to Review.) Deliverables next go through "writer review," where other TWs, Team Leads, or editors review deliverables for compliance with Epic's writing guidelines. (See Sending a Document to Review; Seeker-Conroy Decl. ¶ 15; Weber Decl. ¶ 13; Thayer Decl. ¶ 16; Wood Decl. ¶ 15; Paley Decl. ¶ 15; Long Decl. ¶ 15; Long Dep. 87:25-88:7; dkt. # 58.33, Reviewing Others' Work, EPICVLONGD007495-508; Long Dep. 64:5-10; 98:25-99:5.)

In sum, according to the discovery that Epic produced in this case, the same

basic process applied to the production of all deliverables without regard to the software application or writing team on which a Plaintiff worked. Epic dictated every aspect of deliverable production by standardizing the deliverable assignment, organization, writing, and review process to ensure consistency and predictability. As a result, Plaintiffs performed the same tasks in the same manner, regardless of application or team.

### C. Epic Recruited and Trained Plaintiffs Using Common Criteria and Programs

Epic used a standard set of criteria to evaluate all Plaintiffs when they were candidates for the position. (Dkt. # 58.36, Tech Comm Criteria, EPICVLONGD012628-30.) As prospective TWs, Plaintiffs underwent a series of logic, math, verbal, general skills, writing, and personality tests. (Id.) Epic prescribed certain minimum scores and results for these tests that apply generally to the entire TW role. (Id.) Plaintiffs then underwent a systematic interview process. (Dkt. # 58.37, Phone Screen and Facesheet Examples, EPICVLONGD005097-5106, 5179-83, 5263-65, 05268-5271.)

Once hired, Plaintiffs completed the same basic training. (Dkt. # 58.38, Overview of Tech Comm Training, EPICVLONGD010667-91; Yenzer Decl. ¶¶ 7-8; Seeker-Conroy Decl. ¶¶ 7-8; Weber Decl. ¶ 6; Thayer Decl. ¶¶ 7-8; Rockhill Decl. ¶¶ 8-9; Pitterle Decl. ¶¶ 7-8; Profumo Decl. ¶¶ 7-8; Wood Decl. ¶¶ 7-8; Paley Decl. ¶¶ 7-8; Kosciolek Decl. ¶¶ 7-8; Long Decl. ¶¶7-8; Vanderwist Decl. ¶ 7.) This common training included (1) "Epic 360," an orientation week for all new hires; (2) "App Camp," in which Plaintiffs attended classes to become certified in the specific Epic

software application to which they were assigned; (3) "Tech Comm Boot Camp" in which Plaintiffs completed a series of projects and classes in preparation "for the tech comm role at Epic"; and (4) "Writing at Epic," in which Plaintiffs performed writing exercises and take classes to learn to "tailor [their] writing to fit the style and conventions that we use at Epic." (See Overview of Tech Comm Training; dkt. # 58.39, Writing at Epic Companion, EPICVLONGD008295-347.) Thus, all Plaintiffs underwent the same basic training program.

### D. Epic Pays Plaintiffs According to a Common Compensation Plan

Epic paid all Plaintiffs a fixed salary without regard to the number of hours that they worked. (See Martin Dep. 195:1-22; Yenzer Decl . ¶ 10; Seeker-Conroy Decl. ¶; Thayer Decl. ¶ 9; Rockhill Decl. ¶ 10; Pitterle Decl. ¶ 10; Profumo Decl. ¶ 9; Paley Decl. ¶ 9; Wood Decl. ¶ 9; Vanderwist Decl. ¶ 8; Long Decl. ¶ 9; Kosciolek Decl. ¶ 9.) Plaintiffs shared a common starting salary of approximately $40,000-44,000 regardless of the application or team on which they would be working. (See dkt. # 58.48, April 8, 2016 Letter from Noah Finkel to David Zoeller; dkt. # 58.40, Tech Comm Salary Review (grouping entire TW role together for purpose of starting salary review).) In addition, regardless of their application, Plaintiffs received a $2,000 raise after completing App Camp and becoming "certified" in the Epic software application to which they were assigned. (See Martin Dep. 197:3-12; Yenzer Decl. ¶ 10; Seeker-Conroy Decl. ¶ 9; Thayer Decl. ¶ 9; Rockhill Decl. ¶ 10; Pitterle Decl. ¶ 10; Profumo Decl. ¶ 9; Paley Decl. ¶ 9; Wood Decl. ¶ 9; Long Decl. ¶ 9; Kosciolek Decl. ¶ 9; Vanderwist Decl. ¶ 8.) Plaintiffs were subjected to a

standardized biannual ranking process which determines performance-based raises. (Dolan Dep. 95:19-96:8.) This process was not dependent on a Plaintiff's team, application, or supervisor.

### E. Epic Expects Plaintiffs to Work, and Plaintiffs Commonly Work, Over 40 Hours Per Week

Epic expected Plaintiffs to work over 40 hours per week. (See dkt. # 58.41, Writing Role Overview, EPICVLONGD005543-44 ("writing work weeks generally vary between 45 and 50 hours, and this number can significantly increase before deadlines"); dkt. # 58.42, Candidate Overview – Writing, EPICVLONGD005548-49 (instructing interviewers as follows: "Don't skip: Cover hours expectations. We expect that writers will average around 45-50 hours a week, but that could vary greatly, especially during crunch times. This is not always a 9-5 job"); dkt. # 58.06, Excerpt from New Writer Keys to Success, EPICVLONGD010626 ("typical work week…takes 45 hours…. Crunch time:… Might have 50 or 60 hour week").) Epic's expectation that Plaintiffs work overtime was consistently reaffirmed, as evidenced by their consistent and similar statements in exit interviews. (See dkt. # 58.43, Profumo Exit Interview, EPICVLONGD012617-20; dkt. # 58.44, Thayer Exit Interview, EPICVLONGD012598-601; dkt. # 58.45, Paley Exit Interview, EPICVLONGD012591-92; dkt. # 58.46, Reuschlein Exit Interview, EPICVLONGD012588-90.) Further, Plaintiffs' counsel has analyzed the TLG data for Plaintiffs, which confirms that they commonly and consistently worked over 40 hours per week. (Kennedy Decl. ¶ 7.)

Thus, Plaintiffs shared a similar employment setting. They were uniformly

subject to Epic's exemption classification based on its blanket consideration of the role's common duties. They underwent the same hiring and training processes. They received similar compensation and consistently work over 40 hours per week. They performed the same primary duty of producing standardized deliverables in conformance with Epic's regimented process for doing so.

## III.   Factual Clarifications and Corrections to Epic's Statement of Facts

Epic's "Statement of Relevant Facts" contains numerous factual inaccuracies. The primary factual basis of much of Epic's argument is the declaration of the "Tech Comm Division Lead" Dana Apfel. Plaintiff noticed the deposition for the person holding this position, but Epic did not produce Apfel, presumably because she was not employed in that role during the relevant statutory period. (See Zoeller Decl. Ex. C, First Amended Notice of Deposition; Martin Dep. 36:15-23.) Epic's refusal to produce Apfel to give testimony regarding Plaintiffs' duties seriously undermines its contention that her assertions regarding those same duties are reliable. Epic nonetheless now leans almost exclusively on Apfel's assertions with respect to Plaintiffs' employment, and Apfel submits that she was "familiar" with the work of Yenzer, Long, Paley, Vanderwist, and Lopez. (See dkt. # 57, Apfel Decl.) Epic also relies on the declaration of Amanda Kroninger with respect to Plaintiff Phelps (See dkt. # 59, Kroninger Decl.) As detailed below, Plaintiffs' responsive sworn testimony clarifies and corrects the second-hand assertions of Apfel and Kroninger:

### A.  Dayna Long

Epic states that Long "was responsible for Implementation writing in

14

connection with Revenue applications." (Dkt. # 56, Defendant's Motion to Decertify Plaintiffs' Collective Action and Supporting Memorandum of Law ("Def.'s Br.") at 5.) This statement is misleading. In fact, Long was one of several implementation writers working on revenue applications; she was not responsible for the group of implementation writers working on revenue applications. (Long Response Decl. ¶ 3.) Epic then discusses Long's time as a Team Lead, focusing on the time she recorded on management duties. (Def.'s Br. 5-6.) As discussed above, the conditionally certified collective class does not include time individuals were working as Team Leads. By the same token, Epic's reference to Long's performance of allegedly "special projects" is irrelevant because she performed both the "Reach for the Stars" project and the "months-long effort to streamline validation documents" only *after* becoming a Team Lead. (<u>See</u> Def.'s Br. 5-6; Long. Dep. 12:13-19, 43-44 (testifying that validation document project occurred in spring 2013 and Reach for Stars project in fall 2012).)

### B.  Michelle Vanderwist

Vanderwist was employed at Epic for less than one year and worked on the support writer team. (Def.'s Br 6.) Epic states that Vanderwist, as "owner" of NoteWriter (a feature in Epic's software applications), was "responsible for creating documents for customers to explain the changes [to NoteWriter] and any impact those changes might have for them." (Def.'s Br. 7.) This statement is misleading. Vanderwist explained her lack of expertise in NoteWriter in her six-month performance review, in which she stated: "I would also like to become completely

knowledgeable about NoteWriter. I recently became the owner of this, so it would be nice to feel like a NoteWriter Master." (Dkt. # 77.4, Michelle Vanderwist Performance Review.) In fact, being "owner" of NoteWriter simply meant that the writing work related to NoteWriter was delegated to Vanderwist. (Vanderwist Response Decl. ¶ 4.) Vanderwist then followed the same fundamental process for producing deliverables that other writers follow. (Id. at ¶ 5; supra part II.A.) This process does not include determining the impact that changes may have for end users, but rather learning that information from other roles and then representing it in a readable way. (Vanderwist Response Decl. ¶ 5.)

Epic also states that Vanderwist had "gotten much better at determining what [her] audience is and, more importantly, how to write for that particular group of people." (Def.'s Br. 7.) In fact, Vanderwist had learned the acceptable Epic language for various audiences, resulting in less edits to her deliverables; she nonetheless followed the same basic procedure to produce deliverables and have deliverables reviewed. (Vanderwist Response Decl. ¶ 7.) Finally, Epic notes that Vanderwist was interested in "volunteer[ing] for more ad hoc projects to mix up [her] work day" and "get[ting] good enough at something to teach (or help teach) a class at some point." (Def.'s Br. 7). Unfortunately, none of these interests came to fruition; Vanderwist continued to dedicate the majority of her time to producing support deliverables. (See Vanderwist Response Decl. ¶ 7; dkt. #72, Vanderwist Decl. ¶ 4.)

### C. Caitlyn Paley (Miller)

Epic's discussion of Paley's work is almost entirely inaccurate. First, Epic states that Paley "was more specialized than most writers" within the Beaker application. (Def.'s Br. 8.) This statement is false; Paley worked at Epic for less than one year and only became certified in the application shortly before leaving. (Paley Response Decl. ¶ 3.)

Second, Epic claims Paley "attended technical EDI [Electronic Data Interchange] training." (Def.'s Br. 8.) This statement is also false; Paley had minimal training on EDI and recalled producing perhaps two deliverables on it. (Paley Response Decl. ¶ 4.)

Third, Epic claims that Paley devoted a quarter of her time to new staff orientation and training and was in Epic's Writer Education Group. (Def.'s Br. 8.) In fact, Paley does not recall spending a quarter of her time working in new staff orientation and training—but rather that *she herself* recorded significant time in her own training to become a TW. (Paley Response Decl. ¶ 5.) Nor does Paley recall being part of a Writer Education Group. (Id.)

Fourth, Epic claims that Paley "devoted a sizeable portion of her time" to "special projects." (Def.'s Br. 8.) But the projects which Epic references as "special" were in fact standard deliverables. (Paley Response Decl. ¶ 6.)

Fifth, Epic claims Paley managed a subset of hundreds of requests, identified which to highlight for customers, and devised the best way to communicate them to customers. (Def.'s Br. 9.) These assertions are false; Paley never prioritized or

assigned release notes and did not have any input as to which information to highlight for customers. (Paley Response Decl. ¶7.)

Finally, Epic claims Paley created documents that helped "share new ideas with customers." (Def.'s Br. 9.) To the extent this implies Paley regularly worked with customers, it is false; she did not. (Paley Response Decl. ¶ 7.)

### D. Steven Yenzer

Yenzer's primary duty, like that of the other opt-in plaintiffs, is producing deliverables pursuant to Epic's guidance. (<u>Compare</u> Yenzer Decl. ¶ 12; Seeker-Conroy Decl. ¶ 11; <u>see</u> <u>supra</u> part II.A.) Epic states that Yenzer wrote blog posts for "the Epic community" for which had "wide latitude to create something that is unique." (Def.'s Br. 10.) In fact, Yenzer (1) devoted at most two hours per week to blog post writing for only the second half of his employment at Epic; and (2) had to have all of his posts reviewed by the head of the blogging team. (Yenzer Response Decl. ¶ 3.) Epic's "facts" also suggests that Yenzer had the general freedom to make suggestions for changes in his employment. (Def.'s Br. 10.) In reality, Yenzer made such a comment in the context of discussing side projects which did not comprise his core job duty of producing support and training deliverables and on which he worked infrequently or irregularly. (Yenzer Response Decl. ¶ 5.) Yenzer did not have freedom to make suggestions in that manner when performing his primary duties of producing support and training documentation, which required that he follow regimented procedures and language rules. (<u>Id.</u>)

### E.  Jennifer Phelps (Pitterle)

As with Long, Epic states that Phelps's time as a Team Lead differentiates her from other plaintiffs. (Def.'s Br. 10.) Phelps is not included in the conditionally certified class when she was a Team Lead, because that class does not include Team Leads. Epic's discussion of Phelps's Team Lead duties is irrelevant. Epic also claims that Phelps "had other unique responsibilities." (Def.'s Br. 10.)  This statement is inaccurate; based on her experience working with other TWs on both the support and implementation writing teams, Phelps does not believe she had "unique responsibilities," but rather performed the same primary duty as her fellow TWs. (Pitterle Response Decl. ¶ 3.) Epic then suggests Phelps regularly worked with customers (Def.'s Br. 11), but in fact she worked very minimally with anyone outside Epic. (Pitterle Response Decl. ¶ 4.) Epic's claim that Phelps was responsible for creating Validation Guides, Starter Sets, and a Success Guide is also misleading; as with all Epic deliverables, Phelps produced such documents based on existing document types but did not determine their structure. (Compare Def.'s Br. 11 with Pitterle Response Decl. ¶ 5.) Phelps determined what to include in her documents based on meeting with expert implementers, and if she was unsure what to include, she discussed it with her Team Lead. (Pitterle Response Decl. ¶ 6.)

Finally, Epic cites that Phelps "did work related to recruiting new members of the Tech Comm Group." (Def.'s Br. 12.) That vague statement is misleading; in fact, during the second half of her employment, Phelps used a rubric given to her by Human Resources to grade prospective TWs' writing evaluations. (Pitterle Response

19

Decl. ¶ 7.) Such grading took Phelps at most one to two hours per week. (Id.) Phelps had no say in who was hired, nor did she help seek out candidates; she simply submitted scores based on the rubric to Human Resources. (Id.)

### F.  Lope Lopez

Epic states that Lopez helped "improve the quality of translations from English to Spanish of software documentation." (Def.'s Br. 6.) In fact, Lopez, a fluent Spanish speaker, helped translate "software strings" (which are lines of text such as "Enter date of administration"). (Lopez Response Decl. ¶ 4.) Moreover, Lopez estimates that he only did 3-4 translation side projects throughout his tenure, for which he had to get permission from his Team Lead, to ensure they did not interfere with his primary duty of producing deliverables. (Id.) Epic also cites without context that Lopez was "happy [to have] begun to make critical decisions about how to write and review documents." (Def.'s Br. 12.) In fact, Lopez believed that he had learned Epic's style and approach to writing, and was better able to recognize how to satisfy Epic's standards. (Lopez Response Decl. ¶ 5.) As owner of certain documents, Lopez's duty was to make sure they conformed to Epic's writing style guides and formatting. (Lopez Response Decl. ¶ 6.)

In short, Plaintiffs' first-hand testimony corrects and clarifies Epic's misstatement of relevant facts provided by an individual who Epic deemed incompetent to testify regarding these very same topics.

### ARGUMENT

The evidence produced in the course of discovery and the sworn statements of

Plaintiffs establish that they are similarly situated. The conditionally certified class contains 15 employees working in the same job position, in the same department, performing the same primary duty, paid according the same compensation plan, and classified as exempt according to a single corporate policy. Given this common evidence, Epic's purported defense can be applied to this homogenous group. In such cases, the FLSA's collective action provision is intended to allow plaintiffs to vindicate their rights by pooling resources. Plaintiffs' claims are most fairly and efficiently tried in a single, collective proceeding, and Epic's motion to decertify must be denied.

## I.    THE DECERTIFICATION STANDARD

The fundamental inquiry in determining whether a collective action under the FLSA is appropriate is whether the plaintiffs are "similarly situated." 29 U.S.C. § 216(b). Here, the parties' stipulated conditional certification "was the first step in a two-step process regarding FLSA collective actions." Kasten v. Saint-Gobain Performance Plastics Corp., 556 F. Supp. 2d 941, 956 (W.D. Wis. 2008) (citing Austin v. Cuna Mutual Insurance Society, 232 F.R.D. 601, 605 (W.D.Wis.2006)). Epic's motion to decertify plaintiffs' collective action is the second step, which involves determining whether the individuals who chose to opt in to the FLSA action are 'similarly situated.'" Id. Plaintiffs bear the burden of establishing that they are similarly situated. Russell v. Ill. Bell Tel. Co., Inc., 721 F. Supp. 2d 804, 810 (N.D. Ill. 2010).

The FLSA does not define "similarly situated." The standard takes into

account the following:

> (1)  whether the factual and employment settings of the
>       individual plaintiffs are similar or disparate;
>
> (2)  whether defendants may assert various defenses that
>       appear to be individual to each plaintiff; and
>
> (3)  whether fairness and procedural considerations
>       support proceeding as a collective action.

Espenscheid v. DirectSat USA, LLC, 2011 WL 2009967 (W.D. Wis. May 23, 2011)

(aff'd, 705 F.3d 770 (7th Cir. 2013) (quoting Thiessen v. Gen. Elec. Capital Corp.,

267 F.3d 1095, 1103 (11th Cir. 2001)). As detailed below, consideration of these

factors supports that Plaintiffs are similarly situated.

## II.   THE CONDITIONALLY CERTIFIED CLASS IS SIMILARLY SITUATED

### A.  Plaintiffs Had Similar Factual and Employment Settings

To maintain a collective action, Plaintiffs must provide "an identifiable

factual nexus that binds the plaintiffs together as victims of a particular violation"

of the law. Russell, 721 F. Supp. 2d at 812 (citing Vennet v. Am. Intercontinental

Univ. Online, 2005 WL 6215171 (N.D. Ill. Dec. 22, 2005)). Certification may be

appropriate even if there are some individualized circumstances, so long as common

questions predominate. Id. (citing cases); see also Morisky v. Public Serv. Elec. and

Gas Co., 111 F. Supp. 2d 493, 498 (D.N.J. 2000) ("collective action would only be

appropriate where the plaintiffs make some showing that the nature of the work

performed by other claimants is at least similar to their own." (internal quotations

and alterations omitted)).

This Court articulated the similarly situated standard in Espenscheid,

finding that "although certification requires a factual nexus, plaintiffs in a FLSA collective action need not be situated identically." Espenscheid v. DirectSat USA, LLC, Case No. 09-cv-625-bcc, Opinion and Order, p. 24 (dkt. # 387) (W.D. Wis., Feb. 10, 2011) (citing Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1260-61 (11th Cir. 2008); Brennan v. Qwest Commc'ns Int'l, Inc., 2009 WL 1586721, at *2 (D. Minn. June 4, 2009); Jordan v. IBP, Inc., 542 F. Supp. 2d 790, 813 (M.D. Tenn. 2008)).

Here, Plaintiffs are bound together by (1) a single classification decision which they allege violates the FLSA and (2) core similarities in their employment, including a common primary duty, training, compensation, hours expectations, and supervisory structure. This strong factual nexus undermines Epic's selective and misleading discussion of a fraction of the opt-in plaintiffs, and distinguishes the present case from those on which Epic relies.

### 1. Epic's Blanket Exemption Determination Supports that the Conditionally Certified Class Is Similarly Situated

Epic applied a corporate policy of classifying all members of the conditionally certified collective class as exempt under the administrative exemption based on the TW *role's* daily activities. (Martin Dep. 17:1-8, 25-18:9.) Epic's executive management decided to classify all TWs as exempt from overtime on a group-wide basis when the role was created 20 years ago. (Martin Dep. 16:2-17:15.) Since then, Epic has neither revised that blanket determination nor conducted any individualized assessment of Plaintiffs' duties. Specifically, after expressing his belief that the daily activities of *the role* rendered TWs properly exempt, Martin

23

testified as follows:

> Q:   Has there ever been a period of time when Epic's technical writers were paid overtime?
>
> A:   Technical writers have always been salaried at Epic.
>
> Q:   Are you aware of Epic ever doing an individualized assessment of the technical writers? In other words, technical writer by technical writer to try to determine whether they should be paid overtime?
>
> A:   An individual assessment of whether a particular person is appropriately classified?
>
> Q:   Right.
>
> A:   I am not aware of such analysis.

(Martin Dep. 201:3-15). Nor has Epic identified any such individualized classification assessment or decisions in its brief asking the Court to decertify the collective class. Epic's exemption decision applied uniformly to all Plaintiffs without reference to their individual responsibilities.

Courts routinely find that this "all-or-nothing" approach to classifying plaintiffs' job position weighs in favor of finding them similarly situated for the purpose of pursuing collective legal action challenging that classification. For example, in Nerland v. Caribou Coffee Co., Inc., as here, the employer's testimony revealed (1) that its "application of a uniform exemption classification is based upon [its] own generalized assumption that all store managers could be considered as similarly situated for the purposes of considering whether or not they should be classified as exempt" and (2) that its "consideration of the applicability of the

exemption to store managers did not encompass or require an individualized

inquiry into the factual circumstances of each store manager in order to determine

whether that particular store manager was exempt." 564 F. Supp. 2d 1010, 1023 (D.

Minn. 2007). The Court found evidence of such a blanket policy "highly persuasive"

to the similarly situated inquiry, explaining:

> The Court finds it disingenuous for [employer], on
> one hand, to collectively and generally decide that
> all store managers are exempt from overtime
> compensation without any individualized inquiry,
> while on the other hand, claiming the plaintiffs
> cannot proceed collectively to challenge the
> exemption. [Employer's] objections are wholly
> inconsistent with its own internal policies and
> practices.

Id. at 1024. See also Ahle v. Veracity Research Co., 738 F. Supp. 2d 896, 922-23 (D.

Minn. 2010) (finding plaintiffs "similarly situated in the sense that [employer's]

decision to classify them as exempt was not the result of a fact-intensive analysis of

the specific duties performed by each individual investigator or of the specific duties

performed by investigators at the various titles and levels. Rather, it was the result

of a single decision by [the employer's] founders … and that decision was applied

uniformly to all levels of investigators regardless of their actual duties. The

uniformity of treatment strongly suggests that Plaintiffs are indeed similarly

situated"); DeWeese v. Git N' Go Convenience Stores, Inc., No. 4:11-cv-00419, slip

op. 2-3 (S.D. Iowa. Aug. 21, 2014) (finding that employer's "policy of classifying all of

its store managers as exempt employees also demonstrates that [named plaintiff]

and opt-in Plaintiffs are similarly situated" particularly given that employer "never

evaluated each individual store's circumstances to determine the propriety of classifying that store's manager as exempt from the FLSA's overtime pay provisions").

The Nerland employer's testimony regarding its lack of individualized inquiry and global assumption of duties echoes Martin's in the present case. Like the employers in Nerland, Ahle, and DeWeese, Epic uniformly applied its official exemption policy to all collective class members based on a generalization of their role's daily activities and without any individualized assessment of their work. So, too, is Epic's objection to collective proceedings inconsistent with its internal policy of grouping collective class members' duties and responsibilities together for the purpose of classifying them as exempt. Rather, Epic's undisputed treatment of Plaintiffs as similarly situated for that purpose supports the finding that Plaintiffs are, in fact, similarly situated.

### 2. Plaintiffs Performed the Same Primary Duty, Underwent the Same Training and Hiring Process, and Were Compensated in the Same Manner

At trial, Plaintiffs will present evidence pertaining to their job duties, and the Court will consider whether those duties render Plaintiffs properly exempt from overtime compensation. The evidence demonstrating the work they performed for Epic, and the lack of discretion and independent judgment they had in that work, will be common for each Plaintiff. Plaintiffs share the same primary duty of producing Epic's standardized documents. (See supra part II.A; dkt. # 55, Plaintiff's Memorandum in Support of Motion for Fed. R. Civ. P. 23 Class Certification ("Pl.'s

Rule 23 Br.") at 4-6). Plaintiffs further attest, and discovery to date establishes, that Epic strictly governs all TWs' work to *enforce* similarity, by proscribing the content, formatting, and language of the standardized documents that they produce through mandatory templates and style rules. (See supra part II.B; Pl.'s Rule 23 Br. 6-14.) Plaintiffs' regimented and standardized work processes support that they not only have the same primary duty, but execute that duty in similar ways.

In addition to a shared primary duty, Plaintiffs' similar employment setting is grounded in other commonalities. For example:

- Plaintiffs are recruited and hired based on Epic's common standardized criteria for the TW role. (See supra part II.C; Pl.'s Rule 23 Br. 15-16.)

- Plaintiffs undergo the same basic training. (See supra part II.C; Pl.'s Rule 23 Br. 16-17.)

- Epic pays Plaintiffs similar salaries and according to standardized criteria without regard to their application, writing team, or supervisor. (See supra part II.D; Pl.'s Rule 23 Br. 16-17.)

- Epic expects all Plaintiffs to work overtime hours, and all Plaintiffs do work over 40 hours per week. (See supra part II.E; Pl.'s Rule 23 Br. 18-19.)

In sum, the evidence establishes that Plaintiffs had a common primary duty, common hiring process, common training, common supervision, common pay, and common work hours.

These factual commonalities further counsel for finding that Plaintiffs are similarly situated. Namely, to determine whether plaintiffs' factual and employment settings are similar, courts consider factors such as job duties, standardized processes and policies, similar training, geographic location,

supervision, and salary. See, e.g., Camilotes v. Resurrection Health Care Corp., 286 F.R.D. 339, 346 (N.D. Ill. 2012) (citing cases); Johnson v. Wave Comm GR LLC, 4 F. Supp. 3d 453, 459 (N.D.N.Y. 2014) (denying motion to decertify where "all of the class members worked out of the same office…performed the same type of work under the direction of the same employers, and were compensated under the same plans."); Judkins v. Southerncare, Inc., 74 F. Supp. 3d 1007, 1013 (S.D. Iowa 2015) (denying motion to decertify where plaintiffs' testimony showed "substantially similar" job duties and "no major variation in the job functions performed by each Plaintiff."); Cruz v. TMI Hosp., Inc., 2015 WL 6671334, at *15 (D. Minn. Oct. 30, 2015) (denying motion to decertify where "'all class members worked at the same location, … had the same job title, and … allege that they performed off-the-clock work.'"); Simmons v. Valspar Corp., 2013 WL 2147862, at *4 (D. Minn. May 16, 2013) (denying motion to decertify where plaintiffs "presented evidence that they had the same detailed job description, followed the same standards of conduct from [employer], received the same training, were under the same supervisory structure, were evaluated using the same checklist, were paid according to the same compensation plan, and executed the same seven categories of duties."). In a case involving an employer's claim that plaintiffs fell under the FLSA's administrative exemption, the court found that the employer's requirement that plaintiffs follow "the same procedures and protocol" in performing their primary duty further supported a finding that they shared similar factual and employment settings. Ahle, 738 F. Supp. 2d at 922.

Here, Plaintiffs have provided ample evidence that they performed the same primary duty, that they must follow Epic's standardized procedures for doing so, that they work in the same location, and that they receive similar training and compensation. Such evidence satisfies Plaintiffs' burden of showing they are similarly situated.

### 3.   Epic's Discussion of Plaintiffs' Work Is Unpersuasive

Against the weight of this common evidence, Epic cherry-picks and distorts the employment history of a handful of opt-ins to claim that Plaintiffs did not perform similar work. However, Epic has not (and could not) refute the mountain of evidence that these 15 Plaintiffs shared the same primary duty and executed that duty in accordance with a regimented, mandatory process that renders such differences immaterial to the ultimate question of misclassification. Instead, Epic relies on the second-hand assertions of the head of the Technical Communications department to ostensibly support its claim that Plaintiffs' "time spent on other activities illustrates notable differences" among them. (Def.'s Br. 15.) Epic's claim is based on its inaccurate depiction of Plaintiffs' work. As detailed above, the sworn statements of Plaintiffs establish that Epic's mischaracterization of their work falls into three categories: Epic (1) ignores that Plaintiffs performed the same primary duty while exaggerating small, infrequent or irregular side projects which did not take away from their primary common duty; (2) focuses on tasks Team Leads performed—despite that they are irrelevant to this case as they were performed by individuals who are not part of the conditionally certified class; and (3) makes

unfounded inference from Plaintiffs' time-keeping record to disingenuously recast the performance of standardized work or the improvement at one's job as somehow special or unique.

### a. Plaintiffs Share the Same Primary Duty Across Applications and Writing Teams

Epic alleges that there are "plain differences" among Plaintiffs' job duties because they worked on different applications and writing teams. But Epic tellingly fails to explain *how* Plaintiffs' application or writing team changed the nature of their writing duties. Epic does not identify a different job description or different requirements for producing deliverables based on the application or writing team of each Plaintiff. To the contrary, Epic's unsubstantiated contention that Plaintiffs' applications and writing teams impact the similarity of their duties contradicts Epic's singular job description, standard technical writing definition, and corporate deposition testimony of a uniform primary duty. (See supra part II.A.)

Plaintiffs' own experiences contradict Epic's assertion that their application and team differentiate their duties. For example, Long worked on the "Tapestry" software application as an implementation writer, while Paley worked on the "Inpatient" and "Beaker" applications as a support writer; yet, both confirmed that their primary duty was to produce Epic's standardized documents. (Def.'s Br. 14; Long Decl. ¶ 11; Paley Dec. ¶ 11.) And, though Yenzer worked as both a training writer and support writer, he affirmed that his "primary duty remained the same throughout the entirety of [his] employment with Epic, regardless of the deliverables [he] worked on." (Yenzer Decl. ¶ 12.) Similarly, Phelps worked as both

a support writer and an implementation writer, and affirmed that her primary duty was the same "regardless of whether [she] was producing support deliverables or implementation deliverables." (Pitterle Decl. ¶ 12.) Just as employees assembling a pickup truck and sports car ultimately create vastly different products, they are both engaged in the same core function of assembling cars. Putting together different types of deliverables is no different. Although the deliverables cover different aspects of the software and are directed towards different Epic customers, the employees creating them share the same core function of producing deliverables.

### b. The Conditionally Certified Class Does Not Include Team Leads

Epic repeatedly raises the irrelevant point that Named Plaintiff Long and opt-in Plaintiff Phelps became Team Leads at some point in their employment. In fact, Team Leads are not included in the conditionally certified class. Both Long and Phelps worked as "regular" TWs during the relevant statutory period, prior to becoming Team Leads, and they are only class members with respect to that period of time. Epic is well-aware that Team Leads are not in the conditionally certified class, rendering its argument relating to Phelps and Long spurious. Specifically, when Epic produced a list of 50 putative FLSA collective action members after the parties stipulated to conditional certification, **Epic excluded Team Leads**. (Compare Zoeller Decl. Ex. A, List of Putative FLSA Class Members, with Zoeller Decl. Ex. B, List of FLSA Class Members' Team Leads.) Epic cannot now claim that Plaintiffs are dissimilar because some had management responsibilities during the time they worked as Team Leads, when, throughout this litigation, Team Leads have clearly

31

been excluded from the conditionally certified class. Moreover, that two Plaintiffs later worked in a position excluded from this class is irrelevant to whether they were properly classified as overtime exempt when working in the role at issue in this lawsuit.

### c. Epic's References to Plaintiffs' Time Records Is Unpersuasive and Unfounded

As noted above, Plaintiffs recorded the time they work using various "TLP" codes, and Epic maintains a list of such codes that correspond to deliverables and writing work. Epic's self-serving manipulation of Plaintiffs' time record data is unfounded for several reasons. First, Epic has no basis for the inferences it makes from several TLP codes. For example, Epic repeatedly suggests that Plaintiffs performed "special projects" based on time data showing that they recorded hours under the TLP code "WR-Project Work." (See dkt. # 60, Hawes Decl.; Def.'s Br. 4-5, 8, 15.) However, nothing in Hawes' Declaration, nor the code name "WR-Project Work," supports the inference that Plaintiffs' "project work" was somehow "special," or different from the work of producing deliverables. Nor has Epic provided any examples of such project work to support its claim that it is anything out of the ordinary for a TW. (See Paley Response Decl. ¶ 6.) In truth, Epic unilaterally and after-the-fact decided to cast such work as "special" to invent non-existent distinctions among Plaintiffs. Similarly, Epic purports that time recorded under the new staff orientation TLP is time *spent* training rather than *receiving* training, though nothing in the record supports such an inference. (See Paley Response Decl. ¶ 5.)

32

Second, Epic cherry-picks from among Plaintiffs' TLP codes to create misleading comparisons. For example, Epic selects a single TLP code corresponding to a single type of documentation and compares one plaintiff's hours on that single code to another plaintiff's hours on that single code. (Def.'s Br. 7.) Epic's selection and comparison of one such code is unrepresentative and carries no weight. As this Court has recognized, "[i]f one zooms in close enough on anything, differences will abound[.]" Kasten, 556 F. Supp. 2d at 956-57 (citing Frank v. Gold 'n Plump Poultry, Inc., 2007 WL 2780504, at *4 (D. Minn. Sept. 24, 2007)).

Finally—as even Epic recognizes (Def.'s Br. 12)—the percentages of time dedicated to different codes will depend on a Plaintiff's tenure at Epic. For example, the comparison of Paley's time records (who worked at Epic less than one year) with Yenzer's (who worked nearly three years) is unpersuasive, given that Paley's time is naturally dominated by new employee training while Yenzer's is not.

Epic's repeated unfounded references to Plaintiffs' TLP codes do not support its motion for decertification. Unlike Epic's distortion of Plaintiffs' time records, Plaintiffs analysis of these records created a holistic and meaningful comparison of Plaintiffs' duties by excluding time recorded under training and by considering the TLP codes associated with writing work, not just a single TLP code. This analysis showed that all Plaintiffs recorded the majority of their time under Writing Team TLPs. (See supra part II.A.)

In short, Epic paints an inaccurate and misleading picture of Plaintiffs' duties. Moreover, the overwhelming evidence—including Epic's internal documents,

Epic's corporate representative's testimony, and Plaintiffs' declarations in support of their motion for Rule 23 certification—establish that Plaintiffs share similar factual and employment settings. As such, because discovery has not yielded "material" or "legally significant" differences among the opt-ins, this Court should deny Epic's motion for decertification. See Morgan, 551 F.3d at 1261; see also Anderson, 488 F.3d at 953; Thiessen, 267 F.3d at 1108.

## III.  EPIC'S PURPORTED DEFENSES CAN BE FAIRLY HEARD ON A CLASS-WIDE BASIS

### A.  Epic's Argument Ignores the Commonalities in Plaintiff's Work

Epic contends that it plans "to assert a variety of defenses to the Plaintiffs' claims" which would "require individualized inquiry." (Def.'s Br. 16.) Epic names only one such defense—the administrative exemption—and then posits that courts routinely refuse to allow cases involving this exemption to proceed collectively. This cursory argument fails where, as here, Plaintiffs are bound by common factual settings:

> Just because the inquiry is fact-intensive does not preclude a collective action where plaintiffs share common job traits. *Given the volume of evidence showing the store managers were similarly situated, and the fact that Family Dollar applied the executive exemption across-the-board to every store manager....* Family Dollar has not shown clear error in the district court's finding that its defenses were not so individually tailored to each Plaintiff as to make this collective action unwarranted or unmanageable.

Morgan, 551 F.3d at 1263 (emphasis added). See also Simmons, 2013 WL 2147862, at *5 (Valspar's primary defense is that Plaintiffs are exempt employees. However

… the Court concludes that Plaintiffs' employment settings were sufficiently similar that it may determine their exemption status collectively.").

As was the case in <u>Morgan</u>, Epic "ignores the overwhelming evidence showing that the Plaintiffs, as a group, shared a number of factual details with respect to their job duties and day-to-day work." <u>Morgan</u>, 551 F.3d at 1263. In claiming that Plaintiffs varied in their exercise of discretion, Epic makes a series of refuted points about irrelevant work performed by individuals not in the conditionally certified class or standardized work that it misrepresents as special. (<u>See</u> Def.'s Br. 17; <u>supra</u> part III.)

### B.  The Cases on Which Epic Relies are Inapposite

The discrete and manageable class of Plaintiffs, bound by common factual and employment settings, distinguishes this case from those upon which Epic relies. For example, <u>Forney v. TTX Co.</u> involved 25 employees in 20 different job positions (each with its own duties) divided between two departments and located in four states.[2] 2006 WL 1030194, at *1 (N.D. Ill. Apr. 17, 2006).[3] In contrast, the 15

---

[2] Epic also cites <u>Drexler v. Tel Nexx, Inc.</u>, 125 F. Supp. 3d 361, 374 (D. Mass. 2015). That case had nothing to do with the question of individualized defenses in the context of decertification, but stands for the unsurprising notion that courts reviewing a technical writer's claim for overtime engaged in "some level of rigorous fact-finding—either at the summary judgment stage or by trial" (not upon decertification)—rather than dismissing the overtime claim upon a motion to dismiss.

[3] Epic's reliance on <u>Espenscheid v. DirectSat USA, LLC</u>, 705 F.3d 770 (7th Cir. 2013) is similarly inapposite. In <u>Espenscheid</u>, the Seventh Circuit affirmed the district court's order decertifying a conditionally certified FLSA collective of 952 plaintiffs and three certified Rule 23 state law classes (and subclasses) consisting of a total of more than 1,600 class members.  <u>Id.</u>; <u>see also</u> <u>Espenscheid v. DirectSat USA, LLC</u>, Case No. 09-cv-625-bcc, Opinion and Order, p. 46 (dkt. # 387) (W.D. Wis., Feb. 10, 2011). <u>Espenscheid</u> is easily distinguishable from this case, which involves 15 Plaintiffs who worked in the same positions under a common job description, performed the same job duties, attended the same training, and were recruited pursuant to common standards. Moreover, <u>Espenscheid</u> is irrelevant because the district court initially refused to decertify the FLSA collective class, and affirmatively certified the state law Rule 23 classes, only decertifying the class after the plaintiffs' repeatedly ignored its request for a trial plan addressing each of the certified sub-classes.

Plaintiffs here work in one department, in the same location, in one job position with the same primary duty.[4]

Epic's implication that the fact-intensive inquiry of the propriety of an employee's exemption precludes final certification, taken to its logical conclusion, would render the FLSA's collective action provision impotent in misclassification cases. Indeed, "if such an argument were credited, 'no FLSA action could be resolved through the collective action process, thereby defeating the stated purpose of the FLSA and wasting judicial resources by requiring courts to consider each individual plaintiff's claims in a separate lawsuit.'" Ahle, 738 F. Supp. 2d at 923 (citing Indergit v. Rite Aid Corp., 2010 WL 2465488, at *9 (S.D.N.Y. June 16, 2010)). In fact, "many courts have expressly rejected the sweeping proposition that any case that turns on the application of the FLSA's ... exemption[s] cannot be resolved through a collective action." Id. (internal quotation marks omitted) (citing Indergit, 2010 WL 2465488, at *9).

Just as Epic classified all Plaintiffs as exempt from overtime on a group-wide basis, Epic can assert its administrative exemption defense on a class-wide basis. The evidence in this case consists of class-wide documents demonstrating the types of work that Plaintiffs performed and Epic's strict directions and processes they followed in doing so. Whether Plaintiffs' performance of those job duties meets with

---

Espenscheid, 2011 WL 2009967 (W.D. Wis. May 23, 2011). Here, Plaintiffs welcome the opportunity to work with the Court to create a workable trial plan.

[4] Epic alleges that there are differences in work location, noting that Long worked at the Tokay location and other Plaintiffs worked at Epic's Verona campus. In fact, "most technical writers are in Verona" – Long was one of only two out of the approximately 110 TWs who worked at Tokay, which is in Madison. (Long Dep. 60:7-15.)

the administrative exemption will require consideration of common evidence. See Espenscheid v. DirectSat USA, LLC, Case No. 09-cv-625-bcc, Opinion and Order, p. 22 (dkt. # 387) (W.D. Wis., Feb. 10, 2011) ("It is clear that plaintiffs are similarly situated when they suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs"). Because Plaintiffs have thoroughly established that they share the same primary duty, and that Epic applied its uniform exemption decision to them based on their common duties, Epic's claim that its individualized defenses preclude certification must fail.

## IV.   PROCEDURAL AND FAIRNESS CONSIDERATIONS WEIGH HEAVILY IN FAVOR OF MAINTAINING THE CONDITIONALLY CERTIFIED CLASS AND TRYING THIS CASE COLLECTIVELY

The FLSA is "remedial and humanitarian in purpose," and therefore not meant to be "interpreted or applied in a narrow, grudging manner." Tennessee Coal v. Muscoda, 321 U.S. 590, 597 (1944). The FLSA's collective action provision is central to this remedial goal. The collective action mechanism provides that cases "in which the claims of different employees, different in amount but all arising out of the same character of employment, can be presented and adjudicated, regardless of the fact that they are separate and independent of each other." Shaine v. Armour & Co., 40 F. Supp. 488, 490 (W.D. Ky. 1941) (emphasis added). Here, Plaintiffs have shown that their claims arise out of the same character of employment.

The Court must consider the FLSA's remedial intent in determining whether the conditionally certified class is "similarly situated" such that a collective trial is

appropriate for adjudication of their claims. See Hoffmann–La Roche Inc. v.
Sperling, 493 U.S. 165, 170 (1989) (ADEA claim). When considering whether
fairness and procedural considerations weigh in favor of a collective action, courts
weigh the primary objectives of § 216(b), which are: (1) to lower costs to plaintiffs
through the pooling of resources and (2) to limit the controversy to one proceeding
that efficiently resolves common issues of law and fact arising from the same
alleged activity. Hoffmann-La Roche, 493 U.S. at 170. Courts must also decide
whether they can manage the collective class in a manner that does not prejudice
any party. Falcon v. Starbucks Corp., 580 F. Supp. 2d 528, 536 (S.D. Tex. 2008).
This logic applies with equal force to exemption case such as this one:

> For many plaintiffs, a collective action is the only
> practical method of adjudicating their FLSA claims.
> Each plaintiff in this case contends [their employer]
> improperly classified him or her under the
> executive exemption of the FLSA, and that a denial
> of overtime compensation resulted. The evidence
> presented by plaintiffs indicates [the employer]
> made its decision concerning the exemption status
> of [plaintiffs] on the basis of generalized evidence of
> [their] duties and responsibilities. Plaintiffs have
> sufficiently demonstrated the existence of common
> proof from which a jury could properly consider the
> misclassification claims plaintiffs raise, and have
> demonstrated the effectiveness and sufficiency of
> the utilization of representative evidence in
> undertaking that collective examination.

Nerland, 564 F. Supp. 2d. at 1025. Recognizing these dynamics, district courts
routinely deny decertification of collective actions when doing so would waste the
parties' and the court's resources and time in litigating dozens of subsequently re-
filed individual cases. See Escobedo v. Dynasty Insulation, Inc., 2009 WL 2382982,

at *9 (W.D. Tex. July 31, 2009); <u>Nerland</u>, 564 F. Supp. 2d. 1025-26; <u>Morrison v. Ocean State Jobbers, Inc.</u>, 290 F.R.D. 347, 362 (D. Conn. 2013) ("litigating overtime claims for each of these [twenty-five] plaintiffs individually would be burdensome on those plaintiffs, the defendant, and the courts"); <u>Ahle</u>, 738 F. Supp. 2d at 926; <u>Simmons</u>, 2013 WL 2147862 at *6.

Collective adjudication of these 15 Plaintiffs' claims is eminently manageable and fair. The parties will present evidence of Plaintiffs' job duties to determine whether they fall properly under an exemption to overtime compensation. Because, as Plaintiffs have demonstrated, the documents and testimony establishing their duties are overwhelmingly common, the evidence would be the same if this Court held 15 separate trials or a single, collective trial. By design, Epic uses common templates and guidelines in directing Plaintiffs' work. These strict guidelines demonstrate the substance of Plaintiffs' work as well as the degree to which they exercised any independent judgment or discretion. The commonality of Plaintiffs' work renders trying this case collectively manageable. The alternative is 15 employees in the same position with the same claim filing suit individually, clogging the Court's docket with 15 near-identical cases.

Moreover, contrary to Epic's assertion, damages are quite easily established. Epic has already produced Plaintiffs' time-keeping records, from which Plaintiffs have already identified the hours worked in excess of 40 in a week. Epic's claim that "common proof of damages is absent" is hollow. Certainly, Epic does not suggest that only cases in which every putative class member has identical damages may be

39

certified. It is well-established that "[d]amages issues do not preclude the collective adjudication of the exemption issue." <u>Judkins</u>, 74 F. Supp. 3d at 1014.

The FLSA and case law clearly sets forth the standard for calculating overtime wages due to an employee who has been misclassified. <u>See</u> <u>Urnikis-Negro</u> <u>v. American Family Property Services</u>, 616 F.3d 665, 684 (7th Cir. 2010) (explaining how to calculate the overtime wages due to a misclassified employee who had been paid a fixed weekly salary). A common formula can be applied to the readily available employment data to calculate damages in this case after determination of liability; this is no barrier or complication to collective adjudication.

## CONCLUSION

The purpose of the collective action mechanism of the FLSA is to enable efficient, meaningful adjudication of claims of different employees arising out of the same character of employment. Plaintiffs performed common primary duties and were commonly classified as overtime exempt. Epic has failed to identify differences in Plaintiffs' job duties that are relevant to the central question in this case: whether Plaintiffs are exempt from overtime compensation. The weight of Plaintiffs' evidence, as well as considerations of fairness and manageability, supports maintaining this case as a collective action. For the foregoing reasons, Epic's motion must be denied.

Dated this 3rd day of June, 2016.

Attorneys for the Plaintiff

By: _/s/ David C. Zoeller_

**HAWKS QUINDEL, S.C.**
David C. Zoeller, State Bar No. 1052017
Email: dzoeller@hq-law.com
William E. Parsons, State Bar No. 1048594
Email: wparsons@hq-law.com
Caitlin M. Madden, State Bar No. 1089238
Email: cmadden@hq-law.com
Katelynn M. Williams, State Bar No. 1090438
Email: kwilliams@hq-law.com
Post Office Box 2155
Madison, Wisconsin 53701-2155
Telephone: (608) 257-0040
Facsimile: (608) 256-0236

**HABUSH HABUSH & ROTTIER S.C.**
Daniel A. Rottier, State Bar No. 1016998
Email: rottier@habush.com
Jason J. Knutson, State Bar No. 1035801
Email: jknutson@habush.com
Breanne L. Snapp, State Bar No. 1091474
Email: bsnapp@habush.com
James R. Jansen, State Bar No. 1010325
Email: jjansen@habus,com
150 East Gilman Street, Suite 2000
Madison, Wisconsin 53703
Telephone: (608) 255-6663
Facsimile: (608) 255-0745