UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

LONG, D.,
individually and on behalf of all
others similarly situated,

      Plaintiffs,

v.

EPIC SYSTEMS CORPORATION,

      Defendant.

Case No. 3:15-cv-00081

## DECLARATION OF DAVID JALENSKY

I, David Jalensky, based on my personal knowledge and pursuant to 28 U.S.C. § 1746, declare as follows:

1. I am over the age of 18, and I make this declaration based on my personal knowledge, my review of business records, and in consultation with others as noted below.

2. I have been employed by Epic Systems Corporation ("Epic" or the "Company") since October 2007, in Technical Communications ("Tech Comm"). Since April 2012, I have been a Team Lead, or "TL." In my current role, I work on Cogito Reporting and Analytics.

3. The bulk of my work (80% or more) during 2012-2014 related to new regulations issued by the federal government to encourage "meaningful use" of Electronic Health Records ("EHR"). The regulations were premised on the idea that electronic records are only better than paper if used in a meaningful way to promote better healthcare for patients. The regulations provided financial incentives to healthcare providers who could satisfy certain measures to show that they were "meaningfully using" EHR technology. The program was rolled out in phases and began to impact customers in earnest around 2011-2012.

27243761v.1

4. When Epic recognized the impact that the Meaningful Use regulations would have on its customers, it put together a group of stakeholders from different roles across Epic. In addition to me, the group included a project manager dedicated to all Meaningful Use efforts; Technical Services personnel who had regular communication with customers and best understood customer needs; Developers who knew the parameters of the regulations and could modify Epic's software to comply; Quality Assurance personnel to test whether the software changes were working properly; Implementation personnel who could help customers implement the new pieces of software; and other Tech Comm personnel who worked with me on the documentation. Together, we worked to identify the challenges that Epic customers would face to comply with the regulations, propose changes to Epic's software to help customers satisfy the new requirements, and identify the types of documents customers would need, among other things.

5. It was clear from the outset that the existing types of documentation did not fit the mold for what customers needed to respond to the regulations. I worked with other members of the group to create a documentation strategy from scratch, putting together a whole different set of guides for software implementation, testing, and training. We also put together documents to help customers prepare for compliance audits.

6. The Meaningful Use regulations impacted some of Epic's largest applications, including EpicCare Ambulatory and Inpatient, and a variety of ancillary applications. I was responsible to fully understand the Meaningful Use program and what had to be communicated to customers. Put differently, I had to understand the regulatory requirements to be met, as well as what Epic was doing with its software to help customers meet those requirements, then communicate clearly to the customers what they needed to do to comply.

27243761v.1

7. The audiences for these documents varied. Many customers identified their own in-house project managers responsible for complying with Meaningful Use. Some communications where specifically for customer analysts who were responsible to install or build the new software features that would help the customers to comply. Other communications were targeted to report developers working for Epic's customers to create records and reports that could be used to establish compliance with the regulations. Still others were concentrated on training users to use the new features.

8. Most of my time was spent in meetings, studying the regulations to understand what they meant, and overseeing smaller projects related to the overall effort. I estimate I spent less than half my time writing content.

9. As a result of my experience with the Meaningful Use regulations, I performed additional work preparing content to be submitted to governmental bodies. For example, the federal Office of National Coordinator for Health IT ("ONC") asked for public commentary on proposed changes to the Meaningful Use rules. It was my responsibility to determine Epic's opinion on the proposal. I spoke with a variety of Epic stakeholders, including those who could speak to the impact of the regulations on Epic's customers and senior leaders at the company. After gathering all of these opinions, I prepared the Company's position, which was submitted to the ONC.

10. The impact of the Meaningful Use regulations was significant enough to warrant being addressed in Epic's annual shareholder letter. I prepared that statement on behalf of the Company.

11. The ONC has also published Safety Assurance Factors for EHR Resilience ("SAFER") Guides, which are self-assessments that organizations can use to determine how well

3

27243761v.1

they are set up to protect patient safety. I created from scratch a document that explained to customers how Epic software can be used to satisfy specific assessment points set by the ONC.

13. Clinical Programs kicked off in 2011, and we finished the pilot in 2012. At that point, Tech Comm began seeking out success stories in earnest, and by 2013-2014, a large number of documents had been created. Some specific examples include customers who had success using Epic software to monitor patients' mental health; combat childhood obesity; identify and treat substance abuse; and care for those with inflammatory bowel disease.

12. I have worked on other special projects as well. One of these projects is Clinical Programs. Epic all-staff meetings often included discussions about "why we do what we do" - examples of how our customers use Epic applications improve healthcare. I had the idea to document the client successes we hear about and share those with other customers. Importantly, we take time with the customers who experienced success to fully understand why their efforts worked, typically working with that customers' technical services representative, then document that in detail so that other customers can replicate the same build or processes to achieve similar excellent results.

14. Tech Comm members have a lot of creativity and discretion in how they put together Clinical Programs documents. Generally, we try to place the focus on the customer and how they build the programs in their own system, keeping Epic out of the story as much as possible. These documents have now become integral to Epic's sales process as evidence of the success that can achieved using Epic's software.

15. As another example, I worked on the rebranding of a specific deliverable, the Post-Live Upgrade Success ("PLUS") document. PLUS was intended to help customers learn how to strategize around a certain feature when upgrading Epic software. But we had received feedback that customers did not know when they were supposed to look at the document, and

4

27243761v.1

that when they did, the document was not intuitive to follow. I worked directly with customers and employees at Epic in customer-facing roles to figure out a better way to present the information. The result was a rebranded document called the Strategy Handbook, with a different look and feel, which was modeled after an existing document that Epic was using. The result was a document more flexible and intuitive for customers, and which was organized and delivered in a way that was already familiar to the customer and did not require further explanation to use.

16. I also help a lot with internal training of Tech Comm personnel. For example, I work one-on-one with new writers during the Writing at Epic class to help them complete and give them feedback on fun exercises that prepare them for future Tech Comm projects. I have also helped to design the writing tests given to prospective writers. In addition, I meet with prospective writers to talk about what I like about the job, interview candidates for writing positions, and participate in hiring decisions.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 2, 2016

_____
DAVID JALENSKY