IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

LONG, D., individually and on behalf
of all others similarly situated,                          OPINION and ORDER

                                                                    15-cv-81-bbc

                Plaintiffs,

      v.

EPIC SYSTEMS CORPORATION,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      This is a civil action for monetary relief under the Fair Labor Standards Act (FLSA), 29 U.S.C. §§ 201-219, and Wisconsin overtime compensation laws.  Plaintiff Dayna Long contends that defendant Epic Systems Corporation misclassified her and other technical writers as exempt from overtime wages and failed to pay them wages of one and one-half times their regular rate of pay for any overtime hours that they worked.  Defendant asserts that technical writers qualify for the overtime exemption for "employee[s] employed in a bona fide executive, administrative, or professional capacity."  29 U.S.C. § 213(a)(1).

      On April 17, 2015, the parties stipulated to conditional certification of a nationwide FLSA collective action and a court-authorized notice to be sent to approximately 50 putative class members.  Dkt. #23.  (Although plaintiff had moved for class certification of her state law claims under Fed. R. Civ. P. 23, dkt. #54, she withdrew that motion on June 13, 2015

because the proposed subclasses would have not met the numerosity requirement.  Dkt. #98.)  Fourteen individuals in addition to plaintiff have opted into the collective action and defendant's motion to decertify the FLSA collective action, dkt. #56, is now before the court.

After considering the arguments of the parties and conducting an independent review of the declarations and other documents in the record, I conclude that plaintiff's FLSA claims may proceed as a collective action.  Although there are individual variances among the opt-in plaintiffs as to their employment experiences, the inquiry at the heart of this case is whether their primary job duties and defendant's practices and processes that applied to all technical writers exempted them from overtime wages under federal law.  It makes sense to decide the exemption issue with respect to all employees in one case.  Defendant has not identified any persuasive reason why individual lawsuits would be a superior method to resolving the parties' dispute.  Accordingly, I will deny defendant's motion to decertify the FLSA collective action.

From the declarations, depositions and other materials submitted by the parties, I find the following facts for the purpose of deciding defendant's motion to decertify.

BACKGROUND

A.  The Parties

Defendant Epic Systems Corporation makes software applications for medical groups, hospitals and integrated healthcare organizations.  The technical writers involved in this case

are all members of the Technical Communications group and performed work in one of three application areas: clinical inpatient (healthcare in inpatient settings), clinical ambulatory (healthcare in outpatient settings) and revenue and reporting (billing, accounting and practice management). (There are other application areas but those are not relevant to the issues in this case.) Defendant's customers may use applications from any or all of these areas. The applications cover a wide range of topics, may have different functions and are used by different types of health care professionals and administrators.

Technical writers provide different types of written materials for different audiences. For example, implementation writers prepare written materials targeted to analysts working for a customer who is installing software for the first time. Support writers develop written materials for analysts who are maintaining and updating an application. Training writers develop written materials that teach end-users, such as clinicians and administrators, how to use software applications. Sometimes a technical writer may work on a special project or write about particular features common to multiple applications. Technical writers are supervised by "team leads."

1. Long

Between July 5, 2011 and August 2012, named plaintiff Danya Long was employed as a technical writer in defendant's Madison office, performing implementation writing for a revenue application called Tapestry related to billing, benefit plans and referrals. Her team lead was Cate Valenzuela. Beginning in August 2012 and until Long left on June 28, 2013,

3

she worked as a team lead.


2. Vanderwist

Opt-in plaintiff Michelle Vanderwist was employed as a technical writer with defendant at its Verona campus from August 1, 2011 to June 15, 2012. Her team lead was Eric Szakacs. She primarily performed support writing for three different clinical inpatient applications, including Op Time (used by surgeons) and Anesthesia (used by anesthesiologists). Vanderwist spent about 60 percent of her time on development log documentation (known as "DLG"), which required her to evaluate whether changes to a software application should be communicated to customers and creating the documents to describe the changes. In addition, Vanderwist became the "owner" of NoteWriter, a feature that appears in several applications. As the owner, she created documents to describe any changes made to the feature. (The parties dispute whether Vanderwist was responsible for NoteWriter documentation or was merely assigned writing work related to the feature.) In a self-assessment form, Vanderwist expressed an interest in volunteering for more ad hoc projects but she dedicated the majority of her time to technical writing.


3. Paley

Opt-in plaintiff Caitlyn Paley was employed as a technical writer at defendant's Verona campus from March 5, 2012 to February 15, 2013. Her team lead was Dana Apfel. Her primary job responsibility was performing support writing for clinical inpatient

applications.  She spent about 27 percent of her time on development log documentation.
Paley worked on the Beaker application, which is used by laboratories to track specimens.
Shortly before leaving her employment, she attended a special training on defendant's
Electronic Data Interchange to learn how to create written materials explaining how to use
Beaker with non-Epic software.

Paley spent about 11 percent of her time on special projects, including writing a guide
for Rover for Lab (a Beaker-like application for handheld devices) and working as part of the
Document Design group (helping use design programs to lay out the way defendant's
documents would look).  (The parties dispute whether Paley spent 25 percent of her time
performing the following tasks:  (1) mentoring a new technical writer; (2) serving as a
member of defendant's Writer Education Coordination group, helping to create new training
materials and processes for writers; and (3) identifying customer requests for highlighting
at a conference as part of an inpatient focus group.  Paley says that she did not do any of
these things.)


4.  Yenzer

Opt-in plaintiff Steven Yenzer was employed as a technical writer at defendant's
Verona campus from July 5, 2012 to May 31, 2013.  He worked primarily as a training
writer for a billing and an appointment scheduling application.  One to two hours a week,
Yenzer also wrote blog posts for defendant's employees. Dkt. #57 at ¶ 27.  In a performance
review document, he wrote that with respect to "internal projects," he liked "the freedom to

make suggestions for big changes, and the opportunity to run with them if they got approved." Dkt. 77, exh. 5 at 7. Yenzer later explained that these projects included the blog, contributing to the design for writers' internal tools and working on new writer education and training. Dkt. #86 at ¶ 5.

5. Phelps

Opt-in plaintiff Jennifer Phelps was employed at defendant's Verona campus from January 3, 2011 to January 16, 2013 and became a team lead in April 2012. Her team leads were Megan Meyers, Mandy Kroninger and Matt Becker. Phelps worked as an implementation writer on clinical ambulatory applications and was the sole "specialty writer" for installations tailored to specific types of clinical practices. In order to do her work, Phelps spoke with defendant's implementers and physicians and visited a few customer sites. Phelps also spent one to two hours a week helping to grade tests taken by prospective training writers.

6. Lopez

Opt-in plaintiff Lope Lopez was employed as a technical writer at defendant's Verona campus from February 6, 2012 to June 21, 2013. His team lead was Sarah Savage. Lopez did training writing for clinical inpatient applications and had an interest in improving the translation of software documentation from English to Spanish. He spent 17 percent of his time at Epic receiving internal training and 43 percent of his time creating written materials.

Lopez performed three or four translations of software strings as side projects after receiving the approval of his team lead.

## B.  Job Duties

Long and the opt-in plaintiffs describe their primary duty as producing or revising standardized documents that describe how defendant's software works, based on templates and instructions and information provided by defendant's software developers, implementers and trainers.  Defendant's corporate representative, Stirling Martin, testified that the primary role of technical communications staff is "to understand what the software does and represent it in one or more documents that would be used by internal staff or customers." Dkt. #52 at 114.

Defendant has one job description for the position of technical writer, which states that "you'll create documentation about the nuts and bolts of our world class software. You'll go behind the scenes and collaborate with other technical roles to understand how the software infrastructure works."  Dkt. #58, exh. #2 at 2-4.  Defendant's training materials state that a writer's role is to "document how Epic works and what changes we make to Epic."  Id., exh. #7 at 1.  In addition, defendant defined technical writing as "a process in which information is gathered from experts and then presented in a clear, easily understandable format that is best suited to the intended audience."  Id., exh. #8.

The opt-in plaintiffs all followed the same process in producing written materials or "deliverables" for defendant.  After receiving writing assignments from their team leads or

defendant's project management software program, EMC2, they gathered information from subject matter experts, which include defendant's software developers, implementers or trainers. Technical writers then prepared written documents using the same basic process and in accordance with defendant's templates and style guide.

In a performance review, one technical writer spoke of writing in the "Epic way" and making her "Epic writing unidentifiable from the next writer's." Dkt. #58, exh. #19 at 3. In the frequently asked questions section of its style guide, defendant explains that "all Style Guide conventions apply to all deliverables unless the instructions on the deliverable's wiki or in the specific Style Guide topic indicate otherwise." Dkt. #58, exh. #20. "Deliverable-specific instructions and conventions" for implementation, support and training writing deliverables are maintained on "wikis" (website pages). Defendant sought to make all of the deliverables produced by technical writers consistent by setting the structure, content and language for them. In addition to the style guide, templates and wikis, defendant has a content management system called Cumulus that controls the structure and format of common types of deliverables. The purpose of Cumulus is to "structur[e] all deliverables of the same type in the same or similar ways." Dkt. #58, exh. #22. Subject matter experts reviewed completed deliverables for accuracy and other technical writers, team leads or editors reviewed them for compliance with defendant's writing guidelines.

All of the technical writers were required to log their time in defendant's time-keeping system (or "TLG") and record what they worked on by entering a code (known as a "TLP"). Defendant has a list of TLPs related to technical writing tasks. (The opt-in plaintiffs assert

that they spent more than 50 percent of their time working on these writing tasks, but the parties dispute the ways the technical writers used these time codes and the specific types of tasks covered by each time code.)

C.  Training and Compensation

Defendant used a standard set of criteria to evaluate prospective technical writers and provided new technical writers the same training.  All of the opt-in plaintiffs attended "Epic 360" (an orientation week for all new hires), an "App Camp" (classes on specific Epic software applications), "Tech Boot Camp" and "Writing at Epic."

 Defendant classifies technical writers as salaried, exempt employees and pays them a common starting salary of $40,000 to $44,000 a year.  Technical writers all receive a $2,000 raise after completing App Camp and becoming certified in the software to which they have been assigned.  They work more than 40 hours a week on a consistent basis. Defendant makes its expectation of overtime clear by telling technical writers that they will work an average of 45 to 50 hours a week and that the number of hours could vary greatly during crunch times.

OPINION

Under the Fair Labor Standards Act (FLSA), employees are entitled to overtime pay equal to one and one-half times their regular rate of pay for any hours worked in excess of forty hours per week, unless they come within one of the various exemptions set forth in the

Act.  29 U.S.C. §§ 207(a), 213.  <u>Schaefer-LaRose v. Eli Lilly & Co.</u>, 679 F.3d 560, 572 (7th Cir. 2012).  Under § 213(a)(1), "any employee employed in a bona fide executive, administrative, or professional capacity" is exempt.  Determining whether an employee qualifies for these exemptions normally requires a "thorough, fact-intensive analysis of the employee's employment duties and responsibilities."  <u>Schaefer-LaRose</u>, 679 F.3d at 572 (citing <u>Roe–Midgett v. CC Servs., Inc.</u>, 512 F.3d 865, 870 (7th Cir. 2008)).

If an employer does not provide required overtime pay, the statute authorizes an employee to bring suit against the employer not only on the employee's behalf, but also on behalf of other "similarly situated" employees.  29 U.S.C. § 216(b); <u>Alvarez v. City of Chicago</u>, 605 F.3d 445, 448 (7th Cir. 2010); <u>Jonites v. Exelon Corp.</u>, 522 F.3d 721, 725-26 (7th Cir. 2008).  The purpose of allowing this type of action is to serve the interests of judicial economy and to aid in the vindication of plaintiffs' rights.  <u>Hoffmann-La Roche Inc. v. Sperling</u>, 493 U.S. 165, 170 (1989).

This court applies a two-part test to determine whether an FLSA claim may proceed as a collection action.  <u>Bitner v. Wyndham Vacation Resorts, Inc.</u>, 301 F.R.D. 354, 357 (W.D. Wis. 2014); <u>Espenscheid v. DirectSat USA, LLC</u>, 2010 WL 2330309, *6 (W.D. Wis. Jun. 7, 2010); <u>Austin v. Cuna Mutual Insurance Society</u>, 232 F.R.D. 601, 605 (W.D. Wis. 2006).  At the first stage, the court considers whether potential opt-in plaintiffs are similarly situated and whether notice should be sent to potential plaintiffs.  <u>Id.</u>  The standard is fairly lenient.  On May 6, 2015, I approved the parties' joint stipulation for conditional certification of plaintiff's FLSA claims as a collective action.  Dkt. #25.

Defendant triggered the second part of the test by moving to decertify the collective action.  At the second stage, the court must determine whether, given what has been learned through discovery, the individuals who chose to opt in to the FLSA action are actually similarly situated.  The court's inquiry is more stringent at the second stage because the parties have conducted discovery and the court has more information on which to base its decision. Anderson v. Cagle's, Inc., 488 F.3d 945, 952-53 (11th Cir. 2007); Reed v. County of Orange, 266 F.R.D. 446, 449-50 (C.D. Cal. 2010); Pacheo v. Boar's Head Provisions Co., 671 F. Supp. 2d 957, 959 (W.D. Mich. 2009).  Although defendant is the movant at the second stage, the burden remains on plaintiff to establish that the individual class members are similarly situated.  Proctor v. Allsups Convenience Stores, Inc., 250 F.R.D. 278, 280 (N.D. Tex. 2008).  If the class members are similarly situated, the representative action may proceed.  If they are not, the class is decertified, the opt-in plaintiffs are dismissed and the original named plaintiff may proceed with her individual claims only.  Alvarez, 905 F.3d at 450.

Although the statute does not define "similarly situated" and neither the Supreme Court nor the Court of Appeals for the Seventh Circuit has articulated a standard for making this determination, district courts in this circuit have adopted a three-factor test that the majority of federal courts considering the issue apply at the second stage of the analysis:  (1) whether the factual and employment settings of the individual plaintiffs are similar or disparate; (2) whether defendants may assert various defenses that appear to be individual to each plaintiff; and (3) whether fairness and procedural considerations support proceeding

as a collective action.  Espenscheid v. DirectSat USA, LLC, 2011 WL 2009967, at *4 (W.D. Wis. May 23, 2011), aff'd, 705 F.3d 770 (7th Cir. 2013) (citing Thiessen v. General Electric Capital Corp., 267 F.3d 1095, 1103 (10th Cir. 2001); Russell v. Illinois Bell Telephone Co., 721 F. Supp. 2d 804, 811 (N.D. Ill. 2010); Mielke v. Laidlaw Transit, Inc., 313 F. Supp. 2d 759, 762 (N.D. Ill. 2004)).  "Similarly situated" does not mean that the plaintiffs must be identically situated.  Camilotes v. Resurrection Health Care Corp., 286 F.R.D. 339, 346 (N.D. Ill. 2012); Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1260-61 (11th Cir. 2008).  The main inquiry is whether the existence of individual issues will interfere substantially with plaintiffs' ability to prove their case with evidence that is class-wide in nature.  Russell, 721 F. Supp. 2d at 812 ("[A]n identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of the overtime laws generally must be present.") (quoting Vennet v. American Intercontinental University Online, 2005 WL 6215171, at *6 (N.D. Ill. Dec. 22, 2005)).  The Court of Appeals for the Seventh Circuit has explained that certification may be appropriate despite individualized questions and circumstances, so long as common questions predominate.  Alvarez, 605 F.3d at 449 ("If common questions predominate, the plaintiffs may be similarly situated even though the recovery of any given plaintiff may be determined by only a subset of those common questions.").  See also O'Brien v. Ed Donnelly Enterprises, Inc., 575 F.3d 567, 585 (6th Cir. 2009) ("[T]he plaintiffs were similarly situated, because their claims were unified by common theories of defendants' statutory violations, even if the proofs of these theories are inevitably individualized and distinct.").

Plaintiff has adduced undisputed evidence that defendant expected all technical writers to work between 45 and 50 hours a week and did not pay any of them overtime wages for the hours they worked in excess of 40 in a work week. The parties' main dispute in this case involves defendant's assertion that technical writers are subject to the FLSA exemption for administrative employees. Because determining whether the opt-in plaintiffs qualify for the exemption requires an analysis of their employment experiences and job duties, the parties' arguments overlap with respect to the first two factors of the similarly-situated test. Accordingly, I will first discuss whether the differences in the opt-in plaintiffs' employment experiences prevent resolution of the exemption issue on a class-wide basis and then address defendant's concerns with fairness and manageability.

## A. Individual Versus Common Questions

Federal regulations define an administrative employee as one whose "primary duty" (1) is "[t]he performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers;" and (2) includes "the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(2) and (3). (Section 541.200(a)(1) also requires that the employee earn at least $455 a week, but the parties assume that all of the plaintiffs are similarly situated with respect to this requirement, so I will do the same.) "The term 'primary duty' means the principal, main, major or most important duty that the employee performs." 29 C.F.R. § 541.700(a). Although the time spent on a task is not always

13

dispositive, "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement." § 541.700(b).  Administrative duties that are directly related to general business operations include "advising the management, planning, negotiating, representing the company, purchasing, promoting sales, and business research and control."  Schaefer-LaRose, 679 F.3d at 574 (quoting Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 69 Fed. Reg. 22, 122, 22, 138 (Apr. 23, 2004)).  See also 29 C.F.R. § 541.201(b) (identifying administrative work in functional areas of finance, accounting, insurance, employee benefits and computer network and database administration).  Considerations with respect to the "discretion and independent judgment" factor include whether the employee has authority to commit the employer in matters that have significant financial impact or to waive or deviate from established policies and procedures without prior approval.  29 C.F.R. § 541.202(b) (listing several relevant factors).  "The section 13(a)(1) exemptions are not available, however, for employees who simply apply well-established techniques or procedures described in manuals or other sources within closely prescribed limits to determine the correct response to an inquiry or set of circumstances."  29 C.F.R. § 541.704.

Although it is defendant's burden to establish on the merits that technical writers fall within this exemption, it is plaintiff's burden at this stage to demonstrate that it is appropriate to resolve the exemption issue on a class-wide basis.  Defendant argues that it is not possible to conduct a common analysis of the type of work performed by technical

writers and the amount of independence and discretion that they exercised because they all worked for different supervisors, wrote about different applications for different audiences and worked on special projects with different levels of responsibility.  Defendant contends that in the absence of a set of job duties common to all opt-in plaintiffs, the court or jury would need to conduct individual analyses of the type of work each opt-in plaintiff performed and how much time was spent performing it.  Plaintiff argues that the distinctions identified by defendant are not material to the exemption determination and points to core similarities in the employment of technical writers.

Plaintiff has presented evidence that defendant viewed technical writing as a common function regardless of the topic, had one job description for the technical writer position and made a general decision to classify technical writers as exempt.  Nerland v. Caribou Coffee Co., 564 F. Supp. 2d 1010, 1024 (D. Minn. 2007) ("[C]lear evidence of Caribou's uniform policy and practice [in classifying store managers as exempt] significantly lessens any concerns about variations in plaintiffs' employment circumstances.").  As defendant argues, even though some of these things may be relevant, none of them alone relieve plaintiff of her burden of showing that technical writers performed similar work.  Morgan, 551 F.3d at 1264 ("Just because a business classifies all employees in a particular job category as exempt does not mean that those employees are necessarily 'similarly situated' for purposes of a 29 U.S.C. § 216(b) collective action."); Schaefer v. Indiana Michigan Power Co., 358 F.3d 394, 400 (6th Cir. 2004) ("We focus on evidence regarding the actual day-to-day activities of the employee rather than more general job descriptions contained in resumes, position

descriptions, and performance evaluations."); <u>Smith v. Heartland Auto. Servs., Inc.</u>, 404 F. Supp. 2d 1144, 1151 (D. Minn. 2005) ("[FLSA plaintiffs] may not rely on the job description itself as generalized evidence that they are [misclassified] as exempt employees"). Rather, it is necessary to review the actual job duties of the employees in the job category to determine whether the employees are similarly situated and whether the exemption defense can be collectively litigated. <u>Morgan</u>, 551 F.3d at 1264.

I conclude that this case should proceed as a collective action. Plaintiff has shown that all of defendant's technical writers had the same basic responsibility of developing written documents related to software and performed that function in essentially the same way, using company-mandated processes and templates. The opt-in plaintiffs all explain that after receiving a writing assignment, they spoke with defendant's subject matter experts, created a written deliverable to explain various aspects of a software application using standardized style guides and templates and submitted their documents for review and approval. I am not persuaded that it matters significantly whether plaintiffs worked for different team leads, wrote different types of documents for different audiences or spent some of their time on special projects. Apart from identifying these differences, defendant does not explain how they would make it impossible to determine on a class-wide basis whether the creation of documentation for defendant's applications directly related to its core business operations or required different levels of discretion and judgment on significant matters. <u>Kasten v. Saint-Gobain Performance Plastics Corp.</u>, 556 F. Supp. 2d 941, 957 (W.D. Wis. 2008) ("If one zooms in close enough on anything, differences will abound.")

(citation and quotation omitted); <u>Spoerle v. Kraft Foods Global, Inc.</u>, 253 F.R.D. 434, 439–40 (W.D.Wis. 2008) ("If simply identifying differences between the parties were enough to defeat a motion for class certification, it would be impossible for any lawsuit to proceed as a class . . . . [Defendant must explain why] these differences are relevant for the purpose of maintaining a class or a collective action.").

For example, a question applicable to all plaintiffs is whether they engaged in activities directly related to the operation of defendant's business when they wrote documents describing how to install or use various software or whether they merely supported defendant's business administratively by representing the company or promoting sales. <u>Schaefer-LaRose</u>, 679 F.3d at 574 (noting these differences when considering whether pharmaceutical representatives qualified for administrative exemption).  Defendant has not shown that this inquiry will require an individual analysis of the specific applications on which each individual plaintiff worked.  <u>Jirak v. Abbott Labs., Inc.</u>, 566 F. Supp. 2d 845, 850 (N.D. Ill. 2008) (questioning whether distinctions in job duties of pharmaceutical representatives—such as type of medications they promote, number and type of physicians they meet with each day and level of control they have in tailoring their presentations—would be material to exemption determination); <u>Delgado v. Ortho-McNeil, Inc.</u>, 2007 WL 2847238, at *3 (C.D. Cal. Aug. 7, 2007) (differences among pharmaceutical representatives in terms of size of regions, sales pitches, products sold and types of clients were immaterial to whether they were properly classified as exempt from FLSA).

In addition, there is no evidence that either the level of discretion a technical writer

had varied on a supervisor-by-supervisor or application-by-application basis. In fact, plaintiff's evidence shows that technical writers were not permitted to deviate from established policies and procedures without prior approval. Although defendant argues that technical writers had different levels of responsibility because some of the opt-in plaintiffs were promoted to a team lead position, plaintiff has not included the position of team lead in the collective action and apparently is not seeking damages for the period of time that she or others worked as a team lead.

Defendant argues that there were significant variations in how the opt-in plaintiffs spent their time, as evidenced by the different special projects on which they worked. As examples, defendant points to Paley's participation in new staff orientation and training, Yenzer's blog entries and Lopez's translation of documents into Spanish. However, nothing in the record shows that the "special" tasks performed by these or other employees amounted to a primary job duty. Both Yenzer and Lopez explained that they spent no more than two hours a week on these tasks and remained responsible for completing their regular tasks. Although the parties dispute whether Paley even helped with training and orientation, her former team lead avers that Paley spent about 25 percent of her time on those tasks. Defendant also does not explain how many of these special projects differed from other forms of technical writing. For example, it is not clear why translating deliverables into Spanish differs in any material respect from creating an English version of the same document. Further, even though some of the opt-in plaintiffs received special training in certain software and became "owners" or "specialty writers" for a subset of applications, their

18

job duties remained essentially the same.

Finally, defendant argues that individual inquiries will be required to determine how technical writers logged their time in defendant's time-keeping system, including how they chose to use the writing-related time codes.  However, it is not clear why such an analysis would be relevant.  At issue in this case are the primary job duties of the opt-in plaintiffs and not the use of defendant's time-keeping system.  Although the parties may attempt to use data collected from the time-keeping system to show the particular work the technical writers were doing or what kinds of tasks that they were performing, that is only one piece of evidence.  It is possible that all of the opt-in plaintiffs had the same primary job duties but chose different codes to identify those duties.  If that is the case, the time-keeping data may be of limited use.  At least at this point, it is not clear from the record or any of defendant's arguments that it will be necessary to determine how each technical writer used the time-keeping system or how relevant that data would be in the analysis of the exemption.  As a result, I cannot conclude that differences among the opt-in plaintiffs' use of the time-keeping system prevents certification of a collective action.

In sum, although there are individual variances among the opt-in plaintiffs with respect to employment experience, I conclude that common questions are predominant in the exemption issue at the heart of this case.


C.  Fairness and Procedural Concerns

The final inquiry is whether fairness or procedural concerns counsel against collective

treatment of plaintiff's claims.  The remedial nature of the FLSA and the purposes of § 216 strongly favor allowing cases to proceed collectively.  E.g., Hoffman-La Roche, 493 U.S. at 170 (Congress intended to give "plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources"); Bradford v. Bed Bath and Beyond, Inc., 184 F. Supp.2d 1342, 1351 (N.D. Ga. 2002) (noting that plaintiffs can "hardly be expected to pursue these small claims individually, so there is little likelihood that their rights will be vindicated in the absence of a collective action.").  However, district courts should determine whether a collective action is an efficient and fair way to resolve the plaintiffs' claims, Alvarez, 605 F.3d at 450, or whether other methods of adjudication would be more efficient and better at protecting the parties' due process rights.

Defendant repeats many of its arguments concerning individualized proof in an effort to show that it and the members of the collective action would be unfairly prejudiced by an "all or nothing" decision for the class.  It contends that the court should decertify the collective action because plaintiff cannot rely on common evidence to establish liability and thus, it would be difficult for the court to manage the opt in plaintiffs' claims as a collective action.

Because there are only 14 opt-in FLSA plaintiffs in this action in addition to Long, the burden of any individual analysis required will be minimal.  The claims of the opt-in plaintiffs involve a limited number of issues and focus on the company-wide decision to classify the technical writer position as exempt from overtime pay.  As discussed above, the cases raises common liability-related questions that can be resolved in a collective trial even

if there may be some individualized questions.  Therefore, even if it turns out that there are a fair number of individual questions, defendant is unlikely to suffer prejudice.  Defendant's rights "must be balanced with the rights of the plaintiffs, many of whom likely would be unable to bear the costs of an individual trial, to have their day in court." Wilks v. Pep Boys, 2006 WL 2821700, at *8 (M.D. Tenn. Sept. 26, 2006), aff'd, 278 F. App'x 488 (6th Cir. 2008).

Accordingly, I am persuaded that a collective action is the most efficient method of addressing these claims without causing undue prejudice to any party. Alvarez, 605 F.3d at 450 ("Sifting through the subclaims of each of the myriad plaintiffs is an unenviable task. But plaintiffs are nonetheless entitled to their day in court.").  Therefore, I will deny defendant's motion to decertify plaintiff's FLSA collective action.

In conclusion, I note that it is possible that as this case develops further or reaches the dispositive motion phase, individual issues may become predominant or the collective action may become unmanageable in its current form.  If that is the case, I reserve the right to reconsider the issue of decertification of the FLSA collective action. Baldridge v. SBC Communications, Inc., 404 F .3d 930, 931 (5th Cir. 2005) (certification of a collective action under § 216(b) of FLSA is "subject to revision before the district court addresses the merits"); In re School Asbestos Litigation, 789 F.2d 996, 1011 (3d Cir. 1986) ("When, and if, the district court is convinced that the litigation cannot be managed, decertification is proper.").  As the trial nears, I will direct the parties to submit proposed trial plans in an effort to maximize efficiency and manageability.

ORDER

IT IS ORDERED that defendant Epic Systems Corporation's motion to decertify the

FLSA collective action, dkt. #56, is DENIED.

Entered this 6th day of September, 2016.

BY THE COURT:

/s/
_____
BARBARA B. CRABB
District Judge

22